# Exhibit 1

In the Matter of the Arbitration

- between -

Commodities & Minerals Enterprise LTD.,

Claimant,

v.

CVG Ferrominera Orinoco, C.A.,

Respondent-Counterclaimant.

Pursuant to the Transfer System Management Contract dated August 7, 2010

FINAL AWARD

December 20, 2018

Before:          A.J. Siciliano
                 George R. Wentz, Jr.
                 John D. Kimball, Chairman

Appearances:     Counsel for Claimant Commodities & Minerals Enterprise Ltd:

                 Seward & Kissel LLP
                 By Bruce G. Paulsen, Esq.
                 Michael G. Weitman, Esq.
                 Brian F. Maloney, Esq
                 Laura E. Miller, Esq.

                 Counsel for Respondent-Counterclaimant CVG Ferrominera
                 Orinoco, C.A

                 De Jesus & De Jesus
                 By: Dr. Alfredo De Jesus O.
                 Eloisa Falcon Lopez, Esq.
                 Marie Therese Hervella , Esq.
                 Deborah Alessandrini, Esq.

                 Mahoney & Keane LLP
                 By: Edward A. Keane, Esq.

                 James Drake, Q.C.

                 Assouline & Berlowe
                 By: Daniel E. Vielleville, Esq.

1

## FINAL AWARD

This unanimous award ("Award") concerns claimant Commodities & Minerals Enterprise Ltd.'s ("CME") claim against respondent-counterclaimant CVG Ferrominera Orinoco, C.A. ("FMO") for damages, and FMO's defenses and counterclaims, under the Transfer System Management Contract ("TSMC") dated August 7, 2010 for the management and operation by CME of FMO's iron ore Transfer System ("TSMC Arbitration"). As amended during the course of the arbitration hearings, CME's claim is in the amount of $135,303,946.90 for unpaid invoices and lost profits, plus interest, attorney's fees and costs. In the alternative, CME alleges a claim for an account stated in the amount of $96,804,020.59. In addition to denying liability, FMO has asserted rights of set-off and counterclaims for CME's alleged breach of the TSMC. The TSMC provides for arbitration in Miami, Florida in accordance with the Rules of the Society of Maritime Arbitrators ("SMA"). However, by special agreement, both parties opted to conduct consolidated hearings in New York for this arbitration and a second related dispute involving the time charter of the MV General Piar ("General Piar Arbitration").

For the reasons discussed in the attached narrative Appendix A "Reasons for Award," (which forms an integral part of this Award) common to both the TSMC Arbitration and the General Piar Arbitration Awards, we find the TSMC was a valid and binding contract which FMO failed to perform and, therefore, breached. Accordingly, except as shown below, FMO's counterclaims are dismissed. The Panel grants CME's claims in part and awards it net damages as summarized below.

All costs of the TSMC Arbitration, including arbitrators' fees and costs, are the joint and several liability of both parties, but as between them, are assessed in full against FMO. Pursuant to the attached Appendix B, which forms an integral part of this Award, the fees and expenses of

2

each of the three arbitrators are assessed in full to FMO and are to be paid from the joint escrow account established for this purpose with Blank Rome LLP. However, FMO's failure to fully fund its share of the escrow has produced a shortfall of $1,102,465.00, which, pursuant to the parties' joint and several liability, is to be made good by CME. The shortfall of $1,102,465.00 is added to the other amounts hereby awarded to CME.

In summary, we unanimously find that FMO breached the TSMC thereby entitling CME to an Award for the following damages:

| | |
|---|---|
| a) Net Invoiced Damages | $ 83,672,102.86 |
| b) Interest at the contract rate of $12% per annum from April 14, 2014 through the date of this award | 47,139,858.67 |
| c) Lost Profits | $ 36,250,194.00 |
| d) Median Amount of Interest at the various prime rates from February 9, 2014 through to the date of this award | $10,571,209.07 |
| e) Allowance for Legal fees and expenses | 6,154,000.00 |
| f) Escrow Shortfall | 1,102,465.00 |
| **Total TSMC Award** | **$184,889,829.50** |

The total amount awarded to CME and for which FMO is hereby held liable under this award is $184,889,829.50. If the amount of this award is not satisfied within 30 days, post-award interest shall run at the rate of 5.50% per annum from the date of the award until the award is fully paid or confirmed and made a judgment of the court.

This final Award may be confirmed by the United States District Court for the Southern District of New York, the Southern District of Florida or any other court which may have jurisdiction.

3

Dated: December 20, 2018

A. J. Siciliano

George R. Wentz, Jr.

John D. Kimball, Chairman

In the Matter of the Consolidated Arbitration

-        between -

Commodities & Minerals Enterprise LTD.,

Claimant,

v.

CVG Ferrominera Orinoco, C.A.,

Respondent-Counterclaimant.

Pursuant to the Transfer System Management Contract dated August 7, 2010

APPENDIX A

In the Matter of the Consolidated Arbitration

-        between -

Commodities & Minerals Enterprise LTD.,

Claimant,

v.

CVG Ferrominera Orinoco, C.A.,

Respondent-Counterclaimant.

Pursuant to the M/V *GENERAL PIAR* Charter Party dated January 21, 2010

Before:                    A.J. Siciliano
                           George R. Wentz, Jr.
                           John D. Kimball, Chairman

1

Appearances:        Counsel for Claimant Commodities & Minerals Enterprise Ltd.

Seward & Kissel LLP
By Bruce G. Paulsen, Esq.
Michael G. Weitman, Esq.
Brian F.  Maloney, Esq
Laura E. Miller, Esq.

Counsel for Respondent-Counterclaimant CVG Ferrominera
Orinoco, C.A

De Jesus & De Jesus
By:  Dr. Alfredo De Jesus O.
Eloisa Falcon Lopez, Esq.
Marie Therese Hervella , Esq.
Deborah Alessandrini, Esq.

Mahoney & Keane LLP
By: Edward A. Keane, Esq.

James Drake, Q.C.

Assouline & Berlowe
By: Daniel E. Vielleville, Esq.

## STATEMENT OF REASONS FOR AND FORMING PART OF FINAL AWARDS

1.      This unanimous Statement of Reasons concerns two consolidated arbitrations between claimant Commodities & Minerals Enterprise Ltd. ("CME") and respondent-counterclaimant CVG Ferrominera Orinoco, C.A. ("FMO").

2.      The first arbitration (the "TSMC Arbitration") concerns CME's claim against FMO for damages and FMO's counterclaims under a Transfer System Management Contract dated August 7, 2010 ("TSMC"). As amended during the course of the arbitration hearings, CME's combined claim is in the amount of $135,303,946.90 for unpaid invoices and lost profits, plus interest, attorney's fees and costs. In the alternative, CME alleges a claim for an account stated in the amount of $96,804,020.59. In addition to denying liability, FMO has asserted rights of set-off

2

and counterclaims discussed below for CME's alleged breach of the TSMC. As discussed more fully below, the TSMC provides for arbitration in Miami, Florida in accordance with the Rules of the Society of Maritime Arbitrators ("SMA").

3.      The second arbitration ("General Piar Arbitration") concerns CME's claim for damages and FMO's counterclaims under a charter party dated January 21, 2010 for the M/V General Piar ("General Piar Charter"). As amended during the course of the arbitration, CME's claim is in the amount of $10,849,878.24, plus interest and attorneys' fees and costs. In the alternative, CME claims an account stated of $4,056,984.82. While denying liability, FMO has asserted counterclaims in the amount of $29,218,500.00 for CME's alleged breach of the charter party and misrepresentations, plus unquantified losses incurred as a result of the vessel's alleged poor performance. The parties disagree as to which of two charter parties for the M/V General Piar was in force and which arbitration clause governs. As discussed more fully below, the Panel holds that the initial charter party was voided and replaced by the second charter party which provides for arbitration in New York in accordance with SMA Rules.

4.      The parties agreed to hold consolidated hearings in New York for the two arbitrations.

5.      Because the arbitrations involve many common facts and legal issues, we discuss them collectively in this document and issue separate final awards that expressly incorporate this Statement of Reasons (Appendix A) for our findings and holdings and may be used for confirmation purposes.

6.      For the reasons discussed below, in the TSMC Arbitration, we find the TSMC was a valid and binding contract which FMO failed to perform and, therefore, breached. The Panel grants CME's claims in part and awards it damages including lost profits in the amount of

$119,922,296.80, plus interest, attorneys' fees and costs in the amounts set out below. Except as shown, FMO's counterclaims are dismissed. All costs of the arbitration, including arbitrators' fees and costs, are the joint and several liability of both parties, but as between them, they are assessed in full against FMO.

7.     For the reasons discussed below, in the General Piar Arbitration, we find the General Piar Charter was a valid and binding contract which FMO failed to perform and, therefore, breached. The Panel grants CME's claims in part and awards it damages including lost profits in the amount of $5,172,524.39, plus interest, attorneys' fees and costs in the amounts set out below. Except as shown, FMO's counterclaims are dismissed. All costs of the arbitration, including arbitrators' fees and costs, are the joint and several liability of the parties, but as between them, they are assessed in full against FMO.[1]

## PROCEDURAL BACKGROUND

8.     The procedural history of these cases is extensive and involves many twists and turns.

9.     On February 9, 2016, Holland & Knight, LLP, which then was counsel for CME,[2] submitted its demands for arbitration to FMO and appointed Mr. A. J. Siciliano as arbitrator in both cases. George R. Wentz, Jr., Esq. was appointed as arbitrator by Diaz, Reus & Targ, LLP, as counsel for FMO in both cases on April 10, 2016. On June 1, 2016, Messrs. Siciliano and Wentz appointed John D. Kimball, Esq. to serve as the third arbitrator and chairperson in both cases. The parties confirmed their acceptance of the Panel.[3]

---

[1] Since the hearings and all other proceedings in the arbitrations were consolidated, the expenses of the arbitration, including arbitrators' fees and costs, were kept in one ledger and they shall be allocated 85% to the TSMC case and 15% to the MV General Piar dispute.

[2] As discussed below, on January 25, 2018, the Panel was notified that Seward & Kissel LLP had replaced Holland & Knight LLP as counsel for CME.

[3] FMO reserved the right, however, to move to dismiss and argue that there are no binding arbitration agreements.

4

10.     The arbitrators and prior counsel for CME and FMO[4] conducted an initial telephone conference on June 23, 2016, to establish a schedule for future proceedings. The Panel also directed each party to make a deposit into the escrow accounts of their respective counsel to cover arbitrators' fees and expenses, and both parties did so.  The funds later were transferred to Blank Rome, LLP to hold as escrow agent.

11.     Based on a schedule accepted by counsel for the parties and approved by the Panel, on July 1, 2016, CME filed statements of claim in each arbitration. CME also filed a memorandum in support of its joint motion for a partial security award in both arbitrations.

12.     On July 22, 2016, FMO filed a demand for a stay or dismissal of the arbitrations based on its contention that the Panel has no jurisdiction in either matter.

13.     On August 17, 2016, FMO filed its opposition to CME's security motions.

14.     On September 2, 2016, CME filed its opposition to FMO's jurisdiction motions.

15.     On September 16, 2016, CME filed a reply brief in support of its security motions.

16.     On October 12, 2016, FMO filed a reply brief in support of its motions for a dismissal or stay of the arbitrations.

17.     On October 25, 2016, the Panel received notice that the law firm of De Jesus & De Jesus was replacing Diaz, Reus & Tarig as counsel for FMO.  The attorneys at Diaz, Reus & Tarig, however, denied having been notified by FMO that they were being replaced.

18.     On October 26, 27 and November 7, 2016, the Panel conducted hearings for oral argument with respect to the pending motions and to consider the contention of De Jesus & De

---

[4] The initial counsel for FMO, Diaz, Reus & Tarig LLP, were replaced by De Jesus & De Jesus on or about October 26, 2016.  See SMA 4293 (2016). All references to counsel for FMO prior to October 26, 2016 are to Diaz, Reus & Tarig.

Jesus that it had been retained to replace Diaz, Reus & Tarig as counsel for FMO in all matters related to the arbitrations and court actions initiated in New York by CME. By agreement among the parties, the hearings were held in New York at the offices of Blank Rome, LLP.

19.     During the October 26th hearing, a video conference call was placed to FMO's in-house counsel, Sr. Carlos Sanchez, in Venezuela, who confirmed that De Jesus & De Jesus had indeed been retained by FMO to replace Diaz, Reus & Tarig.  Thereafter, the Diaz firm withdrew from the case.

20.     At the hearing on November 7, 2016, counsel for FMO requested an opportunity to submit additional documentation in support of FMO's contention that the Panel does not have jurisdiction in either of the two disputes.  According to FMO, both the TSMC and General Piar Charter together with their respective arbitration agreements were procured through and are the result of corruption and therefore, are invalid. Counsel for FMO submitted the documents on December 20, 2016. Counsel for CME later submitted written responses.

21.     The Panel issued a unanimous partial final award on November 12, 2016 concerning an award of fees and expenses for the hearing on October 26, 2016 and the delay caused by FMO's last minute change of counsel.  SMA 4293 (2016). FMO complied with the partial final award.

22.     On January 5, 2017, the Panel issued a unanimous partial final award granting in part and denying in part CME's motions for partial security and denying FMO's motions to dismiss the arbitrations for lack of jurisdiction. SMA 4296 (2017). The Panel directed FMO to deposit the amount of $62,730,279.98 into an escrow account to be established by the parties to serve as security for CME's claims under the TSMC. The Panel denied CME's companion motion for security in respect to its claims under the General Piar Charter, but without prejudice to its

right to renew the motion at a later time. As discussed below, CME subsequently filed a motion with the United States District Court for the Southern District of Florida for confirmation of the partial final award for security. FMO, however, moved to have the partial final award vacated.

23. On March 3, 2017, the Panel majority issued a partial final award concerning FMO's motion to overrule CME's objections to FMO's first request for the production of documents, under which award FMO was generally granted its requests for document production from CME related to its allegations of corruption. Arbitrator Siciliano agreed that CME should produce documents dealing with FMO's corruption allegations, but issued a partial dissent that unless and until FMO challenges CME's performance under either contract, and/or explains the relevancy of its discovery requests, it was inappropriate to require CME to produce its performance and other documents, especially those documents that are or ought to already be in FMO's possession.

24. On March 10, 2017, the Panel issued a unanimous partial final award directing (a) FMO to deposit $375,000 in escrow to cover certain document production costs CME attorneys projected would be incurred in responding to FMO's document requests related to its allegations of corruption; (b) granting CME's motion for the designation of an independent escrow agent; and (c) denying certain other requests of CME, without prejudice to its right to renew them. SMA 4309 (2017). The Panel was later advised that FMO failed to pursue its document production requests related to its corruption allegations as granted by the Panel. Nor did FMO make the escrow deposit required by the March 10, 2017 partial final award.

25. On March 20, 2017, FMO filed an Amended Answer, Defenses and Counterclaims in both arbitrations.

26.    On May 4, 2017, CME submitted its answers to FMO's counterclaims in both arbitrations.

27.    Evidentiary hearings were held on May 30 and 31, 2017, with testimony from Tyrone Serrao of CME.

28.    Evidentiary hearings were held on June 1 and 2, 2017, with testimony from Lisa Sherriff of CME.

29.    On June 21, 2017, FMO filed an application with the Panel for review and set aside of the Partial Final Award on Security dated January 5, 2017. CME opposed the application.

30.    An evidentiary hearing was held on June 26, 2017 with further testimony from Lisa Sherriff.

31.    An evidentiary hearing was held on June 27, 2017 with testimony from Ms. Danny Guerrero of FMO.

32.    An evidentiary hearing was held on June 28, 2017 with testimony from Ms. Danny Guerrero and Ms. Paula Maria Ziri-Castro Lopez. At the time of the hearing, Ms. Ziri-Castro was a prosecutor in the Venezuelan Prosecutor General's office and personally handled the criminal prosecution of Mr. Serrao discussed below.

33.    An evidentiary hearing was held on June 29, 2017 with further testimony from Ms. Paula Maria Ziri-Castro Lopez.

34.    An evidentiary hearing was held on September 19, 2017 with further testimony from Tyrone Serrao.

35.    Evidentiary hearings were held on September 20 and 21, 2017 with further testimony from Ms. Danny Guerrero of FMO.

36.     An evidentiary hearing was held on September 22, 2017 with testimony from Ramon Russian of FMO.

37.     On September 27, 2017, the Panel issued a unanimous partial final award and ruling regarding CME's in camera document production.

38.     On October 12, 2017, a hearing was held for oral argument in connection with FMO's motion for review and set aside of the partial final award on security.

39.     On October 20, 2017, CME submitted a motion for the adoption of a case management plan and other relief. FMO filed its opposition and alternative proposal on October 31, 2017. CME submitted a reply brief in further support of its motion on November 8, 2017 and FMO filed a sur-reply on November 17, 2017.

40.     Meanwhile, on November 2, 2017, the Panel issued a unanimous partial final award denying FMO's application for review and set aside of the partial final award on security dated January 5, 2017. SMA 4328 (2017).

41.     On November 20, 2017, the Panel issued a unanimous partial final award denying CME's motion for adoption of the proposed case management plan.

42.     On January 25, 2018, the Panel received a letter from the law firm of Seward & Kissel LLP advising that it had been retained to represent CME going forward in the arbitrations and had replaced Holland & Knight LLP.

43.     On January 29, 2018, the Panel held a conference call with counsel to discuss plans for hearings which had been scheduled for March 2018. Among the points discussed were FMO's request that it be permitted to recall Ms. Paula Ziri-Castro to testify and that FMO also be permitted to submit supplemental expert reports to reflect new evidence.

44.    By a letter dated February 2, 2018, FMO's counsel made a formal request that it be permitted to recall Ms. Paula Ziri-Castro to testify and submit supplemental reports from Prof. Alejandro Canonico and Dr. Daniel Flores.

45.    By a letter dated February 7, 2018, CME objected to FMO's requests.

46.    By an email dated February 8, 2018, the Panel unanimously issued a direction to counsel regarding FMO's requests. The Panel directed FMO to submit a written witness statement from Ms. Paula Ziri-Castro and a written justification for recalling her. The Panel also granted FMO's request for the submission of supplemental expert witness reports, setting dates for the submission of supplemental expert witness reports from FMO's experts, Prof. Canonico and Dr. Flores.

47.    FMO submitted a letter dated February 21, 2018 in support of its request to recall Ms. Ziri-Castro. FMO also submitted a second written declaration signed by Ms. Ziri-Castro.

48.    On the same date, counsel for CME requested leave from the Panel to (a) submit a rebuttal report from Mr. J. Eloy Anzola to Professor Canonico's Second Expert Report, (b) have Tyrone Serrao testify by video link rather than in person because of travel restrictions and (c) certain other administrative items.

49.    On February 22, 2018, counsel for FMO submitted objections to CME's request to have testimony from Mr. Serrao by video link. FMO also requested that further testimony from Mr. Serrao and Ms. Sherriff be "rebuttal" only.

50.    On February 23, 2018, the Panel issued an order granting FMO's request that it be permitted to recall Ms. Ziri-Castro. In addition, the Panel issued a ruling that all witnesses must appear in person to testify.

51.     By a letter dated February 26, 2018, counsel for CME moved for reconsideration of the Panel's ruling requiring Mr. Serrao to testify in New York in person and in support of its request that he be permitted to testify by video link, principally because he was unable to obtain a visa to enter the United States as a result of the criminal prosecution against him in Venezuela.

52.     On February 26, 2018, CME submitted a Second Amended Statement of Claim in both arbitrations.

53.     On February 27, 2018, counsel for FMO submitted a motion to the Panel to limit the testimony of Mr. Serrao and Ms. Sherriff to the issues previously identified by CME's counsel as rebuttal testimony.

54.     On February 27, 2018, the Panel issued a unanimous email ruling permitting Mr. Serrao to testify by video link if he was unable to obtain a visa which would enable him to testify in person.

55.     On February 28, 2018, counsel for FMO submitted a letter to the Panel outlining its continued objections to Mr. Serrao's testimony, notwithstanding the Panel's ruling the previous day. CME submitted a written reply the same day.

56.     On February 28, 2018, CME's counsel also submitted a written response to FMO's motion to limit the testimony of Mr. Serrao and Ms. Sherriff.

57.     The Panel issued an order on February 28, 2018, *inter alia*, adhering to its ruling that Mr. Serrao could testify by video link and denying FMO's motion to limit the testimony of Mr. Serrao and Ms. Sherriff.

58.     Hearings were held in the arbitrations at the office of Blank Rome LLP on March 5-8, 2018. Testimony was given by Ramon Russian and Ms. Paula Ziri-Castro for FMO and Ms. Lisa Sherriff and Tyrone Serrao (by videoconference) for CME.

11

59.      On March 23, 2018, counsel for CME provided the Panel with copy of an order dated March 19, 2018 issued by the Tribunal in the London arbitrations between CME and FMO. Along with the said Order, the Panel received copies of four partial final awards issued in the London arbitrations between CME and FMO concerning charter parties for the MV Palini/MV Taiglad and the MV WH Blount/MV Gypsum Integrity.

60.      Additional hearings were held at the office of Blank Rome LLP on March 26-29, 2018. Expert testimony was given by Prof. Alejandro Canonico Sarabia, FMO's Venezuelan law expert[5]; Professor J. Eloy Anzola, CME's Venezuelan law expert; and Dr. Daniel Flores, FMO's expert economist. CME did not call an economist to provide expert testimony.[6]

61.      On March 29, 2018, the Panel sent an email to counsel confirming the post-hearing briefing schedule set at the hearing that day, as follows:

> April 6, 2018 – Counsel will submit a list of agreed issues to be decided by the Panel; Counsel for CME will submit an updated escrow order with Signature Bank agreeing to act as Escrow agent
>
> May 18, 2018 – Counsel will submit statements of agreed and contested facts with citations to the exhibits and testimony
>
> June 15, 2018 – Main briefs
>
> August 10, 2018 – Reply Briefs
>
> September 6, 2018 – Oral argument (if the Panel decides it would be helpful)

62.      By an email dated April 6, 2018, counsel for CME requested that the Panel issue an amended partial final award which would modify the March 10, 2017 partial final award in order to name Signature Bank as the independent escrow agent for purposes of holding security to be deposited by FMO under the partial final award of January 5, 2017.

---

[5] FMO also had submitted written expert opinions concerning Venezuelan law from Professor Carlos Enrique Mourino Vaquero, but did not call him to testify.

[6] CME submitted written expert reports from John Salmon but did not call him to testify.

12

63.     The Panel signed and issued an amended partial final award designating Signature Bank as escrow agent on April 10, 2018.

64.     There was subsequent correspondence between counsel and the Panel concerning the list of issues, as to which the parties were in substantial disagreement. By an email dated April 19, 2018, the Panel issued further directions to counsel and stated it would adopt the statement of issues submitted by counsel for FMO, subject to certain amendments noted in the email. FMO submitted a detailed list of issues on April 20, 2018, to which CME objected by its letter of April 25, 2018 and its counter-statement of the issues.

65.     On April 12, 2018, the Panel directed the parties to make an additional deposit of funds in the escrow account established for arbitrators' fees by May 14, 2018. CME complied with the Panel's order and deposited funds in the account by the due date. FMO, however, failed to make its payment to the escrow account.

66.     By a further partial final award dated May 2, 2018, the Panel approved the wording of an Escrow Deposit Agreement submitted by CME and approved by Signature Bank.

67.     On May 10, 2018, counsel for CME requested adjustments to the post-hearing briefing schedule, which were approved by the Panel on May 15, 2018, as follows:

> June 1, 2018 – Parties to submit agreed and contested facts
>
> June 29, 2018 –main briefs.
>
> August 10, 2018 –reply briefs
>
> September 6, 2018 – Oral argument (if the Panel decides it would be helpful).

68.     On May 24, 2018, the Panel advised counsel that FMO remained in default in the payment of funds to the escrow account for arbitrators' fees.

69.     On May 30, 2018, counsel for CME provided the Panel with a copy of a partial award dated 16 April 2018 issued by an arbitration panel in an arbitration between CME and

FMO before the International Court of Arbitration of the International Chamber of Commerce seated in Switzerland. ("ICC Arbitration")

70.    On June 1, 2018, counsel for CME timely submitted its Statement of Facts. Counsel for FMO, however, failed to make any submission to the Panel on that date.

71.    Because of FMO's default in the payment of a further deposit to the escrow account for arbitrators' fees and the submission of a statement of agreed and contested facts, the Panel directed counsel to participate in a conference call. The call initially was scheduled for June 6, but at the request of FMO's counsel, was adjourned until June 11, 2018.  At the further request of FMO's counsel, the conference call was adjourned a second time to June 12, 2018.

72.    On June 10, 2018, counsel for FMO wrote to the Panel and advised that "We have been informed by Ferrominera that it is taking the necessary steps in order to pay the additional deposit of USD 200,000 requested by the Panels. As it happened in relation to past payments, the wire transfer might take some extra time to be made. We will keep the Panels duly informed."

73.    Despite this statement from FMO's counsel and further emails from the Panel, FMO failed to make the payment to the escrow account and remains in default.

74.    During the conference call on June 12, 2018, counsel for FMO requested that it be permitted to submit its Statement of Facts on June 19, 2018, and that the date for main briefs be adjourned to July 13, 2018, with the remaining dates unchanged.  The Panel directed FMO to make its request in writing, with CME being given the right to reply.

75.    On June 12, 2018 counsel for FMO submitted a letter to the Panel requesting that it be permitted to submit its Statement of Facts on June 19, 2018 and the date for main briefs be pushed back to July 13, 2018. Counsel for CME submitted a written opposition to this request.

76.     By an order issued on June 14, 2018, the Panel granted FMO's request and directed that its Statement of Facts be submitted by June 19, 2018 and the date for submitting main briefs be extended to July 13, with reply briefs due on August 10, 2018 and oral argument scheduled for September 6, 2018.

77.     On June 20, 2018, FMO submitted its Statement of Facts one day late.

78.     The parties submitted their respective main briefs on July 13, 2018.

79.     On July 18, 2018, counsel for CME provided the Panel with copy of a decision issued earlier that day by Judge Jose E. Martinez of the United States District Court for the Southern District of Florida confirming the Panel's partial final award dated January 5, 2017 and denying FMO's motion to vacate same. The Panel subsequently was informed that FMO filed a notice of appeal to the 11th Circuit Court of Appeals on August 16, 2018, which was thereafter withdrawn by FMO and dismissed by the Court on October 15, 2018.

80.     On August 9, 2018, counsel for FMO informed the Panel of a ruling of the First Court of Administrative Matters of the Bolivarian Republic of Venezuela issued on July 25, 2018 declaring illegal (i) the Commercial Alliance Agreement between FMO and CME dated December 21, 2010 and (ii) the Framework Agreement dated January 30, 2009 between Corporacion Venezolana de Guayana ("CVG") and CME. Counsel for FMO provided a partial translation of the court's decision.  FMO's counsel also indicated its intention of submitting a further expert report from its Venezuelan law expert concerning the July 25, 2018 decision.

81.     Counsel for CME submitted its reply brief and additional materials on August 10, 2018.

82.     Counsel for FMO submitted its reply brief and additional materials on August 11, 2018 (one day late).

15

83.     By an email dated August 11, 2018, the Panel issued directions permitting FMO to submit a supplemental expert report concerning the July 25, 2018 decision on or before August 17, 2018. The Panel further stated that CME could submit an expert response on or before August 24, 2018.

84.     FMO submitted the Third Legal Opinion of Professor Alejandro Canonico Sarabia on August 17, 2018.

85.     On August 24, 2018, CME submitted the Fifth Expert Witness Statement of J. Eloy Anzola in response to Professor Canonico's report.

86.     At the direction of the Panel, counsel for FMO provided a full English translation of the July 25 decision on August 25, 2018.

87.     By an email dated August 28, 2018, the Panel directed counsel for FMO to advise the Panel by no later than August 30, 2018 when it would deposit funds in the escrow account for arbitrators' fees as previously ordered by the Panel.

88.     On August 29, 2018, counsel for FMO advised that "[w]ith respect to the deposit of the funds, FMO advises that it is not positioned to indicate the exact date when the requested funds would be available." In addition, counsel for FMO advised that "in light of the current circumstances of the case, it does not intend to appear at the hearing scheduled for September 6, 2018." At the same time, counsel for FMO requested that the Panel disregard the Fifth Expert Report of J. Eloy Anzola. FMO also noted that:

> As the Panels will doubtless be aware, even in the absence of the Respondent at this discrete hearing, the Panels will remain under a general duty, as enshrined on Sections 9 and 21 of the SMA Rules, to act fairly and impartially as between the parties and, moreover, Claimant carries the burden of proof on its claims and must prove its case in all respects.

16

89.     By an email dated August 30, 2018, the Panel confirmed its intention to proceed with a hearing and oral argument on September 6, 2018 and encouraged FMO to reconsider its decision not to attend. The Panel's email noted that "the Panel considers this an important hearing and desires to hear FMO's presentation and arguments, and to ask counsel for FMO such questions as the Panel may have."

90.     There was no response from counsel for FMO to the Panel's email of August 30, 2018.

91.     Oral argument was held on September 6, 2018. The hearing was attended by counsel for CME and the Panel. Counsel for FMO did not appear and its absence was noted.

92.     At the hearing on September 6, 2018 the Panel issued a ruling rejecting FMO's request that the Fifth Expert Report of J. Eloy Anzola be disregarded. The Panel further directed the parties, on a joint and several basis, to make additional payments to the escrow account for arbitrators' fees by October 5, 2018.  A transcript of the hearing was made available, and remains available, to counsel for FMO.

93.     At the September 6 hearing, the Panel established the following schedule for the parties to submit their respective applications for an award of legal fees and expenses:

   a.     legal fee applications are due from both sides on September 21, 2018;

   b.     objections are due on October 5, 2018; and

   c.     replies to the objections are due on October 12, 2018.

94.     CME submitted its fee application timely, on September 21, 2018.

95.     FMO submitted its fee application a few hours late on September 22, 2018.

96.     Both sides filed objections to the other side's fee application on October 5 and replies to the objections were duly submitted on October 12, 2018.

17

97.     CME made a further payment to the escrow account for arbitrators' fees, as directed by the Panel. FMO again failed to make any payment and is in default.

98.     On November 12, 2018, counsel for CME submitted a letter to the Panel enclosing two arbitration awards and their accompanying appendices issued in the London arbitrations. The 2018 London Awards are in favor of CME and against FMO, and award CME damages and legal fees and costs. In addition, the London Tribunals made rulings on a large number of points.

99.     In granting these awards, the London Tribunals concluded, among other things, that the net sum due across all of the contracts between the parties is $138,594,179.48 in favor of CME. Thus, the London Tribunals considered not only the claims under the charters at issue before them, but also made rulings concerning all of the other contracts between CME and FMO, including the TSMC and General Piar Charter.

