UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 19-cv-25217 (DPG)

COMMODITIES & MINERALS
ENTERPRISE LTD.,

                          Petitioner,

vs.

CVG FERROMINERA ORINOCO, C.A.,

                          Respondent.

_____/

**RESPONDENT'S RESPONSE IN OPPOSITION TO FIRST AMENDED PETITION TO
CONFIRM, RECOGNIZE, AND ENFORCE FINAL ARBITRATION AWARD AND
FOR ENTRY OF JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

CASE NO.: 19-cv-25217 (DPG)

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ........................................................................ 4

II.  MEMORANDUM OF LAW ............................................................................ 4

A.  THE PETITION SHOULD BE DENIED UNDER ARTICLE V(2)(b) OF THE NEW
YORK CONVENTION ............................................................................................ 7

(1)  An Award Issued Based on a Contract Secured by Bribery or Corruption Cannot be
Enforced Under Article V(2)(b) of the New York Convention. .................................... 7

(2)  The Court Should Undertake an Independent Review of the Record. ................................. 9

(3)  The Court Should Find that the TSMC was part of a Contractual Scheme which was the
Product of Corruption. ...................................................................................... 10

(4)  Enforcement of the Arbitral Award would be Contrary to United States Public Policy. ... 16

B.  THE FINAL AWARD IS NOT REASONED ............................................................. 20

III.  CONCLUSION .................................................................................................. 22

CERTIFICATE OF SERVICE .................................................................................... 23

## Cases

*Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836 (11th Cir. 2011) ....................................... 7, 21

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58 (2nd Cir. 2017)........................ 5

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85 (2d Cir. 2005) .. 5

*England v. Sys. Mgmt. Am. Corp.*, 38 F. Appx' 567 (Fed. Cir. 2002)...................................... 6, 19

*Grynberg v. BP, P.L.C.*, 527 F. App'x 278 (5th Cir. 2013)...................................................... 19

*Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas*, 314 F.Supp. 3d 95 (D.D.C. 2018) .............................................................................. 8

*Karahas Bodas*, 364 F.3d at 306.................................................................................... 17

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614 (1985) ..................... 8, 10, 16

*Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969 (2d Cir. 1974).......................................................................................... 9

*S.E.L. Maduro (Florida), Inc. v. M/V Santa Lucio*, 116 F.R.D. 289 (D. Mass 1987) ................... 8

*Schlumberger Tech Corp. v. United States*, 195 F.3d 216 (5th Cir. 1999)..................................... 8

*TermoRio S.A.E.S.P. v. Electranta S.P.*, 487 F.3d 928 (D.C. Cir. 2007)..................................... 8

*Tully Constr. Co. v. Canam Steel Corp.*, No. 13 Civ. 3037, 2015 WL 906128 (S.D.N.Y. Mar. 2, 2015) ...................................................................................................................... 20

*United Food & Commercial Workers Union AFL-CIO v. Pilgrim's Pride Corp.*, 193 F.3d 328 (5th Cir. 1999)........................................................................................................... 10

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29 (1987) ............... 6, 9, 19

*W.R. Grace & Co. v. Local 759, Int'l Union of United Rubber Workers*, 461 U.S. 757 (1983) .... 9

## Statutes

15 U.S.C. §§ 78dd-1 .................................................................................................... 16

28 U.S.C. § 1331.......................................................................................................... 4

28 U.S.C. § 1333.......................................................................................................... 4

9 U.S.C. § 201 ............................................................................................................. 5

## Other Authorities

Analytical Commentary on Draft Text of a Model Law on International Commercial Arbitration, A/CN.9/264, March 25, 1985 ...................................................................................... 9

Carolyn B. Lamm, Hansel T. Pahm & Rahim Moloo, *Fraud and Corruption in International Arbitration*, LIBER AMICORUM BERNARDO CREMADES, p. 669 at 703 (2010)......................... 18

Constantine Partisides, *How Should Tribunal Deal with Evidence of Corruption of an Investment or the Securing of Government Permits?*, 25 ICSID REVIEW 1, ¶56 (2010) ........................... 18

N.Y. Convention, art. I(1)............................................................................................... 5

N.Y. Convention, art. V(2)(b)...................................................................................... 6, 8, 9

United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958.......................................................................................................................... 5

## Rules

Section 29 of the Maritime Arbitration Rules of the Society of Maritime Arbitrators, Inc. ........ 21

## Treatises

Restatement of the U.S. Law of International Commercial and Investor-State Arbitration, Final Draft § 4.23(d) (2019).................................................................................................. 9

Respondent, CVG Ferrominera Orinoco, C.A. ("Respondent" or "FMO"), respectfully submits its response in opposition to Commodities & Minerals Enterprise Ltd. ("Petitioner" or "CME")'s First Amended Petition to Confirm, Recognize, and Enforce Final Arbitration Arbitration Award and for Entry of Judgment (the "Petition") (ECF No. 24).