100.    In the present cases, CME contends that under principles of collateral estoppel, the Panel should reach the same conclusions as the London Tribunals. Counsel for FMO has not submitted any response to the November 12, 2018 letter from CME's counsel.

101.    We shall discuss the London Awards more fully below.

102.    By an email dated November 14, 2018 the Panel directed both sides to make an additional deposit of funds in the escrow account for arbitrators' fees by November 23, 2018. CME complied with the Panel's request and made the additional deposit of funds. FMO did not do so and is in default with respect to its obligation to make the required payment.

103.    The Panel notes that FMO's counsel has failed to respond to several communications from the Panel to counsel. Nevertheless, we wish to emphasize that the lack of responses from FMO has played no role in our evaluation of the merits of the party's claims,

18

counterclaims and defenses.  We have decided the cases based solely on our best understanding of the very extensive body of evidence and arguments that each party has presented.

104.   The Panel has carefully reviewed the extensive record and having deliberated, now unanimously issues these final findings and rulings which form an integral part of each of the two awards.

## THE CLAIMS AND COUNTERCLAIMS

## CME'S CLAIMS

### A.      TSMC Arbitration

105.   CME's Second Amended Statement of Claim in the TSMC Arbitration, dated February 26, 2018, asserts claims for breach of contract and accounts stated.  The claims arise under the TSMC, by which FMO appointed CME to:

> maintain, manage and operate, including technical management, the M/V Rio Caroni, the M/V Rio Orinoco, the iron ore transfer station Boca Grande II and the planned preventative maintenance of the Shiploader/Conveyer System (collectively, the "Transfer System"), for the purpose of transporting iron ore to ocean going export vessels in order to maximize the iron ore shuttling and effective export output capacity of iron ore.

106.   For its breach of contract claim, CME asserts that FMO is liable to CME for:

a.      $97,695,046.94 in outstanding invoices;

b.      $37,608,899.96 in lost profits; and

c.      pursuant to Clause 43 of the TSMC, contractual interest on

all unpaid and outstanding invoices at the rate of 12% per

annum.

107.   For its accounts stated claim, CME asserts that pursuant to the 2014 Financial Audit, FMO accepted as undisputed, and promised to pay, the majority of outstanding invoices issued by CME under the TSMC, amounting to $96,804,020.59.

19

108. CME also claims prejudgment interest and reasonable attorneys' fees and costs, including arbitrators' fees and expenses, upon any award issued by the Panel, under applicable law and SMA rules pursuant to Clause 41 of the TSMC.

## B.   General Piar Arbitration

109. CME's Second Amended Statement of Claim in the General Piar Arbitration, dated February 26, 2018, asserts claims for breach of contract and accounts stated that arise under the General Piar Charter, under which CME (as disponent owner) chartered to FMO (as charterer) the M/V General Piar to act as a shuttle vessel for the purpose of "providing iron ore shuttling services from Puerto Ordaz Port or Palua Port to the Boca Grande II transfer station located in Venezuela." For its breach of contract claim, CME contends that FMO is liable for:

    a.    $4,406,985.53 in outstanding invoices or, alternatively, $4,056,984.82 on its account stated claim;

    b.    $4,710,000.00 in lost profits; and

    c.    $1,732,892.71 paid by CME to Gretchen Shipping Inc. by way of settlement, which amount was incurred as an alleged natural consequence of FMO's breach of the General Piar Charter.

110. In addition, CME claims prejudgment interest and reasonable attorneys' fees and costs.

## FMO'S DEFENSES TO CME'S CLAIMS

111. FMO has asserted the following defenses to CME's claims:

20

## **TSMC ARBITRATION**

112.   FMO contends the arbitration should be dismissed for lack of jurisdiction because: (l) the arbitration agreement contained in the TSMC, as well as the underlying contract, is null and void, unenforceable or incapable of being performed because it is tainted by corruption; (2) the arbitration agreement contained in the TSMC is null and void, unenforceable or incapable of being performed because it is not valid under Venezuelan law; (3) there was no meeting of the minds as to the TSMC's arbitration clause; (4) the Commercial Alliance Contract dated December 21, 2010, *subsumed* the TSMC and modified its terms, including its arbitration clause; (5) CME's claims are not arbitrable; and (6) CME has waived any right to arbitration and is otherwise estopped from pursuing any arbitration under the TSMC.

113.   FMO contends, in the alternative, that if the Panel finds it has jurisdiction, it should find that the TMSC contract is null and void, unenforceable or incapable of being performed because it was concluded as part of an enormous corruption scheme that has brought many of the protagonists to jail, including the former management of FMO. According to FMO, Mr. Tyrone Serrao, CME's Chairman, was complicit in that scheme and is now wanted by the Venezuelan judiciary. The Office of the Prosecutor General of Venezuela contends that Mr. Tyrone Serrao, CME and its agents engaged in a series of illicit actions that left FMO in financial disarray by securing contracts for prices of iron ore well below international market prices and circumventing mandatory bidding and approval requirements for the provision of services to a Venezuelan government-controlled entity.

114.   In the further alternative, if, contrary to FMO's case, the Panel considers that the TSMC was not null and void, unenforceable or incapable of being performed, FMO contests CME's breach of contract claim.

21

115.   FMO contends that FMO and CME were parties to a series of intertwined contracts for the provision of services in exchange for payment of money and/or iron ore, or what it refers to as a "Barter Agreement." FMO and CME did not maintain an accounting mechanism that would tie FMO's invoices to specific services rendered by CME under the TSMC or any of the other agreements between them, nor to the delivery of a particular iron ore shipment. Instead, deliveries of iron ore by FMO were credited against the services allegedly provided by CME in the aggregate.

116.   As a result, CME cannot show that FMO failed to pay for the services purportedly rendered under the TSMC by taking into account only the invoices sent by CME to FMO. Instead, FMO contends that its invoices for the sale of iron ore and/or hot briquetted iron ("HBI") must also be taken into account.

117.   FMO also asserts it either paid all the monies it owed under the TSMC or its debt to CME was extinguished by other compensation.

118.   FMO also submits that CME's demand for payment of lost revenues, interest, or attorneys' fees and costs under the TSMC for over $120 million has no contractual or legal support.

119.   Although the findings of its expert on damages (Dr. Daniel Flores) differ, FMO maintains that after a proper reconciliation of the accounts, FMO will owe nothing to CME under the TSMC, and that CME will owe FMO considerable amounts in dollars.

**GENERAL PIAR ARBITRATION**

120.   FMO contends the Panel should dismiss the arbitration for lack of jurisdiction because (1) the arbitration agreement contained in the General Piar Charter as well as the underlying contract is null and void, unenforceable or incapable of being performed because it is

tainted by corruption; (2) the arbitration agreement contained in the General Piar Charter is null and void, unenforceable or incapable of being performed because it has not met the conditions or requirements of validity under Venezuelan law; (3) there was no meeting of the minds as to the General Piar Charter's arbitration clause; (4) on 21 December 2010, the Commercial Alliance Agreement *subsumed* the General Piar Charter and modified its terms, including its arbitration clause; (5) CME's claims are not arbitrable; and, in any case, (6) CME has waived any right to arbitration and is otherwise estopped from pursuing arbitration under the General Piar Charter.

121.   FMO further contends, in the alternative, that if the Panel finds it has jurisdiction, the General Piar Charter is null and void, unenforceable or incapable of being performed because it was concluded as part of an enormous corruption scheme and violates mandatory provisions of Venezuelan law. FMO argues that CME and its agents engaged in a series of illicit actions that left FMO in financial disarray by securing contracts for iron ore at prices well below international market prices and circumventing bidding requirements for the provision of services to a Venezuelan government-controlled entity.

122.   FMO also argues, in the alternative, that if the Panel decides the General Piar Charter was not null and void, unenforceable or incapable of being performed, the Panel should deny CME's breach of contract claim for monies purportedly owed by FMO under the categories set forth in CME's Statement of Claim.

123.   FMO further contends that it and CME were parties to a series of intertwined contracts for the provision of services in exchange for payment of money and/or iron ore but did not maintain an accounting mechanism that tied CME's invoices for services allegedly rendered to FMO's delivery of a particular payment or iron ore shipment. Instead, FMO alleges that deliveries of iron ore by FMO were credited against the services allegedly provided by CME in

23

the aggregate.  As a result, CME cannot and has not proved that FMO failed to pay for the services purportedly rendered under the General Piar Charter.

124.   According to FMO, the invoices issued by FMO for the sale of iron ore or HBI should also be taken into account and that it either paid all the monies it owed under the General Piar Charter or its debt to CME was extinguished by other compensation.

125.   FMO also submits that CME's demand for payment of lost revenues, interest, or attorneys' fees and costs under the General Piar Charter has no contractual or legal support.

126.   FMO contends that after proper reconciliation of the accounts, the evidence shows that it owes nothing to CME under the General Piar Charter, and to the contrary, CME owes FMO considerable amounts of dollars. However, as in the case with the TSMC, the findings of Dr. Daniel Flores, FMO's expert on damages, differ.

### FMO'S RIGHTS OF SET-OFF AND COUNTERCLAIMS

127.   FMO has asserted the following rights of set-off and counterclaims:

**A.     TSMC ARBITRATION**

128.   If the Panel decides it has jurisdiction, FMO claims a right of set-off for crew salaries in the amount of $18,598,547.16 against amounts payable to CME under the TSMC. FMO also claims compensation in the amount of $12,160,000.00 for CME's alleged failure to maintain the Punta Barima Pilot Station.  FMO also claims interest, all costs of the arbitration and attorneys' fees and costs.[7]

---

[7] In its Amended Answer, Defenses and Counterclaims dated March 20, 2017, FMO also alleged a counterclaim for "other damages totaling USD 2.2 million" for alleged pending work that was not executed ($830,043) and alleged lack of maintenance ($1.4 million). Dr.  Flores' powerpoint of March 27, 2018 (Ex. EO-46) also refers to a counterclaim for $1,395,283 for CME's alleged failure to maintain PTLB-II. That claim, however, is not referred to in FMO's post-hearing brief or reply brief.

B.     **GENERAL PIAR ARBITRATION**

129.   If the Panel decides it has jurisdiction, FMO seeks damages of $29,218,500 for CME's breach of the General Piar Charter and misrepresentation of the vessel's performance capabilities, plus interest, all costs of the arbitration and attorneys' fees and costs;

## FACTUAL BACKGROUND

130.   Although these arbitrations only involve claims under the TSMC and General Piar Charter, CME and FMO also were parties to a series of other contracts which must be discussed as well.

131.   CME's Statement of Facts is 262 pages in length and includes 1504 proposed findings, plus a number of exhibits.  FMO's Statement of Facts is shorter, but still is 52 pages in length and offers 184 proposed findings, many of which are directly contrary to CME's submission.  As a result, we outline here only the basic facts and discuss the parties' many contested points below.

132.   CME is a British Virgin Islands entity and is in the business of trading commodities and minerals, particularly iron ore.

133.   FMO is a company organized and existing under the laws of the Bolivarian Republic of Venezuela and is, and always has been, an organ of the Venezuelan State.  FMO's counsel described it in the following way:

> [FMO] is a Functionally Decentralized entity operating as a business created by the Venezuelan State at the end of 1975, aimed at developing the constitutional and legal monopoly of the iron ore exploitation industry on behalf of the State. The stated purposes of FMO is to manage iron production for the government across and [the] entire country in conformity with the guidelines of the Ministry of the Popular Power of Basic Industry and Mining (*Ministerio de Industrias Basicas y Mineria*) and in furtherance of a presidential mandate.  As an organ of Venezuela that was granted the right to mine and export iron ore—one of the country's important

25

government-owned natural resources—FMO has a responsibility to protect and maintain the revenue of the country.

134.   FMO's Transfer System is the means by which it delivers iron ore mined in the interior of Venezuela to large bulk carrier vessels, which then transport the iron ore to customers around the world.

135.   Iron ore is transported from FMO's mines to Puerto Ordaz and Palua ("Inland Ports"), which are inland ports approximately 180 miles up the Orinoco River.  FMO uses Panamax and Handymax size ships as "shuttle vessels" to transport the ore from the inland ports to an offshore transfer station located in deep water off the Venezuelan coast.  The offshore transfer station is a converted self-unloading vessel named the "M/V BOCA GRANDE II," which is permanently moored several miles off the mouth of the Orinoco River in Venezuelan waters. The M/V BOCA GRANDE II is commonly called the "Transfer Station" because of the role it plays in the Transfer System.  Large bulk carrier ships load iron ore cargoes directly from the Transfer Station for international sales.

136.   At all relevant times, FMO owned all of the components of the Transfer System, which consisted of: (1) the Transfer Station, (2) two shuttle vessels, the M/V RIO CARONI and the M/V RIO ORINOCO, (3) a ship loader and conveyor system that transported the iron ore from the stockpile to shuttle vessels, and (4) the Punta Barima pilot station.  As needed, FMO also would charter additional shuttle vessels to operate as part of the Transfer System.

137.   In 2004, CME entered into a contract with FMO for the sale and purchase of Venezuelan iron ore (the "IOSC-1"), by which FMO agreed to sell to CME certain quantities of various iron ore products for the period from January 2005 through December 2009.  Under that contract, FMO was to deliver iron ore to CME at Puerto Ordaz, the Transfer Station, or by transshipment in Venezuelan waters, at which point the iron ore would be loaded into export ships

26

for delivery to CME's customers in China. Adjustments to the price and quality specifications of the iron ore to be delivered by FMO were made from time to time through mutually-agreed addenda.

138.   IOSC-1 was a U.S. dollar contract, meaning that pursuant to its terms, FMO was to invoice CME, and CME was to pay FMO, in U.S. dollars.

139.   CME was invoiced by FMO in U.S. dollars, which invoices included the details of FMO's bank accounts in New York at Bank of America and BNP Paribas.  However, the invoices issued in relation to some shipments delivered under Addendum 7 to IOSC-1 were split into U.S. dollars and Bolivar fuerte ("BsF") portions.

140.   In addition to the sale of iron ore from FMO to CME, the parties' relationship developed into one where FMO would request that CME make payments to third-parties on FMO's behalf and, in exchange, FMO would reimburse CME for these payments in kind, via delivery of iron ore or HBI.  Whenever FMO requested that CME make a payment in Venezuela in BsF, CME did so through its local Venezuelan agent, Arivenca, because CME itself was unable to pay in BsF.

141.   On those occasions, CME would put Arivenca in funds for the purpose of making payments in Venezuela as requested by FMO.  Arivenca's only source of funds was CME.  To do this, CME would first exchange U.S. dollars into BsF in large sums.

142.   Arivenca would then make the payments in question and, on behalf of CME, invoice FMO for reimbursement in BsF.

143.   Although Arivenca issued invoices to FMO in BsF, FMO and CME understood that FMO would ultimately reimburse CME for these expenses, and would do so by delivering iron ore materials (which are priced in U.S. dollars).

27

144.   Arivenca never itself received any payments or deliveries of iron ore from FMO.

145.   During the course of the performance of IOSC-1, FMO was often short of cash and had difficulty maintaining a steady output of iron ore from its mines.   This problem was exacerbated by the financial crisis of 2008, whereby FMO was unable to obtain conventional financing for capital investment required to sustain its operations.

146.   In order for FMO to maintain its supply of iron ore to its customers, and at the request of FMO, on several occasions CME provided financial support to FMO by funding works, goods and services for FMO's mining and transport operations.   This arrangement is reflected in addenda to IOSC-1.

147.   By 2009, the relationship between CME and FMO had changed from a cash buyer/seller relationship, in which CME paid in cash for FMO's iron ore, to a barter relationship, in which CME provided goods, services and financing in exchange for iron ore.

148.   This barter arrangement was attractive to FMO because CME would help provide the investments to maintain output and develop the Cerro Bolivar mine thereby allowing FMO to increase iron ore production and the cash coming into the business. FMO would then pay CME for those contributions in iron ore deliveries. This barter arrangement was also beneficial for FMO's cash flow, as it allowed FMO to maintain and increase production without having to spend cash up-front at a time when FMO was cash poor and unable to obtain conventional financing.

149.   Ultimately, FMO was only able to avoid suspending production as a result of CME's assistance, a fact acknowledged internally by FMO in 2012.

150.   Correspondence at the time demonstrates that it was FMO which wanted CME to provide it with services and then be compensated with iron ore.

151.   For example, FMO Board Resolution No. JD-168-A/2009, dated December 8, 2009, states:

> That CVG Ferrominera Orinoco C.A. does not have sufficient equipment or adequate infrastructure to enable it to guarantee these volumes of sales, putting at risk the operational continuity and financial health of the company. . .
>
> To authorise the Chairman of CVG Ferrominera Orinoco C.A., in accordance with that established in Clause Fifteen of the Company Statutes, to sign with the CME Company the contracts necessary for the execution of the works to increase shipment capacity at both the Puerto Ordaz Ferrominera Wharf and the Palúa Wharf for an estimated amount of US $73,888,758.00 by means of payment by offsetting with iron ore and briquettes in accordance with the letter of intent as per letter PREG-0780/09 dated 01.12.09.

152.   This resolution demonstrates that FMO needed to make very substantial investments to maintain production, but it did not have the cash to do so.

153.   CME was willing to make such investments, provided that it would be repaid by FMO in iron ore via the barter deal.

154.   In addition to the services that it provided, when requested to do so, CME also advanced funds to FMO and paid invoices on behalf of FMO.  Between 2009 and 2012, CME advanced over $140 million to FMO in cash (including funds paid to other contractors) in exchange for the future delivery of iron ore.  CME did not charge interest on these cash advances and payments.

155.   During these years, CME and FMO entered into additional agreements. In January 2009, CME entered into an agreement with CVG (the "Framework Agreement") whereby both parties agreed to take certain action necessary to reactivate production from the Cerro Bolivar mine.  Under the terms of the Framework Agreement, in return for CME's investment to reopen the Cerro Bolivar mine, CVG guaranteed that CME would receive from FMO up to three million

29

metric tons of iron ore per year for each year of the Framework Agreement's ten-year term, or a total of thirty million metric tons of iron ore.

## TSMC

156.   The prior manager of the Transfer System terminated its contract with FMO for non-payment.   As a result, FMO had an urgent need for a replacement to take over the management of the Transfer System.   CME's first proposal to FMO was made on July 15, 2010. On July 26, 2010 FMO's Board of Directors authorized FMO to commence negotiations with CME for the operation and maintenance of the Transfer System.

157.   On August 7, 2010 CME and FMO entered into the TSMC for the management of the entire Transfer System.

158.   The TSMC and its Addendum No. 1 were signed by FMO's then President, Radwan Sabbagh, and CME's Chairman, Tyrone Serrao.

159.   FMO's Board of Directors expressly validated the TSMC, as executed between FMO and CME (Resolution No. JD-067-A/2010).

160.   FMO's Board of Directors also expressly authorized FMO's President to execute Addendum No. 1 to the TSMC.

161.   One of the stated reasons FMO's Board approved the execution of the TSMC with CME was "for the purposes of avoiding the ultimate collapse of the Transfer System."

162.   Under the TSMC, CME was to maintain, manage, and operate the Transfer System for a term of 5 years, to be automatically renewed for an additional 5 years unless terminated by either party.

163.   The TSMC placed upon CME responsibility for, *inter alia*, the following operations: (a) the loading of the shuttle vessels at the Inland Ports through a system of conveyors

and a ship loader, (b) the transportation of the iron ore loaded into the shuttle vessels from the Inland Ports to the Transfer Station offshore, (c) the operation and maintenance of the Punta Barima pilot station (used by the vessel pilots for the Orinoco River and Transfer Station), (d) the transshipment of the iron ore from the shuttle vessels into the Boca Grande II Transfer Station, and (e) the loading of the large bulk carrier export vessels from the Boca Grande II Transfer Station.

164.   The Transfer System was to have a minimum throughput of 6,000,000 metric tons of iron ore from FMO's mines per calendar year for the duration of an initial 5-year term of the TSMC.  See TSMC, Clause 2(viii) (defining "Minimum Tonnage").

165.   Under the TSMC, CME was to receive as payment from FMO compensation based on a processing or throughput rate of a minimum of 500,000 metric tons of iron ore per month, which payments would be made in accordance with the existing 2004 Iron Ore Sales Contract.

166.   CME was to invoice FMO at the beginning of each month in advance in a sum equal to processing 500,000 metric tons of iron ore at an agreed-upon rate under the TSMC.  If the Transfer System then processed more than 500,000 metric tons of iron ore for a particular month, CME would invoice FMO for the additional throughput exceeding the minimum throughput charge of 500,000 metric tons a month.  See TSMC, Clause 17.

167.   At various times during the performance of the TSMC, CME and FMO agreed to price adjustments to the iron ore processing rate.

168.   Regardless of the processing rate that governed at the particular time, CME invoiced FMO for the amounts due under the TSMC in U.S. dollar amounts each month.  CME (through Arivenca) also invoiced FMO in BsF for advance payments made by CME (through Arivenca) within Venezuela.

31

169.    Under Clause 17 of the TSMC, CME was to be compensated with iron ore and/or DRI-HBI:

> All payments under this Contract will be paid by FMO to CME with iron ore and/or DRI-HBI delivered through the existing Contract between FMO and CME and will be compensated through a barter arrangement.  Payment will therefore be made via contra, to offset the invoices from CME to FMO under this Contract against the invoices from FMO to CME for the supply of iron ore and/or DRI-HBI.

170.    Mr. Serrao testified that at no point during the negotiation, execution, or performance of the TSMC did anyone from FMO suggest that the TSMC required some further level of formality or additional authorization, because it included an arbitration clause or for any other reason.

171.    The TSMC contains the following arbitration agreement at Clause 41:

> 41.    Arbitration
>
> The Parties hereby expressly declare their Contract to submit to binding arbitration any and all controversies arising from, or in any way related to, this Contract and/or the execution and/or interpretation thereof, including, but not limited to, the validity and/or enforceability of this clause; and consequently further expressly waive their right to submit any such controversies to the jurisdiction of the Courts of any State/Country, including expressly, but not limited to, the jurisdiction of the Venezuelan Courts, as allowed by the Venezuelan Commercial Arbitration Act and any other applicable Venezuelan laws.  The parties further declare that this Contract has been negotiated at arm's length and in no way may be construed as a contract of adhesion for neither of them.  Should a controversy arise that, by virtue of any applicable legislation, may not be submitted to arbitration, then only that controversy, and no other, may be submitted to the Courts having jurisdiction.
>
> Arbitration shall be conducted in Miami, Florida, in accordance with the Rules of the Society of Maritime Arbitrators then in force, in the English language.  The arbitration shall be exclusive and mandatory. The following procedure shall be followed for the appointment of arbitrators:

(i) The arbitration panel shall consist of three arbitrators, one to be appointed by each of the parties hereto and the third by the two so chosen. The Arbitrators shall be experienced in both commercial and maritime law. Either party may initiate the arbitration as provided in the Rules of the Society of Maritime Arbitrators. The Arbitrators shall apply the General Maritime Law of the United States of America as the substantive law.

Their decision shall be final and binding for the parties as though it were the final and unappealable decision of a Court of competent jurisdiction. The Arbitration Panel shall have the authority to order any and all preventive measures as it deems fit, and either party shall be entitled to present such order to any competent Court for its enforcement. The Arbitrators shall also have the authority to certify copies of any and all documents submitted to them and/or orders issued by them. The award shall be reasoned and shall set forth findings of fact and conclusions of law. The award shall include interest at the prime rate of interest announced publicly by the Wall street Journal (or its successors) as the so-called "prime rate."

The prevailing party shall recover all attorney's fees and costs from the other party.

## GENERAL PIAR CHARTER

172. In January 2010, the parties entered into a charter party by which CME time chartered the M/V General Piar to FMO to act as a shuttle vessel to the Transfer Station for a term of 60 months at a rate of $35,000 per day, with the daily charter hire rate to increase over time as per the parties' agreement.

173. The M/V General Piar was to be used by FMO principally as a shuttle vessel transporting iron ore from the Inland Ports to the Transfer Station.

174. CME had time chartered the vessel from its owner, Gretchen Shipping, Inc. ("Gretchen"), for a period of five years, and then sub-chartered it to FMO.

175. On January 21, 2010, while CME and Gretchen were still in negotiations concerning the head-charter party, CME and FMO executed a provisional sub-charter party for the General Piar.

176. The provisional charter was executed with the understanding that an updated agreement would be executed after the head-charter party between CME and Gretchen was finalized which took place on January 25, 2010.

177. The General Piar head charter provided for an initial hire rate of $25,641.03 per day, increasing by 2% per annum, commencing one year after date of delivery.

178. After the head charter was executed by CME and Gretchen, in April 2010, CME and FMO executed a revised charter party agreement for the M/V General Piar. Radwan Sabbagh, then President and Chairman of the Board of Directors of FMO, signed the finalized General Piar Charter.

179. FMO's Board of Directors expressly approved the General Piar Charter.  See DG4-43 (Resolution No. JD-118/2010).

180. It was important to CME that the head charter with Gretchen and the sub-charter with FMO be on back-to-back terms, including the dispute resolution clauses.

181. As such, one of the provisions that was amended in the finalized General Piar Charter between CME and FMO was the arbitration clause, which states, in pertinent part:

> In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA small claims procedure current at the time when the arbitration proceeding are commenced.

> This charter shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this contract shall be referred to three persons at New York, one to

34

be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the shortened arbitration procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.

182.    The provisional charter contained the following different arbitration clause:

Time Charter Contract (GENERAL PIAR) (FMO's version) General average/Arbitration in New York USA. International Maritime Law to Apply

All disputes arising out of this contract shall be arbitrated in New York, USA, and unless the parties agree forthwith on a single arbitrator, be referred to the final arbitrament of two arbitrators carrying on business in New York, USA, who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in shipping, one to be appointed by each of the parties with power to such arbitrators to appoint an umpire. No Award shall be questioned or invalidated on the grounds that any of the arbitrators are not qualified as above, unless objection to his action be taken before the award is made.

Any dispute arising hereunder shall be governed by International Maritime Law.

For disputes where the total amount claimed by either party does not exceed USD 50,000, the arbitration shall be conducted in accordance with the small claims procedure of the International Maritime Arbitrators Association.

183.    There was no objection from FMO to the inclusion of the modified arbitration clause, and there was no suggestion that FMO required any form of higher approval before the arbitration clause could be agreed.

184.    Although executed in April 2010, the final MV General Piar Charter was backdated to January 21, 2010, to accurately reflect the actual commencement of the vessel's service and charter period.

185.    At the same time the General Piar Charter was executed, the original signed copy of the provisional charter was stamped "void" and initialed as such by FMO and CME, to indicate that the provisional charter agreement had been superseded by the revised charter.

186.    The initial hire rate for the M/V General Piar remained $35,000 per day.

187.    Beginning in February 2011, the daily hire rate under the General Piar Charter increased to $36,000.

188.    Under Clause 7 of the General Piar Charter, FMO's hire payments to CME were to be made in the form of deliveries of iron ore or HBI three days prior to each 15 day charter hire payment period.

189.    In addition, Clause 7 of the General Piar Charter provided for an escrow deposit of $3,000,000 upon which CME could draw in order to guarantee payment of CME's hire charges in the event of FMO's default.  Clause 7 states in relevant part:

> An [e]scrow deposit for an amount of USD 3,000,000 will be organized via iron ore barter arrangement to guarantee the payment of the subject vessel hire charges in case iron sales exports to CME are significantly delayed or suspended for reasons accountable to FMO.   Funds to be available against beneficiary's draft(s) accompanied by a statement signed by someone purporting to be an officer of the beneficiary certifying that FMO has not fulfilled its iron ore export deliveries to CME over an agreed period of time. Partial draws: permitted.

> In default of payment (compensation) owners shall have the right of withdrawing the vessel from the service of the charterers, without noting any protest and without interference by any court or any other formality whatsoever and without prejudice to any claim the owners may otherwise have on the charterers under the[i]r charter.

36

190.    As is standard in time charters, clause 8 of the General Piar Charter provided that FMO was responsible for certain operational expenses, such as bunker fuel, port dues and river toll fees.

191.    In practice, however, FMO did not pay these costs or expenses. Rather, CME paid these costs at FMO's request. FMO had significant cash flow problems, was unable to obtain conventional financing, and would frequently ask CME to pay these operational expenses on its behalf.

192.    Arivenca, CME's Venezuelan billing and payment agent, made the payments of these expenses for CME on behalf of FMO as they generally arose within Venezuelan territory.

193.    Thus, CME would pay (through Arivenca) FMO's operational expenses for performing the shuttle service, and thereafter, invoice FMO for reimbursement of those costs.

194.    FMO would then repay CME with iron ore/HBI under the barter arrangement.

195.    FMO also was responsible under clause 6 of the General Piar Charter for purchasing the bunkers (IFO/MDO) for the vessel.

196.    In reality, however, bunkers were also purchased by CME (through Arivenca) for FMO, as FMO did not have the cash to buy bunkers.

197.    CME bought bunkers for FMO, at FMO's request, on the understanding that CME would invoice FMO for these costs and FMO would then repay CME in iron ore/HBI under the barter agreement.

198.    Had CME not provided this additional financial assistance, FMO would not have been able to continue shuttling product from Puerto Ordaz to the Transfer Station.

## COMMERCIAL ALLIANCE AGREEMENT

199.    In December 2010, CME and FMO entered into a Commercial Alliance Agreement.

37

("CAA") The parties disagree as to the purpose and intent of the CAA. FMO contends, *inter alia,* that one of the aims of the CAA was to "*subsume*" all underlying "development contracts," such as the TSMC and General Piar Charter. FMO contends that post-CAA, FMO and CME operated as a general partnership making it impossible for any particular invoice issued by CME to be credited to any particular "development contract," as CME attempts to do in these arbitrations. CME contends, *inter alia*, that the purpose of the CAA was for CME to provide the financial support FMO needed to reactivate the Cerro Bolivar mine by financing construction projects, acquiring assets, and rendering services that would facilitate FMO's production and supply of the iron ore. CME further contends the CAA was intended to complement the provisions of the Framework Agreement by allowing CME and FMO to enter into separate "development contracts" for those projects and services required to support FMO's ongoing operations under an exception to the application of the Venezuelan public bid laws. CME asserts that these "development contracts" stand alone, were not subsumed into the CAA, and are therefore individually enforceable.

200.  Under the terms of the CAA, CME was to provide financial support to reactivate the Cerro Bolivar mine by financing construction projects, acquiring assets, and rendering services that would facilitate FMO's production and supply of the iron ore. Clause 5 states in part: ". . . CME undertakes to make their best efforts to mediate before foreign financial entities, in order to obtain the ordinary and extraordinary funds that [FMO] requires to guarantee and enable the development of their operations, assuming the position of [FMO] in regard to the obligations that they assume with the different asset providers, the construction of projects, or the rendering of services. . .."