## I.   PRELIMINARY STATEMENT

CME is a company that sells various commodities and minerals, including iron ore. In 2004, it entered into a series of contracts with FMO, a Venezuelan State-owned entity that focuses on producing and exporting iron ore. Under the contracts, CME agreed to supply financing, equipment, and  services to FMO in connection with FMO's iron ore mining and sales operations in Guayana. CME alleges FMO breached several of these contracts. *See*, Final Award, ¶ 2.

These contracts included, <u>inter alia</u>, the so-called Transfer System Management Contract, ("TSMC"), a wagons contract, English charter parties, and the General Piar Charter.  A copy of the TSMC is attached as Exhibit 1 to the accompanying Declaration of Daniel E. Vielleville, Esq. ("Vielleville Declaration") (ECF No. 32). The Miami-based TSMC arbitration was conducted jointly with a New York-based General Piar arbitration, and, accordingly, both arbitrations were addressed concurrently in the Panel's Final Award dated December 20, 2018 (the "Final Award"). *See, generally*, Final Award, Exhibit 1 to Paulsen Affidavit (ECF No. 27). However, only so much of the Final Award as concerns the TSMC is now before the Court for review, the General Pair arbitration being properly before the United States District Court for New York for any confirmation and enforcement proceedings.

## II.   MEMORANDUM OF LAW

The Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1333.

This proceeding is governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 ("the New York Convention"). The New York Convention is applicable to the courts of the United States pursuant to the Federal Arbitration Act ("FAA"). 9 U.S.C. § 201 *et seq*. The New York Convention applies to "arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought." N.Y. Convention, Art. I(1) "Under Second Circuit precedent, a nondomestic arbitral award is an award that is "made" in the United States because the parties agreed to arbitrate before an arbitrator in the United States, but which nonetheless falls under the New York Convention and Chapter 2 of the FAA for one of two reasons: (1) it was "made within the legal framework of another country, e.g., pronounced in accordance with foreign law[,]" or (2) it was decided under the laws of the United States but involves either entities that are not U.S. citizens or, even if only U.S. citizens are involved, also involves "property located abroad, [or] envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58 (2nd Cir. 2017) (*citing Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2nd Cir. 1983)).

Article V of the New York Convention specifies the grounds under which a court may refuse confirmation of an arbitral award. *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85 (2d Cir. 2005). And, although the United States' pro-arbitration policy is well recognized, it is equally well established that an U.S. court must vigorously enforce the narrow but fundamental safeguards specified in Article V of the New York Convention for refusing recognition of arbitral awards, including when recognition would conflict with other U.S. public policies. *See,* New York Convention, Art. V(2)(b). The enforcement of these fundamental safeguards ensures that the credibility of the U.S. judiciary is not placed behind an arbitral award

that offends U.S. public policy, thereby safeguarding both the right of the parties to the arbitration in question and the continuing legitimacy of arbitration as a dispute resolution mechanism. Here, recognition and enforcement of the arbitral award would allow CME to reap the benefits of a contract it obtained through corruption, including of foreign public officials, in violation of fundamental U.S. public policy, *see United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 42 (1987), and recognition should therefore be denied under Article V(2)(b) of the New York Convention.

The Final Award should not be confirmed because doing so would be contrary to the public policy interests of the United States. *See* New York Convention, Art. V(2)(b). Enforcing a contract [for otherwise legitimate goods or services] that has been procured by bribery in favor of the party that secured such contract thought corruption is against U.S. public policy.  A court must not give the U.S. judiciary's stamp of approval, to an award of lost profits based on a contract obtained through the bribery of foreign public officials and other illegal acts, in violation of well-defined U.S. public policy. *England v. Sys. Mgmt. Am. Corp.,* 38 F. Appx' 567, 572 (Fed. Cir. 2002). During the course of the arbitration, FMO submitted numerous evidence to prove that CME has probably secured all of its agreements with FMO, including the TSMC, through corruption of foreign officers and clear violations of other Venezuelan laws. It also submitted evidence that the TSMC's umbrella agreement, the CAA, had been declared void by a competent Venezuelan court. As reflected in the Final Award, the arbitral tribunal rejected FMO's corruption defense. In doing so, the arbitral tribunal failed to consider most of the evidence submitted by FMO, which established numerous red flags of corruption acts committed by CME and the arbitral tribunal did not even bother to identify the applicable law and standard of proof in this regard. Likewise, the arbitral tribunal impeded FMO from securing evidence from CME in connection with the

allegations of corruption. Final Award, ¶ 24. Confirming the Final Award would thus violate public policy and FMO should be provided an opportunity to have arbitral tribunal's determination on corruption reviewed by the Court.