201.   In return, CME was to be compensated by FMO in iron ore.  Clause 5 states in part:

" . . . [FMO] undertakes to contribute a volume of ore and/or hot briquetted iron enough to back up the contributions made by CME, and an additional amount enough to obtain revenues from its commercialization in the international market, under the terms established in the corresponding Project Contract for each case."

202.   The negotiations for the CAA took around 23 months from signing of the Framework Agreement in January 2009 to the signing of the CAA in December 2010.

203.   In December 2010, CME and FMO agreed to a short term "spot" iron ore sales contract for a total of 900,000 metric tons of FF1 ("Ferrominera Fines 1").

204.   In November 2011, CME and FMO agreed to a short term "spot" iron ore sales contract for a total of 140,000 metric tons of Ferrominera Sinter Feed ("FSF). ("IOSC-3").

205.   In December 2011, CME and FMO agreed to a short term "spot" iron ore sales contract for 250,000 metric tons of FSF and 30,000 metric tons of San Isidro Calibrated Lump Ore ("SICLO-1").

206.   In May 2012, CME and FMO entered into a further iron ore sales agreement (the "2012 Iron Ore Sales Agreement"), pursuant to which FMO agreed to sell and deliver to CME certain specified amounts of designated iron ore products.

207.   In July 2012, CME and FMO entered into a contract for the sale and purchase of a number of railway wagons for the transportation of FMO's iron ore ("Wagons Contract").

208.   The collective price for these railway wagons was $35,000,000.

209.   It was contemplated that FMO would pay CME for the railway wagons with the equivalent U.S. dollar value of iron ore products.

39

210.    FMO failed to provide the iron ore to CME that it was obligated to provide under the terms of the Wagons Contract, and the majority of CME's invoices to FMO for these railcars remain outstanding. CME claims that, in total, FMO owes $31,198,266.29, plus interest, for the railway wagons.

211.    The Wagons Contract contains an arbitration provision calling for disputes to be submitted to the Court of Arbitration of the International Chamber of Commerce ("ICC") in Zurich, Switzerland, in accordance with ICC Rules. The ICC Panel has issued an award holding FMO in breach of the Wagons Contract, but has yet to issue an award on quantum.

212.    CME contends that, over time, the CME/FMO relationship evolved into an alliance whereby CME would provide various forms of financing, goods, and services for the cash-poor FMO which was unable to obtain conventional financing.  In return, CME would receive a predetermined U.S. dollar cash equivalent in iron ore products from FMO.  According to CME, it would invoice FMO for services it provided under the various contracts described above, and FMO would invoice CME for the iron ore products it provided to CME.  CME argues that had the system worked as contemplated by the parties, the total amount of CME's invoices to FMO would equate or be in close balance with the total amount of FMO's invoices to CME.

213.    Beginning as of 2010 onwards, however, FMO never provided CME with any iron ore as a specific payment against any of CME's invoices.

214.    On August 19, 2009, CME and FMO entered into a Debt Compensation Agreement which netted off all transactions between the parties that had not previously been reconciled up until that point.

215.    The result of this agreement was that a net sum of $1,258,478.51 was due from CME to FMO and CME paid this amount to FMO in August 2009.

40

216.   By 2011, the difference between the parties' respective financial positions worsened. Moreover, the amount of iron ore FMO provided to CME on a monthly basis began to decrease substantially, creating a mounting financial imbalance between the parties.

217.   In May and June 2011, FMO's accounts were being audited by external auditors, who were placing considerable pressure on FMO to ensure that its accounts with CME were in order.

218.   As a result, FMO and CME engaged in a process to reconcile their accounts through December 31, 2010, which was finalized in August 2011.

219.   The final 2011 reconciliation statement between CME and FMO (the "2011 CME/FMO Reconciliation Statement") was signed by the parties on August 15, 2011.

220.   The Reconciliation Statement listed all outstanding invoices issued by FMO as of December 31, 2010 and showed an outstanding final balance of $1,572,474.52 owed by FMO to CME. CME and FMO signed the Reconciliation Statement, which included a note of "observations" listing transactions that had been omitted from the statement.  The parties dispute the impact of the Reconciliation Statement on their respective claims.

221.   During this same time period, FMO also provided a reconciliation statement relating to its accounts with Arivenca (the "2011 Arivenca/FMO Reconciliation Statement").

222.   The 2011 Arivenca/FMO Reconciliation Statement, however, contained errors and was not intended to be a final and binding reconciliation of the parties' accounts. Rather, both CME and FMO simply considered it as a placeholder document only signed by Arivenca and FMO to placate the demands of FMO's external auditors to show that some progress had been made. However, both CME and FMO knew the document contained errors which needed to be corrected.

41

**Discussions Between the Parties in Late 2011**

223.   Following the completion of the 2011 CME/FMO Reconciliation Statement in August 2011, the parties attempted on several occasions to reach further agreement regarding their accounts.

224.   Meetings between CME and FMO were held frequently, and there was substantial communication between the parties regarding the reconciliation of accounts, but no further agreements were ever made.

225.   As 2011 progressed, the difference between the parties' financial positions mounted as the amount of iron ore FMO provided to CME on a monthly basis began to decrease substantially.

226.   Also, by mid-2011, FMO had entered service contracts with other companies, which also provided services to FMO in return for iron ore products.

227.   In spite of the parties' coming to an agreement in the 2011 CME/FMO Reconciliation Statement, FMO's debt to CME increased as 2011 progressed.

228.   FMO did not provide CME with enough iron ore or HBI under the various IOSCs to balance the support/services which CME was providing under the various Development Contracts.

229.   Under the IOSCs, CME was supposed to be provided with 3,000,000 MT of ore/HBI per annum.  However, in 2010-2012 the actual tonnage received was as follows:

      a.   2010: 2,780,532 MT

      b.   2011: 1,375,623 MT

      c.   2012: 1,658,250 MT

42

230.   IOSC-5 set forth FMO's revised monthly delivery obligations for the five-year period commencing on June 1, 2012.

231.   Specifically, between June 1, 2012 and June 30, 2013, FMO was obligated to sell and deliver 1,770,000 MT of FSF and 750,000 MT of SICLO-1 (i.e., a total of 2,520,000 MT of ore).

232.   FMO had to deliver this quantity of ore "uniformly throughout the duration of [the] Contract."

233.   Accordingly, FMO was obligated to deliver 210,000 MT of ore to CME each month (2,520,000 MT / 12 months).

234.   FMO fell short of these delivery obligations.

235.   Between June 2012 and December 2012, FMO only delivered and sold 707,926.813 DMT of ore to CME (i.e. an average of 101,132.402 DMT per month over this seven month period).  This was just 48% of FMO's contractual obligation.

236.   Of this total figure, the total quantity of FSF delivered was 493,636.377 DMT.

237.   The total quantity of SICLO-1 delivered was 214,290.436 DMT.

238.   In January 2013, CME wrote to FMO to complain that FMO had failed to supply 210,000 MT of ore each month as it was required to do under IOSC-5.

239.   CME's letter stated that FMO's repeated failure to deliver the contracted quantities of ore was making it impossible for CME to perform any of CME's obligations under the Development Contracts and under the TSMC.  See Serrao 2 ¶ 117; Serrao Ex. 106.

240.   CME requested an urgent review of the loading sequence for vessels at the Transfer Station.

43

241.   CME requested that a "first in, first out" system be adopted, and asked for assurances that FMO would meet its commitments for 2013.

242.   The five vessels referred to in CME's January 2013 letter, which should have been loaded in 2012, were ultimately loaded in 2013.

243.   This was not the first time that CME had asked FMO to abide by a "first in, first out" system.  CME had been requesting FMO follow that system for several years, as FMO would consistently load other vessels before those chartered by CME, both delaying payment to CME for work performed under the barter agreement and causing CME to incur demurrage charges in the process.

244.   Between January and June 2013, FMO only delivered and sold 369,241.996 DMT of ore to CME (i.e., an average of 61,540.332 DMT per month over this six month period).  That was just 29% of its shipment obligation.

245.   Of this total figure, the total quantity of FSF delivered was 321,298.987 DMT.

246.   The total quantity of SICLO-1 delivered was 47,943.009 DMT.

247.   Accordingly, FMO supplied a total of 814,935.364 DMT of FSF and 262,233.445 DMT of SICLO-1 between June 1, 2012 and June 30, 2013.

248.   By mid-2013, the situation between CME and FMO deteriorated further.

249.   In or about March 2013, President Chavez died, and was succeeded by the current president of Venezuela, Nicolas Maduro.

250.   In an effort to address the extraordinary economic difficulties facing the Venezuelan government, President Maduro sought means by which Venezuelan state-owned companies and their subsidiaries could lessen their financial commitments to non-government entities, such as CME.  As part of a broad plan to implement President Maduro's newly announced

44

policy, in 2013, FMO took the position that all of CME's contracts violated Venezuelan law and stopped supplying iron ore to CME.

251.   On May 9, 2013, Mr. Radwan Sabbagh signed over the presidency of FMO to Mr. Ivan Hernandez.

252.   As soon as Mr. Hernandez assumed his position as FMO's president, he commenced investigations of corruption within FMO.

253.   Heading the corruption investigations was General Jesus Manuel Zambrano Mata, who at that time was an active duty military officer in the "SEBIM" (Servicio de Inteligencia Bolivariana de Investigation Militar), the Venezuelan political police.

254.   FMO's state-owned parent corporation, CVG, with its own newly-appointed General in charge (General Carlos Osorio), later appointed General Zambrano to replace Mr. Hernandez as FMO's president only four months after Mr. Hernandez replaced Mr. Sabbagh.

255.   With respect to CME, the inquiry into CME's contracts with FMO commenced with FMO's sending to CME two letters dated May 8, 2013, and May 14, 2013.

256.   These letters, which related to how the iron ore supplied would be priced and how CME's invoices for services should be billed, demonstrated FMO's decision to change certain fundamental aspects of the parties' off-setting arrangement.

257.   Specifically, in its May 8, 2013 letter, FMO sought to retroactively raise the price of iron ore sold under the IOSC-5 to an "FOB" price, despite CME's performance of significant pre-FOB operations.  Those operations included loading ore onto trucks after blasting at the mine site, transporting the ore to the processing facility, processing it through the crushing and screening plant to make it suitable for loading onto vessels, and then loading it into the railcars for transport to the port.

45

258.   FMO also stated in its letter that all the contributions for production operations provided by CME under the strategic alliance should now be invoiced to FMO in BsF, rather than allowing CME a U.S. dollar credit against FMO cargoes.

259.   Furthermore, FMO sought to impose these changes retroactively to the commencement of these production activities in October 2011 (after approximately 18 months of operations).

260.   The effect of these changes would have been to greatly modify the accounting position between the parties, re-balancing the account in FMO's favor, thereby turning CME from a net creditor into the net debtor.

261.   In its May 14, 2013 letter, titled "Request for a Meeting," FMO requested CME's attendance at a meeting to discuss FMO's claim that CME owed FMO money for iron ore cargoes provided to CME in the collective amount of $116,138,899.20.

262.   On May 14, 2013, CME responded to FMO's May 8 and May 14, 2013 letters.

263.   CME's letter first responded to FMO's position that the iron ore sales be invoiced to CME under FOB terms rather than the terms set forth in IOSC-5.

264.   CME referenced IOSC-5, which by its express terms contradicted FMO's claims, and explained why the retroactive change in the terms of IOSC-5 would be unfair.

265.   CME's letter then turned to FMO's position that CME owed $116,138,899.20 to FMO for iron ore cargoes, pointing out that FMO had not credited CME's contributions under the parties' alliance.

266.   CME's May 14, 2013 letter further explained that FMO's cargoes were calculated according to the parties' contract in accordance with Platts' international benchmark pricing.

267.   Having pointed out these issues, CME proposed a meeting with FMO. Certain meetings took place and further correspondence was exchanged.

268.   By mid-2013, however, FMO would only agree to load CME cargoes if CME paid 100% upfront in cash.

269.   FMO's last shipments to CME, the M/V W SKY and M/V GRAND AMANDA, were in August 2013.

270.   CME paid for these two shipments upfront with 100% cash.

271.   CME has not received any iron ore or HBI cargo as payment for its services rendered to FMO under the TSMC or General Piar Charter since the M/V CK ANGIE cargo loaded on April 19, 2013.  FMO did not supply any shipments of iron ore to CME after August 2013.

272.   On September 19, 2013, CME's Venezuelan lawyers wrote to FMO regarding CME's intention to demobilize from its duties under the TSMC.

273.   CME provided notice to FMO so that the Transfer System equipment would not be left unattended and possibly subject to damage or loss.

274.   Clause 25 of the TSMC provides a list of "events during the Term of [the TSMC]" which "shall constitute a default by FMO."

275.   Clause 25 includes the following as an event of default: "FMO's failure to supply the agreed scheduled deliveries of iron ore to CME on a timely basis for compensation and/or costs."

276.   The final paragraph of Clause 25 provides that:

> Should a default occur under any of those events set forth above, CME has the right to terminate this Contract with immediate notice in writing to FMO, and to claim any and all damages that may arise as a result of the early termination of the contract.

277.   On September 27, 2013, CME wrote to FMO requesting redelivery of the MV General Piar as a result of FMO's failure to deliver sufficient shipments of iron ore/HBI to pay for the hire due under Clause 7.

278.   Clause 7 of the General Piar Charter entitled CME to withdraw the vessel if FMO defaulted in its obligation to pay hire.

279.   FMO redelivered the MV General Piar approximately three weeks later, on October 19, 2013, at 9:24 AM.

280.   CME then redelivered the MV General Piar to Gretchen on October 20, 2013.

281.   Gretchen alleged that CME owed it a total of $18,413,841.72 for the remaining period of the MV General Piar Head Charter, which Gretchen claimed was approximately 20 months when prior off-hire periods were added onto the remaining time.

282.   CME settled Gretchen's hire claims of $18,413,841.72 for the total amount of $1,732,892.71.

283.   CME paid this sum to Gretchen in two tranches, the first $1,632,892.71 on December 4, 2013, and the final $100,000 on April 17, 2015.

284.   On August 8, 2013, after attempts to open a dialogue with FMO had failed, CME commenced an action in Venezuela's Fifth Superior Administrative Court of the Capital Region (the "Administrative Court") against both FMO and CVG to obtain a declaratory judgment from that court declaring that the Framework Agreement and CAA were legal and enforceable (the "Declaratory Judgment Action").

285.   CME did not seek damages against FMO or CVG in the Declaratory Judgment Action, but rather only sought a ruling that the Framework Agreement and the CAA were lawful and that CME's method of compensation (being paid iron ore valued in U.S. dollars) was lawful.

48

286.   CME's application to the Fifth Administrative Court was therefore limited in scope.

287.   CME did not ask the Fifth Administrative Court to determine the financial position as between the parties, or to determine any issues of breach of contract or damages.

288.   CME also did not raise any question of performance or any other disputes under any of the Development Contracts.

289.   CME did not ask the Fifth Administrative Court to determine what sums were owing under each of the individual Development Contracts and no issues were raised in relation to the TSMC or the General Piar Charter.

290.   Notably, in FMO's defense to the Declaratory Judgment Action, it denied the existence of a strategic alliance between CME and FMO, and, instead, insisted that all contracts were to be viewed separately.

291.   In June 2013, prior to the Declaratory Judgment Action being filed, the Venezuelan Office of the Prosecutor General (the "Prosecutor General") initiated a criminal investigation into FMO's former president, Radwan Sabbagh, concerning alleged misappropriation of public funds.

292.   This initial investigation by the Prosecutor General had nothing to do with CME or Mr. Serrao.

293.   The Prosecutor General, however, subsequently expanded the investigation to examine several companies that had done business with FMO, including CME.

294.   On October 23, 2013, shortly after CME filed the Declaratory Judgment Action against FMO, and after FMO took delivery of the railcars under the Wagons Contract, the Venezuelan Prosecutor requested the arrest of Mr. Serrao for the alleged commission of fraudulent personal embezzlement, collusion by a public official with a contract, and conspiracy to commit a crime under Venezuelan law, in connection with FMO's contracts with CME.

49

295.   The following day, October 24, 2013, the Venezuelan Criminal Court issued a warrant for Mr. Serrao's arrest.

296.   In response to the criminal proceedings described above, CME filed an application for protection before the Constitutional Chamber of the Supreme Court on October 8, 2013 (the "Constitutional Court Proceeding").

297.   CME asked the Constitutional Court to order that:

    a.    The review of the legality of the contracts be carried out through the pending Declaratory Judgment Action;

    b.    Once the Administrative Court had issued its judgment in the Declaratory Judgment Action, the parties would create a commission composed of representatives from CME, FMO, the Attorney General's office and the General Controller's Office, to perform a financial audit; and

    c.    The criminal proceedings be suspended pending a decision from the legal and financial audits on whether there truly had been damages to the public patrimony (as had been alleged in the criminal action).

298.   Following CME's application to the Constitutional Court, the Administrative Court urged the parties to take part in a meeting to attempt to resolve the criminal and administrative issues.

299.   Thereafter, the parties engaged in administrative proceedings for the audit and reconciliation of their respective accounts.

300.   The 2014 Financial Audit consisted of reviewing the paper trail of all transactions that had not previously been reconciled in any of the previous reconciliations, such as the 2011 CME/FMO Reconciliation Statement.   The 2014 Financial Audit included a review of: (i) invoices issued by CME under the various Development Contracts and by FMO under the various Iron Ore Sales Contracts; (ii) invoices issued by CME under the IOSCs (for items such as

50

demurrage, penalties, commissions etc.); and (iii) payments that CME had made on behalf of FMO to its suppliers.

301.   As the invoices that were subject to the 2014 Financial Audit all had been issued under particular contracts (either the IOSCs or one of the Development Contracts), the review of the invoices during the 2014 Financial Audit was divided on a per-contract basis.  No invoices were issued under the CAA.

302.   The purpose of the 2014 Financial Audit was to determine whether the parties could agree to the invoices for the services and goods that each party had issued. The 2014 Financial Audit took place in a series of 11 meetings between December 2013 and March 2014.

303.   These meetings were attended by two persons on behalf of CME: Mr. Francisco Jose Gomez Nives (an accountant) and Mr. Carlos Miguel Moreno Malave (a lawyer).  CME did not give Mr. Gomez or Mr. Moreno authority to settle any of CME's claims, enter into any agreements on CME's behalf, or make decisions on CME's behalf during the 2014 Financial Audit.  Rather, their role was to act as messengers in conveying information from CME to FMO and *vice versa* during the 2014 Financial Audit meetings.

304.   The 2014 Financial Audit process resulted in both CME and FMO producing summaries of their position with respect to the parties' financial positions.   There was, however, no final agreement between the parties. The result of the 2014 Financial Audit was simply that CME and FMO each outlined what it believed its net position to be.

305.   In April 2014, following the conclusion of the 2014 Financial Audit, FMO issued a unilateral resolution which purported to record all of the invoices issued by CME/Arivenca and all of the invoices issued by FMO under the various contracts (the "2014 Financial Resolution").

306. FMO's 2014 Financial Resolution was a unilateral document to which CME did not agree. Although CME and FMO were unable to reach a fully-agreed position, FMO's 2014 Financial Resolution lists those CME invoices that FMO considered to be accurate, and those which it did not. The 2014 Financial Resolution accepted as undisputed the majority of CME's and Arivenca's outstanding invoices issued under the CME/FMO contracts, totaling an amount of $386,376,244.72. As a consequence of the 2014 Financial Audit, the Constitutional Court Proceeding fell away.

307. The Venezuelan Fifth Administrative Court issued a ruling on August 5, 2015. The Fifth Administrative Court held that:

    a.    It had subject matter jurisdiction over CME's application;

    b.    The Framework Agreement and CAA were "executed in compliance with laws;" and

    c.    The Framework Agreement and CAA "do not violate or were not executed in violation of the foreign exchange laws then in effect . . . therefore can be subject to payment by offsetting iron ore."

308. On or about June 30, 2016, FMO commenced a declaratory action before the Superior State Judge of Contentious Administrative Matters of the Bolivar State seeking an order that the arbitration clauses in the Wagons Contract and certain other agreements between CME and FMO were void and superseded by the CAA's dispute resolution clause.

309. On October 10, 2016, the Venezuelan court declared FMO's action inadmissible on the grounds that the court did not have jurisdiction to decide questions relating to the validity of the various arbitration agreements.

310. On July 12, 2017, the Venezuelan Criminal Court dismissed the criminal charges against Mr. Serrao.

311.   Although the Prosecutor General has appealed this decision, the appeal remains pending and, as of this writing, no decision has been reported to the Panel.

312.   As noted above, on July 25, 2018, the First Court of Administrative Matters issued a decision declaring the Commercial Alliance Agreement and the Framework Agreement illegal. CME states it is appealing that decision.

## DISCUSSION

313.   The basic arrangement between CME and FMO was simple in concept: CME provided a range of services for which FMO was to make payment to CME in the form of iron ore deliveries. Based on our careful review of all of the evidence presented, we hold that CME has, by a preponderance of the evidence, proven that it properly performed its obligations under the TSMC and General Piar Charter, but FMO did not and thus breached both contracts. As discussed below, we also hold that CME has proven it suffered compensable damages under both contracts as a result of FMO's breaches.

314.   Because of difficulties FMO's counsel reported in getting instructions from FMO, the Panel went to great lengths to ensure that both sides had a full and fair opportunity to prepare their respective cases and submit fact and expert evidence. Indeed, with respect to FMO, the Panel granted broad documentary discovery related to FMO's allegations of corruption on the part of CME (which FMO ultimately declined to pursue).  The Panel also went beyond what the arbitral process requires to permit FMO to make submissions which were overdue and late. CME provided a very sound argument as to why the Panel would be justified in denying FMO's defenses and dismissing its counterclaims due to FMO's defaults. However, the Panel has chosen not to adopt that approach. Instead, we have given very careful and due consideration to all of the

defenses and arguments FMO has raised, but find that most are simply not supported by the evidence. We discuss the reasons for reaching our decisions below.

## THE PANEL HAS JURISDICTION OVER CME'S CLAIMS AND FMO'S COUNTERCLAIMS

315.   The Panel has carefully reviewed and considered the numerous arguments FMO has asserted in support of its contention that the Panel lacks jurisdiction over the claims at issue under both the TSMC and the General Piar Charter. In our view, FMO's contentions are without merit.  We conclude that we have jurisdiction to hear and decide the claims and counterclaims. We now address the various jurisdictional points in the same order in which they are discussed in FMO's post-hearing brief.

## THE GENERAL PIAR CHARTER

316.   We find that CME has proven by a preponderance of the evidence that the original arbitration clause in the provisional or initial M/V General Piar charter was voided by mutual agreement of the parties and replaced by the following provision:

> This charter shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this contract shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by any court of competent jurisdiction.  The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

317.   There is no dispute between the parties that they entered into a charter party for the M/V General Piar which was performed for a lengthy period of time. As stated above in the Statement of Facts, the charter was approved by FMO's Board of Directors and was signed by Radwan Sabbagh, who was then President and Chairman of the Board of Directors. Mr. Serrao's

testimony that the initial provisional charter was modified to conform with the head charter CME entered into with Gretchen has not been challenged by any FMO witness with personal knowledge of the events. The Panel finds Mr. Serrao's explanation of the events in question to be credible. FMO has failed to show there was no meeting of the minds concerning the arbitration clause as set forth in the final General Piar Charter.

318.   Thus, our conclusion is that the parties agreed to New York arbitration "of any dispute arising out of or in connection with…" the charter and that the arbitration shall be conducted under SMA Rules. There can be no question that CME's claims and FMO's counterclaims concerning the MV General Piar charter fall within the scope of the arbitration clause. Thus, we find that the claims and counterclaims are to be decided by this Panel.

### FMO'S CONTENTION THAT THE TSMC AND GENERAL PIAR CHARTER ARE VOID AB INITIO

319.   The Panel is of the opinion that FMO's contention that the TSMC and General Piar Charter are void *ab initio* is without merit. We do not accept FMO's argument that either the TSMC or the General Piar Charter are subject to Venezuelan law. The TSMC expressly provides for the application of the General Maritime Law of the United States and we find that law governs with respect to the claims and counterclaims which have been submitted by the parties. We disagree with FMO's argument that the references to Venezuelan law in the TSMC were intended to extend that law to the claims at issue. The express wording of the arbitration clause in the TSMC constitutes a binding waiver of Venezuelan law.

320.   Equally, the General Piar Charter calls for the application of US maritime law and we conclude that the claims and counterclaims at issue before us concerning the charter are to be decided pursuant to that law.

321.  In light of our conclusion that the claims and counterclaims at issue in both arbitrations are governed by US law, we need not discuss the arguments asserted by FMO concerning Venezuelan law, which we hold has no application to these disputes. The Panel notes, however, that we were persuaded by Mr. Anzola's testimony and expert reports that under the Venezuelan doctrine of "good faith," Article 4 of the Venezuelan Commercial Arbitration Act ("LAC") does not void an international commercial contract with a foreign company governed by U.S. law. The Panel further finds that, even if Venezuelan law applied, FMO did not carry its burden of proof that the TSMC and General Piar Charter did not have the approvals required under the laws of Venezuela. Both contracts were formally approved by FMO's Board of Directors and FMO had the burden of showing the Board acted *ultra vires* in giving those approvals. In our view, FMO did not carry its burden of proof on this point, although, to be clear, we rule that Venezuelan law has no application to this dispute.

322.  In addition, the Panel finds that Article 21 of the Guayana Statute has no bearing on these matters and is not applicable to the TSMC or the General Piar Charter. Similarly, Articles 5 and 12 of the Attorney General's Law do not apply here. The expert evidence presented to the Panel shows that those articles only apply to contracts entered into by the Republic of Venezuela, as opposed to a commercial entity such as FMO. Mr. Anzola also presented a persuasive argument that Article 5 does not apply to the TSMC or the General Piar Charter and, instead, refers to a particular form of administrative proceeding not at issue here. The Panel also was persuaded by the evidence showing that even had a violation of Article 5 been shown, that would not necessarily nullify the TSMC and General Piar Charter or affect their respective New York arbitration clauses.

## FMO'S CORRUPTION DEFENSE

323. Among FMO's key defenses is its contention that the contracts at issue, including the arbitration clauses, were the product of corruption. Stated in the most simple terms, the main elements of the corruption defense are that Venezuela's public procurement laws were violated to CME's benefit; CME overcharged FMO; and Venezuelan legal requirements for the approval of the contracts were violated.

324. Mr. Tyrone Serrao, the CEO of CME, was charged with criminal law violations in Venezuela on these and other grounds and, on October 24, 2013, a warrant for his arrest was issued by the Venezuelan authorities.

325. On July 12, 2017 the Ninth Court of the First Instance Functioning as State Control of the Criminal Judicial District of the Judicial District of the Metropolitan Area of Caracas court dismissed the criminal charges against Mr. Serrao. The court's order found that the charges made by the Venezuelan prosecutor "are not of a criminal nature…."

326. FMO has advised the Panel that the Venezuelan prosecutor is appealing the dismissal order in favor of Mr. Serrao, but as of the date of this award, the appeal is still pending and the Panel has no basis for speculating when a decision will be issued or what the outcome may be.

327. FMO's allegations of corruption are very serious and were given thoughtful consideration by the Panel. Indeed, the Panel was made aware that Mr. Radwan Sabbagh, the former president of FMO, is currently serving six years in prison in Venezuela for the crimes of corruption of which he was accused, and that other former managers of FMO were likewise sentenced to imprisonment for their alleged criminal misdeeds.

57

328.   Obviously, it is not the function of the Panel to investigate or determine the innocence or guilt of Mr. Serrao or any other person to the criminal charges which have been alleged in Venezuela. Our only role in this commercial arbitral setting is to provide the parties with a full and fair opportunity to present their arguments and evidence and to then evaluate whether the submissions are sufficient to accept FMO's corruption defense.

329.   The Panel notes that although FMO was granted liberal discovery it represented was relevant to its allegations of corruption, FMO chose not to take advantage of the Panel's ruling.   Indeed, FMO presented no direct evidence of any illicit payments or other illegal transactions on the part of CME or Tyrone Serrao.

330.   Instead, to support its corruption defense, FMO called Ms. Paula Ziri Castro to submit written statements and testify in person before the Panel. Ms. Ziri Castro is a former prosecutor and, at the time of her initial testimony on June 28-29, 2017, she was the lead prosecutor in the criminal case against Mr. Serrao in Venezuela.

331.   She originally testified in these arbitrations with the authorization of the prosecutor general of Venezuela. Although, the Panel was very impressed by her depth of knowledge of Venezuelan criminal law and procedure, she testified that she was then restricted as to what she could disclose about any particular evidence in the pending prosecution of Tyrone Serrao in Venezuela.

332.   Over CME's strenuous objection, the Panel allowed FMO to recall former prosecutor Paula Ziri Castro to testify a second time.

333.   With leave from the Panel, FMO submitted a second written declaration from Ms. Ziri Castro on February 21, 2018 and she testified in person at a hearing on March 6, 2018. Ms. Ziri Castro stated she no longer works as a prosecutor and was testifying in her private capacity

58

at the request of FMO based on information she previously acquired as a prosecutor. Ms. Ziri Castro said she was now free to testify about the contents of the criminal case against Mr. Serrao, because that information had since been disclosed to Mr. Serrao's Venezuelan attorney.

334. Thus, the Panel allowed FMO to recall Ms, Ziri Castro to give FMO an opportunity to supplement and fill-in gaps from her initial testimony. Although Ms. Ziri Castro again came across as a very forthright and impressive witness, her testimony was broad and procedural in nature. She focused on the position that the barter payment system set forth in the various agreements was in itself criminal and corrupt. However, she did not provide any specific direct or circumstantial evidence of corrupt or criminal behavior on the part of Mr. Serrao or CME.

335. Having weighed all of the evidence presented, and despite FMO's often stated position that something untoward took place, the Panel finds that FMO has failed to meet its burden of proof and did not make a convincing showing that the TSMC and/or the General Piar Charter were entered into as the product of corrupt acts by CME. That being the case, the Panel denies FMO's corruption defense.

336. According to Ms. Ziri Castro's second written statement, the prosecution in Venezuela is based on a presumption that Mr. Serrao committed the crime of being a direct accomplice in the crime of embezzlement by a public official. Ms. Ziri Castro's second written statement outlines the evidentiary support for this presumption. FMO's basic allegations in these arbitrations are that the TSMC and General Piar Charter were entered into without complying with Venezuela's public procurement law. In addition, FMO argues that the price and payment structures of the TSMC and General Piar Charter evidence corruption since TSMC was to be paid in the form of iron ore deliveries at a cost to CME which was below the international market prices for iron ore it was charging to its customers.