In conjunction with the Panel's omission to review FMO's corruption allegations, the Panel failed to issue an award comporting to the requirements of the Maritime Arbitration Rules of the Society of Maritime Arbitrators, Inc. ("SMA Rules") and U.S. law. While fidelity to the parties' arbitration agreement requires court to defer to the decisions of the arbitral tribunal in most instances, when the parties' arbitration agreement requires a reasoned award, a court must confirm that the arbitrators in fact fulfilled this duty. *See Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 843 (11th Cir. 2011). Moreover, Section 684.0042 of the Florida International Commercial Arbitration Act ("FICAA") states that "the Award shall state the reasons upon which it is based, unless the parties have agreed no reasons are to be given[.]" Here, the Panel failed to provide any mention of the reasons why all the substantial evidence and arguments –other than the discrete testimony of Mr. Ziri-Castro, the prosecutor in charge of the FMO corruption investigation– concerning a "direct" payment by CME submitted by FMO in support of its corruption defense did not warrant adoption of this defense. Accordingly, the Court should put aside the Panel's conclusion on FMO's corruption defense and conduct its own review in this regard.

FMO respectfully submits that CME's motion should be denied on any one of the following bases.

## A.        THE PETITION SHOULD BE DENIED UNDER ARTICLE V(2)(b) OF THE NEW YORK CONVENTION

(1) <u>An Award Issued Based on a Contract Secured by Bribery or Corruption Cannot be Enforced Under Article V(2)(b) of the New York Convention.</u>

It is accepted principle that an arbitral award has no legal effect without the stamp of

judicial approval of the judiciary. *Schlumberger Tech Corp. v. United States*, 195 F.3d 216, 220 (5th Cir. 1999). The New York Convention acknowledges the right of the courts of each contracting state to "refuse" to lend its judiciary's imprimatur and coercive authority of the State to an arbitral award if it to do so would "be contrary to the public policy of that country", in this case the United States. Art. V(2)(b). Indeed, the United States' policy promoting arbitration relies on the understanding that "[h[aving permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate [public policy] interest … has been addressed*." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 638 (1985).

An arbitration award is against public policy where it is "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought." *TermoRio S.A.E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007). It is well established that the enforcement of a contract procured by bribery of a foreign public official is repugnant to fundamental notions of decency and justice in the United States, and thus, such a contract is not enforceable, whether by a U.S. court in the first instance in a breach of contract suit or by a U.S. court asked to recognize and enforce an arbitral award based on the claimed breach of such a contract. *See, S.E.L. Maduro (Florida), Inc. v. M/V Santa Lucio*, 116 F.R.D. 289, 297 (D. Mass 1987) ("In sum, it is beyond doubt that commercial bribery clearly contravenes a strong public policy and that the Court, in due administration of justice, cannot enforce a contract which is obtained by that means."); *Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas*, 314 F.Supp. 3d 95, 110 (D.D.C. 2018) (finding that petitioner "met its burden of demonstrating that confirmation of [a] … portion of the award would be contrary to U.S. public policy, and therefore … declin[ing] to confirm th[at] portion of the award"). The Supreme Court has instructed that a court's refusal

8

to enforce such an arbitral award be rooted in the fundamental common law notion "that no court will lend its aid to one who found a cause of action upon an immoral or illegal act." *Misco*, 484 U.S. at 42.

Significantly, FMO's failure to seek vacatur of the Final Award is not ground for the Court not to consider an objection to confirmation under Article V(2)(b). *See* Restatement of the U.S. Law of International Commercial and Investor-State Arbitration, Final Draft § 4.23(d) (2019) ("A party ordinarily does not waive a particular objection merely by failing to bring a timely action to stay the arbitration or by failing to seek to have the award set aside.") (attached as Exhibit 2 to the Vielleville Declaration).[1] In this sense, The Restatement distances itself from the case law cited by CME in this regard (ECF No. 26 at pp. 6-7.) In any event, a party's waiver of an objection to confirmation of an arbitral award does not preclude a court from considering such objection *sua ponte*, if the ground for denying enforcement is one the two objections set out in Article V(2) of the New York Convention. *Id.*, § 4.23(b) (*citing Parsons & Whittemore Overseas Co. v. Societé Générale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir. 1974)).