337. FMO has relied heavily on the guilty plea entered by Mr. Sabbagh to criminal charges against him as evidence the TSMC and General Piar Charter were procured by corrupt acts. Although we have received only a partial record of the proceedings against Mr. Sabbagh, we have seen no statement or confession from him which indicates these contracts were procured by any corrupt acts on the part of CME or Mr. Serrao. We also note that Mr. Sabbagh made the following statement in open court on May 7, 2015 about his guilty plea:

> I have been listening, I know that the law is logical, like most social sciences, but the situation here is the Defendant has not been proved to have done any wrongdoing, and there is no evidence of the exact amount in the company's accounts, because it does not exist, in fact, it does not appear anywhere in the accounting statistics of the company. My salary comes from CVG not Ferrominera, I am an official of the Venezuelan Corporation of Guayana, I am a career official just like you, I am not asking for anything, it is my right as a civil servant and this is what is set out in the Constitution, but if you do not want to give it to me, I can't say I'm surprised, even with the facts, and I've served my time, and I lost the capacity for [illegible]. I lost it as a prisoner, I lost my family, and during my imprisonment there hasn't been any evidence regarding the amount that was lost or not, and that's why I'm admitting to the crime, I'm in very delicate health, there are three medical forensic reports, there is a report by the Military Hospital of Caracas, you can't said that I paid off a private doctor, five doctors attended to me there at the Military Hospital, that's where they study tropical exotic diseases, but it's not typical of the tropics, it' known as polyeroserosis and it's an inflammation of the internal organs that causes the slow deterioration of the kidneys, and in this country I can't get the medicine I need to calm the continuous and powerful attacks, which is why I'm appealing to your humanity and asking for a less serious measure, that you let me go home, for the sake of my family and my only son who is 5 years old and he is going to lose the chance to get to know his father, and although it cannot be demonstrated how much the damage was, I am appealing to the Venezuelan laws for a sense of humanity and justice to be granted. (Ex. R-26 at 22.)

338. We further note that the "Opening Record of the Proceedings Against Mr. Radman Sabbagh and Mr. Noel Ramirez" dated May 7, 2015 contains detailed information about a range of transactions by FMO with companies other than CME. In addition, the Record contains

60

information about the alleged irregularity of certain transactions between FMO and CME, but there is no specific reference to the TSMC.  Instead, the complaints concerning CME refer to transactions which occurred in 2011 and 2012, or after the TSMC was executed.  The same applies to the General Piar Charter.

339.   No direct evidence from Mr. Sabbagh, Mr. Ramirez or anyone else from FMO's upper management was presented to the Panel.

340.   Mr. Serrao testified on numerous occasions, however, both in person on May 30 and 31, 2017 and September 19, 2017 and by video on March 5, 2018, because he could not obtain a visa to travel to the United States. Mr. Serrao also submitted several very detailed written statements with supporting exhibits. Thus, counsel for FMO had repeated opportunities to cross-examine Mr. Serrao and was given wide latitude by the Panel to do so.

341.   Counsel for FMO was given a full opportunity to question Mr. Serrao about all elements of the corruption defense it has asserted in these arbitrations. For example, Mr. Serrao answered questions about his dealings with Mr. Sabbagh and others from FMO; his knowledge of how the TSMC and General Piar Charter came about; his knowledge of Venezuela's bidding requirements for public contracts; the profit margins built into the TSMC and General Piar Charter; the warrant for his arrest in Venezuela; and several other related topics. Mr. Serrao answered the questions which were put to him and, overall, the Panel found his testimony to be credible.

342.   Thus, as the record stands, the Panel has seen no direct proof of corruption leading to the agreement of the parties to enter into the TSMC or the General Piar Charter. Instead, although under appeal, the initial criminal charges in Venezuela against Mr. Serrao on which FMO places considerable reliance have been dismissed.

343.   We note, as stated above, that on July 25, 2018, the First Court of the Contentious Administrative Jurisdiction issued a decision declaring that the Framework Agreement dated January 2009 and the Commercial Alliance Agreement dated December 2010 were illegal. The Panel received briefing and conflicting expert witness reports from both parties concerning this decision. It appears the First Court's ruling is being appealed and, therefore, although we have given it due weight in reaching our own decision, we have not relied on it as being dispositive. The First Court's ruling does not directly address the legality of the TSMC or the General Piar Charter. Moreover, as stated above, our view is the TSMC and General Piar Charter are governed by the general maritime law of the United States rather than the laws of Venezuela. It also bears repeating that the Panel Majority (as noted above, Arbitrator Siciliano agreed that CME should produce documents dealing with FMO's corruption allegations, but issued a partial dissent with respect to the production of vessel performance and other documents) issued an order allowing an extensive document production to FMO by CME, in large part to enable FMO to pursue fully documents or information relevant to its corruption defense.  When questioned by the Panel why the permitted document production was not pursued, counsel for FMO represented that FMO was financially unable to post the required security to cover the potential costs for CME to comply with FMO's discovery requests.  The Panel notes, however, that while FMO decided not to pursue the evidence due to the potential costs of doing so, it did employ quite a large international legal team at a cost that exceeded $ 19,000,000.

344.   The Panel is charged with the responsibility to decide the cases based upon the evidence presented to it.  Mere suspicion of possible wrongdoing is not the standard that we,

62

as arbitrators, are required or expected to follow. Here, despite it having been given ample opportunity to do so, FMO has not presented the Panel with convincing evidence to support its claims of corruption on the part of CME.

345.   FMO contends that the standard of proof should be relaxed to allow the Panel to find corruption in situations where there are sufficient signs of an unlawful act. However, even if the Panel were to apply this very low standard of proof (which we do not), the evidence presented by FMO failed to meet even that reduced standard and, thus, the outcome would be no different.

346.   It also bears emphasis that we have seen no direct or circumstantial evidence indicating that the arbitration clauses in either the TSMC or the General Piar Charter were themselves tainted by corruption or fraud. See e.g., Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395 (1967) (arbitration clause is separable from the remaining provisions of the contract); and Siderurgica del Orinoco (SIDOR), C.A. v. Linea Naviera de Cabotaje, C.A., 1999 U.S. Dist LEXIS 12705, at *11-12 (S.D.N.Y. 1999).

## FMO'S PUBLIC INTEREST DEFENSE

347.   FMO contends the TSMC and General Piar Charter are unenforceable because both violated Venezuelan law relating to public procurement. According to FMO, both contracts fall within the ambit of Venezuela's public procurement laws and, therefore, the parties were bound to comply with the requirements of those laws. FMO further contends that both contracts were procured without compliance with those laws. According to FMO, because both contracts involve matters of national public interest, the approval of the Venezuelan National Assembly was required and, since that approval was never obtained, the contracts are not enforceable. FMO

further argues that certain tendering and registration requirements in Venezuela's Law of Public Contracts were not complied with and that certain internal control procedures were violated.

348.   In support of its position, FMO offered the expert testimony of Prof. Alejandro Canonico.  CME, in turn, upon called Mr. Eloy Anzola to testify on these points.

349.   As stated above, the Panel is of the opinion that the TSMC and General Piar Charter are governed by the maritime law of the United States and are both valid and enforceable under that law. Thus, we accept CME's contention that issues of Venezuelan law are irrelevant. Even if Venezuelan law were applicable, however, we accept the expert testimony of Mr. Anzola that the TSMC and General Piar Charter were valid and enforceable. Our finding is that the tendering and registration requirements of Venezuelan law do not apply to these contracts because Article 5.5 of the LPC expressly exempts commercial and strategic alliances. We were not persuaded by FMO's argument that non-compliance with the LPC would render the contracts void.  In our view, FMO's argument is to be measured against the years of performance involving hundreds of millions of dollars in transactions between both parties.  It is notable that during those years of extensive performance, no similar complaint was raised by FMO.   Having thus received substantial benefits from CME's performance of both contracts, we find that, under U.S. Law, FMO is estopped from now pleading that the contracts did not comply with the administrative requirements of Venezuelan law.  Based upon the expert testimony on this subject by Mr. Eloy Anzola, we anticipate that the result under Venezuelan law would be no different, were it to apply, which it does not.

350.  FMO's defense that the TSMC and General Piar Charters are unenforceable because they did not comply with FMO's internal controls is also rejected. As Mr. Anzola explained, these procedures were not binding on CME and, in our view, could not be relied upon

64

to justify voiding contracts which were approved by FMO's Board of Directors, signed by FMO's senior management and performed by both parties. The doctrine of good faith unquestionably comes into play and precludes FMO from attempting to avoid its contractual obligations.

351.    Thus, we find that the TSMC and General Piar Charter were valid and enforceable contracts and cannot be voided by the post-performance application of Venezuelan law, which we are persuaded does not apply.

### FMO'S DEFENSE OF FRAUDULENT NON-DISCLOSURE

352.    FMO argues that the TSMC and General Piar Charter can be avoided because they were obtained through and performed by the fraudulent non-disclosure of information. According to FMO, CME acted in bad faith; failed to fully disclose to FMO the arrangements which were put in place to carry out CME's operational responsibilities under the TSMC and General Piar Charter; and failed to disclose to FMO the level of profits CME made under those contracts.

353.    FMO has the burden of proof as to these defenses and, in our opinion, has failed to establish any fraudulent non-disclosure by CME. The Panel gave FMO a full and fair opportunity to prove its defenses, but we were not persuaded that FMO's defenses have merit. FMO's defenses largely rest on circumstantial evidence, some of which is discussed above. In particular, FMO did not establish that CME made illicit or improper profits under either contract. The totality of the evidence shows that FMO was aware of the contractual arrangements CME put in place to perform both contracts. We were not persuaded by the argument that CME was precluded from making a profit. Indeed, CME took over the TSMC at a time when the TSMC was at risk of collapse, and FMO was cash poor and could not obtain conventional financing. FMO needed CME's assistance, which CME agreed to provide at considerable commercial risk and expense. Thus, although CME stood to make a profit on these transactions, it was fully aware of the

significant commercial risks involved and proceeded accordingly. In the circumstances, we do not consider that CME stood to earn exorbitant profits. In our opinion, the potential profits involved in these transactions were warranted by the high level of commercial risk they entailed. Indeed, the fact that CME has to date not been paid for its performance justifies its apparent risk/reward analysis.  FMO had several opportunities to cross-examine Mr. Serrao and to confront him with any evidence available. To the extent FMO's counsel did so, we were not persuaded that CME acted in a fraudulent or otherwise improper manner.

354.   The TSMC permitted CME to sub-contract, and Mr. Serrao's declaration and testimony included disclosure of CME's arrangements with its affiliate, Paramount Marine Services, Ltd. and an affiliate of SMT Shipping Management named Terminales Perla Ltd., as well as Baumann Holdings Corp. FMO had a full opportunity to cross-examine Mr. Serrao about these topics and his testimony did not establish that there was an improper kickback scheme or other illicit arrangements.

355.   Thus, we find that FMO did not sustain its defense that the TSMC and General Piar Charter were the product of any fraudulent non-disclosure or that CME breached any obligation it had to act in good faith in performing its duties under these contracts.

## THE 2018 LONDON AWARDS

356.   The Panel has reviewed the 2018 London Awards referred to above and given full and careful consideration to CME's contention that, under principles of collateral estoppel, we should reach the same conclusions as the London Tribunals. We note, however, that the 2018 London Awards were decided under English law, whereas the TSMC and General Piar Charter are both governed by United States law. Thus, we decline to apply principles of collateral estoppel

66

and will not simply adopt the rulings of the London Tribunals. We note, however, that for the reasons stated herein, we are in agreement with the London Tribunals on many key points.

## DAMAGES

### Introduction To The Claimed Damages

357.   We have summarized above the respective claims, set-offs and counterclaims submitted by the parties, and stated our reasons for ruling in favor of CME in its liability case. We now turn to the issue of damages due.

358.   Part of the evidence was submitted in the form of English translations of documents and accounts originally prepared in the Spanish language.  The panel notes and has taken into account FMO's standing objection against this panel deciding any of the parties' disputes that concern contracts other than the TSMC and General Piar Charter.  However, we find that standing objection unpersuasive in light of the broad language of both arbitration clauses.  Moreover, as discussed below, FMO's own expert witness on damages took a broad approach, reviewing the overall relative financial status of the parties based on all their commercial interactions.  We follow this same course.

359.   Dr. Daniel Flores of Econ One Research Inc., FMO's expert on damages, submitted two very comprehensive reports with the second, dated February 20, 2018, superseding the first dated 15 May 2017.  During his March 27, 28, and 29, 2018 testimony, Dr. Flores supplemented and refined his second report with a visual and a hard copy arithmetical and organizational analysis of each party's claims and counter-claims. (Econ One Exhibits 46 and 47)

360.   He then summarized FMO's objections to certain of CME's TSMC invoices in his "ANNEX: 1." (Econ One Exhibit 49).  Dr. Flores noted that, as part of the "Ordinary Course of Business," the parties conducted the following four (4) financial reconciliations of their accounts.

67

The italicized descriptive commentary following each lettered reconciliation is that of the panel, not Dr. Flores:

  a.   The 2009 Debt Compensation Agreement (EO-32)

       This agreement reconciled accounts through July 15, 2009 and found that FMO was owed the net amount of $1,258,478.51, which amount CME paid the following month.

  b.   The 2011 *Acta de Compensacion* between CME and FMO (EO-9)

       Under pressure from external auditors for FMO, the parties engaged in a second reconciliation of their respective accounts through December 31, 2010. The result was that FMO owed CME a net balance of $1,572,474.52, which was not paid but simply carried forward. That 2011 Acta was signed and dated August 15, 2011.

  c.   The Alleged 2011 Reconciliation between Arivenca and FMO (EO 10)

       During this same timeframe, FMO prepared a separate statement which purported to reconcile its accounts with Arivenca. However, CME argued the document contains several unsettled and questionable entries. Although signed to appease FMO's external auditors, CME insists the document does not and was never intended to represent a full and final agreement between Arivenca and FMO.

  d.   The 2014 *Acta de Termination* Exhibit (EO -4; Exhibit 5 to CME's Amended Statement of Claim)

       This 2014 Acta summarized the eleven meetings that took place between December 16, 2013 and April 14, 2014 during which the parties attempted but were unable to reconcile the respective balances each owed to the other. Consequently, no net balance due either was agreed. At least one of those meetings was attended by two members from the office of the Federal Public Prosecutor. Among the more significant disagreements was FMO's insistence and CME's refusal to revisit FMO invoices for sales of ore, pellets and briquettes from 2004 through 2010. CME considered those invoices to have already been resolved in the parties' prior 2009 and 2011 Reconciliations.

361.   Notwithstanding a significant number of disagreements on individual invoices, Dr.

Flores adopted the 2014 *Acta de Termination* (2014 Acta) as the appropriate starting point for his

68

analysis. (Tr. Page 4770). In doing so, Dr. Flores made it clear that his analysis does not consider nor attempt to resolve any of the jurisdictional or other legal issues raised, but on instructions from FMO, accepts a number of unresolved issues in a manner favorable to FMO.

362.   That said, the panel found the testimony and particularly exhibits Econ One 46, 47, 49 and the Second Econ One Report and its Annex I offered by Dr. Flores to be helpful in sorting out each party's position. We agree with Dr. Flores that:

> In order to properly conclude whether amounts are owed under the TSMC or the General Piar charter party agreement, one needs to conduct an account of the overall position as between the parties. (Second Flores Report and Tr Pages 4791, 4792).

363.   It is common ground that the parties did not abide by the TSMC's requirement to conduct quarterly reconciliations of their accounts. Nor did they follow a regimen of allocating the value of individual shipments of iron ore/HBI against specific CME invoices. Instead, the parties opted to offset their respective debit/credit balances by periodically conducting an overall reconciliation of accounts. We favor using the 2014 *Acta* as the logical starting point from which to discern the parties' current net financial position. However, we do so with the clear understanding that not all invoices were reconciled in 2014 and that we are only deciding claims under the TSMC and General Piar Charter.

364.   Nevertheless, for our purposes, it is enough that some invoices were resolved and those that weren't were at least identified. Moreover, our use of the 2014 *Acta* follows the very same method to balance accounts as the parties themselves adopted. An added reason is that the 2014 *Acta* took place months after CME ceased performance under both the TMSC and General Piar Charter and all invoices from both parties should have then been available for discussion. Nevertheless, the hundreds of barter transactions which took place, together with their

69

documentary complexity, makes reconciliation of the parties' current disparate accounts a truly daunting task.

365.   Adding to that task is FMO's seemingly recent change in position. In the closing days of this proceeding and notwithstanding Dr. Flores' advocacy and careful preservation of FMO's 2014 *Acta* and current objections, FMO's lead counsel appeared to take issue with Dr. Flores' use of the 2014 *Acta*.   In its July 13, 2018 Post Hearing Brief at paragraph 339, FMO urged the panel to adopt the arithmetical findings of Dr. Flores (Econ One 46) that CME is due US $3,289,981 and Arivenca is due Bolivars 132,373,544.  Both those findings were predicated on Dr. Flores using the 2014 *Acta* as the starting point for his analysis and his acceptance of CME's instruction to adopt its version of certain unresolved accounts and/or counter claims.

366.   However, throughout Econ Exhibit 49 and at paragraphs 56 and 59 of its August 10, 2018 final post hearing Reply Brief, FMO argued that it is beyond the authority of this panel to consider any CME claims which do not directly arise under the General Piar Charter or the TSMC.  FMO insists that doing so would require this panel to improperly decide unresolved issues under contracts that are beyond the limited (albeit still FMO contested) jurisdiction conferred by the General Piar Charter and the TSMC.  But, like the 2009 Debt Compensation Agreement, both the 2011 *Acta* and 2014 *Acta* sought to reconcile the gross and net amounts due to each party, including those that arose under the several IOSCs and other development contracts. We understand that FMO has raised modified versions of this same argument in both the London and ICC arbitrations.

367.   It appears FMO now contends that none of the three arbitration panels (Zurich, London, Miami/New York) may intrude into the jurisdiction of the others or consider claims arising under the Iron Ore Sales and/or other Development Contracts.  FMO insists that all claims

70

that arise under the several Iron Ore contracts lie beyond the Panel's jurisdiction and must be resolved in the forum specified in those contracts. In our view, however, FMO overlooks the parties' intertwined barter arrangement whereby amounts due CME under the TSMC, General Piar Charter and Development Contracts were to be off-set with iron ore/HBI shipped under the several IOSCs.  It is that barter method of compensation that joins the IOSCs and Development Contracts to both the TSMC and General Piar Charter.  FMO's stated position is also at odds with its participation in the several past "reconciliations" and particularly the 2014 *Acta*.  Separately, FMO also argues that CME's selective set-off of its services invoices against as yet unresolved FMO Iron Ore invoices amounts to an improper "taking" of $149,178,145.86.

368.   After due consideration, we continue to endorse Dr. Flores' approach, but only as an arithmetical starting point.  Doing so preserves all of FMO's 2014 *Acta* and subsequent objections, as well as the claims and counter-claims it has put forth in this proceeding.  The panel is mindful of CME's equally pertinent Financial Position Report ("FPR") and will not take-up any item of claim that is before either the London or Zurich arbitration panels.

369.   CME presented the opinion of John I. Solomon as its expert on damages and FMO presented the views of Public Accountants Gonzales, Valdez & Associates and Venezuelan law expert Professor Carlos Enrique Mourino Vaquero. But despite both parties making occasional references to their respective reports, none of these experts was made available for questioning by the panel or cross-examination by opposing counsel. We have opted, therefore, not to consider their views in our decisions.

**Discussion and Decisions**

370.   We begin with a comparison of each party's position as shown at page 16 of Dr. Flores' Econ One 46.

371.    According to Dr. Flores, the result of CME's FPR is that CME is due US $83,001,564 and Bolivars 233,359,875 from FMO.  But after accounting for CME's corrective deduction of $219,126 (M/V *W.H. Blount*)[8], honoring FMO's instruction to accept its counterclaims of USD 37,792,255 and applying other Econ One adjustments, Dr. Flores concludes that the parties' current net financial is that FMO owes CME US $3,289,981 and Bolivars 132,373,544 to Arivenca. (Econ One Exhibit 46 at page 35)[9]

372.    In reaching these net results, Dr. Flores confirmed that FMO has withdrawn its prior objections to:

a.    Table R54, invoice for the *U Sea Panache,* ($3,244,725) and CME's adjustments of CIQ weights ($604,525). However, FMO maintains its objections regarding the appropriate prices for the ore shipped;

b.    Table R56, CME's/Arivenca's Final Weight Adjustments (BsF 7,116,525) but maintains its objections regarding the proper application of VAT and the rates of exchange used by CME;

c.    Table 61, *WH Blount* waiting time ($288,799 and $15,278);

d.    Table R62 payment to Curacao Shipyard ($2,288,366);

e.    Tables R63 General Piar Bunkers and Hire ($988,115);

f.    R66 Gypsum Integrity Bunkers ($128,262.50);

g.    R67 Taiglad Bunkers ($174,340); and

h.    Table R64 Fuel purchased for Boca Grande II at international as opposed to subsidized domestic prices ($806,316.00).

373.    Counsel for CME prepared an equally comprehensive "Claimant's Summary Table of Disputed Quantum Issues" dated August 10, 2018.  The "Summary" is likewise linked to

---

[8] CME's $219,126 correction deduction concerns a matter involving the MV W.H. Blount which is among the items to be decided by the separate London arbitration panel.  As suggested by counsel for CME, we ignore that credit.

[9] Dr. Flores has often chosen to round figures to the nearest whole dollar and so there are some slight differences between his and CME's calculations.

CME's FPR and confirms that CME concedes/withdraws the following items of claim totaling $22,455.48:

| | | | |
|---|---|---|---|
| 1. | Page 9 | Pattison Survey | $125.66 |
| 2. | Page 11 | Panostar Ore Penalty | 60.37 |
| 3. | Page 12 | Panos Earth Ore Penalty | 72.92 |
| 4. | | Fiuggi Ore Penalty | 66.01 |
| 5. | | Unity Pride Ore Penalty | 136.77 |
| 6. | Page 21 | Demurrages dealt with in ICC PFA dated April 16, 2018 | 21,993.75 |

374.   Although both Dr. Flores and CME's Summary purport to rely on the 2014 Acta (especially as to what was agreed and not agreed) and CME's subsequent FPR, our own examination of those key documents causes us to respectfully disagree with a number of each party's representations and conclusions.

375.   That said, we now take up the following objections and Counter-Claims raised by FMO which, on instructions, Dr. Flores accepts as valid.

## ANNEX I - FMO Objections/Counter Claims

376.   As per Annex I to the Second Econ Report, FMO asserts the following objections and counter claims to the items claimed by CME:

## FMO ANNEX I

## Item 1 –Thirty Six (36) Misidentified Invoices which CME's FPR shows as Accepted but are in fact Contested by FMO - $1,373,814

377.   EO-16 at page 13, Table 4, items 2 through 37 details the 32 CME invoices to which FMO objects.

378.    According to Dr. Flores, "The documents [presented] do not conclusively support CME's claim" in that no supports were submitted for three (3) debits totaling $10,087, and that neither "…Pattinson documentation or FMO's CIQ results" were submitted for 15 other debits totaling $179,795.  FMO's objections to the remaining eighteen (18) debits totaling $1,183,932 are detailed in Annex I, pages 46 through 60.  All but the *MV Stefanos T* deadfreight $232,016, *MV Cihan* Intertek $5,035.15 survey fee and *MV General Piar* $34,0216.53 demurrage invoices concern ore quality/penalty issues and/or the proper (albeit monetarily inconsequential) allocation of the costs for the Pattison & Stead chemical and quality analysis of the iron ore.

***Like Dr. Flores, we found little to no documentary support for the debits totaling $10,087 and CME's claim for same is denied.***

379.    Mindful of Dr. Flores' use of the qualifying adverb "conclusively," we approach the next 15 debits totaling $179,795 more cautiously.  We note Dr. Flores' confirmation that CME's documentation included "CME CIQ results," but not necessarily Pattinson or "FMO's CIQ results."  We question the references to "CME CIQ results" and "FMO's CIQ results."  Mr. Serrao testified that "CIQ" refers to the mandatory China Inspection and Quarantine report required by the Customs Authorities of the Peoples Republic of China prior to permitting commodities to enter the country.  The CIQ report is, therefore, understood to be an unbiased report independent of either party.  Indeed, Clause 5 of the May 14, 2012 IOSC provides that the ore's chemical characteristics are to be "… made by the CIQ of the Peoples Republic of China…."  We also note Dr. Flores' conclusion that, "*Thus the documentation provided does not appear to resolve the objection brought by FMO, as to whether the costs actually were incurred and who is contractually responsible.*"  (Emphasis added)

74

380.   It appears that FMO's objection was more concerned with "the costs" of the analysis rather than the actual composition of the FSF or SICLO-1 ore as determined at destination.  The ore is shipped "wet," but the IOSCs called for the price and final payment to be made on the cargo's dry weight and its chemical composition, especially the FE content, as determined at destination.  We think it significant that neither FMO nor Dr. Flores takes issue with either the China Inspection and Quarantine (CIQ) analysis or CME's conversion of wet metric tons into dry metric tons on which CME's invoices are priced.  *FMO's objection is therefore denied and CME is awarded its claimed $179,795.*

381.   Of the remaining eighteen (18) debits to which FMO objects, one (1) for $125.66 has since been withdrawn (thereby reducing CME's claim to $2,265.78), five (5) are under $150.00, four (4) are under $260.00 and one (1) is for $629.76. The remaining ten (10) debits total $2,265.78 and have been rejected by FMO for alleged documentary deficiencies, including proof of payment.  We will allow $1,195.71 to each party.  *Accordingly, against CME's revised claim of $2,265.78, CME is awarded $1,132.89.*

382.   Our discussion and decision regarding each of the last seven (7) debits to which FMO objects follows.

**DNB 669-11 - $77,307.22**

383.   This debit concerns penalties assessed to FMO for the cargo carried by the *MV Venturer* not meeting the required contractual specifications for FE $73,225.20, SIO, $2,847.65 and size $1,234.37. The cargo was discharged at two separate ports following which CIQ issued two certificates of analysis on January 4, 2010, the results of which were agreed to be averaged.

384.   Dr. Flores acknowledges that CME submitted "CME'S CIQ Results" but "not the official CIQ results." As previously discussed, the CIQ report is required by the Customs

75

Authorities of the Peoples Republic of China prior to permitting commodities to enter the country. The CIQ report is, therefore, the unbiased findings of a Government agency that is independent of either party. We have seen no evidence of there being an "official" report would be different than that made available to either CME or FMO.

**This objection by FMO is denied and CME is awarded its claimed $77,307.22.**

**DNB 725-11- $785,508.00**

385.    This debit concerns two shipments of FSF loaded aboard the *MV Hebei Mercy* in May 2011. The Chinese receiver was refusing to accept the shipment unless it was paid non-conforming penalties of $785,508.00. In order to ease that situation and have the receiver accept the cargo, FMO provisionally agreed to accept the $785,508.00 for its account subject to a final Pattinson & Stead arbitration analysis. The pertinent part of the September 20, 2011 agreement read:

> In the event that the arbitration proceeding validate[s] the results presented by CME, CIQ and SGS, this agreement shall be deemed final. Otherwise, the penalty applied for said shipment shall be calculated based upon the results report by Patterson & Stead, Middlesborough, England.

386.    Thus, in addition to CIQ, the cargo in this instance was also tested by SGS with the following results SGS 1- 62.63%, SGS 2 – 63.93% and SGS 3- 62.07%.

387.    But Dr. Flores contends that CME never provided the applicable Pattinson & Stead analysis. However, according to CME, with its October 7, 2011, it sent the Pattinson & Stead analysis to FMO. That letter states Pattison & Stead determined the Fe content of the ore tested to be 62.35%, thereby confirming the initial findings of CIQ/SGS. The panel has not been shown either the original or a photocopy of the October 7, 2011 letter.

388.   Instead, we have a certified translation of that letter (Sherriff Supplemental Declaration at Exhibit S17, CME US_12280A) which purports to show an FMO "RECEIVED" stamp.  Exhibit S17 does not include a copy of the Pattinson & Stead report nor does it identify the *MV Hebei Mercy* by name.  The letter, however, does, reference the September 20, 2011 agreement and DNB 725-11.

389.   In her Fifth Witness Statement, FMO's Ms. Guerrero acknowledges CME's DNB-725-11 (USD 785,508.70) relates to the *MV Hebei Mercy* and the correct Fe content was indeed the 62.35% stated by CME. Therefore, pursuant to the quoted September 20, 2011 agreement, FMO's provisional acceptance of the $785,508.70 penalty became final.

390.   Nevertheless, Ms. Guerrero inconsistently argues:

> This debit note was rejected by FMO in a letter dated 20 August 2012 [DG5-5]. As explained in said letter, CME used a percentage of iron ore content that is not consistent with the results of the Pattison analysis. Further, FMO's final invoice already took into account the actual level of iron ore as shown in the Pattison analysis, i.e. 62.35%.

391.   Interestingly, Ms. Guerrero's argument was not carried over into either Dr. Flores' Annex I nor FMO's Post Hearing summary.  Dr. Flores argued that FMO never received the Pattinson & Stead analysis, which is contradicted by Ms. Guerrero.  FMO's Post Hearing summary merely objects to the panel's jurisdiction and not the substance of CME's claim. We are satisfied, however, with the submissions that persuasively show the $785,508.70 to be the proper responsibility of FMO.  ***We, therefore, deny FMO's objection and award CME its claimed $785,508.70.***

## DNB 863-12 - $33,259.41

392.   FMO acknowledges that CME submitted "CME'S CIQ Results" but "not the official CIQ results."  As previously discussed, the CIQ report is required by the Customs

77

Authorities of the Peoples Republic of China prior to permitting commodities to enter the country. The CIQ report is, therefore, the unbiased findings of a Government agency independent of either party. We have seen no evidence of there being an "official" report different from that made available to either CME or FMO. ***Accordingly***, ***FMO's objection is denied and CME is awarded its claimed $33,239.41.***

## DNB 913-12 - $14,167.42

393. Both FMO's objection and our decision mirrors that made with respect to the previous DNB 863-12. ***Accordingly, FMO's objection is likewise denied and CME is awarded its claimed $14,167.42***.