(2) <u>The Court Should Undertake an Independent Review of the Record.</u>

The United States Supreme Court directs courts to substitute their own judgment for that of an arbitrator if the arbitration award, left unchanged, would violate public policy. *See, W.R. Grace & Co. v. Local 759, Int'l Union of United Rubber Workers*, 461 U.S. 757, 766 (1983). ("[T]he question of public policy is ultimately one for resolution by the courts.")    In such

---

[1] Further, Section 684.0048 (Grounds for Refusing Recognition or Enforcement) of FICAA is based on the Model Law of the United States Commission on International Trade ("UNCITRAL"). The drafters of the UNCITRAL Model Law were clear in stating that the failure to seek vacatur of the award does not create a waiver of the objections to confirmation to the enforcement of the award. *See* Analytical Commentary on Draft Text of a Model Law on International Commercial Arbitration, A/CN.9/264, March 25, 1985, p. 71 (attached as Exhibit 3 to the Vielleville Declaration).

instances, the reviewing court should resolve the issue by "taking the facts as found by the arbitrator, but reviewing his conclusion de novo*." E.I. DuPont de Nemours v. Graselli Emp. Ass'n*, 790 F.2d 611, 617 (7th Cir. 1986). This ensures that a federal court does not place its imprimatur on a private arbitral award that offends fundamental U.S. policy. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 638 (1985) ("[T]he national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate [public policy] interest … has been addressed.").

Accordingly, "an exception to th[e] general deference to arbitration exists for awards that clearly violate 'well-defined and dominant' public policy." *United Food & Commercial Workers Union AFL-CIO v. Pilgrim's Pride Corp.*, 193 F.3d 328, 332 (5th Cir. 1999) (citation omitted.) The Court should conduct its own review of the Final Award and the evidence related to FMO's corruption allegations to determine whether enforcement its enforcement violates U.S. public policy.

(3) <u>The Court Should Find that the TSMC was part of a Contractual Scheme which was the Product of Corruption.</u>

CME procured all the agreements arising out of its alliance with FMO (including the TSMC) through a scheme to obtain millions of Dollars from FMO through illegal contracts. The corruption scheme involved CME executives and directors at the highest levels, including Mr. Tyrone Serrao. *See* Witness Statement of Paula Maria Ziri-Castro, Exhibit 4 to the Vielleville Declaration.

The FMO officers involved in the scheme have each been criminally convicted in Venezuela for participation in the corruption scheme, which was part a far-reaching corruption scheme within FMO. The Venezuelan authorities have determined that as a result of this massive

corruption scheme, which include CME's alliance with FMO, FMO was overcharged by millions of Dollars. After discovering the corruption scheme in FMO, the Venezuelan police and judiciary vigorously investigated and prosecuted those linked to the scheme, resulting in the convection of several FMO managers and officers and the indictment of CME's officers.

FMO's evidence in support of the corruption underlying the TSMC party and its master agreement, the Commercial Alliance Agreement ("CAA") (attached as Exhibit 5 to the Vielleville Declaration), should have led the Panel to conclude that CME engaged in a corruption scheme. This evidence includes:

- FMO submitted a witness statement from Mrs. Paula Maria Ziri-Castro Lopez, the prosecutor in charge of the FMO corruption investigation. (Exhibit 4 to the Vielleville Declaration). In her witness statement, Mrs. Ziri-Castro testified that on October 24, 2013, the criminal court in Venezuela where the prosecution of FMO's former officers took place, issued an arrest order against Mr. Serrao on the basis that there was sufficient evidence to presume his participation, as CME's agent and chairman, in the crimes of embezzlement, collusion of a public official with a contractor and collusion to commit a crime. *Id.* at ¶ 4. Mrs. Ziri-Castro submitted a second witness statement providing further information to the Panel on the status of the criminal prosecution of Mr. Serrao and testified twice as to the content of these witness statements. The testimony of Mrs. Ziri-Castro shows that the iron-for-services agreements entered into by FMO with entities like CME established numerous crimes under Venezuelan law. *See* Exhibits 4, 6-8 to the Vielleville Declaration.