## DNB 966-13 - $232,016.17

394. This debit represents a deadfreight charge for short-loading the M/V *Stefanos T* by 4,189,53 metric tons. FMO acknowledges that the Master timely served a deadfreight notice, but questions CME's use of its related company, Paramount Marine Services, to charter the vessel. However, FMO's only substantive defense appears to be that its shore scale indicated that 946.53 metric tons more were loaded than does the ship (29,137mt v. 28,190.47mt). FMO seeks to reduce this claim by $52,418.83 (946.53MT x $55.38 MT freight rate). We have not been presented with the ship's draft survey, shore scale weights or the cargo's outturn reports. As the parties' positions on this particular issue are in equipoise, we consider it equitable that the difference of $52,419.00 be halved. ***Accordingly, CME's claim for $232,016.172, is reduced by $26,209.50 and it is, therefore, awarded the sum of $205,806.67.***

## DNB 1047-13 - $5,035.15

395. This debit calls for FMO to reimburse CME for the cost of an "independent inspection of iron ore fines" loaded aboard the MV *Cihan*. CME contends that the survey

performed by Intertek Inspection was requested by FMO on July 4, 2013 to determine the quantity of wet tons loaded.  FMO does not deny that Intertek attended the vessel and reported that 79,169 wet metric tons had been loaded.  Ignoring that the number of the wet tons loaded was its responsibility, FMO objects to this debit because the CME attached Intertek invoice is dated "June 25, 2013" or some 9 days prior to FMO's stated July 4, 2013 request.  We consider the date of the invoice to likely be a typographical error and dismiss FMO's objection to what is obviously a charge incurred for its benefit.  ***CME is awarded its claimed $5,035.15***

### DNB 485-09 - *MV General Piar* - Delayed Sailing $34,246.

396.   This debit dates back to an October 6, 2010 email from CME to FMO wherein CME alleges the *MV General Piar* "… did not sail from the sea port was delayed for 0.9785 days … because documents presented by FMO to the master were wrong."   CME contends the Master contemporaneously protested the delay but has not furnished the panel with that protest nor the October 6, 2010 email.

397.   FMO argues that, beyond an unreadable copy of the October 6th email, CME did not submit any support for the debit, without which FMO cannot determine which party should bear this detention. CME acknowledges that FMO disputed the debit during the 2014 *Acta,* but notes FMO had previously booked it as "payable" during November 2011.

398.   The arguments presented suggest that the delay occurred following the discharge of yet another export cargo to China.  We assume that CME's time charter with FMO was suspended for the duration of that voyage.  We, therefore, question CME's use of its $35,000 per day time charter rate to FMO, as opposed to its "out-of-pocket" obligation to head owner Gretchen that began with a daily hire rate of $25,641.03, and increased by two percent (2%) annually. That

79

said, we must agree with FMO that CME's documentation falls woefully short of carrying its burden of proof. ***We, therefore, deny CME's claim for $34,246.***

## FMO ANNEX I – Item 2 - Six (6) Debits Totaling $1,317,848

### 1. DNB 421/A 09 -  MV W H Blount - $15,278

399.   This Debit concerns disputes related to the return of the *MV W H Blount* to FMO's shuttle service after carrying an export cargo to China.  FMO has withdrawn its objection to this Item (and related Annex I -Item 29 discussed below).   Accordingly, ***CME is awarded its claimed $15,278.***

### 2. DNB 492-09  -  $32,600.21 – MV  General Piar – Lost Time

400.   The MV *General Piar* was taken out of its time charter shuttle service to FMO to carry an export cargo to China.  During its "Off-Hire" return to Venezuela, an INEA inspection required for the vessel to resume its domestic shuttle duties came due.  CME recommended and FMO agreed to "make all the necessary arrangements" to have INEA perform the inspection during the ship's transit through the Panama Canal.  Adopting this approach was intended to avoid a more costly inspection in Venezuela for the account of FMO.  Unfortunately, the inspectors and thus the MV *General Piar* were delayed.   Although the ship was then Off-Hire, CME, nevertheless, invoiced FMO at the time charter rate of $35,000 per day for the February 11-12, 2011 (0.8028 days or $28,098) delay to and bunkers ($7,901.00) consumed by the MV *General Piar*.  *(Note a further $3,380.51 was billed to FMO for Agency Charges which are separately discussed under Annex I Item 28 DNB 1043-13*).

401.   FMO objects to the billing on grounds that the ship was off-hire and, therefore, it is inappropriate to measure the ship's lost time by the daily time charter rate of $35,000.

402.   Obviously, this well-intentioned arrangement did not go as expected.  Both parties sought to avoid a prospective future detention after the ship returned to Venezuela and regained an "On Hire" status with FMO.  However, as the actual delay took place while the ship was "Off-Hire," we agree with FMO that CME's use of the $35,000/day time charter rate is inappropriate. In our view, CME is entitled to only recover $25,641.03 time charter rate paid to head owner Gretchen.  We, therefore, find that CME is due lost time of $20,584.62 (0.8028 days x $25,641.03/day), plus $7,901 for bunkers or a total of $28,485.62.00. ***Accordingly, CME's claim is reduced by $4,114.59 and it is awarded the remaining $28,485.62.***

### 3. CMEB 881-12 -  MV General Piar $933,160.00

403.   This debit concerns the return of the MV *General Piar* to FMO's shuttle service after carrying one of several export cargoes to China.  It consists of charter hire of $540,000 for the period Aug. 18, 2012 to September 2, 2012, in addition to $248,982.26 for IFO 380 and $144,177.65 for MDO said to represent the value of bunkers remaining on board ("ROB") when the ship returned to FMO's shuttle service on August 17, 2012.

404.   During the 2014 *Acta* (E0 3, page 142), FMO objected to the entire $933,160, but in this proceeding has only questioned the bunkers claimed by CME.  More specifically, FMO takes issue with CME's reliance upon a "Certificate of On Hire Bunker Quantity" dated Aug. 23, 2013, which merely estimated the bunkers ROB six (6) days earlier. FMO also takes issue with CME's use of prices that predated the "redelivery" by one to several weeks.

405.   It appears that the MV General Piar TCP was suspended to accommodate an export cargo. At page 28 of its August 10, 2018 Summary, CME treats the $540,000 as having been conceded by FMO.  Nevertheless, as FMO has offered no objection to such a routine charge, we accept that the forward 15 days hire of $540,000 is rightly due CME.  As to the surveyor's

81

estimate of the ROB, such estimates are routine and the accepted method to judge a days earlier ROB.  It is likewise customary to value those bunkers at the "last paid" prices.  ***We, therefore, deny FMO's objections and award CME its claimed $933,160***.

### 4. CMEB 881-12 MV General Piar Final Hire -$268,473.60

406.   CME argues that the vessel was redelivered to it on October 19,2013 at 0924. Measured from the last hire payment that ran through October 12, 2013, CME calculates it is due additional hire of 7.4576 days at the then $36,000/day time charter rate or $268,473.60.

407.   FMO has raised two separate objections to this invoice.  It notes that except for the day the ship reported passing the Buoy #1 redelivery point, CME has not accounted for the ship's activities between October 12 and 19, 2013.  FMO contends, but offers no support for its position, that redelivery from FMO to CME took place on October 17, 2013. Moreover, FMO rightly notes that it has not been credited with the value of the redelivery bunkers.

408.   Since these were the final days of the time charter and tensions between CME and FMO were increasing, we agree it would have helpful to have details of what the ship was doing after October 12, 2013. Surely that information was available to both parties, but neither produced it during these proceedings. Nor has FMO indicated that the ship was placed "Off-Hire" during the period in question.  We are left, therefore, with the time charter requirement that "hire shall continue until … redelivery … at DLOSP mile 0.1 Orinoco River Channel, Venezuela."  Based upon the Master's confirmation, (and notwithstanding that redelivery from CME to head owner Gretchen took place at Point Lisas, Trinidad October 20, 2013, we find that redelivery to CME took place on October 19, 2013 at 0924 local time (1424 GMT).  CME, therefore, is entitled to and is awarded its claimed additional hire of $268,473.60.

014570.00956/115711213v.2

409.   However, FMO argues it is entitled to the value of the bunkers remaining aboard at the time of redelivery.  CME's response is that the bunker ROB is irrelevant to its claim for final hire.

410.   Ordinarily, such competing claims are reconciled in a "Final Hire Statement" by CME to FMO, but no such document was presented to the panel.  However, Exhibit S-5 to Ms. Sherriff's Supplemental Declaration includes a bunker survey carried out at the time of CME's redelivery of the MV General Piar to head owner Gretchen at Point Lisas at 0530 (Local) on October 20, 2013.  That bunker survey confirmed that 16.661 MT of IFO and 65.265MT of MDO remained on board at that time.

411.   We find that FMO is due a credit for the value of the ROB as of 0924hrs October 19,2013, which we estimate to be $45,000.00.  ***Accordingly, we reduce CME's claim by $45,000 and award it the remaining $228,473.00.***

**5. DNB 1054-13 – Bunkers for M/V General Piar - $64,955**

412.   This Debit is for bunkers delivered to the MV General Piar on or about September 30, 2011.  FMO does not dispute the delivery, but questions CME's evidence that it (rather than Silva Shipping) actually paid the supplier.  We note that PDVSA quoted the stem to Silva Shipping USA LLC , which company is an affiliate of CME.   Pursuant to the General Piar Charter, it was FMO's responsibility to furnish the vessel with bunkers. However, due to FMO's strained financial condition, it often fell to CME to arrange delivery and advance the cost of needed fuel.  Based upon our review of the documents, we conclude that this was one of those instances.  Accordingly, FMO's objection is denied.  ***CME is awarded its claimed $64,955.00.***

**6.  DNB 1043-13 – INEA Inspection of General Piar at Panama -$3,380.51**

413.   This Debit relates to the prior Debit 492-09 regarding time lost at the Panama due to the late arrival of the INEA inspectors.  Here CME seeks to recover the travel and associated costs for the INEA surveyors to perform their inspection at Panama.  FMO objects, arguing that CME presented no document confirming that FMO formally authorized the inspection.   As already discussed in respect to DNB 492-09, we are satisfied that FMO agreed to carry out the needed INEA inspection during the ship's "Off Hire" transit through the Panama Canal.  The alternative was to perform the survey at a greater cost to FMO after the ship returned to Venezuela. *CME is awarded its claimed $3,380.51*.

## ANNEX I - Item 3

## DNB 770-11  MV Good Pride-  Demurrage  $609,450

414.   According to CME, on June 10, 2011, it nominated the MV *Good Pride* to FMO to "fulfill our last HBI agreement." CME's nomination set forth a laycan of June 26 to July 5, 2011, a demurrage rate of $34,000 per day and an ETA at Puerto Paula of July 3, 2011. FMO accepted the nomination on June 14th.  The vessel arrived on July 2, but remained at anchor and was not brought to the load berth until the early hours of July 21, 2011.  The delayed loading was due to a dispute between FMO and Comsigua, the actual supplier of the contracted HBI cargo. Reportedly, FMO owed money to Comsigua and it was refusing to load the ship until it had been paid.  In order to allow the ship to load, at FMO's urging, CME purchased the cargo from Comsigua at a cost of $20,440,000, following which the MV Good Pride was finally loaded. However, the delay gave rise to CME's demurrage claim for 17.9250 days at $34,000 per day or $609,450.

415.   FMO refuses to accept this debit because CME's purchase of the cargo resulted in Comsigua replacing FMO as the exporter of record.  If the thrust of this argument is that CME's

purchase of the cargo insulates FMO from its demurrage obligations, we must disagree.  FMO also questions the validity of the $34,000 daily demurrage rate charged.

416.   FMO overlooks that it cleanly accepted the vessel's nomination, including the $34,000 daily demurrage rate and, therefore, is bound by those terms.  We are satisfied that, but for CME's purchase, FMO's quarrel with Comsigua would have persisted and the demurrage for which FMO was clearly liable would continue to mount.   *CME is awarded its claimed demurrage of $609,450.00.*

## ANNEX I  Item 4

## CME Payment to Oxbow for Alcasa - $5,000,000

417.   Based upon the letters from the President of CVG Aluminio del Caroni S.A. (Alcasa), CME paid $5,000,000 toward Alcasa's November 2009 purchase of 17,500 mt of calcined petroleum coke from Oxbow Carbon and Minerals and now seeks reimbursement of that amount from FMO.  Calcined petroleum coke is used by Alcasa in its large scale production of aluminum.  In November 2009, Alcasa was in urgent need of calcined petroleum coke and approached Texas-based Oxbow Carbon & Minerals LLC ("Oxbow") to obtain a shipment of 17,500 MT.  Oxbow was willing to supply 17,500 MT of calcined petroleum coke for $10,237,500, but required 50% to be paid in advance.

418.   Alcasa, like FMO, is a subsidiary of CVG that was also facing financial difficulties. It did not, then, have the $5,000,000 advance payment required by Oxbow.  Eager to complete the purchase, CVG's then president (Rodolfo Sanz) approached CME to make the $5,000,000 payment to Oxbow on Alcasa's behalf.   The request was made at a meeting attended by CME, CVG and FMO, and CME's willingness to make the payment was confirmed in a letter to both CVG and FMO dated December 1, 2009. Oxbow's representative in Venezuela was Master

85

Alloys Caroni CA ("MAC"), a company related to CME, and it was through MAC that the payment to Oxbow was made. However, FMO now contends it never agreed to assume Alcasa's liability to CME and rejects this claim.  Moreover, as the payment was made through MAC, FMO questions whether CME, in fact, paid the $5,000,000 advance to Oxbow.

419.   The record for 2011 Acta includes a handwritten note signed by CME's Tyrone Serrao and Juan Anibel Vasquez, a member of FMO's Marketing and Sales Department reading:

> CME has remaining credit balance of 5,000,000.00 USD for a payment issued in December 2009 to the Alcosa [sic] OXBOW supplier on behalf of FMO, this will be offset through Iron Ore sales. (CME_US 10252).

420.   In a letter dated 1 December 2009, CME's Tyrone Serrao confirmed the following to Rodolfo Sanz, (CVG President/Minister of Mining), Radwan Sabbagh (FMO President) and Jorge Canas (FMO General Manager of Marketing and Sales) concerning the $5,000,000 advanced to Oxbow:

> The reimbursement of this payment may be made to CME before 31/12/2009 and if not it is understood that we will be compensated through the shipment of briquettes of the month of January 2010.

421.   Despite the foregoing, no payment nor compensating shipment was ever provided by FMO to CME.

422.   We consider that satisfactory proof of payment to Oxbow via MAC is shown in CME's contemporaneous bank statements and also by Alcasa's president (Cesar Aguilar) confirmation on January 6, 2010.  (Serrao Ex 128).

423.   Dr. Flores questions the authenticity of the 2011 Acta note because it is handwritten rather than typewritten and its signatures not verified.  We consider the note to be genuine, however, and it, together with CME's bank records and Mr. Aguilar's January 6, 2010

confirmation, persuades us that the $5,000,000 is a reimbursable obligation of FMO to CME. ***Accordingly, CME is awarded its claimed $5,000,000.***

## ANNEX I   Item 5

### DNB 433-09 MV W H Blount Deadfreight - $998,200.00

424.   This debit represents a deadfreight charge for short-loading the *MV W H Blount* by an extraordinary 14,260 metric tons at a freight rate of $70.00/mt.  The short loading involved an export shipment under an IOSC and, therefore, is not among those being considered by the UK arbitration panel.

425.   Contrary to CME's assertion that this claim has been accepted by FMO, page 72 of the 2014 *Acta* (EO-04) confirms this charge was rejected by FMO on grounds it "… require[s] evaluating whether the costs were, in fact, incurred, and which party is contractually bound to assume them."

426.   Dr. Flores likewise treats this Debit as among those to which FMO objects.

427.   The *M/V W H Blount* is described as a 1984 built but 1991 converted self-discharging bulk carrier having a deadweight of 59,954 MT on a summer salt water draft of 12.57 meters.

428.   According to CME, FMO was to load 37,070 metric tons of FSF at Puerto Ordaz and a second parcel of 15,250 metric tons FF-1 from the Boca Grande II.  However, rather than the expected 52,320 metric tons, the two bills of lading issued confirm that only 38,060 metric tons were loaded at Puerto Ordaz.   It follows that the planned loading of 15,250MT from the Boca Grande II was cancelled, but neither party has offered an explanation why that was done.

429.   The weights shown in the bills of lading are prima facie evidence that only 38,060 metric tons were loaded and thus support that 14,260 metric tons were indeed short loaded.  More

importantly, FMO has not argued nor even suggested that the short loading was attributable to *Force Majeure* or some other contractually excused event.  FMO acknowledges having received a stowage plan calling for a two parcel load of 52,320 metric tons, but argues the stowage plan does not indicate who prepared it or if it was approved by FMO.  FMO also questions CME's use of its related company, Paramount Marine Services, to charter the vessel from its head owner, Vulica Shipping.  We are satisfied that CME's use of Paramount was permissible, that the stowage plan was likely prepared by the vessel and the nomination of cargo quantities included with the NORs tendered by the vessel.

430.   The submissions confirm that CME's Paramount voyage chartered the vessel to carry this cargo to China from Vulica Shipping at freight rate of $70.00/MT.  At page 72 of his Annex I, Dr. Flores confirms FMO did receive the voyage charter between Paramount and Vulica which contains "… a provision for deadfreight which sets the rate at US$70…."

431.   ***We are satisfied that FMO's unexplained failure to the load the full 52,320 metric tons gives rise to a deadfreight claim of $998,200 (14,260mt x $70/mt), which amount is awarded to CME.***

**ANNEX I  Item 6**

**CMEB 529-11  Puerto Ordaz Dock Engineering Study - $365,000**

432.   FMO acknowledges that it asked CME to "develop detailed engineering" to improve and expand its facilities at Puerto Ordaz and Palua.  However, FMO did not issue a purchase order and contends that which CME presented went far beyond what was requested.  It therefore rejects CME's claimed $365,000 for a study it never used.

433.   According to Dr. Flores, this expansion project was initiated with a letter from FMO's former president Radwan Sabagh to CME's Tyrone Serrao dated December 1, 2009,

88

explaining that payments would made be made to CME in iron ore. On December 8, 2009, FMO's Board of Directors authorized its President to contract with CME to increase the capacity of the docks at Puerto Ordaz and Palua at an estimated cost of $73,888,758.

434.  CME states that not only was FMO in direct contact with Barr, but at an April 2010 meeting with CME, FMO approved the Barr drawings and specifications.  CME also notes FMO first booked this invoice as "payable" in November 2011, and only raised its belated objection during the 2014 Acta.

435.  In a letter dated January 6, 2011, CME advised FMO that it had hired Barr to develop the study.  Thereafter, on December 1, 2011, CME's Arturo Contreras wrote to FMO describing the scope of the engineering study undertaken by its sub-contractor Barr and its $365,000 cost.  That December 1, 2011 letter was sent months after CME had invoiced FMO for the $365,000.

436.  It is entirely possible that FMO failed to effectively communicate its intention to limit the scope of the study.  It is also possible that CME misunderstood what FMO required. Nevertheless, in our view, the engineering study had to have been influenced by the project's ambitious cost of nearly $74,000,000. Clearly a project of this size and importance would call for a comprehensive rather than a cursory study.  We also consider that FMO should have registered its objection promptly after CME advised it that the cost of Barr was $365,000.  That FMO did not object until the 2014 Acta, suggests its belated objection may have been linked (at least in part) to the parties' then deteriorated relationship and/or the decision not to go forward with the project.  Nevertheless, FMO only argues that the study went well beyond its initial request.  It follows that that some elements of the study did comply with its initial either miscommunicated

or misunderstood requirement and, therefore, some unquantified portion of the $365,000 cost is rightly for its account.

437.   Mindful that CME's involvement was initiated by FMO and that the Barr study was undertaken solely for FMO's need, we find FMO's belated objection to be misplaced.  We accept CME's evidence that FMO was in direct communication with Barr. Therefore, FMO either knew or was able to discern if Barr had strayed or was about to stray beyond its requirements.

438.   But instead of objecting to or limiting its scope, FMO silently allowed the study to proceed as both Barr and CME understood FMO required.  We consider FMO's silence to be the primary reason that the study proved more extensive than FMO now says was required. Moreover, that silence trumps any possible misunderstanding on the part of CME.  Certainly, CME had no incentive for the study to exceed FMO's requirements.  *CME is awarded its claimed $365,000.*

## FMO ANNEX I - Item 7

## Adjustments for Price and Quality of Ore - $545,391

439.   FMO disputes parts of the price adjustments made by CME for the six shipments carried by the *MV Stefanos T, MV Cihan, MV Chang Hang Ji Hai (SICLO), MV Chang Hang Ji Hai (FSF), MV W Sky, and MV Grand Amanda.* Originally, FMO objected, but has since accepted CME's dry vs. wet tons adjustments.

440.   *MV Stefanos T* – CME seeks a price adjustment in its favor of <u>$8,713.42</u>.

441.   The IOSC's contain an involved formula to determine the final price for a particular shipment.  Briefly, the first step is to determine the base price by averaging the Platts IODEX 62% FE CFR North China published eleven days prior to the bill of lading date, on the bill of lading date and eleven days after the bill of lading date.  The base price is then divided by the expected iron content to arrive at the price per Metric Ton Unit ("MTU").  The MTU is then

90

multiplied by the actual iron content of the ore as determined by CIQ to arrive at the price per Dry Metric Ton (DMT). The price per DMT is then multiplied by quantity of dry metric tons discharged to arrive at the final amount to be charged to CME by FMO.

442. In this instance, the parties agree that the price per MTU was correctly calculated at $1.48881, but they differ on the price of $95.49227 per DMT.

443. CME's submission can be read to incorrectly imply that FMO overlooked the essential step of multiplying the MTU price by the actual iron content found by CIQ to determine the price per DMT. But that is not the case. The quarrel actually stems from CME using an iron content (Fe) of 64.06% vs FMO using an FE content per CIQ of 64.14%. Both parties followed the previously described contract formula and each party's calculation of the DMT price is mathematically correct.

444. Multiplying CME's Fe 64.14% by the MTU price of $1.48881 results in a price of $95.37317 per DMT. FMO, however, contends the Fe was 64.65% which produces a DMT price of $95.49227. The difference is the $8,713.42 credit adjustment sought by CME, of which FMO inexplicably accepts only $2,982.07.

445. The applicable CIQ report (Exhibit EO 43) confirms the Fe content of this shipment was found to be 64.14%. ***Thus, CME is awarded its claimed $8,713.42 (which includes the $2,982.07 accepted by FMO).***

446. *MV Cihan* – CME seeks a price adjustment in its favor of $238,003.68.

447. Of this amount, FMO accepts $167,835.89 and rejects $70,167,79, but apart from reducing the dry weight quantity from the 75,162.433MT invoiced to the now agreed 74,015.098 MT, it offers no explanation for doing so.

448.   The parties agree that the dry weight was 74,015,098MT and the price per MTU was $1.31670, but disagree with each other's calculation of the price per DMT.  Using an Fe content of 64.650% FMO calculates the DMT price at $85.12466, whereas CME contends the correct Fe factor per CIQ was 63.21% and, therefore, the correct price per DMT was $83.22861.

449.   The applicable CIQ report (Exhibit EO 43) confirms the Fe content of this shipment was found to be 63.21%.  ***Thus, CME is awarded its claimed $238,003.68 (which includes the $167,835.89 FMO accepts).***

450.   *MV Chang Hang Ji Hai* (FSF) - CME seeks a price adjustment in its favor of $164,327.50[10]  of which FMO accepts $151,107.21 and rejects $13,220.29.  But apart from reducing the dry weight quantity from the 29,981.498 MT invoiced to the now agreed 29,155.944, it is unclear precisely what portion of CME's claimed price adjustment FMO accepts and rejects.

451.   The parties now agree that the dry weight was 29,155.944MT and the price per MTU was $1.3206, but disagree with each other's calculation of the price per DMT.  Using an Fe content of 64.670% FMO calculates the DMT price at $85.40385, whereas CME contends the correct Fe factor per CIQ was 62.921% and, therefore, the correct price per DMT was $83.09278.

452.   The applicable CIQ report (Exhibit EO 43) confirms the Fe content of this shipment was found to be 62.92%.  ***Thus, CME is awarded its claimed $164,327.50 (which includes the $151,107.21 accepted by FMO).***

453.   *MV Chang Hang Ji Hai* (SICLO) - CME seeks a price adjustment in its favor of $173,868.11, of which FMO accepts $70,505.49 and rejects $103,362,62.  But apart from reducing the dry weight quantity from the 51,799,570 MT originally invoiced to the now agreed 50,388.561MT, it offers no explanation for doing so.

---

[10]  Dr.  Flores mistakenly shows this item to be $137,868.11.

454.   The parties now agree that the dry weight was 50,388.561 MT and the correct price per MTU was $1.43126 but disagree with each other's calculation of the price per DMT.  Using an Fe content of 64.310%, FMO calculates the DMT price at $92,04433, whereas CME contends the correct Fe factor determined by was 63.701% and, therefore, the correct price per DMT was $91.1726.

455.   The applicable CIQ report (Exhibit EO 43) confirms the Fe content of this shipment was found to be 63.70%.  ***Thus, CME is awarded its claimed $173,868.11 (which includes the $70,505.49 accepted by FMO).***

456.   *MV W SKY* - CME seeks a price adjustment in its favor of $444,296.71 of which FMO accepts $277,708.29 and rejects $166,528.42.  Unlike the prior Annex I items, in this instance the parties' disagreements go beyond the Fe factor and include both the dry weight quantity and price per MTU.  CME contends that the correct dry weight quantity was 83,091.229 MT or 159.488 MT more than the 82,931.74 MT FMO originally invoiced.  As CME's dry weight quantity favors FMO, it has been accepted by FMO.

457.   However, CME takes issue with FMO's calculation of the MTU price of $1.30812 and, based upon the IOSC formula, argues the correct MTU price was $1.2250 (Platts $78.29 divided by the expected Fe content of 63.91%).

458.   CME then multiplies its MTU price of $1.2250 by the CIQ Fe factor of 64.39% (versus FMO's 64.510%) to arrive at a DMT price of $78.87775. Applying the DMT price of $78.87775 to the amended dry weight quantity of 83,091.229 MT results in final cost to CME of $6,554,049.18. or $444,296.71 less than the $6,998,345.90 billed by FMO.

459.    The copy of the applicable CIQ report included in EO-43 confirms the Fe content was found to be CME's 64.39%. ***Accordingly, CME is awarded its claimed $444,296.71 (which includes $277,708.29 accepted by FMO).***

460.    *MV Grand Amanda* - CME seeks a price adjustment in its favor of $416,964.24, of which FMO accepts $204,143.08 and rejects $212,281.16.   Like the *W Sky*, the parties' disagreements again go beyond the Fe factor and include both the dry weight quantity and price per MTU.   CME contends and FMO now agrees that the correct dry weight quantity was 71,220.690 MT or 432,464 MT less than FMO originally invoiced.

461.    However, CME also takes issue with FMO's calculation of the MTU price of $1.30812 and, like the *W Sky,* argues the correct MTU price was $1.2250.   CME then multiplies the MTU price of $1.2250 by the CIQ Fe factor of 64.58% (versus FMO's 64.560%) to arrive at a DMT price of $79.11050. Applying its DMT price of $79.11050 to the amended dry weight quantity of 71,220.690 MT results in final cost to CME of $5,634,304.40.

462.    The copy of the applicable CIQ report included in EO-43 confirms the Fe content was found to be CME's 64.58%. ***Accordingly, CME is awarded its claimed $416,964.24 (which includes $204,143.08 accepted by FMO).***

**FMO Annex I – Item 8**

**MV U Sea Panache  -  $3,244,725**

463.    At page 34 of Econ 46, Dr. Flores confirms that FMO has withdrawn its objection to the $55.00 price adjustment sought by CME.   ***Accordingly, CME is awarded its claimed $3,244,725.00.***

**FMO Annex I– Item 9**

**Claims by CME Not Included in the 2014 Acta - $740,540**

94

464.   Included in this group of 15 Items are five (5) CME claims totaling $324,596.25 that are not before this panel for decision.  Three of those five claims totaling $302,602.50 involve the charters that are before London arbitrators.  The other two CME claims total $21,993.75 and are before the ICC panel in Zurich.  *We, therefore, eliminate CME claims of $324,596.25 from this proceeding.*

**Administrative Fee 5% Charged by CME to FMO - $116,521.31**

465.   Of the remaining ten (10) CME claims, seven (7) involve instances where CME paid invoices on behalf of FMO.  When invoicing FMO for reimbursement, CME routinely added a five per cent (5%) "administration fee" to which FMO now objects. These seven claims by CME total $116,521.31.

466.   FMO rightly points out that its contracts with CME make no provision for CME to receive any fee for advancing payments on FMO's behalf.  It contends that FMO's only obligation is to reimburse CME for the amounts of the disbursements actually paid.

467.   From the start of its dealings with FMO, CME invoiced FMO for a 5% administrative commission on nearly all transactions involving payments it made to a third parties on behalf of FMO.  Clause 7 of the TSMC provides that vessel drydocking, major capital expenditures, insurance premiums and Transfer System refurbishments are for the account of FMO.  However, due to its stressed financial position, FMO from time to time asked CME to advance significant sums to third parties on its behalf.  According to CME, its willingness to accommodate FMO and assume this added credit risk was conditioned upon FMO accepting a flat 5% administrative fee.  CME did not charge interest for this accommodation.

468.   As proof FMO accepted that fee, CME points to its July 16, 2012 letter concerning repairs to the MV Rio Caroni.  That letter in part read:

> CME undertakes to proceed with the disbursement of the works of improvement as long as it is confirmed that the final invoicing in both dollars and bolivars will be made by considering 5% of administrative costs, under the model of reimbursable expenses (already deployed for the costs invoiced in BsF), as agreed in a meeting held with the Presidency and General Management of Marketing and Sales of FMO.

469.   The issue was again raised by CME in its October 31, 2012 response to FMO's request for CME to pay for bunkers to be furnished to the MV *General Piar*.  In pertinent part that letter read:

> In attention to your request that CME perform the payment of the fuel of the General Piar in behalf of Ferrominera, we inform you that under the regulation of our company we can make the payment only under the modality of reimbursable expenses, as it has been done with all disbursements of the restoration of the Transfer System, thus applying a charge of 5% for administrative costs.

470.   The panel has considered FMO's argument and agrees that neither the MV *General Piar* Charter nor the TSMC call for a 5% Administrative Fee to be paid on moneys CME advanced on behalf of FMO.  But that does not resolve the issue.  We have seen compelling evidence that FMO was experiencing severe financial difficulties and often sought help from CME to pay its obligations.  CME's willingness to do so was conditioned upon it being reimbursed with iron ore plus the 5% administrative fee mentioned in the quoted letters.  Although CME was under no contractual obligation to accommodate FMO, it nonetheless did so and paid very large sums to FMO's vendors.