- On July 21, 2016, FMO's former president, Mr. Radwan Sabbagh pleaded guilty on the charges against him, including the charges of collusion with private contractors. *See,* Exhibit 5 to the Vielleville Declaration, at pp. 15-16; Exhibit 9 to the Vielleville Declaration, at p.21. CME was not only mentioned in the list of companies with which FMO had illicitly contracted but CME was also the object a criminal investigation in itself. *See* Exhibit 10 to the Vielleville Declaration, at pp. 255-258. The latter resulted in Mr. Tyrone Serrao, CME's agent and chairman, being charged with immediate accessory to the crime of intentional embezzlement, collusion between a public official and a contractor and criminal association punished under Articles 52 of the Venezuelan Anti-Corruption Law  and  Article 83 of the Criminal Code, Article 70 of the Anti-Corruption Law and Article 37 of the Law against Organized Crime and Financing Terrorism, for the contracts he entered into with FMO. Exhibits 11-12 to the Vielleville Declaration.

- Email dated September 3, 2010 from Mr. Tyrone Serrao to his lawyer Gerardo Vazquez, Esq. (Exhibit 13 to Vielleville Declaration). Ms. Lisa Sherriff, CME's comptroller, and an individual by the name Clemente Silva were copied in the email. During the hearings, Mr. Tyrone Serrao conceded that the multi-million dollar payments described in the September 3, 2010 email directly related to the relationship between CME and FMO. *See* Exhibit 14 to the Vielleville Declaration, at pp. 1128:25-1130:11. Significantly, Mr. Serrao's distribution of the amount discussed in the September 3, 2010 email left a 10% unaccounted for. During the hearing, Mr. Serrao could not explain

12

the destination of this 10%. *Id.* at p. 1132:18-25.  Mr. Serrao testified that Clemente Silva was a partner in the subcontractor that CME retained to operate the transfer station subject of the TSMC. *Id.* at pp. 1257:25-1258:24. In responding the Panel's interrogation, Mr. Serrao confessed that the above described payment was a "gift" from Mr. Silva representing several tens of millions of U.S. Dollars from funds paid by FMO to CME and then by CME to the subcontractor. *Id.* at p. 1264:6-14. Mr. Serrao could not properly described the reasons for Mr. Silva to give a gift of such magnitude. However, Mr. Serrao did admit that he did not disclosed to FMO that he was receiving these paybacks from CME's subcontractor. All this evidence should have raised a red flag that CME's principal had accepted an unjustified and poorly explained multi-million dollar payment in exchange for granting the operation of the transfer station which is the subject-matter of the TSMC.

- During the hearings, CME was unable to explain its corporate structure, particularly whether Ms. Sherriff was a shareholder in the company. (Exhibit 15 to the Vielleville Declaration). Furthermore, Mr. Serrao could not or would not reveal the identity of the beneficial owner of 80% of the stock of CME. (Exhibit 14 to the Vielleville Declaration, at pp. 1158:4-1159:23). Neither Mr. Serrao nor Ms. Sherriff has been able to provide satisfactory responses as to who owned CME between 2009 and 2013. CME's witnesses were not able to explain why there are contradictory documents showing Ms. Sherriff and her father as CME's shareholders at one point in time. Moreover,

the Panel requested CME to provide a flow chart of CME dating back to five or six years. *Id.* at p. 1160:7-20. CME never provided such chart.

- Ms. Sherriff's testimony at the hearing indicated that CME is a sham company not following any corporate formalities. In this sense, Ms. Sherriff, CME's corporate secretary, showed complete lack of knowledge with respect to CME's corporate structure and affairs, or any corporate meetings or resolutions adopted by the shareholders or the board of directors. See, Exhibit 16 to the Vielleville Declaration. CME's legal status should have raised alarm with the Panel as to how a company like CME could have received hundreds of millions of Dollars from a state-owned company.

- Neither CME not Mr. Serrao had any experience in most of the services to be provided to FMO, including charter of vessels. (Exhibit 17 to the Vielleville Declaration, at pp. 874:14-875:10).

- During the hearing, Mr. Serrao testified that CME did not present bids in order to be awarded the TSMC or any other of the contracts between CME and FMO. *Id.* at pp. 1254:22-1256:24.

- During the arbitration, CME disclosed that an entity with no relation with CME, PMS, entered into a contract with SMT Ship Management to assign all the services concerning the transfer station which is the subject matter of the TSMC. *See* Exhibit 17 to the Vielleville Declaration. CME, however, could not explain why PMS and not CME, entered into the subcontract with SMT Ship Management and the reasons for such an enigmatic contractual arrangement.