471.   It does not appear that FMO formally responded to either of CME's letters.  But by first seeking and then accepting CME's financial help, we find that FMO accepted CME's stated terms, including the "extra-contractual" 5% administrative fee.  We have received testimony and seen evidence that FMO routinely and without complaint accepted invoices which included

96

the 5% administrative fee. But for CME's intervention, one is left to wonder how and at what cost FMO would have been able to fund its ongoing operational obligations.

472.   FMO not only objects to the imposition of the 5% administrative fee, but also takes issue with its application to charges it argues are rightly for the account of CME. We have examined the record, but conclude that the funds advanced under this claim reference were not obligations of CME. Accordingly, we find that FMO accepted the 5% administration fee for funds it either specially requested or those that it routinely relied upon CME to advance on FMO's behalf. ***CME is awarded due its claimed $116,521.31.***

### Wire Transfers -$60,384.06 (Feb 12, 2008) & $77,993.26 (Aug 29, 2008)

473.   The last two items in this grouping concern CME's request for FMO to reimburse it for two mistakenly made over-payments, FMO rejects both for want of persuasive supports.

474.   The first overpayment arose from CME's settlement of FMO's invoice No. 9000838 dated Oct. 25, 2007 in the amount of $2,444,758.92 for cargo shipped aboard the *MV Swift Fair*. On January 31, 2008, FMO issued Credit Note 70000703, reducing the amount due by $14,281.33 to $2,429,477.59. However, for reasons that have not been explained, CME claims it mistakenly made four payments totaling $2,489,861.74 or $60,384 more than the reduced invoice.

475.   We have carefully followed the path of the four payments made by CME and are satisfied that CME did erroneously pay $60,384.06 more than the net amount due FMO. ***CME is, therefore, awarded its claimed overpayment of $60,384.06.***

476.   The claimed second overpayment of $77,993.26, concerns FMO's August 21, 2007 invoice No. 90000758 in the amount of $2,439,626.25, for cargo shipped aboard the *MV Leonard Lembo*. Days later, based upon the CIQ report, FMO issued a credit of $31,430.25, thereby

reducing the amount due to $2,408,196.  Although the several payments and set-off transactions CME contends to have made here are more difficult to decipher than those for the first overpayment, we again carefully followed the path for each.  Despite our earnest effort, we are not persuaded that CME's bank statements support the partial payments claimed.  For example, the bank statement corresponding to CME_US 13261 records a block payment to FMO of $3,921,990.17 said to represent 56% of the amounts due to three vessels, among which is the "MV LEONARDO." Even if we were to accept that the 56% payment applies to the *MV Leonardo Lembo* invoice, CME's second wire transfer (CME_13263) does not.  That block payment of $590,138.76 to FMO makes no mention of the *MV Leonardo*, *MV Leonardo Lembo* or FMO invoice No. 9000758.  Simply stated, CME's evidence falls short of its burden of proof. ***Accordingly, CME's second overpayment claim for $77,993.26 is denied.***

## Orinoco River Toll for MV Merilla - $161,045.24

477.  The last item (DNB 242-09) in this group is the Orinoco River Toll ("ORT") for the *MV Merilla* that FMO accepted for its account, but asked CME to pay on its behalf. FMO does not contest its responsibility for the ORT nor its agreement that CME be reimbursed by means of a corresponding credit against the cost of the *MV Merilla* shipment.  FMO, instead, complains that CME failed to advise the cost of the ORT or provide a receipt or other evidence that it paid the ORT.  That which CME did submit was barely legible and is invoiced in Bolivars, not US Dollars.

478.  Dr. Flores, at page 88 of FMO Annex I, cites the following excerpt from FMO's 2 December 2009 email to CME:

> [we] confirm that FMO will cover the ORT for this vessel. However, order to avoid any delays, please confirm that CME will pay this cost now and deduct the amount from the payment of this cargo.

98

479.   Thus, FMO's acceptance was not pre-conditioned on CME providing advance notice of the ORT cost, nor would there be any purpose for doing so.  The ORT is a verifiable cost imposed by an official Venezuelan agency and not subject to negotiation.  We, therefore, dismiss FMO's advance notice objection.

480.   Although difficult to read, FMO acknowledges it received supports invoiced in Bolivars rather than US Dollars.  According to CME, it submitted "…three receipts issued by the Venezuelan Government Ministry" confirming that a total of BsF 346,247.26 was paid on February 12, 2009.  When invoicing FMO, CME converted those Bs 346,247.25 into US Dollars at the then prevailing rate of exchange of 1 USD to BsF 2.15, which we consider to be correct.

481.   It bears repeating that this charge was only advanced by CME because FMO asked CMO to expeditiously do so.  We are satisfied that CME has adequately supported its invoice for $161,045.24.  It is irrelevant that this invoice does not appear in CME's FPR; the amount remains FMO's obligation.  ***CME is, therefore, awarded its claimed $161,045.24.***

482.   In summary, against CME's claims totaling $740,540 in this Item 9, we eliminate $324,596.25 as beyond our jurisdiction, deny $77,993.26 for lack of persuasive proof and ***award the balance of $337,950.49 to CME.***

**FMO Annex I – Item 10**

**Remaining Stacker Payments $1,617,645.00**

**(a) - Iron Ore Stacker Installment- CME Claims of $1,617,645.00**

483.   At page 44 of Econ One 47, Dr. Flores explains that during the 2014 Acta, FMO repeated its July 31, 2009 rejection of CME's invoice CMEB-066-09 for $1,078,430.  According to FMO, the adjusted contract price of $10,245,085 "had already been compensated" and CME's invoice CMEB -066-09 was returned (EO-35 at page 30).

99

484.   CME's August 10, 2018 SUMMARY TABLE OF DISPUTED QUANTUM ISSUES (page 25) states: "CME accepts that FMO paid for this with cash held in escrow" but argues it (CME) never received a compensating shipment of iron ore from FMO.  CME makes that same claim in respect to the remaining escrow of $539,215 discussed hereinafter and thus asserts a claim against FMO for a total of $1,617,645,00 ($1,078.430 + $539,215.)

485.   It appears that CME's position is that upon paying a purchase installment into the escrow, it then became contractually entitled to receive a compensating shipment of Iron Ore/HBI from FMO.  For the reasons that follow, we have more than a little difficulty with CME's position.

486.   Firstly, the 21 July 2008 Stacker contract as well as its Addendum No.1 provided that once CME established an escrow equal to 25% of the agreed contract price, all further escrow deposits would only follow after it (CME) first received a compensating shipment of Iron Ore/HBI. Thus, the Stacker contract operated in the *reverse* from the other contracts which called for CME to first disburse and then be compensated with Iron Ore/HBI. CME applied the earliest shipments to off-set that initial 25% and was not required to replenish same. It follows that CME need only fund the escrow after and not before the compensating shipment was in hand. Assuming CME followed this favorable contractual pathway, it should never have been "out of pocket" and so we reject its claim that it was not compensated for one of the $1,078,430 installments.

487.   Secondly, Clause 5.2 of the Stacker System Contract Clause expressly provides that the final 5% or $539,215 is not included in the pre-agreed payment schedule to be made by CME. Instead, that final payment was to be made by FMO (as Purchaser) "… upon satisfactory completion of the performance tests."

100

488.   In our view, FMO was only required to furnish Iron Ore/HBI to CME equal to the installments CME made to TKF on FMO's behalf.   Since CME acknowledges that FMO reimbursed it for the $539,215, *we deny both of CME's claims totaling $1,617,645.*

**FMO Annex I- Item 11**

**Refurbishment of Boca Grande II Transfer System - $2,823,390.36**

489.   This dispute concerns the following four (4) invoices claimed by CME for refurbishments/improvements made to the Boca Grande II transfer station:

| | | | |
|---|---|---|---|
| 1. | CMEB 643-11 – 07/19/2011 - | | $1,322,214.35 |
| 2. | " 668-11   08/26/2011 - | | 420,779.53 |
| 3. | " 789-12   01/13/2012 | | 444,005.75 |
| 4. | DNB 953-13   01/16/2013 | | 636,390.73 |
| | | Total | $2,823,390.36 |

490.   Our review begins with the TSMC's Clause 7 "**COSTS FOR THE ACCOUNT OF FMO,**" and in particular sub-clause 7 (vii) which reads:

> All costs arising from, connected with, or related to the Transfer System being in operational condition, which has an indicative cost of Three Million, Four Hundred Thousand US Dollars ($3,400,000.00).

491.   Among the documents CME sent FMO to support its claimed $2,823,390.36 were periodic inspection reports signed by FMO's representative and a spreadsheet itemizing the underlying invoices from third-party suppliers.   FMO does not dispute that it is contractually responsible for refurbishments/improvements, but argues CME has not furnished proof that the work was properly authorized and completed and/or that CME paid the subcontractors. We have received testimony and been shown compelling photographic evidence (Serrao Second Statement Exhibit 150; Sherriff Supplemental Exhibit 6) of the many improvements made to the Boca

101

Grande II by CME.  Those photos stand in stark contrast to the highly subjective and superficial objections raised by FMO.  To suggest (as FMO has) that its refusal to pay CME is justified because its own employee imperfectly applied a "received" stamp or a document was acknowledged by someone in FMO other than the person authorized to do so, smacks of something less than good faith.  Moreover, as the owner of the Boca Grande II, FMO is the sole beneficiary of those betterments and in the best position to verify that the work was done.  We have examined the evidence and have no doubt that the improvements were carried out at the direction of and by sub-contractors hired by CME.  We are also satisfied that CME paid its subcontractors.  Had that not been the case, those who were not paid would have undoubtedly sought payment directly from FMO.  We have examined the available evidence and find it sufficient to support CME's claim.  ***Accordingly, CME is awarded its claimed $2,823,390.36.***

## FMO Annex I -Item 12

### MV Rio Caroni -Repairs, Including Main Engine, Refurbishments, Crew Travel Expenses - $2,497,105

492.  FMO initially objected to these invoices, later accepted $1,297,926.89 (ex DNB 504-11) but then returned to its original position and objected to the entire $2,497,105 that CME paid to Curacao Drydock for the drydocking and repair of the MV Rio Caroni. FMO not only takes issue with the sufficiency of CME's supporting documentation but contends a fire damaged boiler was caused by the negligence of CME's crew.  FMO insists that the costs to inspect ($11,732) and repair ($281,515) a fire damaged boiler are for the account of CME.  FMO also objects to the amounts of $183,542 (ex DNB 504-11), (ex DNB 644-11) and $305,355.69 (ex CMEB 793-12) for wages, travel allowances and other benefits CME was obliged and did pay to the crew during the vessel's protracted repair and out of service time (February 25, 2010 through

102

July 28, 2011 in Curacao. FMO contends that under the TSMC, the cost of the crew was contractually allocated to and assumed by CME, CME's position is that the cost of crew during the drydock and repair period forms part of the "Costs of all vessel drydockings" which TSMC Clause 7 allocates to FMO. We are satisfied that the documentation submitted by CME is sufficient proof that the sums claimed were in fact paid to Curacao Drydock.  Had that not been the case, the shipyard would have undoubtedly taken action to prevent the vessel from leaving Curacao.  But that did not occur. Moreover, as the owner of the MV Rio Caroni, FMO is primary beneficiary of those services and able to readily ascertain whether the claimed repairs were or were not carried out. However, FMO does not argue that the claimed drydocking and repairs were not made, but merely contends that CME's documentation is insufficient to justify reimbursement.  We disagree with FMO's position and find that against CME's debit DNB 504-11 totaling $1,481,469.00, CME is entitled to $1,287,926.89.  For the reasons discussed below, the balance of $183,542.00 representing amounts CME paid to the vessel's crew is disallowed.  The submissions suggest that FMO's position regarding the fire damaged boiler is misplaced.  Firstly, what FMO perceives to have been one fire incident were actually two separate events, involving different equipment (boiler and control room) that took place months apart. Secondly, we have seen no evidence to implicate CME in those fires, nor do we find language within the TSMC to support FMO's novel notion that CME is somehow responsible for the ordinary acts and/or omissions of the vessel's crew.  Indeed, Clause 22 of the TSMC expressly provides that "CME shall have no liability … whatsoever to FMO… unless … proved to have resulted solely from the gross negligence or willful misconduct of CME or its employees, agents or sub-contractors in connection with the Transfer System."  FMO's submissions do not meet this contractually imposed high level of proof.  CME, therefore, is entitled to its

103

claimed $281,515.00 and $11,732,00.   The terms of the TSMC allocate all crew costs to CME.  Although the repair time for the MV Rio Caroni was extensive, we do not read the quoted language from Clause 7 of the TMSC to have the meaning urged by CME.  Clause 7 is clearly intended to cover costs caused or derived directly by drydocking and repair of the vessel.  We do not read the clause to also transfer from CME to FMO the ongoing and unavoidable crew costs incurred during such drydockings.  In our view, pursuant to the TSMC, those costs remain the sole responsibility of CME.  ***Accordingly, CME's claim for Crew costs of $488,897.69 ($183,542 + $305,355.69) is denied.  We also deny FMO's non-specific partial objection to CME Invoice CMEB 644-11.  In summary, against FMO Annex I – Item 12 for $2,497,105, we deny CME's claims for crew costs of $488,897.69 but award CME the balance of $2,008,073.10 representing the drydock and repair costs it advanced for the MV Rio Caroni.***

## FMO Annex I – Item 13

### Drydock Costs for MV Rio Caroni - $2,288,366

493.   FMO originally objected, but has since accepted CME's claims for $988,366 (CME Reference 11445) and $1,300,000 (CME Reference 11536) representing amounts paid to Curacao Ship Handling for the drydocking and repair of the MV Rio Caroni.  ***CME is, therefore, awarded its claimed $2,288,366.***

494.   We are satisfied that the documentation submitted by CME is sufficient proof that the sums claimed were in fact paid to Curacao Drydock.  Had that not been the case, the shipyard would have undoubtedly taken action to prevent the vessel from leaving Curacao.  But that did not occur.

495.   Moreover, as the owner of the MV Rio Caroni, FMO is primary beneficiary of those services and able to readily ascertain whether the claimed repairs were or were not carried out.

104

However, FMO does not argue that the claimed drydocking and repairs were not made, but merely contends that CME's documentation is insufficient to justify reimbursement. We disagree with FMO's position and find that against CME's debit DNB 504-11 totaling $1,481,469.00, CME is entitled to $1,287,926.89. For the reasons discussed below, the balance of $183,542.00 representing amounts CME paid to the vessel's crew is disallowed.

496.   The submissions suggest that FMO's position regarding the fire damaged boiler is misplaced. Firstly, what FMO perceives to have been one fire incident were actually two separate events, involving different equipment (boiler and control room) that took place months apart. Secondly, we have seen no evidence to implicate CME in those fires, nor do we find language within the TSMC to support FMO's novel notion that CME is somehow responsible for the ordinary acts and/or omissions of the vessel's crew. Indeed, Clause 22 of the TSMC expressly provides that "CME shall have no liability … whatsoever to FMO … unless … proved to have resulted solely from the gross negligence or willful misconduct of CME or its employees, agents or sub-contractors in connection with the Transfer System". FMO submissions do not meet this contractually imposed high level of proof. CME is, therefore, entitled to its claimed $281,515.00 and $11,732,00.

497.   The terms of the TSMC allocate all crew costs to CME. Although the repair time for the MV Rio Caroni was extensive, we do not read the quoted language from Clause 7 of the TMSC to have the meaning urged by CME. Clause 7 is clearly intended to cover costs caused or derived directly by drydocking and repair of the vessel. We do not read the clause to also transfer from CME to FMO the ongoing and unavoidable crew costs incurred during such drydockings. In our view, pursuant to the TSMC, those costs remain the sole responsibility of CME. Accordingly, CME's claim for Crew costs of $488,897.69 ($183,542 + $305,355.69) is denied.

105

We also deny FMO's non-specific partial objection to CME Invoice CMEB 644-11. *In summary, against FMO Annex I – Item 12 for $2,497,105, we deny CME's claims for crew costs of $488,897.69 but award CME the balance of $2,008,073.10 representing the drydock and repair costs it advanced for the MV Rio Caroni.*

## FMO Annex I – Item 14

### Bunkers Supplied to Boca Grande II at International Prices -$806,316.

498.   FMO originally objected, but has since accepted CME's four claims (DNB 502-09, 556-09, 633-11 and 656-11) shown on table R63 for bunkers supplied to the Boca Grande II by PDVSA at international rather than subsidized domestic prices.  *CME is, therefore, awarded its claimed $806,316.*

## FMO Annex I – Item 15

### Commissions Charged on Sales Under the Iron Ore Sales Contracts - $3,033,412 (FMO Counter Claim $3,951,819)

499.   Despite none of the Iron Ore Sales Contracts calling for FMO to pay such commissions, CME's invoices for those commissions were routinely accepted by FMO without complaint until August 1, 2011.   By letter dated 28 July 2011, FMO advised CME that it would no longer recognize "…  any sales commission for those vessels that will be loading from August 2011."  According to FMO, the commissions claimed by CME in this proceeding for post-August 1, 2011 ship loadings amount to $530,247.00.   FMO previously accepted, but now objects to invoices totaling $3,951,819.  FMO also objects to what Dr. Flores described as CME's "not-yet-paid" commission amounting to $2,503,165 i.e. $3,033,412 less $530,247. Thus, FMO asks:

    1.     that CME's post -August 1, 2011 commissions of $530,247 commissions be denied;

106

2.      that FMO be repaid or credited with CME's pre-August 1, 2011 commission invoices of $3,951,819; and

3.      that CME be denied the "not-yet-paid" commissions of $2,503,165

500.    CME acknowledges that the Iron Ore Contracts make no mention of a 1.5% sales commission. Nevertheless, CME insists this was an ongoing non-controversial practice that both parties observed until discontinued by FMO's 28 July 2011 letter. CME does not seriously question FMO's standing to discontinue the practice with effect from August 2011, but insists it is, nevertheless, entitled to retain all invoices previously billed to and accepted by FMO.

501.    According to the unchallenged testimony of CME's Tyrone Serrao, between 2000 and 2004 (i.e. prior to the 2004 Iron Ore Sales Contract) he was selling iron ore products through a Germany based company called Eiron. Eiron purchased iron ore from FMO which it then sold to third-party buyers in China. Throughout this period, FMO routinely paid Eiron a commission of 1.5% on the final invoice value of all iron ore it purchased from FMO.

502.    When the 2004 Iron Ore Sales Contract came into force, FMO continued the practice. Between 2004 and 2011, CME regularly invoiced FMO for commission fees of 1.5% on the iron ore sales it arranged. FMO never raised an objection to these invoices, all of which were routinely paid or offset by FMO. According to Mr. Serrao's testimony, it was standard market practice for FMO to also pay a 1.5% sales commission to buyers/traders of iron ore other than CME.

503.    The 1.5% sales commission took the form of a discount from the sale price from FMO. It was paid in recognition that CME (as well as other competing buyers/traders) carried out extensive sales and marketing efforts that enabled FMO to sell its iron ore into the Chinese market.

504.   As for commissions of $530,245 invoiced for ship loadings on and after August 1, 2011, CME argues FMO's letter of 28 July 2011 ought not apply.  CME explains that all of the vessels in question had arrived and were ready to load prior to August 1, 2011 but, for its own purposes, FMO improperly delayed those loadings to dates beyond August 1, 2011.

505.   The panel has carefully reviewed the record, including the ECON 46 and 47 exhibits.  It appears that the post August 1, 2011 commission invoices to which FMO objects, but which CME argues should be accepted, are:

| Vessel | | Date Loaded[11] |
|---|---|---|
| MV Samoa (FSF) 1.5% Commission Fee | $95,865 | 8/20/11 |
| MV Navios Star (FF1) 1.5% Commission Fee | 42,745 | 8/12/11 |
| MV Navios Star (FF1) 1.5% Commission Fee | 50,907 | 8/12/11 |
| MV Best Glory (FF1) 1.5% Commission Fee | 56,155 | 9/23/11 |
| MV Maud (SICLO) 1.5% Commission Fee | 41,857 | 9/11/11 |
| MV Stefanos T (FSF) 1.5 % Commission Fee | 43,897 | 10/02/11 |
| MV Stefanos T (SICLO) 1.5 % Commission Fee | 61,381 | 9/03/11 |
| MV Hebei Pride (FSF) 1.5% Commission Fee | 80,972 | 10/29/11 |
| MV Hebei Pride (SILCO) 1.5% Commission Fee | 56,466 | 10/29/11 |
| | $530,245 | |

506.   It is noteworthy that (as per page 23 of Econ One 47) each of the listed vessels incurred and FMO has accepted demurrage claims of $1,464,102, $688,368, $428,991, $1,032,721, $88,293 and $1,773,224, respectively.  This is a strong indication that, except for the *MV Maud*, the listed vessels encountered significant delays to load their assigned cargoes.

---

[11] Loaded dates are those shown in Econ One Exhibit 4.  For an added margin of safety, the panel's calculations do not include a provision for contractually allowed laytime.

108

However, the customary and preferred standard of proof to fix each ship's arrival and readiness date is the Notice of Readiness (NOR) tendered by or on behalf of each vessel. We have searched the record, especially CME's Table R60, in vain for copies of the NOR's, Statements of Fact, Time Sheets, Bills of Lading or other contemporary evidence that each of the above vessels arrived and was in fact ready to load prior to August 1, 2011. Absent such evidence, we examined each of the FMO accepted demurrage invoices with the following results:

1. MV Samoa -  CME Debit dated Sept 14, 2011

   Based upon a loaded date of August 20, 2011, FMO accepted demurrage equal to 56.311601 days which places the arrival of this vessel well before the August 1, 2011 cut-off date. ***We, therefore, award CME its claimed commission of $95,865.***

2. MV Navios Star – CME Debit dated Oct. 10, 2011

   Based upon loaded dates of August 12, and 31, 2011, FMO accepted demurrage equal to 26.475694 days which places the arrival of this vessel well before the August 1, 2011 cut-off date. ***We, therefore, award CME its claimed commissions of $42,745 and $50,907.***

3. MV Best Glory – CME Debit dated Oct. 11, 2011

   Based upon a loaded date of September 23, 20111, FMO accepted demurrage equal to 22.578472 days from which we conclude that this vessel did not arrive prior to the August 1, 2011 cut-off.   Moreover, as per letter dated August 22, 2011(Econ 48-21) FMO accepted CME's May 30th nomination

109

of this vessel with a laycan of August 20-29, 2011.  ***CME's claim for commissions of $56,155 is denied.***

4.  MV Maud – CME Debit dated Dec. 08, 2011

Based upon a loaded date of September 11, FMO accepted demurrage equal to 3.2701 days which is insufficient for us to conclude that this vessel arrived and was ready to load prior to the August 1, 2011 cut-off.  Moreover, as per letter dated August 22, 2011(Econ 48-21), FMO accepted CME's May 30th nomination of this vessel with a laycan of August 26-September 4, 2011.  ***CME's claim for commissions of $41,857 is denied.***

5.  MV Hebei Pride – CME Debit dated Jan. 10, 2012

Based upon a loaded date of October 29, 2011, FMO accepted demurrage equal to 98.512447 days which places the likely arrival of this vessel during the second/third week of July 2011. As per letter dated August 22, 2011(Econ 48-21), FMO accepted CME's May 30th nomination of this vessel with a laycan of July 5-14, 2011.  ***We, therefore, award CME its claimed commissions of $80,972 and $56,466.***

6.  MV Stefanos T – CME Debit dated Dec. 08, 2011

Based upon loaded dates of September 3 and October 2, 2011, FMO accepted demurrage equal to 39.720025 days, which is insufficient for us to conclude that this vessel arrived and was

110

ready to load prior to the August 1, 2011 cut-off.  Moreover, as per letter dated August 22, 2011(Econ 48-21) FMO accepted CME's May 30th nomination of this vessel with a laycan of August 16-24, 2011. ***CME's claim for commissions of $43,897 and $61,381 is denied.***

507.   In summary, FMO is denied its claim for return of the $3,951,819 commissions previously off-set.  CME is awarded $2,503,165 for its "not yet paid" commissions but against its claims of $530,245 for commissions related to post August 1, 2011 loadings, CME is only awarded the sum of $326,955; the balance of $203,290 is denied. ***Thus, CME is awarded net additional commissions of $2,830,120 ($2,503,165 + $326,955)***

## Annex I – Item  16

## PTLB II Payments - $4,416,667

508.   In return for the equivalent payment in iron ore, CME agreed to finance the $26,500,000 cost to construct the PTLB for FMO.   The tri-party agreement called for CME to make 24 monthly installments of $1,104,167 to EHI on behalf of FMO.  However, there came a time when FMO took issue with EHI's performance and instructed CME not to pay the final four installments.  CME honored those instructions and, despite EHI's requests for payment, CME has not paid and arguably still owes those four installments totaling $4,416,667 to EHI. Despite it having only paid $22,083,280 to EHI, CME argues that it was entitled to iron ore shipments sufficient to off-set the full contracted undertaking to EHI of $26,500,000.  CME contends that it remains legally exposed to EHI for the unpaid last four installments totaling $4,416,667.  Its submissions suggest its disagreement with FMO's unsupported contention that EHI failed to complete its contract obligations. But that aside, CME argues that FMO's obligation to offset the

111

contract price of $26,500,000 was not linked to the amount it actually paid to EHI.  We have considered, but find no logic to this argument.  Although not specifically addressed within the three-party construction and financing contract, we consider that CME's rights of set-off were intended to coincide with the amounts of its actual payments to EHI.

509.    A more knotty issue is CME's ongoing exposure to EHI for the last four installments that FMO instructed CME not to pay.   It's possible, but far from certain, that CME may still be contractually exposed to EHI.  Despite CME's skepticisms, there may very well be some justification to FMO's criticisms of EHI.  Clearly, there is no basis to award set-off moneys to CME, unless and until the underlying disbursement is actually made or a corresponding judgment for the same is rendered against CME.  In view of the fact that this item has been outstanding for years without either taking place, we do not consider this item of claim ripe for decision by this panel.   It is entirely possible that EHI may never pursue collection of the unpaid balance, in which case any award would be a windfall for CME.  Rather than risk doing so, ***the panel denies CME's $4,416,667 claim without prejudice to CME's right to again pursue its claim against FMO if and when CME's exposure to EHI is resolved by settlement or otherwise.***

### FMO Annex I – Item 17

### PTLB II Production Adjustments - $12,160,832

510.    This item refers to four invoices totaling $43,259,239 that CME presented for mining operations at the Cerro Bolivar Mine and PTLB II.  Of this amount, FMO has accepted $31,098,407 and rejected $12,160,832.

511.    By way of background, pursuant to Annex C of IOSC – 5, CME agreed to extract ore from the Cerro Bolivar and Los Barrancos mines. Although the IOSC-5 was signed on 14 May 2012, Mr. Serrao states it likewise applied to pre-contract or what he described as "early"

production.  In short, actual excavation and crushing operations were ongoing since October 2011, with the understanding that they would be retroactively covered when the final agreement was reached.

512.   Sometime between June and October 2001, CME hired the Barsanti Group to perform its obligations at PTLB II and in December 2011 also engaged GDT International (GDT) for the Cerro Bolivar mine.  Those subcontractors prepared and presented monthly production reports to FMO's on scene representatives.  Since the price payable by FMO to CME was linked to three different categories, the monthly reports separated the production into quantities of Direct Shipping Ore ("DSO") and Ground Material, and non-conforming Run of Mine.

513.   With one price exception, FMO's objections are primarily focused on the last Non-Conforming Run of Mine category which is shown as "NCRM." The single price exception concerns CME invoice DNB 1063 and the proper price for conforming material processed prior to start of the 14 May 2012 contract. During the sixth meeting of the 2014 Acta, FMO recognized a price of $7.63 per ton for conforming Ground Material vs. CME's May 14, 2012 "early" production contract price of $12.52 per ton.

514.   The pertinent part of Annex C that applies to "early" production reads as follows:

**EARLY START**

The Parties acknowledge that October 1, 2011, has been established by THE SELLER as the early start date for the set of activities agreed to under this Contract, therefore the amounts processed as of that moment shall be taken into account for all purposes as established herein.

113

515.   We consider the above clause reinforces Mr. Serrao's "early" production understanding and is sufficient to support CME's application of the Contract's price of $12.52 per ton.

516.   With respect to the absence of production reports for NCRM material, Mr. Serrao at pages 43 and 44 of his Second Witness Statement explained:

> The Production Certificates did not record the quantity of NCRM which was extracted and processes each month.

517.   This is because the handling of NCRM was an implicit activity in the iron ore extraction process, and therefore:

    a.    A proportion of the crushed/screened material was in fact NCRM; and

    b.    A proportion of the AIO/TEU/ROM was in fact NCRM

518.   It was therefore agreed by the Parties that NCRM would comprise:

    a.    One-third of the quantity of crushed/screened material; and

    b.    One-third of the quantity of AIO/TEU/ROM material.

519.   As support for this "agreed" arrangement, Mr. Serrao points to Table 1 of Annex C where the projected NCRM for each of the five years of the contract is exactly one-third of the projection for both DSO and Ground Material.  FMO has not challenged the explanations offered by Mr. Serrao

520.   In view of the foregoing, it appears that FMO's presumption that the NCRM quantities were missing from the Production Reports was misplaced. In fact, the Production Reports were never intended to include actual NCRM quantities.  Instead, the parties relied upon the described one-third calculation.  *FMO's objection is, therefore, denied and CME is awarded its claimed $12,160,832.*

**FMO Annex I – Item 18**

**Double Counting of PTLB II Payments – $1,104.167**

521.    As previously discussed under above Annex Item 16, CME agreed to finance the $26,500,000 cost to construct the PTLB II for FMO.  The tri-party agreement called for CME to make 24 monthly installments of $1,104,167 to EIH on behalf of FMO. FMO took issue with EHI's performance and instructed CME not to pay the final four installments.  Thus, only twenty (20) installments of $1,104,167 were to be made.

522.    As per Dr. Flores (pages 29, 30 of Econ One 46), rather than seeking compensation for the 20 installments, CME is improperly claiming an extra or 21st installment of $1,104,167.  The quarrel stems from FMO's comparison of the 2011 and 2014 reconciliations.   More specifically, the issue is whether the June 2010 installment was or was not included in the 2011 Reconciliation.  If omitted, then CME is correct that it has properly accounted for 20 of the contemplated 24 installments.  On the other hand, if it was included in 2011, then FMO is correct that CME has double-counted the June 2010 installment.