14

- On July 25, 2018, a Venezuelan court annulled the two umbrella agreements –the Framework Agreement and the CAA- pursuant to which the TSMC was executed. (Exhibit 18 to the Vielleville Declaration). Significantly, the petition for a declaratory judgment on the legality of the Commercial Alliance Agreement that provoked the annulment of the TSMC's umbrella agreement had been initiated by CME. (Exhibit 20 to the Vielleville Declaration)

There can be no dispute that FMO submitted numerous evidence indicating that CME –at least probably- engaged in a corruption scheme to secure the CAA and all its underlying agreements, including the TSMC.[2]  Faced with all this substantial evidence, however, the Panel decided to do nothing, exclusively focusing on Mrs. Ziri-Castro's testimony that the Venezuelan prosecutors did not resolve whether Mr. Serrao had made a direct payment to FMO's officers. The Panel's bias and lack of diligence against FMO's corruption allegations is highlighted by the Panel's decision to requests a $300,000 security deposit to cover FMO's request for production of documents from CME, where many of the requests were aimed at probing corruption allegations that FMO had red flagged. Final Award, ¶ 24. Having denied FMO the ability to adduce critical evidence regarding the bribery scheme, the Final Award barely considered the bribery issue at all, and summarily concluded that FMO had not carried its burden of proving its bribery and corruption allegations.

While the Panel declined to conclude that CME had made a direct payment to a FMO's

---

[2] During the arbitration proceeding, FMO filed detailed memoranda concerning all the circumstantial evidence underlying the issues with how CME secured the different agreements with FMO.  (Exhibits 17 and 19 to the Vielleville Declaration). The Final Award utterly fails to address the evidence and reasons submitted within these memoranda.

public officer, there is no question that the corruption scheme –whoever perpetrated it- produced the TSMC, as indicated by Mrs. Ziri-Castro's testimony and the orders and judgment issued by the Venezuelan criminal courts, and in contravention of established U.S. public policy. Moreover, even if the Final Award did not explicitly find that TSMC was obtained through bribery, that omission does not help CME. Deference is owed only to the factual findings made by the arbitrators, not those that they consciously avoid making. *See W.R. Grace*, 461 U.S. at 766; *Mitsubishi Motors*, 473 U.S. at 638.

Here, FMO submitted evidence confirming that the TSMC, as well as the entire universe of agreements comprising the FMO-CME relationship, was likely secured by corruption. The FMO employees involved in the relationship with CME pleaded guilty to many corruption-related crimes, Exhibit 4 to the Vielleville Declaration; Mr. Serrao was indicted by a Venezuelan criminal court, *Id.*; the CAA, the key agreement regulating the FMO-CME contractual relationship which includes the TSMC, was declared null and void by a Venezuelan court; and numerous circumstantial evidence leads to believe that TSMC was likely secured by corruption, Exhibit 19 to the Vielleville Declaration.

(4)     Enforcement of the Arbitral Award would be Contrary to United States Public Policy.

Recognition and enforcement of the Final Award would therefore violate the clear U.S. public policy against enforcement of a contract procured by corruption.  The majority of U.S. states, including Florida, reject enforcing illegal contracts. Moreover, bribery of foreign public officials and representative of a foreign political party (as the evidence suggest that what occurred here is a crime under the FCPA, and is a particularly pernicious form of bribery that undermines institutions and market-driven political economies at the very core of most basic U.S. public policy.) *See*, FCPA, 15 U.S.C. §§ 78dd-1, et seq. (prohibiting companies and their officers and

agents from influencing foreign officials through bribery, direct or indirect).

The United States is also a signatory to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, *see*, Exhibit 20 to the Vielleville Declaration, at p. 1 ("[B]ribery is a widespread phenomenon in international business transactions, including trade and investment, which raises serious moral and political concerns, undermines good governance and economic development , and distorts international competitive conditions"); and the United Nations Convention Against Corruption, *see,* Exhibit 23 to the Vielleville Declaration, at p. iii ("Corruption is an insidious plague that has a wide range of corrosive effect on societies. It undermines democracy and the rule of law, leads to violations of human rights, distorts markets, erodes the quality of life and allows organized crime, terrorism and other threats to human security to flourish."). *See also*, Emmanuel Gaillard, *The emergence of transnational responses to corruption in international arbitration*, ARB. INT'L, Vol. 35, Issue 1, pp. 1-2 (2019), attached as Exhibit 23 to the Vielleville Declaration (explaining the development of a true transnational public policy against corruption.)