523.    CME explains that it exchanged correspondence with FMO that corrected FMO's mistaken impression that the June 2010 installment had been reconciled.  FMO subsequently prepared and on August 14, 2011 emailed its *"Acta de Conciliation Parcial No. 2"* to CME.  That "*Acta de Conciliation Parcial No. 2"* excluded the June 2010 installment.  However, when the 2011 Reconciliation was signed the following day (August 14, 2011), those signing wrongly attached FMO's first spreadsheet instead of the intended corrected version "*Acta de Conciliation Parcial No. 2."*

524.    We accept CME's explanation that the parties mistakenly failed to attach FMO's corrective ***Acta de Conciliation Parcial No. 2***   which correctly excluded the June 2010

115

installment from the 2011 Reconciliation.  We find no double-counting of the $1,104,167 June 2010 installment.  ***Accordingly, CME is awarded its claimed $1,104,167.00.***

## FMO Annex I – Item 19

### TSMC Escrow Money/Liquidated Damages $4,640,000

525.    FMO first argues that CME wrongly abandoned the TSMC and so it, not CME, is entitled to the $4,640,000 currently held in escrow by CME.

526.    The original 2010 escrow of $3,500,000 was increased by $990,000 in 2011, a further $75,000 in 2012 and a final $75,000 in 2013.  We, however, find that the TMSC was breached by FMO.  More specifically, FMO's repeated failure/unwillingness to timely furnish CME with the contractually agreed quantities of iron ore/HBI caused CME to justifiably discontinue performance under both the TSMC and the General Piar Charter.

527.    FMO separately contends that, pursuant to TSMC Clause 26 "REMEDIES OF CME UPON FMO DEFAULT," CME's claim for lost profits is capped at $4,640,000, (500,000 mt @ US $9.28/mt), whereas CME argues it is entitled to the contract's stipulated liquid damages in addition to its lost profits and has unilaterally applied the $4,640,000 held in escrow to discharge FMO's "Liquidated Damages" obligation.  For the reasons that follow, we disagree with both positions.

528.    We begin by noting that any consideration of the Clause 26 **REMEDIES** requires a concurrent examination of **DEFAULT** Clause 25, the operative language of which reads:

**DEFAULT**

The occurrence of any one or more of the following events during the Term of this Contract or any renewal hereof shall constitute a default by FMO:

(i) Any material breach and failure to remedy the same within Thirty (30) days of notice from CME requiring that such

116

breach be remedied, or …

(iv) FMO's failure to supply the agreed scheduled deliveries of iron ore to CME on a timely basis for compensation and/or costs.

Should a default occur under any of those events set forth above, CME has the right to terminate this Contract with immediate notice in writing to FMO, and to claim any and all damages that may arise as a result of the early termination of the contract.

The operative language of Clause 26 reads:

### REMEDIES OF CME UPON FMO DEFAULT

Upon the occurrence and during the continuance of a FMO Default, CME *may* … do any or all of the following as CME in its discretion shall determine:

(i) CME *may* terminate this Contract by providing sixty (60) days prior notice and shall be entitled to recover from FMO the amount of compensation based on 500,000 metric tonnes at the rate per metric tonne in effect at the time of the default, as liquidated damages for such breach it being agreed by the Parties that actual damages for any such breach would be difficult to assess.  For example, should the rate in effect be USD 6.87 per metric tonne:

Damages would be: Three Million Five Hundred Thousand ($3,500,000.00) U.S. Dollars.

(iii) CME *may* exercise any of its other rights and remedies provided for hereunder of [sic] at law.  (***Emphasis added***)

529.   FMO's focus on Clause 26 (i) overlooks the elective discretion given to CME by the multiple use of the word "*may*" within the body of Clause 26.

530.   Moreover, Clause 26 makes no provision that the stated liquidated damages are the sole compensatory remedy available to CME.   Rather, the Clause merely illustrates the arithmetical method on which CME's compensation is to be "based."  We consider that view to be reinforced by the given "example" which only accounts for one month's compensation for breach of a five (5) year contract.  That is especially true when DEFAULT Clause 25 expressly provides that "CME has the right to terminate this Contract with immediate notice in writing to

117

FMO, and to claim any and all damages that may arise as a result of the early termination of the contract."

531.   FMO also argues that CME did not give the contractually required 60 days advance notice of termination.  However, we find that as per the quoted section of Clause 25, CME had the right to terminate the TSMC with "immediate notice" rather than 60 days advance notice.

532.   As result of our reading of Clauses 25 and 26, we conclude that CME is entitled to an election of remedies. CME could have elected to claim either the stated liquidated damages (if a month or less remained under the TSMC) or its lost profits (if more than a month remained), but not both.  ***Accordingly, CME's claim for liquidated damages of $4,460,000 in addition to and separate from its claim for lost profits is denied.***

## FMO'S ASSUMPTION OF CREW SALARIES- $18,598,547.

533.   The TSMC provides that CME was responsible for the payment of wages, benefits and other compensation to both the officers and crewmembers of the vessels (MV Rio Caroni, MV Rio Orinoco, Boca Grande II) used to service the TSMC.  However, for reasons not fully explained, there came a time on or about May 1, 2011, when FMO chose to assume responsibility for and to significantly increase the wages and benefits for all of the unlicensed crew.  The licensed officers, however, remained the sole responsibility of CME.  This new FMO arrangement continued until the TSMC contract was finally terminated.  The increased compensation to the unlicensed crew was widely celebrated in Venezuela and became well known to the licensed officers of the several vessels.

534.   Since the cost of the unlicensed crew was included in the compensation contractually payable to CME, FMO argued it ought to receive back the savings CME realized by reason of it (CME) no longer paying the unlicensed crew.  FMO estimated that savings to be

118

$600,000 per month for the 31 months that the TSMC contract remained in force. FMO's premise was supported (at least conceptually) by the testimony of Dr. Flores. However, neither FMO nor Dr. Flores offered a breakdown or otherwise explained how the presumed savings of $18,598,547.16 were calculated.

535. Nevertheless, FMO's notion of a net set-off for the crew savings thus realized by CME has commercial, as well as equitable appeal. However, CME contends that it realized no such savings. It explains that in order to restore the compensational parity between the licensed officers and unlicensed crew, it was necessary to increase the compensation of the licensed officers by amounts comparable to those FMO unilaterally conferred upon the unlicensed crew. Accordingly, the resulting increased compensation now payable by CME to the licensed officers alone was slightly higher than CME's combined cost for both officers and unlicensed crew prior to FMO's take-over on May 1, 2011.

536. This very same issue was raised during the 2014 Acta meeting that took place at Puerto Ordaz on Feb 26, 2014. The minutes of that meeting recite FMO's claim of $18,598,547.16 for the presumed savings realized by CME, as well as CME's contention that no savings were in fact realized. According to those minutes, prior to May 1, 2011, CME's combined monthly costs for officers and crew were said to be BsF 2,541,870.92. But after FMO unilaterally increased the unlicensed crew compensation, CME's costs for only the officers rose to BsF 2,595,295.46. Neither party then questioned the other's calculations and so, for purposes of this award, we adopt those figures as correct.

537. It is not surprising that FMO's unilateral decision to increase the compensation of the unlicensed crew would trigger the need for CME to likewise increase the compensation of the licensed officers. It is noteworthy that the TSMC imposes no maximum on the compensation

119

payable to the unlicensed crew or licensed officers.  Accordingly, irrespective of whether FMO is contractually entitled to an equitable set-off for CME's savings, the panel is satisfied that there were no actual net savings for CME to pass on to FMO.  Rather the increased compensation that CME found necessary to pay for only the licensed officers exceeded and thus extinguished any presumed savings linked to FMO assuming the cost of the unlicensed crew.  ***FMO's counterclaim is denied.***

### FMO Annex I – Item 21

### Punta Barima Pilot Station (PBPS) - $12,160,000 Counterclaim

538.    FMO contends CME failed to maintain and repair the pilot PBPS as required by Clause 4 of Addendum No. 1 to the TSMC, which reads:

> CME agrees to include in the scope of this contract, the general maintenance and operation of the Punta Barima Pilot Station, including the restoration of its infrastructure, the latter being a reimbursable investment on the part of FMO. (Exhibit 22 to Serrao Witness Statement)

539.    FMO seeks repayment of its own unexplained and highly suspect estimate of $640,000 per month for some 19 months (January 2011 – July 2012) for such failure. We note that FMO's estimate, provided by FMO's Docks and River Transport Management, is more than twice the cost CME stated was paid to its sub-contractors to operate and maintain the PBPS.

540.    FMO's primary support for its claim is the testimony of its employee R. Russian, who acknowledged that CME did not proceed with the PBPS restoration/repair work because FMO's then President Radwan Sabbagh directed that work be discontinued.  Interestingly, FMO's complaint originated with an internal report that first surfaced during the 2014 Acta.  That report focused on the corroded condition of the PBPS fuel and water tanks structure and the deteriorated condition of the base to which its antenna was affixed.  FMO contends it only discovered those

120

conditions after it resumed control of the PBPS on 1 December 2013, but we have seen photos that suggest some of the conditions predated CME's involvement.

541.   By way of background, since such structural renewals were not included in the TSMC through-put rate, CME was asked by FMO to submit a bid to restore sections of the Pilot Station's infrastructure, including the fuel and water tanks as well as the antenna base.  FMO sent the specifications for that bid to CME on 9 September 2012 and CME submitted its proposal 24 October 2012.  The aforementioned internal report correctly states that CME's bid was approved by FMO on 5 November 2012.   However, the report fails to mention that, by letter from FMO's then President Sabbagh dated 23 November 2012, FMO revoked that approval.  Had the work gone forward, pursuant to the above quoted Addendum No.1, that cost would have been an extra that FMO was required to make good with iron ore/HBI to CME.

542.   FMO has failed to distinguish between amounts for ongoing ordinary maintenance of the PBPS included in the through-put rate and those for extraordinary and reimbursable costs that were not.  We have been shown dozens of daily maintenance reports contemporaneously signed by FMO's on-scene representatives, as well as "before and after" photos (Serrao 142, 143, 146, 147, 148) attesting to the upkeep, maintenance and improvements to the PBPS made by CME.  FMO has presented nothing to contradict or cause us to question that persuasive evidence.

***FMO's counterclaim is denied.***

## FMO Annex I – Item 22

## PTLB 1II – Iron Ore Crusher Lack of Maintenance - $1,395,283

543.   At page 14 of the <u>SECOND REPORT OF ECON ONE</u> dated 20 February 2018, Dr. Flores quotes the following from the 2014 Acta:

> CVG FERROMINERA states CME breached its obligation on
> upkeep and maintenance for perfect conditions at the PTBL II

121

plant facilities, and estimates US$ 1,395,283 is the amount for damages caused by said breach, without considering damages or hidden defects.

544.   Dr. Flores also refers to Ms. Danny Guerrero's Fifth Witness Statement:

CME was to maintain the PTLB II crushing plant from June 2012 onwards "and "CME's lack of maintenance had resulted in damages amounting to USD 1,395,283.00.

545.   FMO contends that CME failed to "maintain" the iron ore crusher and seeks compensation.  CME rejects this counter claim and insists the plant was properly maintained throughput the period of its responsibility.

546.   The PTLB II was built by EHI (a member of the Barsanti Group) and then operated for FMO by both EHI and Barsanti until June 2012.  At that time, pursuant to Clause 1 of Annex C of the May 14, 2012 Iron Ore Sales Contract (IOSC-5), CME assumed responsibility to carry out "effective maintenance," which continued until November 2013 when FMO took control of the plant.  During this 17month period, CME subcontracted and again entrusted the plant's maintenance to EHI/Barsanti.

547.   At no time during the 17 months CME was responsible for the plant's maintenance did FMO raise any concerns.  Indeed, at page 69 of his Second Witness Statement, M. Serrao says that EHI/Barsanti recommended, but FMO "rejected," that a "formal audit should be performed and a proper hand over process should be carried out" prior to the FMO take over.  The November 2013 take-over of the plant by FMO went forward without the recommended "audit," which we interpret to be the equivalent of a condition survey.

548.   According Mr. Tyrone Serrao's Second Witness Statement (pages 68/69), FMO was presented with "daily production reports," prepared by Barsanti, showing the plant to be well maintained and recording among other unspecified items the hours spent "adjusting belts,

122

repairing meshes, repairing plates."  Additionally, CME contends FMO was furnished with contemporaneous reports, correspondence and invoices showing the major purchases made for the Plant's upkeep, including the October 2012 replacement of conveyor belts (Eur 273,694), replacement of rubber screens (US $258,2350), the purchase of four (4) 90 ton capacity Komatsu dump trucks (US $4,678,880).

549.  Ms. Guerrero's Fifth Witness Statement includes a number of photos that purport to show sections of the plant in poor condition.  However, those photos were not taken when FMO assumed control of the plant in November 2012, but in February 2013.  Mr. Serrao suggests that FMO modified the plant's hoppers to accommodate dump trucks of 180 MT capacity rather than the designed maximum of only 90 MT.  He explains this alone can account for the spillage shown in the Guerrero photos. Mr. Serrao also takes issue with the remaining modifications FMO made to the plant's original and FMO approved design.

550.  The panel has examined, but beyond the obvious spillage, draws no conclusions from the Guerrero photos.  Rather than rely on the photos taken by FMO itself, it would have been more persuasive had FMO either invited CME to take part in or simply arranged for a recognized independent surveyor to conduct a condition survey and to comment on FMO's complaints.  ***Absent such corroboration, we are obliged to deny this counter claim by FMO.***

## FMO Annex I – Item 23

## FMO Claim for Unperformed Work on Stacker - $830,043.22

551.  This dispute is related to a 21 July 2008 contract for the "Design, Manufacture, Supply and Provide Technical Assistance to Erect; One (1) Stacking System for Iron Ore" at the agreed cost of $10,784,300.00.

552.   The parties to the contract were FMO (The Purchaser), CME (The Seller) and Thyssenkrupp Foerdertechnik GMBH (TKF).   As with many of its other contracts, FMO persuaded CME to fund the project on its behalf in return for shipments of Iron Ore/HBI of equivalent value.   Clause 5.2 provided that the final 5% of the contract price (US $539,215) was to be paid by Purchaser FMO "… upon satisfactory completion of the performance trials."

553.   It is common ground that the 5% final payment of $539,215 was effectively held by CME in the form of an escrow deposit.   The parties also agree that a portion of the Stacker Contract work was not performed because FMO (for reasons which remain unclear) decided not to proceed with the Stacker's final installation.   As the project did not proceed to the "performance trials," FMO is to be credited for that unperformed work.   However, the parties disagree on the cost of the work not performed.   According to FMO, based upon its 2014 estimate, it is entitled to a credit of $830,043.22, whereas CME contends that the unperformed work (including materials) amounts to $161,642.43 plus technical supervision of $262,500 or a total of $424,142.43.   It is important to note that CME has issued and FMO acknowledges having received two separate credits (Table 68, transactions 24774 and 24775) totaling the stated $424,142.43.   CME also issued an additional credit of $115,072. 57, thus exhausting the $539,215.00 escrow.

554.   The minutes of a meeting held by the parties on January 29, 2014 confirm that FMO then advised CME that the work remaining to be performed on the Stacker was estimated at $187,000.   Those same minutes record that "In the next meeting, the Engineering Management will consign the evidence of the relevant estimates." (EO-48, Tab 9).   FMO later produced internal correspondence dated March 17, 2014 from its Engineering Department to its "Legal Counsel" increasing the estimate to the currently claimed $830,043.22.   Except for a modest $2,900.36, this latest estimate was supported by contemporaneous quotations from local vendors.

124

555.   Skeptical of the nearly five-fold increase, CME approached the Stacker's manufacturer for a quote on the unfinished work.  It received an email reply dated March 31, 2014, indicating the unfinished work would cost $161,642.43 to which CME added an additional $262,500 for engineering supervision.  However, as Dr. Flores testified (Tr 4879) and a close examination of that reply confirms, the quoted price of $161,642.43 dates back to early July 2008, or six (6) years prior to those offered by FMO.  Dr. Flores suggests, and we agree, that the July 01, 2008 quote obtained by CME is stale, but, for the reasons that follow, we consider FMO's reliance on its 2014 estimate likewise to be inappropriate.

556.   At pages 146 -148 of the Second Report of Econ One, Dr. Flores questions whether the two CME credits to FMO of $161,642.43 and $262,500.00 apply to this dispute.  We are satisfied that both do.  Dr. Flores, however, accepts the further credit of $115,072.57 issued against the 5% final payment held in escrow by CME.  Dr. Flores at page 146 contends "CME does not offer any support for its proposed budget of US $161,642.43…," but also states "I have been instructed by counsel for FMO to proceed on the basis that the amount of $830,043 should be reimbursed by CME to FMO."

557.   FMO's position appears to cast CME in the role of a sort of guarantor of or co-vendor with TKF, rather than a third party merely providing FMO with needed financial assistance.  Additionally, FMO appears to overlook that it was FMO (not CME or TKF) that decided to not to go forward with the completion work.  Thus, there was no of default by either CME or TKF that might justify an award for compensatory damages for FMO.

558.   In our view, CME's role was more akin to that of a stakeholder and its responsibility did not extend beyond its custodial duty toward and returning the $539,215.00 escrow to FMO.  It follows that, irrespective of the year when the unperformed work was costed,

125

we do not consider CME to be liable for the value of that unperformed work beyond returning the escrow.  We have examined the history of this transaction and are persuaded that the three credits ($161,642.43, $262,500, $115,072.57) totaling $539,215.00 that CME previously issued to FMO fully discharged CME's escrow obligation.  *This counter claim by FMO for $830,043.22 is denied*.

## FMO Annex I – Item 24

## Credit Owed by FMO to CME -$85,962.

559.  According to Dr. Flores, FMO accepted that this amount was due CME during the 2014 Acta meetings, but it is not shown in CME's FRP.  However, CME explains this credit applies to the *MV Bulk Trader* cargo and is not included in its FPR because it was already allocated in the prior 2011 Reconciliation statement.  FMO exhibit EO-10 at page 23 confirms that to be the case.  *Accordingly, the panel will ignore and __not take this FMO proffered credit of $85,962 into account in its findings of amounts due to CME__*.

## FMO Annex I- Item 25

## Arivenca Invoices Not Accepted by FMO

560.  This Item 25 concerns FMO's objections to the following seven (7) invoices submitted by Arivenca.

561.  **1. Factura 0014 – BsF 70,013.08 or US $ 16,281.11 (SOF pg 179**) - This invoice is for reimbursement of Stevedore services for the *MV Pride* that CME asked and FMO agreed should be paid on FMO's behalf.  FMO accepts that the charge is for its account but takes issue with adequacy of Arivenca's documentation.  We, however, consider Arivenca's documentation to adequately support its claim for Reimbursement. Here again FMO relies on facile objections to evade paying a cost it not only accepts is rightly for its account but asked CME to pay on its

126

behalf.  On June 1, 2010, the stevedore invoiced CME's agent, Silva Shipping, for BsF 65,511.68, which Arivenca paid June 4, 2010.  Arivenca then sought reimbursement for BsF 70,013.08, which includes the addition of the 12% for VAT. CME correctly converts the BsF into US Dollars at the 1 USD to BsF 4.3 rate of exchange prevailing on the date of its June 17, 2011 invoice. ***CME is awarded its claimed $16,281.11 under the TSMC.***

562.  **2. Factura 0082- BsF 82,938.25 or US $13,164.80 (S&K 8/10/18 <u>SUMMARY</u> <u>pg 39</u>).**  Here Arivenca seeks reimbursement for the cost to two transports of fuel to the *MV General Piar* during October and November 2013.  FMO objects because the charges are for "the transportation of fuel to haulage vessels" and that Arivenca's documents do not show that CME or Arivenca paid the underlying invoices. We have little to no information regarding the circumstances that led to this transport, but we note that pursuant to the MV General Piar charter, FMO was the party required to furnish fuel to that vessel.  If compliance with that essential service entailed transport costs, such as barging, that would likewise be for the account of FMO.  ***CME is awarded its claimed US $ 13,164.80.***

563.  **3. Factura 0055 – BsF 477,583,34 or US $111,065.34**.  Arivenca invoice for restoration costs related to the *Boca Grande II* and *MV Rio Orinoco*.  FMO complains that none of the 40 items were supported by an original invoice.  But more importantly, FMO contends the claimed costs are "…consumables, spares, fuel, bunker and lubricants required for the operation of the Transfer System…" and, therefore, pursuant to TSMC Clause 8(iii), (EO-11) are for CME's not FMO's account.  However, CME disagrees and insists that the claimed costs rightly fall under TSMC Clause 7 (vii) which allocates to FMO:

> All costs arising from, connected with, or related to the Transfer
> System being in an operational condition …."

127

564.   Although CME says that copies of the supporting third party invoices are to be found in Exhibit S-1 to Ms. Sherriff's Supplemental Declaration, the majority of the photocopies provided simply cannot be read and none have been translated.  Our admittedly imperfect but best understanding of the invoices, persuades us that most fall under TSMC Clause 8 (iii), as argued by FMO, rather than Clause 7 (vii) as urged by CME.  *CME's claim for US $ 111,065.34 is denied for lack of persuasive proof.*

565.   **4.  Factura 0069 – BsF 294,793.22 or US $68,556.56 (SOF pg 40).**  Arivenca invoiced FMO for the inspection and survey fees of the Boca Grande II and other unnamed vessels by Lloyds Register and the American Bureau of Shipping. FMO's primary objections mirror those it put forward for the above Factura 055.  We find no justifiable need for the vendors' original invoices; photocopies are now commonly accepted worldwide. The need to maintain a vessel's class and certifications is undoubtedly a cost falling under TSMC Clause 7 (vii).  We find no possible application of these costs to TSMC Clause 8 (iii).  *We, therefore, award CME the $68,556.56 invoiced by Arivenca.*

566.   **5.  Factura 0070 BsF 110,584,32 or US $25,717.28.**  This invoice is for reimbursement of CME's subcontractors' costs to transport and store Yokohama fenders belonging to the Boca Grande II from January to August 2012.  The actual out-of-pocket cost to Arivenca/CME was BsF 104,720.00 (i,e BsF. 86,800.00 plus BsF, 17,9200) to which Arivenca added BsF 5,236.00 for the 5% Administration Fee discussed under Item 15.  As in Factura 0055 and 0069, FMO again argues these costs are for CME pursuant to TSMC Clause 8 (iii). However, the transport and storage of Yokohama fenders is clearly not associated with "…consumables, spares, fuel, bunker and lubricants required for the operation of the Transfer System…" but lies

128

more comfortably under TSMC Clause 7 (vii). ***We, therefore, award CME the $25,717.28 invoiced by Arivenca.***

567.   **6. Factura 0074 BsF 18,923.52 or US $4,400.82.** This item concerns a second invoice for storage of the Boca Grande II Yokohama Fenders, but for September to October 2012. The actual out-of-pocket cost to Arivenca/CME was BsF 17,920.00 to which Arivenca added BsF 896.00 for the 5% Administration Fee discussed under Item 15. FMO again raises the TSMC Clause 8 (vii) defense, which we find unpersuasive.  As in the case of Factura 0070, we find the claimed cost to lie more comfortably under TSMC Clause 7d (vii). ***We, therefore, award CME the $4,400.82 invoiced by Arivenca.***

568.   **7. Factura 0079 BsF 18,923.52 or US $3,033.74.**  Except for the storage dates being from March to April 2013, the amount and each party's position is identical to Factura 0074, but the rate of exchange for this item was Bsf 6.3 to 1 USD.  It follows that our decision is also the same. ***Accordingly, we award CME, its claimed $3,033.34.***

## FMO Annex I – Item 26

### 1. FPR Table R75 No, 22083-85 BsF 1,000,000 or US $232,558.14 (SOF pg 181

569.   This dispute concerns three (3) payments CME made to Suministros y Mantenimiento Lopenza (Lopenza) for the installation of a new alternative conveyor belt at Puerto Ordaz.  The need for the new conveyor belt followed the July 2012 collapse of the facility's main gantry.  During this proceeding, FMO argued that TSMC Exhibit A (EO-11, page 72/73) placed the responsibility to maintain the Conveyors on CME.  Therefore, the Lopenza invoices for installing the new conveyor belt are for CME's rather than FMO's account. (Guerrero Tr 3088).

570.   However, Dr.Flores does not carry this argument over into his Second Econ One Report nor its Annex I.   Instead, Dr. Flores focuses on FMO's perceived deficiencies in the documentation presented by Arivenca. Since it is unclear whether FMO has or has not abandoned this argument, we have addressed it in the ruling that follows.

571.   Although, Exhibit A to the TSMC does provide that CME is to _maintain_ Conveyors JD 8016, JD 8014, JD 8013 and JD 8012, there is more than a little doubt it has the meaning urged by FMO. Firstly, we note that the following appears under each of the four Conveyors:

"Belt (FMO/PMH)"

572.   At page 23 of D. Guerrero's Fifth Witness Statement, the acronym "PMH" refers to the "iron ore processing plant" at Puerto Ordaz. This insert can be read that (a) CME's responsibility to maintain the Conveyor did _**not**_ extend to the Conveyor's "Belt" and (b) that responsibility for all four Conveyor belts was contractually allocated to FMO.  That interpretation is reinforced by the section of Exhibit A entitled "**Equipment to be maintained by FMO/PMH**" (EO-11, page 72) which includes:

"Belts – JD 8012, JD 8013 JD 8014, JD 8016"

573.   However, our understanding is that the belt at issue here is not among those addressed in Exhibit A, but a newly installed temporary belt to allow resumption of some operations while repairs to the collapsed main gantry were carried out.  Ms. Guerrero opines that the gantry collapsed because CME failed to properly maintain it.  But absent evidence of what caused the structure to fail, we have no choice but to treat Ms. Guerrero's opinion as uncorroborated speculation.  Both parties have described, and we are disposed to treat, the gantry's failure as an "accident" for which neither party was at fault.  We also consider that the

130

work (albeit temporary) carried out by Lopenza was for the mutual benefit of both FMO and CME and direct that each should bear 50% of the Lopenza invoices.

574.   In reaching this decision, we are mindful that FMO is the owner of the Puerto Ordaz facility.  As such, it arguably derives the greater benefit from that work. As regards the objections raised by Dr. Flores, we are satisfied that Lopenza performed the work and was paid by CME. Had that not been the case, Lopenza would have undoubtedly sought payment directly from FMO. Accordingly, against its claimed $232,558.15, *CME is awarded 50% or $126,279.08.*

## 2. FPR Table R75 No 22089 BsF 1,025,000 or US $238,372.09

575.   This quarrel relates to Annex I – Item 20, and FMO's decision to assume responsibility for the unlicensed crew of the vessels that comprised the Transfer System.  Of the 161 crew members affected, 18 declined to become employees of FMO.  The amount of BsF. 1,025,000 sought by CME represents the severance pay that FMO on March 1, 2012 agreed CME should pay to 8 of those 18 crew. According to CME, on March 2, 2012, it paid BsF 1,025,000 to Arivenca, which Arivenca then made available to SMT to pay to the 8 former crew members.

576.   FMO's objections are confined to its perceived deficiencies in Arivenca's supporting documentation.   Significantly, FMO does not deny its agreement that the severance of BsF 1,025,000 be paid by CME.  Moreover, as the payment resulted from FMO's unilateral take-over of the crew, we consider its insistence for better supports to be unreasonable.  *We accept CME's representations that it paid the severance and award it US $ 238,372.09.*

## FMO Annex I - Item 27

## FMO Counter Claim - VAT/Weight Adjustments - BsF 105,003,824

577.   This item concerns 61 invoices in Bolivars that FMO sent to Arivenca.  Those invoices made adjustments to the original iron ore weights claimed by CME and added a 12%

factor for VAT.  CME objected to the imposition of VAT and converted the Bolivars into US Dollars using the rates of exchange rates applicable to each transaction. According to Dr. Flores, the net adjustments made by CME/Arivenca amount to BsF. 105,003,824, but at Section II, page 125, of the summary attached to its post hearing brief, FMO confirms it no longer objects to BsF 7,116,251 in weight adjustments made by CME/Arivenca, thereby reducing FMO's claim to BsF 97,887,573.

## **VAT (IVA)**

578.    Notwithstanding that the ore was destined for export by CME, FMO has applied at 12% AD VALOREM TAX (VAT) on shipments of iron ore invoiced to CME's local agent Arivenca.  Because CME is not a Venezuelan company nor domiciled in Venezuela, no VAT was charged on the iron ore shipments FMO invoiced directly to CME.

579.    FMO argues that Venezuelan law requires that a VAT tax be imposed at each stage in the production of goods and services within its borders.  In response to a question from the panel, Dr. Flores explained VAT also applies, at least initially, to such elementary production considerations as the supply of electricity.  However, those Venezuelan resident companies required to pay the VAT for exports are entitled to apply to the tax authorities for a refund.  If granted, that refund is given the applicant in the form of a credit against its future VAT obligations.  However, as CME is not resident in Venezuela and after both the TSMC and General Piar contracts were terminated, neither CME nor its Venezuelan billing agent Arivenca had or were likely to have future VAT obligations equal to those FMO seeks to impose. However, our understanding is that FMO is free to apply for a refund of any VAT it paid for the export cargoes.

132

580.   CME, however, argues that the governing contracts expressly provide that any taxes levied in Venezuela are for the account of FMO.  Support for CME's position can be found in TSMC Clauses 18(i),18(ii) and 18 (vi) which read:

**Taxes**

(i)  **Ad Valorem Taxes**: FMO shall be responsible for and pay all ad valorem taxes, which may be levied against CME, the Vessels, stores, or the iron ore/DRI-HBI."

(ii) **Value Added Taxes**: FMO shall be responsible for and pay all value added taxes levied against the services provided by CME.

(vi)  **Gross Up**:  Without prejudice to the foregoing and that regardless of anything to the contrary in the Contract, or that could be interpreted as contrarian, CME shall receive the compensation provided in Section 14 hereof and if any taxes, fees or other similar contributions are assessed against CME, then FMO shall pay such contributions tom whichever authority is demanding its payment, either directly or through CME:  provided further that if CME is made to pay and effectively pays any such contribution, then FMO shall be liable to CME for any and all amounts so paid and shall reimburse CME therefore forthwith.

581.   The quoted clauses are unmistakably clear that any and all responsibility for VAT was contractually allocated to FMO.  Arivenca itself was not a party to the cited contract clauses, nor was it a party to the export sales of iron ore.  But FMO knew that Arivenca's involvement did not extend beyond it acting as CME's designated local billing and paying agent. *We find that FMO's attempted imposition of a 12% VAT on invoices billed to Arivenca was improper and its claims for same in this proceeding are denied*.