Accordingly, although "[t]he public defense is to be construed narrowly," *Karahas Bodas*, 364 F.3d at 306, the exceptional circumstances of this matter present a compelling case for application of that defense. The Final Award dealt with a corruption scheme in a manner that was at best both cursory and vague, simply finding that the public prosecutor in charge on the FMO criminal investigation did not testify that CME made a direct payment to any FMO official. However, the same witness (Mrs. Ziri-Castro) did provide extensive testimony as to the criminal intent that the Venezuelan public ministry found in the barter system adopted by FMO and CME in their dealings. *See*, *i.e.*, Exhibit 6 at p. 12.   In the vast majority of cases involving alleged corruption, there is no admission or other direct proof of the crime, and arbitrators must assess the

allegations based on circumstantial evidence. This circumstantial evidence is frequently described as "indicia" or "red flags" of corruption. *See*, Carolyn B. Lamm, Hansel T. Pahm & Rahim Moloo, *Fraud and Corruption in International Arbitration*, LIBER AMICORUM BERNARDO CREMADES, p. 669 at 703 (2010) (attached as Exhibit 21 to the Vielleville Declaration); Constantine Partisides, *How Should Tribunal Deal with Evidence of Corruption of an Investment or the Securing of Government Permits?*, 25 ICSID REVIEW 1, ¶56 (2010) (attached as Exhibit 22 to the Vielleville Declaration); Claus Werner Von Wobeser, *The Corruption Defense and Preserving the Rule of Law*, ICCA Congress Series, Volume 19, pp. 203-224 (2017) (attached as Exhibit 24 to the Vielleville Declaration).

However, the Final Award fails to discuss any of the evidence of corruption with the exception of a reference to Mrs. Ziri-Castro's testimony only to conclude that she had not identified any CME-related direct payment to FMO officials. The Panel utterly disregarded Mrs. Ziri-Castro's detailed testimony as to how CME's conduct was indicative of corrupt intent under Venezuelan law. *See*, Exhibit 8 to the Vielleville Declaration, pp. 3774-3791. The strong U.S. policy demands more and calls for this Court to decline to recognize and confirm the award in the face of substantial direct and circumstantial evidence that corruption was the reason CME was awarded all of its contracts –including the TSMC– with FMO.

The weight of evidence (discussed above) compels the conclusion that CME likely obtained the TSMC through corruption. In fact, CME's principal, Mr. Tyrone Serrao was indicted, together with several former FMO officials, for corruption. *See* Exhibits 11 and 12.  The Panel, like it was the case with most of the evidence submitted by FMO, failed to consider this evidence.

More fundamentally, even if there are doubts about whether CME paid a bribery to one or more FMO officers, the barter scheme by which CME obtained the TSMC was both criminally

CASE NO.: 19-cv-25217 (DPG)

and administratively illegal under Venezuelan law. Indeed, several former FMO officers were criminally charged and convicted in Venezuela for those acts. Mr. Serrao himself was indicted for those acts. Regardless of the Final Award's uncertainty as to whether CME actually paid a bribe to a former FMO officer, the illegal scheme and acts resulted in CME's acquisition of the TSMC. Therefore, this Court must refuse to recognize and enforce the Final Award, as to do would contrive a strong policy against corruption, and would require the Court to "lend its aid to one who found a cause of action upon and immoral and illegal act," *Misco*, 484 U.S. at 42.

In addition, the recognition and confirmation of the Final Award's conclusion that CME did not engage in corruption in its dealings with FMO, would itself violate U.S. public policy related to bribery. In particular, is clear that where (as here) there is evidence that a contract was obtained by bribery or corruption of a foreign public official, a U.S. cannot give legal effect to an arbitral award that upholds a contract while failing to resolve the question of whether bribery has occurred. *See, Grynberg v. BP, P.L.C.*, 527 F. App'x 278, 281 (5th Cir. 2013) (finding, with respect to a payment intended to bribe a public official, that "[t]he arbitrator's failure to determine the nature of the disputed payment warrants the vacatur of the [the Award]" (internal quotation omitted)). *See also England v. Sys. Mgmt. A, Corp.*, 38 F. App'x 567, 572 (Fed. Cir. 2002) ("The case law uniformly states that public policy considerations … preclude the enforcement of contracts tainted by bribery, kickbacks or conflicts of interests.") That is because giving legal effect to the corruption of foreign public officials violates U.S. public policy. Accordingly, the Panel simply did not have the discretion to give legal effect to a contract that was obtained by violating Venezuelan criminal and public procurement laws as well as U.S. laws adopted to fight corruption.