**Rates of Exchange for Arivenca Invoices**

582.   The record confirms that FMO frequently called upon CME to pay obligations it incurred in Bolivars.  That, in turn, required CME to furnish Arivenca with Bolivars with which to discharge local obligations, including those reimbursable from FMO.  According to CME,

133

when such occasions arose, it would purchase the required amounts of Bolivars from authorized sources using US dollars.   All of such Arivenca's Bolivar invoices were then converted back into US dollars at the very same rates of exchange charged to CME.   Over the course of the parties' relationship, the Venezuelan Bolivar currency underwent devaluations from 2.15 Bolivars to 1 USD, to 4.3 Bolivars to 1 USD and 6.1 Bolivars to 1 USD.

583.   FMO contends that any amounts of Bolivars found due to it or CME or Arivenca should not be converted into US dollars but shown in Bolivars.   Doing so would allow FMO to satisfy such an award with Bolivars, which have undergone successive staggering devaluations and are now nearly worthless.

584.   We find no merit to FMO's argument.   Firstly, both the TSMC and General Piar agreements were U.S. dollar contracts, as were the several IOSCs.   It follows that, pursuant to the parties' barter arrangement, advances made by either CME or Arivenca in Bolivars were required to be made good by FMO in iron ore at U.S. Dollar prices.   Secondly, FMO argument would place the risk of a devalued currency on the innocent creditor rather than the defaulting debtor.   That is not only patently inequitable but contrary to prevailing U.S. Law requiring judicial judgments and by extension U.S. arbitration awards to be stated in US Dollars. *Jamaica Nutrition Holdings, Ltd. v. United Shipping Co., Ltd.,* 643 F.2d 376 (2d Cir. 1981); *Hicks v. Guinness*, 269 U.S. 71, 80 (1925).

585.   In our view, CME's conversion of its and Arivenca's Bolivars invoices into U.S. Dollars at the rates of exchange CME was charged when it purchased those Bolivars is the proper method to apply here.   It is especially appealing in that it places the injured CME in precisely the same position it would have enjoyed had no default taken place. *Landaeta v. Century Grand I, LLLP*, 2011 U.S. Dist. LEXIS 163118 (S.D. Fla. June 2, 2011)

134

**Weight Adjustments**

586.   Dr. Flores at page 164 of his Second Econ One Report correctly observes that the method of payment for invoices rendered in Bolivars to Arivenca differed from that which applied to U.S Dollar invoices rendered directly to CME.  The CME U.S. Dollar invoices called for an initial payment of 95% with the remaining 5% to be adjusted based on outturn weights.  The Bolivar invoices issued to Arivenca, however, made no provision for weights to be adjusted, but called for 100% of the invoiced amount to be paid.  Noting this disparity, Dr. Flores questions whether the parties intended to adjust the Arivenca invoices to conform to the discharged weights.

587.   We have received no direct evidence on this issue.  Nevertheless, applying our collective commercial experience, we are unable to find a plausible reason why the two should differ.  Both the CME and Arivenca invoices are for payment of iron ore shipped under one or more of the IOSCs between CME and FMO.  There is no separate contract between Arivenca and FMO.  That being the case, we conclude that Arivenca's acceptance of the FMO's invoices during the 2011 and 2014 Actas was preliminary and anticipated a final adjustment linked to the quantity of cargo actually discharged at destination.

588.   We, therefore, find that, like the CME US Dollar invoices, the invoices sent to Arivenca are to be adjusted for weight, elimination of VAT and exchanged into US Dollars at the rates used by CME.  ***For the reasons stated, all of FMO's 61 counter claims in this Item 27 are denied***.

## FMO Annex I – Item 28

## MV W H Blount -Waiting time at Serpent Mouth - $288,799

589.   In this instance, the vessel was being used to carry an export cargo to China.  As per page 34 of Econ 46, FMO has withdrawn its objection to this claim for 8.2515 days lost at

Serpent Mouth at $35,000/day or $288,799. FMO also withdrew its objection to CME's invoice DNB 421/A-9 for $15,278.48. **Accordingly, *CME is awarded its claimed $288,799.* (*See also the $15,278.48 awarded CME for Annex I Item- 2*).

### End of Annex I Items

### Additional CME Claim Not Addressed by Dr. Flores' Annex I

### Debit DNB 942-12   $272,379.96

590.    Although mentioned, this claim by CME is not discussed by Dr. Flores. CME is claiming an additional $272,379.96 for Invoice DNB 942-12 dated "12/08/2012" representing a 5% Administration Fee on 12 invoices totaling $5,447,599.11 which CME paid on FMO's behalf. We have examined the invoice and are satisfied that all of the underlying charges were for the account of and rightly accepted by FMO.

591.    Although all twelve transactions predate the above cited June 15, 2012 and October 31, 2012 letters, FMO was often financially stressed and regularly reached out to CME for help to pay its ongoing obligations to third party vendors. When CME did so, it would routinely add and FMO would routinely accept a 5% Administrative Fee to its invoices for reimbursement. CME did not charge interest to FMO.

592.    As with the previously discussed $116,521.31, we have received testimony and seen evidence that FMO routinely and without complaint accepted invoices which included the 5% administrative fee. It bears repeating that but for CME's intervention, one is left to wonder how and at what cost FMO would have been able to fund its ongoing operational obligations. Accordingly, *CME is awarded its claimed $272,379.96*.

### CME ADDITIONAL CLAIMS NOT INCLUDED IN THE FPR

**(a)  Lost Profits Claimed by CME for FMO's Breach of the TSMC**

593.  CME contends it is entitled to lost profits for the period September 2013 through July 2015.  According to CME, but for FMO's breach, it would have earned revenue of $107,602,164.  It arrives at this figure by including the contract's escalations to the agreed throughput rate on the monthly contract minimum 500,000 metric tons of ore to be supplied by FMO.  From this gross revenue, CME deducts $70,168,459 representing its projected future costs to operate all components of the TSMC for those same 23 months.  The resulting $37,433,705 represents CME's claim for lost profits.

594.  CME's projected costs are largely composed of the amounts it would have paid to its sub-contractors, plus a cumulative 10% annual addition for inflation.  But as CME's sub-contractors, vendors and labor would likely all have been residents of Venezuela, FMO argues the 10% inflation rate used by CME is unrealistic and that rates reflecting the actual annual rates of inflation in Venezuela ought to be applied.  According to FMO, the International Monetary Fund reports the Venezuelan annual rates of inflation for calendar years 2013, 2014 and 2015 were 43.51%, 57.3% and 111.8% respectively.  CME has not challenged these rates of inflation

595.  CME has advised that at the time the TSMC was terminated (August 2013), its monthly costs for maintaining and operating the Transfer System averaged some $2,983,412.00 as follows:

| | |
|---|---|
| Terminales Perla | $2,300,000.00 |
| Punta Barima Pilot Station | 275,000.00 |
| Shiploader System (Timaca) | 219,362.00 |
| AltaTek | 16,400.00 |
| Eco Crane Hire | 13,650.00 |

137

| | |
|---|---|
| Lloyd Air Transport | N/A |
| Labor and Consumables | 20,000.00 |
| General Overheads | <u>139,000.00</u> |
| | $2,983,412.00 |

596.   Going forward, CME's highest cost would have continued to be Terminales Perla (TP), the sub-contractor it engaged to maintain, manage and operate the Transfer System's maritime assets.  That sub-contract was dated August 10, 2010 and ran for a term of five (5) years. The compensation originally payable to TP was $4.15 per mt per month for a minimum of 500,000 metric tons, increasing each anniversary year by a fixed $0.15 per mt.  Therefore, no inflation escalation applies beyond that already calculated by CME.  Accordingly, for the 12 months from September 2013 through August 2014, TP would have been compensated at $4.60 per mt per month or an annual total of $27,600,000.  For the next 11 months, September 2014 through July 2015, an increased rate of $4.75 would apply resulting in a further $26,125,000 payment to TP. Combining both obligations results in a going forward savings to CME of $53,725,000.

597.   For the remaining $683,412 of its monthly costs, CME has applied an annual inflation increase of 10%, which (although generous by U.S. and European standards) we consider to be inadequate for Venezuelan vendors and laborers and/or for purchases of consumables and other supplies made within Venezuela.  We agree with FMO that the $683,412 portion of CME's monthly costs should be adjusted for inflation at the rates reported by the International Monetary Fund which, as shown below, we calculate to be $1,908,494.00:

<u>For the 4 months September through December 2013</u>

$683,412 x 41.51% x 4/12ths or $94,561.00

<u>For the 12 months January through December 2014</u>

138

| | |
|---|---|
| $777,973 ($683,412 + 94,561) x 57.3% or | 445,779.00 |
| <u>For the 7 months January through July 2015</u> | |
| $1,223,752 ($777,973 + $445.779) x 111.8% | <u>1,368,154.00</u> |
| | $1,908,494.00 |

598.    After substituting the $1,908,494 for CME's 10% inflation factor on other than TP costs and then adding back the TP costs plus the $0.15 per mt annual price increase, we calculate that CME saved going forward costs for the 23 months remaining under the TSMC of <u>$71,351,970</u> as follows:

| | |
|---|---|
| Terminales Perla (including fixed escalations) | $53,725,000 |
| Other Costs ($683,412/month x 23 months) | 15,718,476 |
| Add Venezuela Inflation factors for 23 months | <u>1,908,494</u> |
| | $71,351,970 |

599.    The savings of $71,351,970 is $1,183,511 more than CME deducted to arrive at its net damage calculation.  Accordingly, we find that CME's claim for lost profits is reduced to $36,250,194, which amount is awarded to CME.

600.    FMO also objects that CME's cost calculations do not include VAT.

601.    This is a significant issue that impacts each and every invoice issued in Bolivars to FMO by CME/Arivenca.  Because of its importance, we have separately discussed VAT under its own heading at Annex I -Item 27.  For the reasons there stated, we conclude that any and all responsibility for VAT was contractually allocated to FMO.  ***Thus, VAT has not been included in our calculation of CME's projected savings for operating the TSMC nor in our award to CME for its lost profits of $36,250,194.***

## (b) Lost Profits Claimed by CME for Breach of MV General Piar Charter $4,710,000

139

602.   CME contends that it is due the net charter hire it would have earned had FMO not breached and repudiated the MV General Piar Charter Party. It calculates that amount at $4,710,000, equal to the $10,000 per day difference between the daily hire payable to it by FMO, less the hire CME was obliged to pay to head owner, Gretchen, multiplied by the 471 days it claims remained under the charter. However, rather than $10,000.00 per day profit claimed, we calculate that at the time of redelivery CME's daily profit was closer to $8,282.70.  We base this on the daily rate of $36,000.00 then charged to FMO less the 2% per annum escalated rate of $$27,717.30 per day that CME was obliged to pay head owner Gretchen.

603.   We accept (Annex I Item 2, CMEB 881-12) that the vessel was redelivered to CME on October 19, 2013.  The time charter at Clause 2 called for "60 months time charter plus/minus 10 days in charters (sic) option …"  Although we have not been given the actual date the ship was delivered to FMO, CME's claim for 471 remaining days suggests a delivery date of February 17, 2010 and an expiration on February 17, 2015.  CME, however, has not taken into account FMO's option to reduce the term of the charter by ten (10) days, which we consider appropriate to apply. ***Accordingly, we reduce CME's claim from 471 days to 461 days at $8,282.70 per day and award it $3,818,324.70.***

## MV GENERAL PIAR T/C /P - FMO OBJECTIONS & COUNTERCLAIMS

604.   Apart from its preference for the first version of the Charter (which called for International rather than the second's stipulation that US law is to apply), FMO has raised the following additional defenses, objections and counter claims:

1. **Difference Between Contract Price To FMO And "Market" For MV General Piar  - $29,218,500.00**

605.     According to Mr. Russian, the daily hire rate CME charged for FMO to time charter the MV *General Piar* was some $21,500 over the market.  Applying this differential ($36,000 less $14,500) for 44 months, 23 days, Mr. Russian suggests FMO is entitled to a refund of $29,218,500.  Apart from there being no legal basis for such a refund, we consider Mr. Russian's comparison of the M/V *General Piar* to the market rate for a similar sized ordinary bulk carrier extremely flawed.  The MV *General Piar* was then a recently converted conveyor belt equipped self-discharging vessel of which there were and still are very few.  An added consideration is that head owners are not keen to commit their ships to long term service within Venezuela.  The notion that such a specialty ship could be had for a time charter rate of $15,000/day is unrealistic. CME itself was required to pay head owner Getchen an initial $25,641/day and FMO has since re-chartered the ship from Gretchen for a reported $22,000/day.  ***This counter claim by FMO is denied.***

2**.  Poor Performance**

606.     FMO claims the M/V *General Piar* never performed to its represented capabilities and especially its discharge rate.  But such claims are rendered moot because FMO's iron ore production never exceeded the ship's actual discharge rate.   Moreover, FMO's non-specific allegations for under/poor performance of the MV *General Piar* are undermined by the fact that FMO has since re-chartered the vessel which its Board of Directors found "… ha[d] already been tested in our Boca Grande II Transfer System with satisfactory results."  ***This non-specific counter claim by FMO is denied.***

**3.  CME's $10,000.00 per day Profit**

607.  FMO objects that it was charged nearly $10,000.00/day more than CME was required to pay head owner Gretchen to time charter the MV *General Piar*.  That substantial

141

difference could *in part* be explained by the fact that FMO was not considered a creditworthy charterer and needed a market acceptable intermediary. A second consideration is that CME would be paying hire in US dollars to Head Owner Gretchen 15 days in advance, but only receiving "hire" from FMO in the form of iron ore and then long in arears. That said, the rate differential was substantial and (had all gone well) would have proven to be very favorable to CME. However, things did not go well and CME did not actually realize that substantial rate differential.

608.   But that is not the primary reason for our disallowing FMO's counter claim. Despite one party having agreed to terms that disproportionately favors the other, arbitrators are not empowered to themselves reform a contract. Despite FMO's apparent belief that something untoward or possibly illegal occurred between its former management and Mr. Serrao, it has not shown that was the case. Absent persuasive evidence of corruption on the part of CME, this panel is powerless to tamper with or otherwise intrude into the parties' agreement. ***We, therefore, deny FMO's counter claim***.

### c) Reimbursement of Settlement with Gretchen - $1,732,892.71

609.   CME contends that not only did FMO's repudiation of its time charter cause CME to withdraw the vessel from FMO's service, it forced CME to likewise prematurely redeliver the vessel back to its head owner, Gretchen. The result was a claim by Gretchen against CME in excess of $18 million. After a hotly contested series of wide reaching claims and counter claims, CME settled Gretchen's early redelivery claim for $1,732,892.71 (including legal costs) and now seeks reimbursement from FMO. FMO did not offer a defense (DeJesus 8/10/18 [para 38] Reply brief) beyond noting that CME did not submit evidence of the settlement.

142

610.    But for FMO's breach/repudiation, the time charter with CME would have run for its full term and no claim for early redelivery to Gretchen would have arisen.   We consider it prudent for CME to have settled and thus resolved Gretchen's claim against it.   Unlike FMO, we are satisfied that CME not only settled with but paid the $1,732,892.71 to Gretchen. ***We, therefore, award CME its claimed reimbursement of $1,732,892. 71.***

## Financial Position Report (FPR)

611.   The CME FPR purports to examine each and every transaction that took place subsequent to the 2011 Acta.  The document itself accounts for hundreds of transactions and runs 190 pages.  At page 177 (CME_02476) and based upon its version of the hundreds of preceding entries, CME calculates it is owed a total of $138,329,698.95 from FMO for both its and Arivenca's billings.  However, that combined total includes CME claims of $302,602.50 before panels in the UK and $31,198,266.29 that are before the Zurich ICC panel, as well as Arivenca's claims of $4,679,895.92 that also are before the UK panel.  Accordingly, from CME's combined invoiced claims of $138,329,698.95, we deduct $36,180,764,71 ($31,500,868.79 and $4,679,895.92) to account for claims that are not included in this proceeding.  As a result, the gross amount of the CME and Arivenca invoiced claims that are before this panel for decision are reduced to $109,667,032.40 as follows:

| | | |
|---|---|---|
| CME for TSMC | - | $55,930,658.47 |
| CME for General Piar | - | 3,141,887.17 |
| Arivenca for TSMC | - | 46,329,388.47 |
| Arivenca for General Piar | - | 4,265,098.36 |
| | - | $109,667,032.40 |

143

612.   These totals are to be further reduced by (a) the escrow/guarantee funds that CME has already taken to off-set a portion of the amounts due to it, (b) CME's post FPR concessions and (c) the amounts of CME's claims that we have disallowed.  Taking all that into account, we find that CME is due an award of **$83,672,102.86** in respect to its and Arivenca's TSMC invoiced claims.   We also find that FMO's breached/repudiated the TMSC, thereby entitling CME to an additional of **$36,250,194.00** representing the lost profits it would have earned had the TMSC continued on to its contractual expiration.  Thus, as a result of FMO's breach/repudiation, CME is hereby awarded TSMC damages of **$119,922,296.86.**

613.   As respects CME's and Arivenca's invoiced claims for the General Piar Charter, we find that FMO is due a net credit of **$378,693.02**.  However, we find that FMO likewise breached/repudiated the General Piar Charter resulting in lost profits to CME of $3,818,324.70 and the need for CME to pay the **$1,732,892.71** to settle the early termination claim brought by Gretchen.   Accordingly, we hereby award CME the sum of **$5,172,524,39** representing both its lost profits and the Gretchen settlement totaling $5,551,217.41, less the net credit of ($378,693.02) due FMO.

## CLAIMS FOR LEGAL FEES AND EXPENSES

614.   Both sides in these arbitrations have submitted claims for attorneys' fees and expenses, as well as all costs of the arbitrations, including arbitrators' fees and expenses. The applicable terms and conditions of the governing contracts are quoted above. The TSMC states that "The prevailing party shall recover all attorney's fees and costs from the other party." The contract also provides for application of the Rules of the Society of Maritime Arbitrators, which allow awards of attorneys' fees and expenses. The General Piar Charter provides that "the proceedings shall be conducted in accordance with the rules of the Society of Maritime

144

Arbitrators, Inc." Thus, as both parties have expressly acknowledged, there can be no question about our authority to award attorneys' fees and expenses.

615.   The amounts claimed are substantial. Counsel for FMO seeks an award of $19,001,800.61.  This amount includes legal fees of $16,447,872.32, broken down as follows:

| | |
|---|---|
| De Jesus & De Jesus | $15,000,000.00 |
| James Drake, QC | $733,986.66 |
| Sandra Healy | $15,332.85 |
| Assouline & Berlows | $381,477.81 |
| Mahoney & Keane | $317,075.00 |

616.   The balance of the claim is for out-of-pocket expenses. The claim does not include the fees and expenses incurred by FMO's initial counsel, Diaz Reus & Targ LLP, but FMO's application states that the non-inclusion of those fees and expenses "may not be construed as waiver of its right to recover the fees and expenses incurred by Diaz Reus and Targ LLP."

617.   We note that FMO's counsel did not comply with the Panel's directions that they provide a breakdown of hourly billing rates or hours billed by the attorneys. Since FMO's claim is being denied for other reasons, we will not dwell on this point except to note that the fee amount is excessive.

618.   CME's claim is in the total amount of $7,440,741.29, broken down as follows:

Legal Fees

| | |
|---|---|
| Holland & Knight LLP | $2,779,665.60 |
| Seward & Kissel LLP | $2,152,472.95 |
| Ince & Co. (Hong Kong) | $1,244,511.18 |

145

| | |
|---|---|
| Ince & Co. (London) | $18,374,10 |
| 20 Essex Street | $93,937.36 |
| Moore & Co. | $11,838.40 |
| Total Fees | $6,300,799.59 |
| Expenses (excluding escrow deposits for the panel's fees) | $1,139,941,70[12] |

619.   In accordance with the Panel's directions, counsel for CME provided a detailed spreadsheet showing the billing rates and hours worked by each attorney or other timekeeper.

620.   We find that the hourly billing rates charged by the numerous different attorneys representing CME are consistent with the hourly rates customarily charged by attorneys from comparable firms in the different locations where the attorneys practice. For example, Seward & Kissel's hourly billing rates range from $505 for associates to $925 for the most senior partner working on the matter. Holland & Knight's billing rates range from $275 to $1090 for the most senior partner, and the greatest number of hours were recorded by associates and partners whose rates range from $390 to $625.00. Given the difficulty and complexity of the matter, we find that the hourly billing rates charged by CME's counsel were reasonable and consistent with the rates charged by comparable law firms in New York. [13]

621.   There was some duplication of effort by Holland & Knight and Seward & Kissel when the latter replaced the former and we are making an allowance in FMO's favor for the time we estimate was spent for Seward & Kissel to "get up to speed."

---

[12] This sum excludes funds deposited in the escrow account for arbitrators' fees.
[13] Both firms agreed to a 10% discount off their total fees.

146

622.   In addition, both sides have included in their claims time and expenses incurred in connection with related court proceedings in the United States, but have not given us a breakdown. The courts involved in those proceedings did not award attorneys' fees. We note, however, that the TSMC provides for an award of "all attorneys' fees and costs."  Thus, we consider it appropriate to include those costs in our award. Taking all of these factors into account, the Panel awards CME legal fees expenses in the total amount of $7,240,000.00, of which 85% or $6,154,000.00 is allocated to the TSMC dispute and 15% or $1,086,000.00 is allocated to the MV General Pair dispute.

623.   The final fees and method of payment for the individual arbitrator is set out in the attached Appendix B, which forms part of each award.

624.   Although charged in full to FMO, those fees remain the joint and several responsibility of both parties.

625.   Our detailed calculations of these separate awards are as follows:

**TSMC AWARD**

**FMO Owes to CME Per FPR page 177**

| | |
|---|---|
| TSMC | $55,930,658.47 |
| Less: Escrow Funds taken by CME (FPR page 178) | (4,565,000.00) |
| | $51,365,658.47 |

Claims in Other Jurisdictions
Blount/Gypsum
Integrity - Shuttle Hire   $ 128,262.50 (UK Arb)                    N/A

Taiglad/Palin1 Shuttle Hire $174,340.00 (UK Arb)

                                                                 N/A

147

| | |
|---|---|
| Wagons $31,198,266.29 (ICC Arb) | N/A |
| Less: Interest earned on Stacker Deposit | (Cr. 6,850.15) |
| | **$51,358,808.32** |

**Deduct CME Post FPR Concessions**

| | |
|---|---|
| Item 2 of Aug. 10, 2018 Summary (Various Shipments) | ($2,176,266.21) |
| Item 6 of Aug. 10, 2018 Summary Row 4 | (125.66) |
| Item 6 of Aug. 10, 2018 Summary Row 13 Panostar) | (60.37) |
| Item 6 of Aug. 10, 2018 Summary Row 17 Panos Earth) | (72.92) |
| Item 6 of Aug. 10, 2018 Summary Row 18 RDB Fiuggi | (66.01) |
| Item 6 of Aug. 10, 2018 Summary Row 21 Unity Pride | (136.77) |
| Item 6 of Aug. 10, 2018 Summary Row 14 Withdrawn ICC | (21,993.75) |
| | **($2,198,721.69)** |
| **S/T** | **$49,160,086.63** |

**Deduct CME TSMC Disallowed Claims**

**Annex I**

| | |
|---|---|
| Item 1-1 | $   10,087.00 |
| Item 1-1 - | 1,132,89 |
| Item 1-1 DNB 966-13 | 26,209.50 |
| Item 2-2 | 4,114.59 |
| Item 9 | 324,596.50 |
| | 77,993.26 |
| Item 10 | 1,617,645.00 |

148

| | | |
|---|---|---|
| Item 12 | 312,044.00 | |
| Item 15 | 203,290.00 | |
| Item 16 | 4,416,667.00 | |
| Item 19 | 4,640,000.00 | |
| Item 25 (**3**) | 111,065.34 | |
| Item 26-1 | <u>126,279.08</u> | |
| | $11,871,124.16 | <u>($11,871,124.16)</u> |
| | Net Due CME for TSMC | **$37,288,962.47** |

**FMO Owes CME for Arivenca Invoices**

As per FPR Page 177

|  |  |
|---|---|
| TSMC   ($46,329,388.47 and $53,751.92) | **$46,383,140.39** |

<u>Claims in Other Jurisdictions</u>

| | |
|---|---|
| UK Arbitration Claims (<u>$4,679,895.92</u>) | <u>N/A</u> |
| Net Due CME for Arivenca Invoices | **S/T $83,672,102.86** |

**ADD**

| | |
|---|---|
| Lost TSMC Profits Awarded CME | **<u>$36,250,194.00</u>** |
| Amount of TSMC Award to CME | **$119,922,296.80** |

**TSMC Interest**

626.   The TSMC at Clause 43 provides<u>:</u>

"Any amount not paid when due under this Contract shall bear interest at the rate of twelve percent (12%) per annum, from the date such payment is due until full and final payment is actually made."

627.   However, the panel recognizes that throughout the *2014 Acta* the parties were actively attempting to reconcile their many differences.  We, therefore, consider it appropriate to only charge FMO with interest from the date the *2014 Acta* was completed or <u>April 14, 2014</u>, and

149

not from the dates of the individual invoices included in that attempted but unsuccessful reconciliation.

| | | |
|---|---|---|
| Interest Due CME on Net Invoices of <u>$83,673,102.86</u> ($37,288,962.47 and $46,383,140.39) from April 14, 2014 through to the date December 20, 2018 date of this award @ 12% per annum (4.68493 years) | | $47,139,858.67 |
| Median or Half of the Interest Due CME on Prospective Lost Profits of $<u>36,250,194.00</u> @ 12% per annum from February 9, 2014 through to December 20, 2018 date of this Award (4.8603 years $21,142,418.14) | | <u>10,571,209.07</u> |
| | S/T | $177,633,520.20 |
| Add: | | |
| 85% of CME's allowed Legal Fees & Expenses | | $6,154,000.00 |
| 85% Arbitrators' Fees and Expenses due from FMO but advanced by CME (Appendix B) | | $1,102,465.00 |
| Total Amount Awarded to CME for TSMC | | **$184,889,829.50** |

## MV GENERAL PIAR AWARD

| | |
|---|---|
| **FMO Owes CME for General Piar** (FPR page 180) | $3,141,877.17 |
| Less Guarantee Payment taken by CME (FPR page 177) | (3,000,000.00) |
| Balance (FPR page 180) | $141,887.17 |
| **Deduct CME Post FPR Concessions** | |
| Item 23 of Aug. 10, 2018 Summary Gen Piar C/P | (436,705.18) |

## Deduct M/V CME General Piar Disallowed Claims

Annex I

| | | |
|---|---|---|
| Item 1 – DNB 485-09 | $34,246.00 | |
| DNB 492-09 | 4,629.01 | |
| DNB 881-12 Final Hire | <u>45,000.00</u> | |
| | $83,875.01 | (83,875.01) |

Add:

| | |
|---|---|
| a) General Piar TCP Lost Profits | $3,818,324.70 |

150

|  |  |
|---|---|
| b) Gretchen Settlement | 1,732,892.71 |
| Net Amount awarded to CME for General Piar | $5,172,524.39 |

**Interest**

| | |
|---|---|
| Median or Half of the Interest Due CME on Prospective Lost Profits of $3,818,324.70 at prevailing prime rates from Oct. 19, 2013 through to the date of this award. | $372,848.94 |

On Gretchen Settlement Payments:

| | |
|---|---|
| a. $1,632,892.71 at prevailing prime rates from December 4, 2013 through to December 20 date of this award | $312,206.85 |
| b. $100,000.00 at prevailing prime rates from April 17, 2015 through to December 20 date of this award | $14,676.71 |
| S/T | $5,872,255.89 |

Add:

| | |
|---|---|
| 15% of CME's allowed Legal Fees & Expenses | $1,086,000.00 |
| Arbitrators' Fees & Expenses due from FMO but advanced by CME (Appendix B) | $207,504.80 |
| **Total Amount Awarded to CME for General Piar** | **$7,165,760.69** |

Dated:  December 20, 2018

151

In the Matter of the Consolidated Arbitration

- between -

Commodities & Minerals Enterprise LTD.,

Claimant,

v.

CVG Ferrominera Orinoco, C.A.,

Respondent-Counterclaimant.

Pursuant to the Pursuant to the Transfer System Management Contract dated August 7, 2010

APPENDIX B

Before:                          A.J. Siciliano
                                 George R. Wentz, Jr.
                                 John D. Kimball, Chairman

Appearances:                     Counsel for Claimant Commodities & Minerals Enterprise Ltd:

                                 Seward & Kissel LLP
                                 By Bruce G. Paulsen, Esq.
                                 Michael G. Weitman, Esq.
                                 Brian F.  Maloney, Esq
                                 Laura E. Miller, Esq.

                                 Counsel for Respondent-Counterclaimant CVG Ferrominera Orinoco, C.A

                                 De Jesus & De Jesus
                                 By:  Dr. Alfredo De Jesus O.
                                 Eloisa Falcon Lopez, Esq.
                                 Marie Therese Hervella , Esq.
                                 Deborah Alessandrini, Esq.

                                 Mahoney & Keane LLP
                                 By: Edward A. Keane, Esq.

                                 James Drake, Q.C.

                                 Assouline & Berlowe
                                 By: Daniel E. Vielleville, Esq.

1

The panel's fees and expenses for rendering both the TSMC Arbitration and General Piar Arbitration Awards amount to $1,914,564.35, of which 85% or $1,627,379.70 applies to the TSMC Award. The parties shall have joint and several liability to pay the full amount to the arbitrators, but as between them, the $1,627,379.70 is allocated entirely to FMO.

A portion of the arbitrators' fees have already been paid and the balances shown below were to be paid to the individual arbitrators or their order from 85% of the escrow deposit FMO was to make for this purpose with escrow agent Blank Rome LLP, as follows:

|  | 85% of Total Fee | 85% of Prior Payments FMO Escrow | Balances Due |
|---|---|---|---|
| A.J. Siciliano | $289,756.82 | $118,183.63 | $171,57319 |
| George R.  Wentz | 408,907.18 | 374,907.18 | 34,000.00 |
| John D. Kimball | 928,715.70 | 836,854.75 | 91,860.95 |
| TSMC Fees | $1,627,379.70 | $1,329,945.56 | $297,434.14 |

However, the amounts due for the arbitrators' fees from FMO exceed its ratable 85% escrow deposits of $531,199.00 ($624,949.00 X 85%) by $1,102,465.00.  Pursuant to the parties' joint and severable obligation for payment of the arbitrators' fees, a portion of this shortfall has previously been advanced and the balance due of $303,717.44 will hereafter be paid by escrow agent Blank Rome LLP to the individual arbitrators or their order from 85% of the surplus deposits remaining in CME's escrow account.

FMO is found liable to CME for the shortfall and due provision for CME to recover the entire $1,102,465.00 from FMO has been made within the body of the main TSMC award.

2

Following payment of the remaining fee balances to the individual arbitrators, escrow agent Blank Rome LLP shall return any balance remaining in the escrow account to CME.

December 20, 2018

3