Finally, the Final Award did not address U.S. public policy, nor would this court owe any deference to the Final Award's resolution of U.S. public policy had it done so. Specifically, the

Final Award based its determination of corruption on no ascertainable law, just the arbitrators' own personal views. However, the arbitrators' personal view, of course, does not determine the scope of U.S. public policy.

In sum, enforcement of the Final Award would result in a windfall to CME based on future services never rendered under contract procured by corruption in violation of U.S. public policy. FMO thus opposes recognition of the lion's share of the Final Award awarding CME millions of Dollars in future lost profits, which would require FMO to pay CME on a prospective basis amounts CME would have received if FMO had not terminated the TSMC that was invalidly obtained by corruption.

## B.        THE FINAL AWARD IS NOT REASONED

Section 29 of the Maritime Arbitration Rules of the Society of Maritime Arbitrators, Inc. ("SMA Rules") requires that the arbitrators provide reasons for her award ("[T]"he Award and the Arbitrator(s)' reasons for same shall be made in writing …"). FICAA is based on the model law of the United States Commission on International Trade ("UNCITRAL") and provides the statutory framework for arbitral awards rendered in international arbitration held in Florida. Section 684.0042 of FICAA states that "[T]he Award shall state the reasons upon which it is based, unless the parties have agreed no reasons are to be given[.]"

The Panel's "discussion" of FMO's corruption defense is found in pages 57-63 of the Final Award and that is not reasoned award. *See, e.g., Tully Constr. Co. v. Canam Steel Corp.*, No. 13 Civ. 3037, 2015 WL 906128, at *15 (S.D.N.Y. Mar. 2, 2015) The Panel was required to issue an award identifying the reasons for its conclusion. This was required by both the SMA Rules and Section 684.0042.  *See also, Cat Charter*, 646 F.3d at 844 (stating that a reasoned award "is an

award that is provided with or marked by the detailed listing or mention of expressions or statements offered as a justification of an act—the 'act' here being, of course, the decision of the Panel.")  As already indicated in this response, the Final Award fails to discuss any of the evidence of corruption with the exception of a reference to Mrs. Ziri-Castro's testimony only to conclude that she had not identified any CME-related direct payment to FMO's officials. The Panel utterly disregarded (*inter alia*) Mrs. Ziri-Castro's detailed testimony as to how CME's conduct was indicative of corrupt intent under Venezuelan law. Moreover, the Final Award ignores all the circumstantial and direct evidence propounded by FMO, concerning CME's inability to be awarded and perform contracts of the magnitude of the TSMC as well as the secret and bizarre dealings and payments between Mr. Serrao, his lawyer, Mr. Gerardo Vazquez, Esq., and the subcontractor for the transfer station, Mr. Clemente Silva.  *See, supra*, pp. 13-14 and Composite Exhibit 21 to the Vielleville Declaration.

Here, the Panel solely provided reasons with respect to Mrs. Ziri-Castro's non-identification of a direct payment from CME to any FMO officer. However, it did not provide any mention or reasoning for FMO's substantial evidence offered in support of its corruption defense –including Mrs. Ziri-Castro's extensive testimony as to the illicit intent of CME entering into the CAA and related agreements– and it did not provide any reasoning with respect to the corruption defense in general.  Under applicable law, the Panel could not reject FMO's corruption defense without providing its reasoning for doing so. This is yet another reason to deny recognition of the Final Award.

CASE NO.: 19-cv-25217 (DPG)

### III.    CONCLUSION

WHEREFORE, FMO respectfully request the Court to deny CME's First Amended Petition to Confirm, Recognize, and Enforce Final Arbitration Award and for Entry of Judgment and grant to FMO such other and further relief as this honorable Court may deem just and proper.

CASE NO.: 19-cv-25217 (DPG)

Dated September 27, 2021.

ASSOULINE & BERLOWE, P.A.
1250 Mary Street, Ste. 100
Miami, FL 33133
Telephone: (305) 567-5576
Facsimile:  (305) 567-9343
By: */s/ Daniel E. Vielleville*
Daniel E. Vielleville (FBN 940496)
DEV@assoulineberlowe.com
Secondary:  mf@assoulineberlowe.com
*Attorneys for Respondent CVG Ferrominera*
*Orinoco, C.A.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 27, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Daniel E. Vielleville*
Daniel E. Vielleville, Esq.

23