Page 1010

```
 1

 2   Before the Society of Maritime Arbitrators
     IN THE MATTER OF THE ARBITRATION BETWEEN:
 3   -------------------------------------------
     COMMODITIES & MINERALS ENTERPRISE, LTD.,
 4
             Claimant,
 5
        v.
 6
     CVG FERROMINERA ORINOCO, C.A.,
 7
 8           Respondent.
     -------------------------------------------
 9

10
                     Volume V
11            TRANSCRIPT OF ARBITRATION

12

13

14

15           TRANSCRIPT of the stenographic

16   notes of the proceedings in the

17   above-entitled matter, as taken by and

18   before TAB PREWETT, a Registered

19   Professional Reporter, a Certified

20   Shorthand Reporter, a Certified LiveNote

21   Reporter, and Notary Public, held at the

22   Offices of BLANK ROME, LLP, The Chrysler

23   Building, 405 Lexington Avenue, New York,

24   New York  10174, on Wednesday, May 31,

25   2017, commencing at 9:30 a.m.
```

Page 1011

```
 1
 2   A P P E A R A N C E S :
 3
 4
 5
 6   The Panel:
 7
 8
 9       John D. Kimball, Chairman
10
11
12
13       George G. Wentz, Jr., Arbitrator
14
15
16
17       A.J. Siciliano, Arbitrator
18
19
20
21
22
23
24
25
```

Page 1013

```
 1
 2
 3   FOR PMO:
 4
 5            DeJESUS & DeJESUS
 6       BY:  DR. ALFREDO DE JESUS O., ESQ.
 7            Special Counsel
 8            ELOISA FALCON LOPEZ, ESQ.
 9            Special Counsel
10       JAMES DRAKE QC, Of Counsel
11       MARIE THERESE HERVELLA, ESQ.
12       JAVIER CARRILLO, ESQ.
13       DEBORAH ALESSANDRINI, ESQ.
14       4 Rue Quentin Bauchart
15       75008 Paris, France
16       Attorneys for Respondent
17
18
19
20
21
22
23
24
25
```

Page 1012

```
 1
 2
 3   FOR CME:
 4
 5
 6
 7            HOLLAND & KNIGHT LLP
 8       BY:  MICHAEL J. FREVOLA, ESQ.
 9       31 West 52nd Street
10       New York, New York  10019
11       Attorneys for the Claimant
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 1014

```
 1
 2
 3       ASSOULINE & BERLOWE
 4       BY:  DANIEL E. VIELLEVILLE, ESQ.
 5       3250 Mary Street, Suite 100
 6       Miami, Florida  33133
 7       Attorneys for the Respondent
 8
 9
10
11
12
13
14       MAHONEY & KEANE LLP
15       BY:  EDWARD A. KEANE, ESQ.
16       11 Hanover Square, 10th Floor
17       New York, New York  10005
18       Attorneys for the Respondent
19
20   Also Present:
21       Andrea Jailbrink, International Law Assistant, Holland & Knight
22
23       Tyrone Serrao, CME
24
25
```

Page 1015

```
 1            CME v. FMO - Volume V
 2        P R O C E E D I N G S
 3           CHAIRMAN KIMBALL:  Ready to
 4    proceed?  Okay.  We will resume the
 5    hearing with the cross examination of
 6    Mr. Serrao.  Before we start with the
 7    questioning, please give us a status
 8    report concerning the discussions on
 9    the wagons contract.
10           MR. KEANE:  I suppose I can
11    speak to that, Mr. Chairman.  There
12    was a proposal which has been
13    considered by my client, but they have
14    declined the offer.  So I think it's
15    back to the panel for a decision.
16           CHAIRMAN KIMBALL:  So you did
17    not revolve the dispute?
18           MR. KEANE:  We did not resolve
19    it.
20           CHAIRMAN KIMBALL:  Okay.  So
21    the panel will take that up at a
22    break.  And let me ask, Mr. Serrao, a
23    few questions about the wagons
24    contract.  Just let me remind you that
25    you are still under oath.
```

Page 1016

```
 1            CME v. FMO - Volume V
 2           THE WITNESS:  Yes.
 3    T Y R O N E    S E R R A O,
 4    having been previously sworn by the notary
 5    public to testify to the truth, testified
 6    as follows:
 7           CHAIRMAN KIMBALL:  When were
 8    the wagons actually delivered to FMO?
 9           THE WITNESS:  In September of
10    2013.
11           CHAIRMAN KIMBALL:  Who was the
12    president of FMO at that time?
13           THE WITNESS:  Mr. Zambrano.
14           CHAIRMAN KIMBALL:  Did FMO ever
15    deliver any iron ore to CME as payment
16    under the wagons contract?
17           THE WITNESS:  No, sir.
18           CHAIRMAN KIMBALL:  Is the claim
19    in the wagons arbitration for the
20    difference the amount CME paid for
21    these wagons and the amount FMO agreed
22    to pay CME?
23           THE WITNESS:  Sorry.  Can you
24    rephrase.
25           CHAIRMAN KIMBALL:  I will be
```

Page 1017

```
 1            CME v. FMO - Volume V
 2    happy to.
 3           Is the claim in the wagons
 4    arbitration for the difference between
 5    what -- the amount that CME paid for
 6    the wagons, and the amount FMO had
 7    agreed to pay CME?
 8           MR. SICILIANO:  For the wagons.
 9           THE WITNESS:  For the wagons.
10           CHAIRMAN KIMBALL:  For the
11    wagons.
12           THE WITNESS:  The question is
13    if the claim is?
14           CHAIRMAN KIMBALL:  In the
15    wagons arbitration.
16           THE WITNESS:  Yes, there is a
17    claim in the wagons arbitration.
18           CHAIRMAN KIMBALL:  What is the
19    claim in the wagons arbitration?
20           THE WITNESS:  I can't remember.
21           MR. FREVOLA:  Are you asking if
22    it's for a difference or a full
23    amount, Mr. Kimball?
24           CHAIRMAN KIMBALL:  Yes.
25           MR. FREVOLA:  Okay.  Because I
```

Page 1018

```
 1            CME v. FMO - Volume V
 2    am not exactly sure what you were
 3    asking.
 4           Is the claim on the wagons
 5    contract for the full amount of the
 6    contract that you have with FMO?
 7           THE WITNESS:  Yes.  It's the
 8    full amount.
 9           MR. FREVOLA:  Okay.
10           CHAIRMAN KIMBALL:  When you
11    negotiated the wagons contract with
12    FMO, who did you deal with?
13           THE WITNESS:  A letter was
14    received from the railroad department,
15    FMO, requesting a quotation to us, and
16    we quoted to them.
17           CHAIRMAN KIMBALL:  Do you know
18    if that letter was sent to other
19    companies?
20           THE WITNESS:  I don't know.
21           CHAIRMAN KIMBALL:  Has that
22    letter been produced, and is it part
23    of the record?
24           MR. FREVOLA:  I don't believe
25    so.
```

Page 1019

```
 1            CME v. FMO - Volume V
 2        CHAIRMAN KIMBALL:  Do you have
 3   a copy of that?
 4        MR. FREVOLA:  I think we could
 5   find it.  We will take a look.
 6        CHAIRMAN KIMBALL:  Okay.  I
 7   would ask you to do that.
 8        (Document, letter from FMO
 9   railroad department to CME requesting
10   quotation, requested.)
11        CHAIRMAN KIMBALL:  Did you
12   advise FMO that CME would be
13   subcontracting with CSR for the
14   construction of the wagons?
15        THE WITNESS:  Yes.  They knew
16   that.
17        CHAIRMAN KIMBALL:  Did anyone
18   from CMO -- from FMO ask you for
19   details of that subcontract?
20        THE WITNESS:  No, they didn't.
21        CHAIRMAN KIMBALL:  Is it
22   correct that FMO accepted CME's
23   invoices for the wagons contract
24   during the financial reconciliation?
25        THE WITNESS:  Yes, they did.
```

Page 1020

```
 1            CME v. FMO - Volume V
 2        CHAIRMAN KIMBALL:  Thanks for
 3   those clarifications.
 4        Mr. Keane.
 5        MR. SICILIANO:  Just one to
 6   follow up on what the chairman was
 7   asking you, Mr. Serrao.
 8        THE WITNESS:  Thank you.
 9        MR. SICILIANO:  You explained
10   that you were invited to bid on this
11   contract by the railroad division of
12   FMO?
13        THE WITNESS:  Yes.
14        MR. SICILIANO:  And you
15   submitted a bid?
16        THE WITNESS:  I did.
17        MR. SICILIANO:  And is that bid
18   the same amount that you eventually
19   invoiced FMO?
20        THE WITNESS:  The first bid was
21   a little higher because it was for
22   less wagons.  And they asked us in
23   another letter if we could reconsider
24   the price, and they were interested in
25   increasing the number of wagons,
```

Page 1021

```
 1            CME v. FMO - Volume V
 2   because -- so we quoted a reduced
 3   price for 200 pieces.
 4        MR. FREVOLA:  Just to be clear,
 5   because there are fewer wagons being
 6   requested, the price per wagon was
 7   higher?
 8        THE WITNESS:  Yes.
 9        MR. SICILIANO:  And you
10   submitted this revised bid?
11        THE WITNESS:  Yes.
12        MR. SICILIANO:  And was that
13   revised bid accepted in a formal
14   letter of acceptance?  How did the
15   contract end?  How did it consummate?
16   How did it finally come to pass that
17   there was an agreement?
18        THE WITNESS:  They sent us a
19   letter accepting our proposal.
20        MR. SICILIANO:  And that
21   proposal, that letter contains the
22   amount of your bid in the body of that
23   letter?
24        THE WITNESS:  I believe so.
25   Yes.
```

Page 1022

```
 1            CME v. FMO - Volume V
 2        MR. SICILIANO:  Thank you.
 3        THE WITNESS:  You are welcome.
 4        CHAIRMAN KIMBALL:  Mr. Keane,
 5   cross examination.
 6        MR. KEANE:  Thank you.
 7   CONTINUED CROSS EXAMINATION
 8   BY MR. KEANE:
 9        Q    Mr. Serrao, turning to your
10   written declaration, paragraph 11 states in
11   part:
12             "Through addendum number seven,
13   FMO transferred to CME part of the
14   operative pulling" -- in brackets --
15   "transportation" -- brackets -- "crushing,
16   homogenization, stacking, and stevedoring
17   costs for the iron ore up to the point when
18   it was loaded into the holds of the ship."
19        Do you see that?
20        A    Yes.
21        Q    And did CME at that point then
22   proceed to take on those responsibilities?
23        A    No, we didn't.
24        Q    Why not?
25        A    Because Ferrominera wanted to
```

Page 1023

```
 1              CME v. FMO - Volume V
 2  accommodate a payment of iron ore that we
 3  were making to them.  They needed cash.  So
 4  we made -- they ask us for a down payment,
 5  which it was part of the price of the iron
 6  ore.  And they will assign that inside
 7  their company to cover those operations.
 8      Q     So they got funding to continue
 9  to handle those operations on their own; is
10  that right?
11      A     Yes.
12      Q     Did there come a time when CME
13  did assume those responsibilities?
14      A     No.
15      Q     It goes on -- getting back to
16  your declaration -- paragraph 11, it states
17  that:
18            "Addendum seven also
19  contemplated among other things an
20  additional transfer station, including
21  shuttle vessels, temporary provision of
22  additional transfer stations including
23  shuttle vessels."
24            Do you see that?  That's on the
25  subparagraph C.
```

Page 1024

```
 1              CME v. FMO - Volume V
 2      A     Yes.
 3      Q     Did that ever come to pass?
 4      A     No.
 5      Q     Why not?
 6      A     Because we didn't get to the
 7  point to put that project together.
 8      Q     And the reason for that was?
 9      A     Time, other considerations that
10  were required, we never put it together,
11  this project.
12      Q     Going on to your next
13  paragraph, it states in part that:
14            "CME would incur expenses
15  resulting from its acquisition of different
16  contributions from service providers and
17  that CME would invoice FMO for those
18  expenses at the corresponding official
19  exchange rate."
20            Do you see that?
21      A     Yes.
22      Q     Now, that says that CME would
23  invoice for the expenses that you took on,
24  but it doesn't say that you invoiced for
25  expenses, plus the margin of profit for
```

Page 1025

```
 1              CME v. FMO - Volume V
 2  CME; is that right?
 3      A     Can you tell me which expenses
 4  you are talking about?
 5      Q     Well, let's say the expense of
 6  chartering a vessel in order to provide --
 7  a shuttle vessel?
 8      A     The shuttle vessel, CME will
 9  charge Ferrominera for that service.
10      Q     Right.  Well, let's look at the
11  language of 12.  We are talking about
12  addendum eight.
13      A     Yes.
14      Q     And what it says is that:
15            "CME would incur expenses
16  resulting from its acquisition of different
17  contributions from service providers."
18            Would a "vessel provider" be a
19  "service provider"?
20            MR. FREVOLA:  Can I ask where
21      it is just so I can --
22            MR. KEANE:  12, paragraph 12.
23            MR. FREVOLA:  Okay.  So you're
24      not talking about addendum eight,
25      language of addendum eight.  You are
```

Page 1026

```
 1              CME v. FMO - Volume V
 2      talking about the witness statement,
 3      right?
 4            MR. KEANE:  I am looking at his
 5      witness statement that references
 6      addendum eight.  It says the next
 7      addendum, addendum eight -- it goes
 8      on.
 9            MR. FREVOLA:  Very good.
10      A     So the services that CME would
11  provide?
12      Q     Well, I'm sorry.
13      A     No.
14      Q     The way I read this is that CME
15  is saying it will go out and obtain from
16  third-party service providers different
17  services.
18            CHAIRMAN KIMBALL:  What
19      specific part of addendum eight are
20      you referring to, Mr. Keane?
21            MR. KEANE:  I am referring to
22      his statement.  He explains the impact
23      of the addendum eight.  I am reading
24      his language.
25            MR. SICILIANO:  Paragraph 12
```

Page 1027

```
 1              CME v. FMO - Volume V
 2       from Mr. Serrao's witness statement
 3       and the language that was used to
 4       describe its services.
 5              CHAIRMAN KIMBALL:  That I
 6       understand.
 7              MR. KEANE:  Look at addendum
 8       eight.
 9       Q    Well, if you look at the actual
10       addendum, there are a number of "whereas"
11       clauses that introduce terms; and the third
12       "whereas" clause states that:
13              "CME has shown that they have
14       sufficient technical, financial, and
15       logistics capacity by intervening in
16       previous and current projects."
17              MR. FREVOLA:  Excuse me.  The
18       third "whereas" clause says that:
19              "The reactivation of Cerro
20          Bolivar requires that an important
21          investment be made in infrastructure."
22              MR. KEANE:  You are on a
23       different "whereas."
24              MR. FREVOLA:  Let's wait until
25       he tells us what he wants to ask
```

Page 1028

```
 1              CME v. FMO - Volume V
 2       about.
 3              MR. WENTZ:  It's on the third
 4       page of the agreement that he's
 5       reading from.
 6              MR. KEANE:  Okay.  I miscounted
 7       the "whereas" I was reading from.
 8              (There was a discussion off the
 9       record.)
10       Q    Why don't you read it to
11       yourself.  We can all read it.
12            All right.  The English version
13       states in part that:
14              "CME has shown sufficient
15       technical, financial, and logistics
16       capacity by intervening in previous and
17       current projects that are still being
18       implemented, mediating the financial
19       leveraging and subrogation of CVG,
20       Ferrominera, Orinoco Sierra, different
21       assets of service providers abroad, and
22       even within the country, all with the
23       purpose of guaranteeing the supply of iron
24       ore established in the contract and
25       complying with the corporate production of
```

Page 1029

```
 1              CME v. FMO - Volume V
 2       commercialization guidelines and goals
 3       established by CVG."
 4              Do you see that?
 5       A    Yes.
 6       Q    So at that point you had
 7       already -- is it correct that CME had
 8       already been engaged in various projects,
 9       which involved their financial leveraging
10       and subrogation of FMO's interest to
11       achieve the guidelines of increasing
12       productivity?
13       A    Yes.
14              MR. FREVOLA:  Could you --
15       Q    And in order to accomplish
16       that, had CME gone into the marketplace and
17       obtained contracts from third parties to
18       perform certain services for FMO?
19       A    If FMO requests CME a service,
20       CME will comply with their request.
21       Q    Okay.  And going back to your
22       statement, paragraph 12 -- well, was the
23       concept there that, when CME did that, that
24       it would invoice FMO for the expenses that
25       were incurred as a result of going to this
```

Page 1030

```
 1              CME v. FMO - Volume V
 2       marketplace and obtaining from third
 3       parties those services?
 4       A    CME will give a quotation
 5       for -- for a product that Ferrominera may
 6       require.
 7              Is that your question?
 8       Q    My question was:
 9              As I read your statement, CME
10       should have been quoting or presenting an
11       invoice or a dollar number or a Bolivar
12       number which would reflect the expenses
13       that FMO was experiencing by contracting
14       with these third parties?
15              MR. FREVOLA:  Well, I think --
16          I'm not sure that characterizes
17          paragraph 12 correctly.
18       Q    Well, it says that "CME would
19       invoice FMO for those expenses" -- and
20       "expenses" is what we have been discussing.
21       And it discusses at which rate the expenses
22       would be invoiced.
23              Do you see that?
24       A    Yes.
25       Q    So my question is:
```

Page 1031

```
 1              CME v. FMO - Volume V
 2          At least as to paragraph 12,
 3   all I'm saying is that the structure of the
 4   deal is that CME would go into the
 5   marketplace and obtain third-party
 6   services, and invoice for the cost of those
 7   services to FMO?
 8       A     This means, if FMO has a
 9   responsibility, for example, to pay a
10   bunker and they don't have money, they will
11   ask CME:
12          "Can you pay this?  And we will
13   reimburse you with iron ore."
14       Q     Okay.  And in doing that,
15   that's different than invoicing for the
16   cost of the bunkers and waiting to be
17   repaid by iron ore -- that's one thing.
18   Another thing is to invoice for the cost of
19   the bunkers and add a profit element into
20   the invoice that is being presented for
21   reimbursement by way of ore.
22          MR. FREVOLA:  Are there bunkers
23       mentioned in either paragraph 12 or
24       the -- or the addendum seven -- I am
25       confused -- addendum eight.
```

Page 1032

```
 1              CME v. FMO - Volume V
 2          MR. KEANE:  Mr. Serrao has
 3       raised bunkers as an example.
 4       A     Of something that we paid for
 5   Ferrominera.
 6       Q     I understand.
 7       A     So if we paid -- if we paid
 8   something, Ferrominera will reimburse us.
 9       Q     Right.  And that's the crux of
10   my question.  Is that how the deal was
11   structured, that, to the extent that CME
12   went into the marketplace and obtained
13   services of goods from third parties, it
14   was to invoice for the value that CME was
15   being charged for those services or goods,
16   present that to FMO, and be reimbursed by
17   way of ore; or was it that you would go
18   into the marketplace, contract for those
19   goods and services, invoice FMO for the
20   value of those services, and then add on
21   another element of profit to CME?
22          MR. FREVOLA:  I'm going to
23       object to the question because there's
24       like multiple different things at
25       issue.  I mean, I have no problem with
```

Page 1033

```
 1              CME v. FMO - Volume V
 2   that question being asked, but just so
 3       it's being asked in a way that he
 4       understands it.
 5          CHAIRMAN KIMBALL:  Well, the
 6       question, Mr. Serrao, can you
 7       understand the question?
 8       A     It's too broad because you are
 9   talking about a specific purchase or a
10   specific contract or a specific element
11   that CME has paid.  Can you tell me where,
12   which one you're talking about?
13          CHAIRMAN KIMBALL:  Mr. Keane,
14       perhaps you can break it down more
15       simply.
16          MR. KEANE:  I will try.
17       Q     You mentioned bunkers.  Were
18   bunkers supposed to be invoiced at the same
19   cost that -- that was paid by CME?
20       A     Yes.
21       Q     And did CME invoice the cost
22   that it paid, or did it invoice the cost
23   that it paid plus a profit margin?
24       A     I can't remember.  I can't
25   remember.
```

Page 1034

```
 1              CME v. FMO - Volume V
 2       Q     What about obtaining charters
 3   or vessels for purposes of servicing FMO's
 4   needs?
 5       A     Charters, Ferrominera requested
 6   us -- invited us to quote, and we quoted
 7   Ferrominera.  We went to the market.  We
 8   contracted with the owners, and we offered
 9   to Ferrominera.  Ferrominera accepted our
10   offer.  And we signed the contract.
11       Q     And in that instance, was CME
12   to invoice FMO just as it did in the case
13   of bunkers?
14       A     No.
15       Q     I think you got ahead of my
16   question.
17          So in the case of the charter
18   party, did CME invoice the cost of the
19   charter party to FMO, or did it invoice the
20   cost of the charter party plus something
21   else?
22          MR. FREVOLA:  The cost to whom?
23       Cost to whom?  I think you are
24       confusing him.
25       Q     Cost to CME.
```

Page 1035

```
 1              CME v. FMO - Volume V
 2          MR. FREVOLA:  Okay.  Could you
 3    start that over again.
 4          MR. KEANE:  I will start it
 5    over.
 6          MR. FREVOLA:  Thank you.
 7     Q     CME chartered vessels at the
 8    request you say of FMO; is that right?
 9     A     Yes.
10     Q     Did CME then present an invoice
11    for the cost of that charter to FMO?
12     A     We presented a proposal, and a
13    contract was agreed.
14     Q     So in the case of a charter,
15    actually, CME entered into another contract
16    with FMO; is that correct, another charter
17    party?
18     A     Yes.
19     Q     Why did it do that as opposed
20    to simply passing on the cost with or
21    without an element of profit for CME to
22    FMO?  Why the need for another sub-charter?
23     A     I don't understand.  We are not
24    owners.  So what is your question?
25     Q     CME entered into charter
```

Page 1036

```
 1              CME v. FMO - Volume V
 2    parties with third-party vessel owners,
 3    correct?
 4     A     Yes.
 5     Q     At that point, CME could
 6    provide the vessel that you say FMO had
 7    requested it to obtain, correct?
 8     A     CME -- Ferrominera asked CME to
 9    provide that service for shuttling.
10     Q     Okay.
11     A     Yes.
12     Q     And CME achieved that goal by
13    chartering in a vessel?
14     A     Yes.
15     Q     CME could have invoiced the
16    cost of that vessel with or without a
17    profit element to FMO the same way it
18    invoiced bunkers that it had paid for the
19    cost of wagons?
20     A     But that's not -- that's not
21    how it works because CME is a company that
22    will make a profit out of the contracts
23    that it is selling to Ferrominera.
24     Q     Okay.  And is that a cost
25    across the board of development contracts
```

Page 1037

```
 1              CME v. FMO - Volume V
 2    that fell under the strategic alliance
 3    agreement?
 4     A     If you read -- if you read the
 5    strategic alliance, you will understand how
 6    it works.
 7     Q     Well, I have read it, and it
 8    seemed to me the way it worked was a
 9    partnership or a joint venture.
10     A     I don't believe so.
11     Q     How did you understand it?
12     A     That the contract for the CAA
13    had different ways that business could be
14    established between the parties.
15     Q     All right.  But is it your
16    testimony today that you did not understand
17    the CAA to be a strategic alliance?
18     A     The CAA is a strategic
19    alliance; but, if you read the strategic
20    alliance, you could see the options that
21    you have in the document.
22     Q     Do you recall yesterday you
23    looked at the CAA?  Do you recall the
24    language "joint venture" in both Spanish
25    and the English version italicized?  Do you
```

Page 1038

```
 1              CME v. FMO - Volume V
 2    recall that?
 3     A     We --
 4     Q     Answer the question, please.
 5          Do you recall your testimony
 6    yesterday where you and I looked at the CAA
 7    and we found the language "joint venture"
 8    in both the Spanish version and the English
 9    version?
10     A     Yes, we saw that.
11     Q     Yes.
12          Do you disagree that that's the
13    way the CAA itself defined the agreements?
14          MR. FREVOLA:  I'm going to
15      object.  He's not a lawyer.
16     A     I am not a lawyer.
17     Q     It doesn't ask for a legal
18    conclusion.
19          CHAIRMAN KIMBALL:  The witness
20      can answer the question.
21          MR. KEANE:  Thank you.
22          MR. FREVOLA:  Please pose the
23      question again.
24     Q     Do you -- well, I asked you if
25    you recalled looking at the CAA yesterday.
```

Page 1039

1            CME v. FMO – Volume V
2    And we found the language "joint venture"
3    in it?
4         A    Yes.
5         Q    Do you disagree today that
6    that's the way the CAA defined itself?
7         A    Yeah, I disagree.
8         Q    But you signed the CAA?
9         A    Yes.
10        Q    And do you recall me asking you
11   questions about your statement where you
12   referred to it as an "alliance."  Do you
13   recall that?
14        A    Yes.
15        Q    Do you disagree that it was an
16   alliance?
17        A    I am not disagreeing on the
18   word that was mentioned.  What I am
19   disagreeing is in what you are saying, that
20   the shuttle vessels are -- the shuttle
21   vessels are to be considered a joint
22   venture.  That I disagree.
23             So the fact that it's -- the
24   name is mentioned in the CAA, that's -- I
25   agree it's mentioned there.

Page 1040

1            CME v. FMO – Volume V
2         Q    And you referred to it as
3    "allies" and "alliance," "partnership"; is
4    that all right?
5         A    It's mentioned in the CAA, yes.
6         Q    And those are your words in
7    your statement?
8         A    That's correct.
9         Q    Now, is it also correct that
10   the charter parties were development
11   contracts under the CAA?
12        A    Under a certain area of the
13   CAA.
14        Q    Under the area called
15   "development contracts"?
16        A    Under the area called
17   "development contracts."
18        Q    The CAA defines "development
19   contracts" and addresses the terms of
20   development contracts; is that right?
21        A    Let's have a look where you are
22   talking about.
23        Q    Let's have a look.
24             MR. FREVOLA:  I'm going to
25        object.  I can have Mr. Serrao move

Page 1041

1            CME v. FMO – Volume V
2    out of the room if you want.
3             MR. KEANE:  No, go ahead.
4             MR. FREVOLA:  I mean, the issue
5        that I have here is that yesterday
6        afternoon, Mr. Kimball, you said that
7        these were questions that were being
8        asked by Mr. Keane multiple times at
9        that point.  And we are returning -- I
10       mean, we are not going to get done
11       with Mr. Serrao if we keep asking
12       about the CAA over and over again.  He
13       answered these questions.
14            CHAIRMAN KIMBALL:  It will be
15       up to Mr. Keane whether we finish
16       today.  I think it's a fair area of
17       examination.  I think he can proceed.
18        Q    "Development contract" is
19   referred to -- sir, if you have a copy of
20   the CAA -- clause two, subparagraph four
21   entitled "Development Contracts."
22            CHAIRMAN KIMBALL:  So the
23       record is clear, we are looking at
24       Exhibit 5 at page three in the English
25       translation.

Page 1042

1            CME v. FMO – Volume V
2             MR. FREVOLA:  Yes.
3             MR. KEANE:  Correct.
4             MR. FREVOLA:  Is there a
5        question pending?
6         A    Yes, the question -- the
7    development contract you asked me to look
8    at, right?
9         Q    I did ask you to look at it.
10   Have you read it?
11        A    Yes.
12        Q    And is it correct that the CAA
13   addresses development contracts and how
14   they fit into the CAA scheme?
15        A    No, because this will be if the
16   option of the trust would have taken place.
17        Q    I see.
18        A    I think so.
19        Q    So you believe that the
20   reference to "development contracts" is
21   only applicable if you set up the trust
22   fund which is referred to in clause seven?
23        A    Development contracts are
24   separate contracts.
25        Q    That doesn't answer my

Page 1043

```
 1                 CME v. FMO - Volume V
 2   question.
 3               Do you believe that the failure
 4   to set up a trust fund somehow changed the
 5   language of the development contract in the
 6   CAA?
 7         A    I don't know if -- I mean, I am
 8   not a lawyer.  I don't know how to phrase
 9   the wording of it.
10         Q    I am referring to your answer
11   to my question about 30 seconds ago.  You
12   can look at it.
13               I asked you a short time ago:
14               Is it correct that the CAA
15   addresses development contracts and how
16   they fit into the CAA scheme?
17               And you answered:
18               "No, because this will be if
19   the option of the trust would have taken
20   place."
21         A    The development contracts does
22   fit into the alliance.
23         Q    With or without the trust fund?
24         A    Depends how you are going to
25   interpret this contract.
```

Page 1044

```
 1                 CME v. FMO - Volume V
 2         Q    All right.  Let's look at your
 3   statement.  You have a whole section on
 4   development contracts.  Section seven
 5   starts at page 12, paragraphs 42 to 46.  Do
 6   you mention any reservations about the
 7   development contracts in connection with
 8   the trust fund?
 9         A    The CAA was intended to
10   complement.  That's what it's saying there.
11         Q    I know that.  My question to
12   you is:
13               Is there any reference in your
14   statement about development contracts
15   somehow being conditioned on trust fund or
16   being understood in a different manner
17   depending whether a trust fund was
18   established?
19         A    Can you repeat it again.
20               CHAIRMAN KIMBALL:  Do you
21         understand the question?
22         A    I'm sorry.  Can you say the
23   question again.
24         Q    Yes.  Read your statement.
25         A    Number 42.
```

Page 1045

```
 1                 CME v. FMO - Volume V
 2         Q    And the entire section,
 3   "Development Contracts."
 4         A    Okay.
 5               MR. FREVOLA:  42, 43, 44, 45,
 6         and 46.
 7         Q    Yes.
 8               Is there any reference there to
 9   development contracts in any way being
10   treated differently depending upon whether
11   a trust fund was established or not
12   established?
13         A    No, it's not saying that.
14         Q    What it is saying is that
15   development contracts fall within the
16   purview of the CAA; isn't that true?
17         A    Yes.
18         Q    And the CAA was a joint
19   venture, a partnership, an alliance,
20   allies; is that correct?
21               MR. FREVOLA:  I'm going to
22         object because nowhere in his witness
23         statement does it use the term "joint
24         venture"; and you are suggesting that;
25         you are putting words in his mouth
```

Page 1046

```
 1                 CME v. FMO - Volume V
 2         with regards to --
 3               MR. KEANE:  I am putting words
 4         from yesterday's testimony in his
 5         mouth.
 6               MR. FREVOLA:  The CAA says
 7         "joint venture."  The witness
 8         statement doesn't.
 9               CHAIRMAN KIMBALL:  The witness
10         can answer.
11         A    The development contracts are
12   in -- they are linked to the CAA.
13         Q    So wasn't the intent of the
14   CAA, in respect to third-party contracts
15   obtained on behalf of FMO, that they would
16   be invoiced at the same cost as CME
17   obtained those services?
18         A    No.
19         Q    And you say that even though
20   CAA itself defines itself as a joint
21   venture?
22         A    The CAA is just a document with
23   a general scope of arrangement of the
24   strategic alliance.
25         Q    All right.  You went out and
```

Page 1047

```
1                CME v. FMO - Volume V
2   obtained a number of charters; is that
3   correct?
4        A    Yes.
5        Q    Was the first the Blount?
6        A    The vessel Blount, yes.
7        Q    Yes.
8        A    It's one of the charters, yes.
9        Q    Do you know what rate you
10  chartered the Blount in -- at?
11       A    I can't remember the rate.  I
12  can't remember the rate.
13       Q    I don't think we have that, the
14  order from the Blount, the charter from the
15  Blount.
16            (Document, charter from the
17       Blount, requested.)
18       Q    Have you produced the head
19  charter on the Blount?
20       A    I don't know.
21            MR. FREVOLA:  I'm not sure if
22       we have or not.
23            MR. KEANE:  I don't think you
24       have.  I call for it.
25       Q    You don't recall the rate?
```

Page 1048

```
1                CME v. FMO - Volume V
2        A    No.
3        Q    The rate charged to FMO was
4   $35,000 a day; is that right?
5        A    I can't remember.
6        Q    Well, should we take a look at
7   that contract?  We can do that.
8            CHAIRMAN KIMBALL:  What is the
9       exhibit number.
10           MR. FREVOLA:  It looks like 21
11      of the Serrao exhibits.
12       Q    Sir, do you have the charter of
13  the Blount from CME to FMO?
14       A    Yes.
15       Q    And does it have a rate, a
16  freight rate?
17       A    Yes.
18       Q    What is the freight rate?
19       A    35,000 US dollars today.
20       Q    And you also chartered in the
21  General Piar at that rate; is that correct?
22       A    I have to see the contract.
23       Q    That's a different exhibit.
24  There are two versions of that contract,
25  but I think both have the same rate.  You
```

Page 1049

```
1                CME v. FMO - Volume V
2   can look at three or four.
3            MR. FREVOLA:  No, seven.
4            MR. KEANE:  Seven.
5        A    35,000.
6        Q    35,000, also?
7        A    Yes.
8        Q    We know the freight rate that
9   CME was paying to the owner of the Piar
10  because there was a lawsuit brought about
11  that one?
12            MR. FREVOLA:  Just for
13       clarification, you said "freight
14       rate."
15       Q    Daily hire.
16            And in those court documents,
17  it's shown that the rate CME was paying the
18  Piar's owner was $25,000 a day; do you
19  recall that?
20            You can look if you want at a
21  number of exhibits including the statement.
22            CHAIRMAN KIMBALL:  It's
23       Exhibit 9.
24       A    Yes.
25       Q    So do you believe that -- so
```

Page 1050

```
1                CME v. FMO - Volume V
2   there was a $10,000 difference between the
3   hire rate that CME chartered the vessel in,
4   and the hire rate that they chartered the
5   vessel out, at least on the Piar, correct?
6        A    Yes.
7        Q    Do you believe that the same
8   price differential was involved in the
9   Blount?
10       A    I don't -- I don't know.  I
11  have -- I will have to look for that.  I
12  don't know.
13       Q    Okay.  And there are -- there
14  is another vessel that --
15            MR. FREVOLA:  Ed, if I may --
16            MR. KEANE:  Sure.
17            MR. FREVOLA:  If we can
18       actually ascertain that during a break
19       and come back and confirm it on the
20       record, are you okay with that as
21       opposed to us trying to find it?
22            MR. KEANE:  Yes, that's fine.
23            MR. FREVOLA:  Okay.
24            MR. KEANE:  And the same would
25       go for the --
```

Page 1051

```
 1                CME v. FMO - Volume V
 2          MR. FREVOLA:  The other
 3      vessels.
 4          MR. KEANE:  The other vessels.
 5          MR. FREVOLA:  Very good.
 6      Q    Now, in any of those instances,
 7   did you tell FMO the freight rate that CME
 8   was paying to obtain the vessels from the
 9   head owner?
10      A    No.  We didn't.
11      Q    And were those contracts signed
12   by you and Mr. Sabbagh on behalf of FMO?
13      A    I don't know.  I have to check
14   that for you.
15          Yes, the General Piar was
16   signed by me and Mr. Sabbagh.
17          And the other one.  He was the
18   president.  Yes, also by me and
19   Mr. Sabbagh.
20      Q    I'm sorry.  "Yes" is the
21   answer?
22      A    You asked me if it was signed
23   by Mr. Sabbagh?
24      Q    And yourself.
25      A    Yes.
```

Page 1052

```
 1                CME v. FMO - Volume V
 2      Q    Now, why did you charter the
 3   Piar to FMO as opposed to simply invoicing
 4   them for either the cost to you for the
 5   Piar's charter or the cost and some
 6   additional profit if that was your desire?
 7          In other words, why was there a
 8   need for another charter?
 9      A    We chartered it from the
10   owners.  And we sold the service to
11   Ferrominera in another contract.
12      Q    Okay.  So did there come a time
13   under the iron ore contracts that CME was
14   asked to assume the responsibilities for
15   the transportation of the ore by vessel?
16      A    Can you show me what you mean.
17          CHAIRMAN KIMBALL:  We will take
18      a short break, Mr. Keane, and give you
19      a minute to ask your question.
20          MR. KEANE:  Sure.
21          (A break is taken.)
22          CHAIRMAN KIMBALL:  Let me just
23      note for the record that we have set
24      aside essentially two days for
25      Mr. Serrao.  So today is the second
```

Page 1053

```
 1                CME v. FMO - Volume V
 2      day.  We do intend to finish him
 3      today.
 4          We are giving you as much
 5      leeway as we can to finish your cross
 6      examination.  We do need to finish
 7      Mr. Serrao today.
 8          MR. KEANE:  I appreciate that.
 9      Understood.
10   CONTINUED CROSS EXAMINATION
11   BY MR. KEANE:
12      Q    Mr. Serrao, I had mentioned an
13   amendment to the "iron ore contract," but I
14   really meant to refer to the "transfer
15   system management contract."
16          You are familiar with that
17   document?
18          CHAIRMAN KIMBALL:  Exhibit 22.
19      Q    Exhibit 22.  You can take a
20   look at your statement at page 28 beginning
21   at paragraph 94.
22      A    Paragraph what, sir?
23      Q    You started paragraph 94
24   talking about it.
25          MR. FREVOLA:  On the statement.
```

Page 1054

```
 1                CME v. FMO - Volume V
 2      Q    And more particularly paragraph
 3   95 says that:
 4          "Pursuant to the TSMC, CME was
 5      to maintain, manage, and operate the
 6      transfer station for a term of five years."
 7          Do you see that?
 8      A    Yes.
 9          MR. FREVOLA:  Read the whole
10      thing, paragraph 95.
11          CHAIRMAN KIMBALL:  I don't
12      think we need to read the whole thing.
13      It's a reference point.
14          MR. FREVOLA:  I'm sorry.  I
15      thought he was pointing him to a place
16      in the document.  Okay.
17      Q    And the transfer station
18   includes two vessels, the Rio Caroni and
19   the Rio Orinoco?
20      A    Yes.
21      Q    So at that point you -- at that
22   point, CME was responsible for the
23   operation of those two vessels, as well as
24   the Boca Grande?
25      A    Yes.
```

Page 1055

```
1                  CME v. FMO - Volume V
2         Q      The General Piar fell outside
3    the transfer system management contract; is
4    that correct?
5         A      Yes.
6         Q      Earlier, I had asked why -- why
7    was there a need to charter the vessel from
8    CME to FMO, as opposed to just invoicing
9    for the cost that CME was experiencing in
10   chartering the Piar or the Blount or any of
11   the time charter vessels.
12               MR. FREVOLA:  That was asked
13         and answered.
14               CHAIRMAN KIMBALL:  What's the
15         question now?
16         A      Can you rephrase it?
17               MR. FREVOLA:  Hold on.  There's
18         an objection.  I think it was asked
19         and answered.  I mean.
20               CHAIRMAN KIMBALL:  I'm asking
21         Mr. Keane to proceed.  What's the
22         question?
23         Q      Why did you charter the vessel,
24   any of the time charter vessels, on to FMO,
25   as opposed to just invoicing for the
```

Page 1056

```
1                  CME v. FMO - Volume V
2    services that you were attaining?
3         A      Can you --
4         Q      Yeah.  Well, again, if you'd
5    take a look at your statement, going back
6    to paragraph 11, wasn't the way the CAA was
7    set up was that you would go -- use your
8    language.
9               Sorry.  Paragraph 12 of your
10   statement, we discussed that CME would
11   incur expenses resulting from the
12   acquisition of different contributions from
13   service providers, and that CME would
14   invoice FMO for those expenses at the
15   corresponding official exchange rate.
16               That, to me, says that you
17   would have kept the charter of the vessel,
18   not entered into another contract with FMO
19   to pass on the -- new charter party, but
20   rather, as this said, went into the
21   marketplace; you got the service providers,
22   entered into contracts; and you would
23   charge for those contracts.  But you
24   wouldn't create a new charter party.
25               Why did you create the new
```

Page 1057

```
1                  CME v. FMO - Volume V
2    charter?
3         A      I think it's a wrong
4    interpretation of yours because that's not
5    what --
6         Q      Okay.  So you're saying the
7    interpretation of paragraph 12 of your
8    statement is incorrect?
9         A      No, your interpretation.
10        Q      Right.  That's what I'm saying.
11        A      Yes.
12        Q      I thought that's what I said.
13   All right.
14               And then paragraph 13 says:
15               "As the foregoing addenda show,
16   the relationship between CME and FMO
17   changed from a buy/sell relationship under
18   the original 2004 iron ore sales contract
19   to a series of linked but distinct
20   contracts with provision of goods,
21   services, and financing in exchange for
22   material."
23               Correct?
24        A      Yes.  That is there.
25        Q      And, again, that doesn't
```

Page 1058

```
1                  CME v. FMO - Volume V
2    reference any subcontracts after CME has
3    obtained the goods and services.  It rests
4    with CME being paid by ore for having
5    obtained and provided those services or
6    goods.
7               CHAIRMAN KIMBALL:  What's the
8         question?
9         Q      Why, then, the need for a
10   sub-charter to Ferrominera?
11        A      Ferrominera needs a sub-charter
12   because -- at that time, I believe it was
13   the Rio Orinoco or Rio Caroni -- into dry
14   dock.  So they may have had that necessity
15   and ask us if we could provide them for
16   another shuttle.
17        Q      And you could have done that by
18   simply chartering a vessel.  That's my
19   point.
20        A      We did charter a vessel, and we
21   chartered it to Ferrominera.
22        Q      What I'm struggling with is the
23   need for the sub-charter to Ferrominera, as
24   opposed to just invoicing them for the cost
25   of the vessel you chartered them.
```

Page 1059

CME v. FMO - Volume V

1     A     I don't -- I don't understand
2  what -- how that could be done.
3           CHAIRMAN KIMBALL:  Why was
4     there was a sub-charter to FMO, as
5     opposed to an invoice for what you
6     paid, plus some markup?
7           THE WITNESS:  Because it was
8     discussed like that, that they asked
9     us to present an offer for a charter
10    hire, and we went in the market and we
11    sold the charter service to
12    Ferrominera under a separate contract.
13          CHAIRMAN KIMBALL:  And the
14    sub-charters were signed by FMO,
15    right?
16
17    A     Exactly.
18    Q     By Mr. Sabbagh, correct?
19    A     Yes.
20    Q     The markup of $10,000 on a
21 $25,000 per day hire, did you believe that
22 that was reasonable?
23    A     We took the risk.  I find it
24 is.
25    Q     You took the risk.  What risk?

Page 1060

CME v. FMO - Volume V

1     A     The commercial risk.
2     Q     Didn't you take the commercial
3  risk on all of the contracts that you
4  entered into under the CAA on behalf of or
5  in subrogation of that FMO?
6     A     I don't know what you mean.
7     Q     Wasn't that built into the CAA
8  in the framework agreement?
9
10    A     No.
11    Q     No?
12    A     Which just specifically you're
13 talking about?
14    Q     When you entered into
15 contracts --
16    A     Yes.
17    Q     -- in order to provide services
18 or goods to Ferrominera, there was a risk
19 element in that, necessarily, correct?
20    A     Yes.
21    Q     And the CAA and the ore
22 purchase and sale agreements all had a
23 compensation mechanism for you taking that
24 risk, which was you'd receive ore at a set
25 price.  And that was -- those were all

Page 1061

CME v. FMO - Volume V

1  negotiated terms, correct?
2           MR. FREVOLA:  I'm just going to
3     point out that at lines 48-21, he is
4     asked specifically what contracts are
5     being talked about.  I mean --
6           MR. KEANE:  I'm talking about
7     the time charters right now.
8           MR. FREVOLA:  Which one?
9           MR. KEANE:  The Piar,
10    25,000/$35,000, differential.
11          MR. FREVOLA:  Okay.  Piar.
12    Q     But my question is:
13          Didn't the CAA and the ore
14 contracts and the payment provisions under
15 the ore contracts already contemplate the
16 risk that you were contracting for services
17 on behalf of FMO?
18    A     It might have been.  I don't
19 know what specifically you're talking
20 about, what risk.
21    Q     I'm saying:
22          As a businessman, wasn't that
23 the nature of this overall agreement?  You
24 agreed to go into the marketplace and

Page 1062

CME v. FMO - Volume V

1  contract the services and goods and
2  subrogation of FMO, and, in exchange, they
3  provided you a certain set amount of ore?
4           MR. FREVOLA:  I'm objecting.
5     He's putting words in his mouth.  He
6     said there were subrogation contracts.
7     He didn't say they were all
8     subrogation contracts.  He said it
9     yesterday.  I'll show you the
10    transcript.  He mentioned specifically
11    one subrogation contract,
12    specifically.
13          CHAIRMAN KIMBALL:  We'll allow
14    the question to proceed.  Mr. Serrao
15    can answer the question.
16          MR. FREVOLA:  Can you rephrase
17    the question?
18          CHAIRMAN KIMBALL:  Mr. Serrao
19    can answer the question.
20    A     The question is not clear.
21 It's not clear to me because, when you say
22 that the charter contract is a subrogated
23 contract, you are wrong in your expression.
24    Q     Moving away from the word

Page 1063

```
 1          CME v. FMO - Volume V
 2    "subrogation," the CAA contemplated CME
 3    would go into the marketplace, obtain goods
 4    and services from third-party interests on
 5    behalf of FMO.  Can we agree on that?
 6          A    Which part are you talking
 7    about specifically?
 8          Q    Well, you can just refer to
 9    your statement, paragraph 13.  It says:
10               "The CAA contracts for
11    provisions of goods, services, financing."
12               And if you look at paragraph 40
13    of your statement --
14          A    40 or 14?
15          Q    40.
16               MR. FREVOLA:  Four zero or --
17          Q    Stay with 13.  Haven't we
18    discussed this ad nauseam, that that was
19    the CAA's intent, that CME would go out and
20    contract for provision of goods, services,
21    and financing in exchange for material?
22               MR. DENIG:  Objection.  So the
23          record is clear --
24               CHAIRMAN KIMBALL:  You can make
25          an objection.  Make it simple.
```

Page 1064

```
 1          CME v. FMO - Volume V
 2               MR. DENIG:  Paragraph 13
 3          doesn't reference the CAA.
 4               MR. FREVOLA:  It's not inside
 5          the CAA section.  I don't think it is.
 6          No, it's not.
 7               MR. KEANE:  Really?  Going to
 8          do this again?
 9               All right.  We'll do it again.
10          Q    If you look at paragraph 41 in
11    the statement referring to the CAA, it says
12    that things had evolved, essentially -- I'm
13    paraphrasing -- and that this was no longer
14    a sales contract relationship, but that CME
15    was providing a wide range of services,
16    including financing, and as an associate or
17    ally of FMO, rather than merely a purchaser
18    or buyer.
19          A    Correct.
20          Q    Correct?
21          A    That's what this is saying.
22          Q    And then it goes on.  I'm not
23    going to go through it again.  The CAA
24    talks about development contracts.
25               Am I wrong to think that the
```

Page 1065

```
 1          CME v. FMO - Volume V
 2    overarching concept of the CAA was that CME
 3    would provide goods and services and
 4    financing to Ferrominera in exchange for
 5    receipt of iron ore?
 6          A    Yes.
 7          Q    So in doing that, CME had
 8    already accepted the risks associated with
 9    that bargain; had it not?
10          A    What do you mean?
11          Q    It means you already accepted
12    the risks of contracting with third parties
13    in order to provide goods and services to
14    FMO, and the quid pro quo for that was that
15    FMO would give you ore?
16          A    The FMO would pay with ore,
17    yes.
18          Q    Right.  So when you say that by
19    taking on a charter there were risks
20    involved, that's true, and there were risks
21    involved in financing, and there were risks
22    involved in paying for bunkers.  There were
23    risks involved up and down the line on the
24    part of CME performing its portion of the
25    CAA.  And in exchange, you got ore.
```

Page 1066

```
 1          CME v. FMO - Volume V
 2               So I'm missing the additional
 3    need for a $10,000-a-day markup on a
 4    $25,000-a-day charter?
 5          A    That was the price we quoted,
 6    and Ferrominera accepted.
 7          Q    Okay.  Did you have any sense
 8    that you were working with an ally for a
 9    mutual benefit and you shouldn't get a
10    40 percent markup on the cost of an item or
11    a service to you?
12          A    Depends how you look at it.  It
13    works for us.  We are a business company,
14    and for making profits, and we presented a
15    proposal and it was accepted.
16          Q    Okay.  And it's all right to
17    make a rather significant profit on a deal
18    with your joint venture partner?
19          A    I don't know what you mean with
20    that.
21          Q    Assume for the sake of
22    argument, you were a joint venturer or a
23    partner with FMO.  Would it be okay to do
24    that, to mark up a contract and take a
25    profit?
```

Page 1067

```
 1                CME v. FMO - Volume V
 2        A    I respect your opinion.  That's
 3   your opinion.
 4        Q    Okay.  But I'm asking for your
 5   opinion.  Would that be okay?
 6        A    We presented the proposal for a
 7   hire, charter hire, and Ferrominera
 8   accepted it.
 9        Q    That's true of the Blount and
10   the -- all the other time-charter vessels?
11        A    That's correct.  They have
12   accepted contracts.  They have accepted
13   agreements.
14             CHAIRMAN KIMBALL:  Mr. Serrao,
15        did FMO ever ask you what CME was
16        paying the owner of the Blount --
17             THE WITNESS:  No.
18             CHAIRMAN KIMBALL:  -- or the
19        General Piar?
20             THE WITNESS:  No, they never.
21        Q    In the interest of
22   transparency, did you tell them?
23        A    What do you mean with that?
24        Q    What do I mean by that?  We
25   discussed yesterday that the CAA has
```

Page 1068

```
 1                CME v. FMO - Volume V
 2   provisions about transparency and
 3   efficiency in the contract.
 4             And I'm asking you:
 5             In satisfaction of the mutual
 6   agreement to be transparent with each
 7   other, did you tell FMO that you were
 8   providing them with a vessel with a hire
 9   rate at $35,000 a day, and you had it in
10   hire at $25,000?
11             MR. FREVOLA:  Objection.  Asked
12        and answered.
13             CHAIRMAN KIMBALL:  I'll agree
14        with the objection.  I think you can
15        ask the question more simply.
16        Q    You didn't tell FMO the cost to
17   you of any of the time charters; is that
18   right?
19        A    No.
20        Q    That's correct?
21        A    That's correct.  I never told
22   them.  They never asked.
23        Q    Now, the iron ore contract
24   provided --
25             CHAIRMAN KIMBALL:  Let's be
```

Page 1069

```
 1                CME v. FMO - Volume V
 2   clear what contract you're talking
 3   about.  Are you talking about the sale
 4   contract?
 5             MR. KEANE:  Serrao witness,
 6        Exhibit 1.
 7             MR. WENTZ:  2004.
 8             MR. Keane:  In the main
 9        contract, clause 4.
10             MR. FREVOLA:  Clause 4.
11        Q    It says:
12             "Buyer shall, at their own
13   expense, arrange for the transportation of
14   said iron ore."
15             Do you see that?
16             MR. FREVOLA:  Is it the third
17        paragraph on the page number 9?
18             MR. KEANE:  The third
19        paragraph, yes, it is.
20             MR. FREVOLA:  The last
21        paragraph before clause 5?
22             MR. KEANE:  Yes.
23             MR. FREVOLA:  Okay.  The first
24        sentence, right there.  He just asked
25        you about that sentence.
```

Page 1070

```
 1                CME v. FMO - Volume V
 2             (There was a discussion off the
 3        record.)
 4             MR. FREVOLA:  Same question.
 5        A    So we are the buyer.
 6             MR. FREVOLA:  He's asking you,
 7        does it say that?
 8        A    It says that, yes.  Yes.
 9        Q    And on contracts under the iron
10   ore agreement, did CME, as buyer, pay for
11   the transportation of the ore?
12        A    This is the transportation as
13   an export, exporting the iron ore.  We were
14   taking transportation.  This is --
15             (Witness reading to himself.)
16             (There was a discussion off the
17        record.)
18             CHAIRMAN KIMBALL:  What is the
19        question?
20        Q    Did CME pay for the
21   transportation of the ore that it
22   purchased?
23        A    CME's responsibility is to take
24   it from the FOB to China.  But I pay for --
25   we pay for the iron ore on an FOB basis.
```

Page 1071

CME v. FMO — Volume V

1
2    Q     On a what basis?
3    A     FOB.
4    Q     FOB at what point?  Who
5  nominated the point of loading?
6    A     Ferrominera.
7    Q     And when you took over the --
8  withdrawn.
9          Did some of the purchased cargo
10 of CME load at the ports?
11   A     In Puerto Ordaz, yes.
12   Q     And then cargo, would —— would
13 it go to China from the load port or would
14 it then also go to the transshipment
15 station, or did it vary?  Some of your
16 cargo, you loaded at the port, right?
17   A     Yes.
18   Q     And at that point, you had
19 purchased the cargo FOB.  Cargo was onboard
20 the vessel, correct?
21   A     Yes.
22   Q     Where did the cargo that was
23 loaded at the port go after that?
24   A     It depends.  I mean, which
25 specific vessel are you talking about?

Page 1072

CME v. FMO — Volume V

1
2    Q     I'm trying to find out what the
3  range was.  Some of your cargo did go
4  directly from the load port to China or to
5  a destination where it was sold?
6    A     If the vessel loads in
7  Puerto Ordaz and only in Puerto Ordaz, it
8  will go to the final destination.  If the
9  vessel is loading in Puerto Ordaz because
10 the vessel size will not take the entire
11 load, it will load part in Puerto Ordaz and
12 the bulk of the balance in Boca Grande.
13   Q     And in those instances, was CME
14 paying for the vessel?
15         MR. FREVOLA:  Can I ask what
16    instance, just so we're clear?  Which
17    one?
18   Q     Either of those two instances
19 you just gave me, got the vessel loaded and
20 then went to its ultimate destination or
21 loaded partially and then went to the
22 transshipment station to top up?
23   A     We would pay Ferrominera on FOB
24 basis.
25   Q     So then all those

Page 1073

CME v. FMO — Volume V

1
2  transportation costs, each leg or leg of
3  the ocean transit was paid by CME, the
4  vessel owner?
5    A     I don't understand that.
6    Q     You chartered a vessel to load
7  your cargo at the port, Puerto Ordaz,
8  right?
9    A     Yes.
10   Q     You paid for that vessel, CME,
11 would pay?
12   A     Yes.
13   Q     And that would be the case if
14 the vessel went to top up at the
15 transshipment or sail directly to its final
16 destination, correct?
17   A     Yes.
18   Q     Now, when CME was managing the
19 transshipment station, including the
20 shuttle vessels, was it handling cargo for
21 vessels that were loading cargo for others
22 than CME?
23   A     You're mixing -- or I'm
24 confused with your question.  Say it again,
25 please.

Page 1074

CME v. FMO — Volume V

1
2    Q     Sure.  What I'm saying is:  As
3  a manager of the transshipment station --
4    A     Yes.
5          MR. SICILIANO:  Transfer
6    station.
7          MR. KEANE:  Transfer station.
8    Q     -- transfer station, including
9  the shuttle vessels --
10   A     Yes.
11   Q     -- did you deal with cargos
12 that were being loaded for purchases other
13 than CME?
14   A     We just operate the shuttle
15 vessels in accordance to the instructions
16 given by FMO.  The material loaded in the
17 shuttle vessel will go to FMO, and FMO
18 decides who the material is for.
19   Q     So CME played no role in
20 designating load ports, whether it was the
21 port or the transshipment or transfer
22 station?
23   A     No.  We were just operating.
24   Q     So when you chartered in
25 time-chartered vessels, did they operate

Page 1075

CME v. FMO - Volume V

1  solely as shuttle vessels between the load
2  port and the transfer station, or did they
3  sometimes carry cargo for purchasers?
4       A    They chart -- when it's
5  chartered for the hire of shuttling, that's
6  the operation they do.
7       Q    Just that?
8       A    Just that.
9       Q    So if CME is a purchaser of
10  ore, it would have no dealings with any of
11  the time-chartered vessels in that -- in --
12  other than in the capacity as manager of
13  the transfer station operation?
14           MR. FREVOLA:  Can you define
15      "time-chartered vessels"?  Because
16      they had a time charter that they
17      brought in.  Do you see what I'm
18      saying?
19           MR. KEANE:  Yes, I do.
20       Q    Time-chartered vessels that
21  have been identified as being used, at
22  least in part, as shuttle vessels.  That
23  would be the Piar, the Blount, that -- in
24  that category.

Page 1076

CME v. FMO - Volume V

1       Do you follow what I'm saying?
2       A    And you said those --
3       Q    My question is -- the Palini is
4  another one.
5           CME's only involvement with
6  those types of time-chartered vessels that
7  operated, at least in part, as shuttle
8  vessels was strictly in respect to its
9  management of the transfer station, not as
10  a cargo buyer; is that right?
11      A    Transfer station, transfer
12  system is one contract.  Hired charter,
13  hired, separate contract.  Ferrominera
14  decides what they're going to do with the
15  vessels.  It's for Ferrominera to decide.
16      Q    Right.  But in some instances,
17  CME was a purchaser of ore and had to deal
18  with its FOB contracts, and that was
19  separate and distinct from its actions in
20  respect to transfer station operation; is
21  that right?
22      A    Yes, separate.
23           MR. WENTZ:  Could I ask a quick
24      question before we move off of that

Page 1077

CME v. FMO - Volume V

1  topic?
2           I don't think we got an answer
3  to, the coal -- not coal, the iron ore
4  that was shuttled to the transfer
5  station under the transfer management
6  contract by CME, was some of that sold
7  to third parties, third-party buyers?
8           THE WITNESS:  Yes, sir.  Sorry.
9           MR. WENTZ:  Okay.  So some of
10      the iron went to third-party buyers
11      other than CME?
12           THE WITNESS:  Yes.
13           MR. WENTZ:  Okay.  I just
14      wasn't clear on that.
15      A    CME don't decide anything.
16           MR. WENTZ:  Simple question.
17      Q    Sir, in your statement, you
18  justify the differential between the cost
19  of the Piar to CME and that which was
20  charged to FMO, in part by saying that the
21  head charter didn't have a force majeure
22  clause.
23           Do you recall that testimony?
24           CHAIRMAN KIMBALL:  Can you

Page 1078

CME v. FMO - Volume V

1  point us to a specific paragraph.
2           MR. KEANE:  Yeah.
3           MR. FREVOLA:  I think that
4      might be assuming testimony not in
5      evidence.
6           MR. KEANE:  I think paragraph
7      74 of the statement.
8           MR. FREVOLA:  He's asking about
9      this paragraph.
10           THE WITNESS:  Yes, I'm reading
11      it.
12           MR. FREVOLA:  Okay.
13      Q    I withdraw the question.
14           You told me earlier that part
15  of the rationale for the difference between
16  the price you chartered the Piar in and the
17  price you chartered it out to FMO was the
18  risk, and you discussed that.
19           Anything else that comes to
20  mind to justify a $10,000 increase in the
21  hire rate?
22      A    If you read paragraph 74 --
23      Q    Right.
24      A    -- that will -- that has, also,

Page 1079

CME v. FMO - Volume V

1    CME v. FMO - Volume V
2    other considerations that should be taken
3    in.
4        Q    Okay.  You filed a lawsuit
5    against the -- among others, the owners of
6    the Gretchen -- the owners of the Piar,
7    Gretchen Shipping?
8        A    Yes.
9        Q    And you claimed fraud in the
10   inducement into that charter party?
11       A    Yes.
12       Q    And you alleged that it was an
13   exorbitant rate of hire charged to CME by
14   Gretchen Shipping; is that right?
15       A    Those were allegations, yes.
16       Q    Allegations you made, right?
17       A    Yes.
18       Q    You submitted an affidavit
19   saying those allegations; is that right?
20       A    Yes.
21       Q    Yes?
22       A    Yes.
23       Q    Did you tell -- once you
24   recognized what you perceived as a fraud
25   and inducement to that contract and what

Page 1080

1    CME v. FMO - Volume V
2    you perceived to be exorbitant hire rates
3    charged to you, did you tell FMO that the
4    contract that they had sub-chartered was
5    the product of fraud and inducement?
6        A    No, we did not.
7        Q    Did you tell them that you had
8    discovered that the charter hire that CME
9    was paying was exorbitant and you were
10   asking the Court to essentially set it
11   aside?
12       A    Those were allegations
13   difficult to prove, but they were alleged,
14   yes.
15       Q    Well, they were allegations
16   that were successful in reducing an
17   $18 million claim to about a $1.7 million
18   claim; is that correct?
19       A    I don't -- what do you mean by
20   that?
21       Q    Well, let's look at your
22   affidavit.
23            Look at paragraph 70.
24            "While CME never proved any of
25   the allegations against Gretchen and

Page 1081

1    CME v. FMO - Volume V
2    against the other defendants in CME's claim
3    under the General Piar head charter, those
4    allegations did result in a substantial
5    benefit.  CME was able to settle Gretchen's
6    hire claims of $18,413,841.72, for the
7    total amount of $1,732,893.71, or less than
8    10 percent of the Gretchen's claim."
9            Do you see that?
10       A    Yes.
11       Q    So it's correct that the
12   allegations were successful in reducing the
13   Gretchen's claim for hire by 90 percent; is
14   that right?
15       A    It might be.
16       Q    Well, it's your statement.  Is
17   it correct?
18       A    Yes.
19       Q    So did you ever tell
20   Ferrominera about any of the lawsuit CME
21   brought against Gretchen Shipping and the
22   outcome of that lawsuit?
23       A    I don't recall having told
24   Ferrominera.
25       Q    And you didn't offer to reduce

Page 1082

1    CME v. FMO - Volume V
2    their rate of hire, having discovered that
3    $25,000 a day was exorbitant?
4            MR. FREVOLA:  I think that
5        the -- that takes a one-sided view of
6        the testimony.  I think he explained
7        why.
8            CHAIRMAN KIMBALL:  Mr. Frevola,
9        just state whether you object.
10           MR. FREVOLA:  I object.
11           CHAIRMAN KIMBALL:  Can you
12       restate the question?
13       Q    Did you ever offer a reduction
14   in the hire rate that CME was receiving
15   from FMO on the Piar after you discovered
16   what, in your view, were exorbitant rates
17   for the hire you were paying?
18       A    At the -- that FMO was
19   receiving.
20       Q    You discovered, right -- your
21   declaration goes through it in some
22   detail -- that the rate CME was paying was,
23   in your assessment, exorbitant,
24   unjustifiable?
25       A    Those were allegations, as I

Page 1083

```
 1                  CME v. FMO – Volume V
 2   mentioned before.
 3         Q     Right.  But those are your
 4   allegations?
 5         A     Yes.
 6         Q     You believed them; didn't you?
 7         A     But it never came to any
 8   conclusion.
 9         Q     They were your beliefs,
10   correct?
11         A     They were my allegations, yes.
12         Q     Your allegations based on your
13   beliefs?
14         A     At that time.
15         Q     At that time?
16         A     Yes.
17         Q     What about today?  Do you have
18   the same belief?  Is the charter hire rate
19   agreed to between Gretchen Shipping and CME
20   exorbitant?
21         A     They are two different
22   contracts.
23         Q     I'm talking about your contract
24   with Gretchen, $25,000 a day.  Is that an
25   exorbitant hire rate?
```

Page 1084

```
 1                  CME v. FMO – Volume V
 2         A     Was that what?  Sorry.
 3         Q     Was that exorbitant?  Is that
 4   unjustifiable?  Did you bring a lawsuit
 5   trying to be relieved of those terms and
 6   conditions because you believed that they
 7   were induced by fraud and unsupportable?
 8         A     That was the allegation that I
 9   mentioned.
10         Q     Right.  Did you believe your
11   allegations?
12         A     We wrote it.  Yes.
13         Q     And you swore to it.  You
14   submitted an affidavit in that court case,
15   saying those very things; did you not?
16         A     Yes.
17         Q     Do you believe it today?
18         A     It never came to any -- just an
19   allegation.
20         Q     I understand.  I'm asking you
21   about your belief.  You believed it then.
22   You swore to it.  Correct?
23         A     I will have to think about
24   that.
25         Q     But in any event, did you ever
```

Page 1085

```
 1                  CME v. FMO – Volume V
 2   tell FMO about any of the substantive
 3   aspects of the lawsuit CME brought against
 4   Gretchen Shipping in regards to the Piar?
 5         A     Not that I recall.
 6         Q     And if the CAA did impose a
 7   duty of transparency, did that ever require
 8   telling FMO about the discovery of fraud
 9   and the inducement and exorbitant hire
10   rates?
11         A     The contract with Ferromitera
12   is different than the contract with the
13   head owners.
14         Q     I understand that.
15         A     Yes.
16         Q     My question is:
17               Assume for the sake of argument
18   that the CAA imposes a duty of transparency
19   with your partner FMO.  Would that have
20   then required you to divulge what you
21   learned about your contract, CME's
22   contract, with Gretchen Shipping?
23         A     If it was within the frame of
24   the contract and which way it was decided
25   to work with the CAA, then we will look
```

Page 1086

```
 1                  CME v. FMO – Volume V
 2   into if we have to discover Ferromitera
 3   anything about our contract -- depends how
 4   you -- the options that Ferromitera will
 5   take in terms of the CAA.
 6         Q     Now, am I correct that, in
 7   addition to charging the hire rate at
 8   $35,000 a day to FMO on the Piar, that CME
 9   also took a commission for the sale of the
10   cargo?
11         A     On the General Piar?
12         Q     Yes.
13         A     No.
14         Q     Did it take a commission on any
15   of the cargos that it purchased from or
16   obtained from FMO?
17         A     CME received commissions from
18   all the cargos to China.
19         Q     And what was the amount of the
20   commission, in percentages?
21         A     I can't remember.
22         Q     Do you have a contract that you
23   can point to which allows you to take
24   commissions on those sales?
25         A     I don't recall.
```

Page 1087

```
 1                    CME v. FMO – Volume V
 2        Q      You don't recall?
 3        A      Yeah.  Ferrominera always paid
 4   commissions, since the very beginning of
 5   the contract.  They pay commissions for the
 6   cargo shipped to China and --
 7        Q      They paid commissions, but
 8   there's no contractual obligation that you
 9   can point to in writing of the payment of
10   those commissions; is that correct?
11        A      They always paid the
12   commission, from the past, and it became
13   custom, practice.  And they accepted it.
14        Q      And the commission was paid
15   from the sale of the cargo?
16        A      The commission was paid to CME
17   for all of the costs that -- not all the
18   costs, but for a commission that was paid
19   for a sale, yes.
20        Q      Well, at least from the point
21   that the CAA was entered into, weren't you
22   obliged under that contract to arrange the
23   sale of the cargo within that part of the
24   entire -- isn't that the thrust of the CAA?
25        A      No.
```

Page 1088

```
 1                    CME v. FMO – Volume V
 2        Q      No.
 3               Do you recall yesterday we
 4   discussed the goal of the CAA was to
 5   increase productivity and to sell more
 6   product?  Correct?
 7        A      Yes.
 8        Q      Everyone would prosper,
 9   correct?
10        A      Yes.
11        Q      Okay.  And your statement says
12   that CME was in the marketing business; it
13   was good at it, and that's what you do for
14   them, in part?
15        A      The CAA -- CAA speaks by
16   itself.
17        Q      Yeah.  And that's what it says;
18   doesn't it?
19               You have to answer audibly.
20        A      Yes.
21        Q      So the CAA and the sales
22   agreements under the CAA, the ore contract,
23   already provided the consideration of your
24   selling the product; did it not?
25               MR. FREVOLA:  I'm just going to
```

Page 1089

```
 1                    CME v. FMO – Volume V
 2   object in terms of that's a legal
 3   conclusion.
 4        A      I don't think so.  I don't
 5   think so.
 6        Q      Weren't you already promising,
 7   under the CAA, to sell the cargo to third
 8   parties?
 9        A      We have a contract for buying
10   iron ore from Ferrominera.
11        Q      For what?
12        A      For buying iron ore.  And
13   Ferrominera would sell iron ore to CME.
14        Q      Right.  And that contract does
15   not call for a commission to be paid?
16        A      I don't remember.
17        Q      You want to take a look at it?
18        A      Pardon me.
19        Q      You want to take a look at it?
20        A      No.  I don't remember having
21   seen any commission specifically said
22   there.  As I said before, Ferrominera paid
23   commissions since the beginning; and it
24   became a custom during the years, until
25   2011, and they decided not.
```

Page 1090

```
 1                    CME v. FMO – Volume V
 2        Q      My point was:
 3               Once the CAA was entered into,
 4   you said the arrangement changed, no longer
 5   a purchase sale agreement, now an alliance.
 6               Do you remember all that?
 7        A      Yes, it changed.  But up to a
 8   certain point, the CAA, if you read the
 9   CAA, it will give you a better
10   understanding of what it means.
11        Q      All right.  So you don't feel
12   that you were double-charging the same
13   service by taking commission and by getting
14   the benefits of the CAA agreement?
15        A      I don't know what you mean with
16   that.
17        Q      I mean that the CAA compensated
18   you for the sale of the cargo, and the
19   commission did the same?
20        A      I don't believe so.
21        Q      Who or what is Arivenca?
22        A      Arivenca is an agent,
23   representative of CME in Venezuela.
24        Q      Did they make payments to third
25   parties for the purchase of goods or
```

Page 1091

1      CME v. FMO - Volume V
2  products that were then provided to FMO?
3       A     They were providing certain
4  services.  We have to see in which you
5  refer to.
6       Q     Well, I believe we already
7  spoke about bunkers.  Correct?
8       A     Yes.
9       Q     What other goods or services
10  did they contract for on behalf of FMO?
11       A     You have to look into those
12  details.  Which one you want to look at?
13       Q     I'm asking you generally what
14  you know.
15       A     Arivenca -- did you see my --
16  yesterday.
17       Q     I did.
18       A     They were all those services,
19  local services, that were provided by
20  Arivenca.
21       Q     And those local services, were
22  they then invoiced to FMO at an increase
23  over the cost to Arivenca?
24       A     Say again.
25       Q     Did you mark up the goods and

Page 1092

1      CME v. FMO - Volume V
2  the services that Arivenca obtained, and
3  then pass them on to FMO?
4       A     It varies.  Arivenca was just
5  the agent of CME and will do certain things
6  that CME have arranged for them to do.
7       Q     Okay.  So you would tell
8  Arivenca when to mark up an invoice to
9  provide for additional profit or not; is
10  that right?
11       A     Yes.  If it was necessary, yes.
12       Q     Well, my question is:
13            What -- in what instances would
14  you decide to mark up an invoice and take
15  an additional profit, and in what instances
16  would you just simply pass on the cost that
17  you experienced to FMO?
18       A     We would have to look at the
19  specific contract or the specific payment.
20  Can you show me something?
21       Q     We're get there, I suppose.
22            Was there any guiding principle
23  in CME's mind that determined that?
24       A     No.
25       Q     Were there any other

Page 1093

1      CME v. FMO - Volume V
2  indications when you just passed on the
3  cost of the service or goods you were
4  obtaining to FMO without any markup?
5       A     You mean who?  Arivenca,
6  specifically Arivenca?
7       Q     Did Arivenca, acting as your
8  agent, ever just pass on the invoice
9  without any markup?
10       A     Depends.  Depends on what
11  you're talking about, which part of the --
12       Q     I'm asking, were there any
13  occasions, any instances, any --
14       A     I believe that there was
15  administration charges, 5 percent
16  administration charges that were charged to
17  FMO.
18       Q     On everything?
19       A     I can't remember if it was
20  everything.
21       Q     And CME, did it have any
22  guiding principle as to when it would mark
23  up an invoice that it incurred as a result
24  of acting for FMO?
25       A     I can't remember specifically

Page 1094

1      CME v. FMO - Volume V
2  what we did.
3       Q     I mean, was there any guiding
4  light on when you would mark up an invoice
5  before passing it onto FMO and when, if at
6  all, you just passed on the invoice and
7  said, "Here is what it cost us; reimburse
8  us"?
9       A     There was no guidance
10  specifically.  Each contract or each area
11  had a different activity.
12       Q     Case by case?
13       A     Yes.
14       Q     Any cases you can think of
15  where you just passed on the invoice
16  without a markup?
17       A     Might be.
18       Q     As you sit here today, you
19  can't come up with any examples?
20       A     It might be.  It might be that
21  we have done that.
22       Q     So if I understand it, under
23  the CAA, you would make money on the price
24  that you paid for the ore and what you sold
25  it at, or at least you'd try to make money

Page 1095

```
                CME v. FMO - Volume V
 1
 2    that way.  Right?
 3         A     No, it's not like that.
 4         Q     No?  How is it like?  You've
 5    got ore.  Didn't you sell it?
 6         A     Never under the CAA.  You are
 7    talking about the CAA.
 8         Q     All right.  Under the iron ore
 9    contracts with FMO?
10         A     What is your question?
11         Q     You were given ore under a
12    barter arrangement, correct?
13         A     Ferrominera will pay CME for
14    services or goods and services delivered to
15    Ferrominera.
16         Q     It was paid by ore, and that
17    arrangement commenced with the signing of
18    the CAA, or actually before the signing of
19    the CAA?
20         A     Ferrominera paid US dollars to
21    CME.
22         Q     Didn't you have barter
23    arrangement?
24         A     Yes, in iron ore.
25         Q     You had a barter arrangement?
```

Page 1096

```
                CME v. FMO - Volume V
 1
 2         A     Barter.
 3         Q     When did the relationship
 4    between CME and FMO change from a
 5    purchase/sale, where you just paid for the
 6    ore that was provided, to a barter
 7    arrangement?
 8         A     It happened, in a way, during
 9    the period of time.  But --
10         Q     Well, can we say, by the time
11    the CAA was signed, you were in a barter
12    arrangement?
13         A     Yes.
14         Q     At that point, in satisfaction
15    of the goods and services and things you
16    did for FMO, they provided you ore; is that
17    right?
18         A     In satisfaction of the goods
19    that we sold to FMO, they paid with iron
20    ore.  For the value of the services, with
21    iron ore.
22         Q     Right.  And you would try to
23    make a profit on the resale of that ore; is
24    that right?
25         A     Yes.
```

Page 1097

```
                CME v. FMO - Volume V
 1
 2         Q     And you were successful in
 3    that; were you not?
 4         A     Sometimes we lose; sometimes we
 5    win, yes.
 6         Q     And in addition to that, in
 7    those cases where you won that compensation
 8    or that profit, you made profit on, for
 9    example, the charter of the General Piar,
10    $10,000 a day; is that right?
11         A     They will pay us with the iron
12    ore for the charter that we charge them
13    for, yes.
14         Q     Right?
15         A     For the services.
16         Q     The differential was $10,000 a
17    day?
18         A     It's a different business.
19    It's a different contract.
20         Q     They paid you $35,000 a day in
21    ore; is that right?
22         A     No.  They paid me $35,000 a day
23    for the hire of a vessel.
24         Q     How did they pay you for the
25    hire?
```

Page 1098

```
                CME v. FMO - Volume V
 1
 2         A     They paid the invoices with
 3    ore.  We could have said US dollars as
 4    well.
 5         Q     Right.  You could have said
 6    bananas.  But they paid you in ore?
 7         A     Yes.
 8         Q     And they paid you the
 9    equivalent of $35,000 a day in ore?
10         A     Yes.
11         Q     And you were paying $25,000 a
12    day?
13         A     Yes.
14         Q     So you were making a profit
15    there?
16         A     Yes.
17         Q     And you were making a profit on
18    every contract for services that you
19    provided FMO, correct?
20         A     Yes.
21         Q     And that was true whether it
22    was CME to FMO or CME to Arivenca to FMO,
23    whether Arivenca was in the middle of the
24    deal, as your agent or not, you were making
25    a profit or a markup on services and goods
```

Page 1099

CME v. FMO – Volume V

1  provided?
2      A    Not necessarily, not always.
3      Q    Not always?
4      A    As I said, we will have to see
5  what specifically you are talking about.
6      Q    Right.  But you can't tell me
7  today of any example where you did not mark
8  up the goods or services provided to FMO?
9      A    No.
10          MR. KEANE:  Can we take a
11  break?
12          CHAIRMAN KIMBALL:  Yes, of
13  course.  We'll adjourn for a short
14  time.
15          (A break is taken.)
16          CHAIRMAN KIMBALL:  We are going
17  to go back on the record.
18          MR. FREVOLA:  First thing,
19  Mr. Kimball, if I can, I was able to
20  check the rates for the Blount, the
21  Taiglad, and the Palini.  The daily
22  hire rates for all those were $28,000
23  a day.
24          CHAIRMAN KIMBALL:  Thank you.
25

Page 1100

CME v. FMO – Volume V

1          MR. SICILIANO:  The hire rates
2  to CME or the hire --
3          MR. FREVOLA:  The daily hire
4  rate from the head owner to CME was
5  $28,000 a day.
6          CHAIRMAN KIMBALL:  All right.
7  Let's proceed with the
8  cross-examination.  Mr. Keane.
9          (There was a discussion off the
10  record.)
11  CONTINUED CROSS EXAMINATION
12  BY MR. KEANE:
13      Q    Mr. Serrao, I have provided
14  you, hopefully, with a copy of your
15  declaration.  It was filed in the
16  Southern District of New York, in the
17  lawsuit brought by Commodities Minerals
18  Enterprises against Gretchen Shipping,
19  et al.
20          Do you see that?
21      A    Yes.
22      Q    Is that your sworn declaration?
23      A    Yes.
24      Q    And that's your signature at

Page 1101

CME v. FMO – Volume V

1  the end of it?
2      A    Yes.
3          MR. KEANE:  I offer this into
4  evidence.  I think we can just
5  continue to mark them numerically as a
6  Serrao exhibit.
7          CHAIRMAN KIMBALL:  Sure.  Why
8  don't we mark this as Serrao 55.
9          MR. FREVOLA:  Should be 55.
10          MR. DENIG:  Was this also an
11  exhibit to the amended answers?
12          MS. FALCON LOPEZ:  It was.
13          MR. DENIG:  Do we want to mark
14  it or just refer to it?
15          MR. KEANE:  Well, I think it's
16  easier if we just mark it.
17          CHAIRMAN KIMBALL:  Mark it as
18  Serrao 55.
19          (Exhibit No. Serrao 55,
20  Mr. Serrao's Declaration in CME v.
21  Gretchen Shipping, et al., is
22  introduced into the proceedings.)
23      Q    Now, when you chartered the
24  Piar, did you have an expectation about the
25

Page 1102

CME v. FMO – Volume V

1  performance of that vessel with respect to
2  its ability to unload cargo?
3      A    Yes.
4      Q    And what was that expectation?
5      A    That it should reach at least
6  what Ferrominera demanded for it.
7      Q    What did they demand?
8      A    2,000 tons per hour.
9      Q    And what did the Gretchen
10  represent to you it was able to do?
11      A    Gretchen?
12      Q    Yeah.  Did they tell you --
13      A    Yeah.  They said they could
14  reach 4,400, something like that, 4,500.
15      Q    Exhibit 6 to your statement, is
16  that the -- are those the requirements of
17  FMO in respect to the discharge rate?
18      A    Yes.
19      Q    And it says at least 2,000
20  metric tons per hour?
21      A    Yes.
22      Q    Did the vessel ever reach that
23  discharge rate?
24      A    I don't believe so.
25

Page 1103

```
 1              CME v. FMO - Volume V
 2      Q    Do you recall -- or you can
 3 look at Exhibit 7 of your statement, which
 4 is the time charter between CME and
 5 Gretchen Shipping -- what the discharge
 6 rate was in the charter itself?
 7           MR. FREVOLA:  I'm sorry.  You
 8      said --
 9           MR. KEANE:  I'm sorry.  I
10 misspoke.
11      Q    CME to FMO?
12           CHAIRMAN KIMBALL:  We're
13      looking at the charter between CME and
14      FMO?
15           MR. FREVOLA:  Do you mind if I
16      show him where it is, to move things
17      along?
18      Q    Under clause 1, discharge rate.
19           MR. FREVOLA:  Right here.
20      Q    Two-thirds of the way down the
21 first page.
22           CHAIRMAN KIMBALL:  We're
23      looking at Exhibit 7?
24           MR. KEANE:  That's correct.
25      Q    Clause 1, about two-thirds of
```

Page 1104

```
 1              CME v. FMO - Volume V
 2 the way down, it says "discharge rate"?
 3      A    Yes.
 4      Q    3,000 tons an hour; is that
 5 correct?
 6      A    Yes.
 7      Q    And the Piar never reached that
 8 discharge rate; did it?
 9      A    It never reached 3,000 tons.
10      Q    Did you complain in the lawsuit
11 you brought against Gretchen Shipping about
12 the vessel not meeting its description as
13 far as the discharge rate?
14      A    Yes.
15      Q    Is it correct that in actual
16 operations the vessel discharged at rates
17 as slow as 1,116 metric tons an hour and
18 never more than 2,000 metric tons an hour?
19      A    Yes.
20      Q    Now, you also made allegations
21 about fraud and inducement of the contract
22 with Gretchen Shipping, correct?
23      A    Yes.
24      Q    And what was the fraud that you
25 were alleging?
```

Page 1105

```
 1              CME v. FMO - Volume V
 2      A    The fraud was that the lawyer
 3 who assisted us was receiving a payment
 4 from Gretchen Shipping, from the head
 5 owners?
 6      Q    And he had not divulged that to
 7 you when he was acting as your counsel; is
 8 that correct?
 9      A    Yes.
10           CHAIRMAN KIMBALL:  What was the
11      name of that lawyer?
12           THE WITNESS:  Pardon me?
13           CHAIRMAN KIMBALL:  What was the
14      name of the lawyer?
15           THE WITNESS:  Oh, the lawyer?
16      Geraldo Vazquez.
17           CHAIRMAN KIMBALL:  Thank you.
18      Q    Now, referring you to your
19 declaration at paragraph 17, the
20 declaration which has been marked as
21 Exhibit 55, you say that the proposed time
22 charter was a back-to-back version of the
23 time charter that CME would have with FMO.
24           Do you see that?
25           MR. FREVOLA:  Ed, can you tell
```

Page 1106

```
 1              CME v. FMO - Volume V
 2 me where we're at?
 3           MR. KEANE:  I'm sorry.
 4      Paragraph 17 in Exhibit 55.
 5           MR. FREVOLA:  He just grabbed
 6      the wrong document.  He grabbed the
 7      exhibit, not me.
 8           Paragraph 17.
 9      Q    Second sentence:
10           "The proposed time charter was
11      a back-to-back version of the time charter
12      that CME would have with FMO if the vessel
13      was used as a shuttle vessel."
14           Do you see that?
15      A    Yes.
16      Q    Was it your intent at that
17 point to enter into a time charter with FMO
18 which would mirror the terms of the time
19 charter that you were going to enter into
20 with Gretchen Shipping?
21      A    Not in its entirety.
22      Q    So as of yesterday, "back to
23 back" doesn't mean the same terms and
24 conditions; it means some of the same terms
25 and conditions?
```

Page 1107
```
1                CME v. FMO – Volume V
2        A    Some.
3        Q    What about the hire rate?
4    Would they be the same?
5        A    No.
6        Q    Would the rate of discharge be
7    the same?
8        A    Not necessarily.
9        Q    Well, the contract you fixed
10   with FMO for the Piar had a discharge rate
11   of 3,000 tons per hour.  Do you know what
12   the rate of discharge in the charter you
13   fixed with Gretchen Shipping was?
14            (There was a discussion off the
15       record.)
16            CHAIRMAN KIMBALL:  We're
17       looking at Exhibit 9, Mr. Keane.  Can
18       you point to a specific clause about
19       the discharge rate?
20            MR. KEANE:  No, I can't.  I
21       didn't think we had the -- oh, we do
22       have that.  I'm sorry.
23            I can't.  But I'll withdraw the
24       question.  I was misrecollecting.  It
25       was the Blount and the others --
```

Page 1108
```
1                CME v. FMO – Volume V
2            CHAIRMAN KIMBALL:  So the
3        question is withdrawn.  Let's proceed.
4        Q    Mr. Serrao, who negotiated the
5    charter for the General Piar on behalf of
6    CME?
7            MR. FREVOLA:  May I ask which
8        one?
9        Q    Any of them.
10       A    I think that was --
11           MR. FREVOLA:  It's sort of like
12       right now it's a dual question.  I'd
13       like one and the other, if we could,
14       just so we know which one --
15           CHAIRMAN KIMBALL:  Mr. Keane is
16       asking an appropriate question.  He
17       can proceed.
18           (There was a discussion off the
19       record.)
20       Q    It's Exhibit 3, 4, 5 -- are the
21   three versions.
22           MR. FREVOLA:  No.  No.  He's
23       using wrong exhibits.
24           (There was a discussion off the
25       record.)
```

Page 1109
```
1                CME v. FMO – Volume V
2        Q    It's Exhibit 7 in R-12 of the
3    amended defense.  I think those are the
4    two.
5            MR. FREVOLA:  We don't have
6        R-12 in front of us.  We have 7 right
7        here in front of us.
8        Q    Let me rephrase the question.
9            Were you involved in
10   negotiating any charter concerning the
11   General Piar?
12       A    No, not in the details of it.
13       Q    Who dealt with the details as
14   far as CME goes, in any respect, to the
15   negotiations for the charter of the
16   General Piar?  Whatever contract it may
17   have ended up producing, who sat down with
18   Gretchen or interfaced with the
19   representative of Gretchen?
20           MR. DENIG:  So the head
21       charter.
22           MR. FREVOLA:  The head charter.
23       A    The head charter, one of our
24   employees.  And I was present in some of
25   the meetings.
```

Page 1110
```
1                CME v. FMO – Volume V
2        Q    Who was that employee?
3        A    It was two of them.  It was
4    Carlos Suarez, and -- also had some
5    discussions, Arturo Contreras.
6        Q    Did they have experience in
7    negotiating charter parties?
8        A    No, not huge experience.
9        Q    And did you have experience in
10   negotiating charter parties at that time?
11       A    No.
12       Q    In 2008, did CME have
13   experience in maintaining vessels?
14       A    No.
15       Q    In repairing vessels?
16       A    No.
17       Q    In fabricating loading
18   equipment for vessels?
19       A    No.
20       Q    You undertook those
21   responsibilities as to FMO; is that
22   correct?
23       A    Sorry.  Again your question?
24       Q    You undertook those
25   responsibilities with respect to FMO,
```

Page 1111

```
 1              CME v. FMO - Volume V
 2    correct?
 3         A    Yes.
 4         Q    Did you then subcontract to
 5    have others perform those duties?
 6         A    Yes.
 7         Q    And how did you select your
 8    subcontractors?  Did you have any
 9    experience with them?
10         A    No.
11         Q    Now --
12              MR. SICILIANO:  Compound
13         question.  You only got an answer to
14         the last half.  The first part was,
15         "how did you select"?
16              MR. KEANE:  Oh.
17         Q    So how did you go about
18    selecting those -- those parties who
19    attended to those duties?
20         A    Which specifically?
21         Q    Let's start with vessel
22    maintenance.  How did you go about
23    fulfilling that obligation?
24         A    We knew the people from SMT,
25    from Holland.  We discussed the possibility
```

Page 1112

```
 1              CME v. FMO - Volume V
 2    of entering into this arrangement.  They do
 3    have experience.
 4         Q    What's the business of SMT?
 5         A    Shipping and maintaining
 6    vessels.
 7         Q    Did they, in fact, act as your
 8    subcontractors to maintain the vessels?
 9         A    Yes.
10         Q    What about the repair of the
11    vessels?  Was there repair done to the
12    shuttle vessels?
13         A    There were repairs made to it,
14    yes.
15         Q    And CME was in charge of those
16    repairs?
17         A    Towards Ferrominera, yes.
18         Q    Right.  And how did you
19    accomplish those repairs?
20         A    With the subcontractor who did
21    them.
22         Q    And which subcontractor did
23    them?
24         A    SMT.
25         Q    So they took care of the
```

Page 1113

```
 1              CME v. FMO - Volume V
 2    maintenance as well as the repairs?
 3         A    Yes.
 4         Q    And did the repairs of the
 5    vessels -- we're talking about the
 6    Rio Caroni and Rio Orinoco?
 7         A    Yes.
 8         Q    Did either of those repairs
 9    require dry docking?
10         A    Yes.
11         Q    Which one or both?  Tell me
12    both.
13         A    Both required dry docking.
14         Q    At what times?
15         A    I can't remember.  They went to
16    dry dock.
17         Q    Was there any time when they
18    were both in dry dock at the same time?
19         A    I can't remember.
20         Q    Do you know who Silva Shipping
21    Agency of Venezuela is?
22         A    Yes.
23         Q    Who are they?
24         A    It's a company in Puerto Ordaz.
25         Q    What do they do?
```

Page 1114

```
 1              CME v. FMO - Volume V
 2         A    Agency, shipping agency.
 3         Q    Do you have a financial
 4    interest in that company?
 5         A    No.
 6         Q    Now, we saw a number of
 7    photographs, and we heard testimony from
 8    you about the improvements you made to the
 9    mining facility Cerro Bolivar.  Do you
10    recall that?
11         A    Yes.
12              MR. KEANE:  Did we ever get
13         hard copies of those photographs?
14              MR. DENIG:  Yes.
15         Q    Who -- who selected those
16    photographs that were shown to us?  Was
17    that you?
18         A    Me, yes.  Well, our -- and our
19    company, yes.
20         Q    Did you select the photographs
21    that demonstrated the before and after
22    efforts most vividly?
23         A    Yes.
24         Q    What -- at what time period did
25    these photographs encompass?  Do you know?
```

Page 1115
1              CME v. FMO - Volume V
2       A     Which ones?
3       Q     The entire group.  What was the
4  time frame of the PowerPoint?
5       A     I can't remember particularly.
6       Q     Well, is it fair to say that
7  there's one photograph you're standing in
8  the middle of a field with a hard hat, next
9  to a railcar.  And you said it's -- you
10 can't see the track; it's -- you know, it's
11 completely covered over?
12            Do you remember that one?  I
13 can show it to you, if you'd like.
14            Here we go.  It actually has a
15 date stamp.  It's 2008.  Do you see it?
16      A     Yes.
17      Q     And at that point, I assume you
18 already had contracts in place for the
19 revitalization of the Cerro Bolivar mines.
20 Is that right?
21      A     In 2008?
22      Q     2008.  I mean, wouldn't that be
23 why you were there?
24      A     I don't understand that.
25      Q     Did you already have

Page 1116
1              CME v. FMO - Volume V
2  contractual arrangements to revitalize the
3  mine in 2008?
4       A     I don't believe so.
5       Q     No?
6       A     I have to check the contracts.
7       Q     When do you think that
8  contract -- when did you first have a
9  contractual commitment to the
10 revitalization of the mine?
11      A     Which contract?  Can you show
12 me?
13      Q     Sir, would it be the framework
14 agreement that first became a contractual
15 undertaking with regard to the
16 Cerro Bolivar mine, which is Exhibit 3 to
17 the statement?
18      A     What's your question, please?
19      Q     What was the first contract
20 that CME had regarding the revitalization
21 of the Cerro Bolivar mine?  What was its
22 date?
23      A     With Ferrominera?  With which
24 contract?  With who?
25      Q     Well, how many contracts did

Page 1117
1              CME v. FMO - Volume V
2  you have concerning the revitalization of
3  the Cerro Bolivar mine, and with whom?
4       A     I would say a few.
5       Q     A few.  Okay.
6       A     Yes.
7       Q     What was the first one?
8       A     The framework agreement.
9       Q     And that was with?
10      A     Two thousand and -- January --
11 January 2009.
12      Q     2009.  And who was it with?
13      A     This is between FMO and CVG.
14      Q     All right.  So can you --
15      A     CME.  And it's between CME and
16 CVG.  Sorry.  I correct that.  It's between
17 CVG and CME.
18      Q     Can you tell me what you're
19 doing in photographs -- I'll show them to
20 you.  This photograph, where you're
21 standing by the --
22            CHAIRMAN KIMBALL:  What's the
23      number?
24            MR. KEANE:  I don't have a
25      number.

Page 1118
1              CME v. FMO - Volume V
2            CHAIRMAN KIMBALL:  There's a
3      number.  Start with 1, 2, 3, 4.
4            MS. FALCON LOPEZ:  We don't
5      have numbers on the --
6            MR. DENIG:  For the record,
7      referring back to the PowerPoint
8      presentation, it looks like slides --
9            MR. FREVOLA:  Slide 41, the one
10     with him standing in the field.
11           MR. DENIG:  41.  And the date
12     on the photograph is 7/14/2008.
13           MR. FREVOLA:  At 5:11 p.m.
14      Q     That's sometime before the
15 contract, the framework agreement, correct?
16      A     Yes.
17      Q     Why were you there at that
18 time?
19      A     I was visiting the area with
20 the Chinese, with one of the Chinese
21 clients.
22      Q     Was that in anticipation of
23 getting a contract to revitalize the mine?
24      A     It could be, yes, because we
25 were looking for the materials to be

Page 1119

```
1              CME v. FMO – Volume V
2   satisfactory to the client.
3         Q    And at that point, were you
4   dealing with anyone at CVG concerning the
5   revitalization of the Cerro Bolivar mine?
6         A    No.
7         Q    Were you dealing with anyone in
8   FMO?
9         A    I don't recall specifically.
10  But we were looking into those -- at that
11  possibility of developing this area, this
12  mine.
13        Q    Were you dealing with anyone
14  from the Government of Venezuela at that
15  point?
16        A    The Government of Venezuela?  I
17  don't remember.
18        Q    When do you believe you first
19  started to address the revitalization of
20  the mine with anyone from the Government of
21  Venezuela?
22        A    We are thinking about this
23  project since 2007, 2008, always in mind.
24  But I can't remember specifically having
25  spoken to anybody.
```

Page 1120

```
1              CME v. FMO – Volume V
2         Q    Did you get an exclusive
3   franchise to sell the ore from the
4   Cerro Bolivar mine once it started to be
5   produced?
6         A    I can't remember specifically
7   if that name, but you could look in the
8   contract to see if it's an exclusivity.
9         Q    Well, if you would, I'd like to
10  know if it was an exclusive contract for
11  the sale of the ore that was produced out
12  of the Cerro Bolivar mine.
13        A    Yes.  We were instructed to
14  sell -- I mean, we had a right to sell that
15  material.
16        Q    Exclusively?
17        A    It could be.  I can't remember.
18  I will have to look at the contract.
19        Q    Okay.  Take a look at the
20  contract, if you would.
21             MR. WENTZ:  You're looking at
22        the framework agreement?
23        A    The framework.  Okay.
24        Q    Framework agreement.
25             CHAIRMAN KIMBALL:  Mr. Keane,
```

Page 1121

```
1              CME v. FMO – Volume V
2   is there a pending question?
3             MR. KEANE:  There is.
4             CHAIRMAN KIMBALL:  What is the
5        pending question?
6         Q    Did CME receive an exclusive
7   contract to sell the ore out of the
8   Cerro Bolivar mine?
9         A    I'm just looking to see if in
10  the contract there is that word of
11  exclusivity.  Sorry.
12             CHAIRMAN KIMBALL:  What is your
13        recollection -- did anyone else --
14        A    I can't remember.  I mentioned,
15  I can't remember if we have exclusivity.
16  But we have the exploitation.
17             CHAIRMAN KIMBALL:  Was any
18        other company brought in to help
19        develop the mine?
20             THE WITNESS:  No.  At that
21        time, it was only CME who started
22        that.
23             MR. WENTZ:  Did any other
24        company buy the ore from the mine,
25        other than CME.
```

Page 1122

```
1              CME v. FMO – Volume V
2             THE WITNESS:  Not that I know.
3             MR. WENTZ:  Okay.
4             THE WITNESS:  After CME was
5        forced out, then other companies went
6        in.
7         Q    Who negotiated the deal with
8   CME and the Government of Venezuela to
9   develop the mine?  Were you the person
10  who -- the chief negotiator for CME in that
11  respect?
12        A    It was a number of meetings
13  that we had, not only me.  I had meetings,
14  and also Arturo had some meetings.
15        Q    Were there any bids or open
16  bidding processes for the right to sell the
17  ore that was to be produced from the
18  Cerro Bolivar mine?
19        A    Not that I recall.
20        Q    You had said yesterday, to a
21  question from Mr. Wentz, if my recollection
22  is correct, that the mine had been inactive
23  since the late '70s.  But your statement at
24  paragraph 14 -- the statement I'm referring
25  to is now the declaration, Exhibit 4 -- not
```

Page 1123

1                CME v. FMO - Volume V
2    4.  It says that:
3                "Cerro Bolivar mine has been
4    inactive since 1997."
5                It explains the reason.
6                Does that refresh your
7    recollection as to how long the mine had
8    been inactive?
9         A    Since 1997, it's saying there.
10        Q    Right.  Is that your
11   recollection --
12        A    Yes.
13        Q    -- today?
14        A    Yes.
15        Q    So about 10 or 11 years when
16   your photograph was taken of you standing
17   next to the railcars; is that right?
18        A    I believe -- I believe that
19   this should be 19 -- '97, is it?  I think
20   it's 1970.  It could be a mistake here.
21   But I could check.
22             MR. SICILIANO:  Yesterday, the
23        date was 1974 that was -- you focused
24        on.
25             THE WITNESS:  Yes.  I think it

Page 1124

1                CME v. FMO - Volume V
2    might be a mistake here, typographic.
3             MR. FREVOLA:  Mistake where?
4             THE WITNESS:  In the 1997.
5             MR. FREVOLA:  Where?
6             CHAIRMAN KIMBALL:  Paragraph
7        14.
8             THE WITNESS:  In page 6.  I
9        believe the mine was out of operation
10       already since 1970 something, '74,
11       '75.
12        Q    All right.  And do the
13   photographs you provided us depict the
14   changes in the Cerro Bolivar mine's
15   condition up to the time that your contract
16   with the Venezuelan government ceased?
17        A    Please, can you repeat that?
18        Q    Yeah.  These photographs, which
19   is -- there's a package, Exhibit 54.
20             MR. FREVOLA:  Can you pass them
21       over?
22             MR. KEANE:  Sure.
23        Q    Is there -- let me rephrase.
24             Is there any significant change
25   in the condition from the time, say, 2008

Page 1125

1                CME v. FMO - Volume V
2    to the time CME's involvement with the
3    Cerro Bolivar mine ceased that's not
4    represented in the photographs that you
5    provided us?
6         A    Between 2008, you said.
7         Q    The end of your involvement.
8             I want to know if Exhibit 54
9    captures all of big things that were done
10   at the mine from the time CME's involvement
11   began to the time it ended.
12            MR. FREVOLA:  Are you listening
13       to him?
14            Please read the question back.
15            Because you were looking at
16       this.  Listen to what the question is.
17            (Reporter read back pending
18       question.)
19        A    Not specifically.  I just
20   wanted to show the panel, for example,
21   pictures of the vessel, pictures of -- for
22   them to have an idea what the area is, in
23   some part.  So if you could point out what
24   specific picture you are talking about, it
25   will be greatly appreciated.

Page 1126

1                CME v. FMO - Volume V
2         Q    No.  I think you misunderstood
3    my question.
4             What I'm asking you:
5             Is -- are we missing some
6    pictures of -- I don't know -- a giant
7    piece of mining equipment that, you know,
8    you provided to the mine that excavates
9    50,000 tons an hour, anything big that you
10   provided that you didn't take a photograph
11   of, so we could appreciate the difference
12   in the Cerro Bolivar mining facility from
13   the time CME became involved in it until
14   the time it ended being involved with the
15   mine?
16        A    The machinery?
17            CHAIRMAN KIMBALL:  I'm not sure
18       I understand the question myself.
19        A    Yes.
20            CHAIRMAN KIMBALL:  Can you put
21       together some pictures, just to give
22       an orientation?
23            MR. KEANE:  Yeah.
24            CHAIRMAN KIMBALL:  It wasn't
25       meant to be comprehensive, as far as I

Page 1127
```
 1              CME v. FMO - Volume V
 2      could tell.
 3          Q    Well, that's my question.
 4              Is it comprehensive as far as
 5      the big items?  Is there something -- is
 6      there a new vessel that you provided to
 7      facilitate the carriage of ore or any big
 8      ticket items?  We saw washing machines.  We
 9      saw generators.  We saw some relatively
10      small --
11              MR. FREVOLA:  Excuse me.  That
12          was for the Punta Barimas pilot
13          station.  It had nothing to do with
14          the Cerro Bolivar mine.
15              MR. KEANE:  That's true.
16          Q    We saw a lot of photographs
17      about the mine before and subsequent, and
18      I'm asking you:
19              Do those pictures capture the
20      major improvements that were made during
21      your tenure as a partner at the mine?
22          A    During ten years?
23          Q    I'm sorry.  During the time
24      period CME was involved with the mine?
25          A    Well, supplied financing.  We
```

Page 1128
```
 1              CME v. FMO - Volume V
 2      were going to start the operations in
 3      Cerro Bolivar.  We started with the
 4      machineries that you saw there, with the
 5      subcontractor.
 6          Q    Right.  Anything else that was
 7      provided, say, of a value of over $20,000
 8      that we don't have a picture of?
 9          A    Over $20,000.  We took -- we
10      incorporated the -- we refinanced the
11      construction of the PTLB-II, which is also
12      going to receive material from
13      Cerro Bolivar.  And we were initiating the
14      operation, but we couldn't continue the
15      operation.  It was stopped.
16          Q    So we don't have pictures of
17      that -- that beginning development of that
18      particular piece of equipment; is that
19      right?
20          A    Nothing here, no.
21          Q    Anything else?
22          A    No.
23              (There was a discussion off the
24      record.)
25          Q    Mr. Serrao, do you have an
```

Page 1129
```
 1              CME v. FMO - Volume V
 2      E-Mail dated September 3, 2010, which I
 3      will represent was appended as Exhibit E to
 4      a declaration of Geraldo Vazquez in the
 5      lawsuit brought by CME against Gretchen
 6      Shipping in the Southern District of
 7      New York?
 8          A    Yes.
 9          Q    Do you recognize that E-Mail?
10          A    Yes.
11          Q    What is that E-Mail?
12          A    That's -- this is a schedule of
13      payment that we were -- we agree with
14      Vazquez to pay him.
15          Q    You agree to pay him a
16      percentage of the participation that was
17      agreed with Clemente; is that right?
18          A    Yes.
19          Q    Who is Clemente?
20          A    Clemente is the chairman and
21      the owner of -- he's part of the Baumann
22      group.
23          Q    Is he part of the Silva agency,
24      which I asked you about shortly before?
25          A    Yes.
```

Page 1130
```
 1              CME v. FMO - Volume V
 2          Q    Why are you asking -- why did
 3      you have to confer with Clemente to agree
 4      on a percentage to be paid Vazquez?
 5          A    This is a payment that I was
 6      supposed to receive from Clemente.
 7          Q    Okay.  And the payment you were
 8      supposed to receive from Clemente was with
 9      a transfer system contract?
10          A    From the revenues that he was
11      going to receive, yes.
12          Q    And --
13          A    We haven't --
14          Q    Why were you discussing with
15      Mr. Clemente revenues CME was supposed to
16      receive from the transfer system contract?
17          A    No.  This is that he was going
18      to receive.
19          Q    Clemente was going to receive?
20          A    Clemente.
21          Q    Why was Clemente receiving --
22      what was the percentage Clemente was to
23      receive?
24          A    I can't remember, but -- I
25      can't remember.  I could look into that.
```

Page 1131

```
 1                  CME v. FMO - Volume V
 2        Q      All right.  If you go down, it
 3   says:
 4               "From my 50 percent,
 5   16.5 percent would be allocated to you in
 6   the following way, which gives you a total
 7   share of the contract in the sum of
 8   $3,293,431.93."
 9               What was Vazquez doing to
10   receive the contract sum of 3 point --
11   almost $3.3 million?
12        A      He was doing the legal advice
13   and the different contracts that we were
14   going to be entering in.
15        Q      Was he charging you by the
16   hour?
17        A      No.
18        Q      Your 50 percent share was
19   estimated to be worth -- did you estimate
20   its worth?
21        A      Sorry?
22        Q      Did you estimate how much your
23   50 percent share was worth?  Is it a
24   calculation we can do based on 16.5 percent
25   of 50 percent being worth 3.3, around
```

Page 1132

```
 1                  CME v. FMO - Volume V
 2   about?
 3               Am I right in understanding
 4   that paragraph, that sentence?
 5        A      Yes.
 6        Q      So your 50 percent,
 7   16.5 percent was worth roughly
 8   $3.3 million, right?
 9        A      Yes.
10        Q      So the rest is mathematical.
11   We can do that.
12               Who is Baumann?
13        A      Baumann is a company owned by
14   the group of SMT.
15        Q      The outfit that was doing the
16   maintenance and repair work?
17        A      Yes.
18        Q      So they're in for 40 percent.
19   You're in for 50 percent.  Where is the
20   other 10 percent?
21        A      I don't know.  I can't remember
22   that.
23        Q      You don't know.  Mr. Sabbagh
24   perhaps?
25        A      No, I don't think so.
```

Page 1133

```
 1                  CME v. FMO - Volume V
 2               CHAIRMAN KIMBALL:  Would you
 3   like to mark this document?
 4               MR. KEANE:  I would like to
 5   mark it.  I think it's 56.
 6               CHAIRMAN KIMBALL:  56.
 7               (Exhibit No. Serrao 56,
 8   September 3, 2010 E-Mail with a
 9   payment schedule for Geraldo Vazquez,
10   is introduced into the proceedings.)
11               CHAIRMAN KIMBALL:  Mr. Keane,
12   is this a convenient time to break for
13   lunch?
14               MR. KEANE:  This would be a
15   convenient time.
16               CHAIRMAN KIMBALL:  All right.
17   We'll break for lunch for 30 minutes.
18               (A lunch recess was taken.)
19               CHAIRMAN KIMBALL:  Back on the
20   record, please.
21               Before we resume the
22   cross-examination, the panel is
23   prepared to give a ruling with respect
24   to the wagons contract.
25               The panel has considered FMO's
```

Page 1134

```
 1                  CME v. FMO - Volume V
 2   request for an order directing CME to
 3   produce the wagons contract with CSR,
 4   which is referred to in Mr. Serrao's
 5   written statement in paragraph 103.
 6               As the parties know, the panel
 7   has granted FMO very broad document
 8   discovery in this case.  However, the
 9   arbitrators unanimously decline to
10   order the production of the wagons
11   contract.  We consider this as a
12   matter which should be dealt with in
13   the "wagons" arbitration, and we also
14   consider that the information in the
15   record thus far about the wagons
16   contract is adequate for purposes of
17   deciding the issues raised in this
18   arbitration.
19               Mr. Keane, you want to proceed?
20               MR. KEANE:  I do.  Thank you.
21   CONTINUED CROSS EXAMINATION
22   BY MR. KEANE:
23        Q      Mr. Serrao, if you'd turn to
24   the witness statement.  It starts at
25   page 56, under C, CME's "application for
```

Page 1135

1        CME v. FMO - Volume V
2    legal protection against criminal action."
3            What "criminal action" were you
4    referring to?
5        A    The criminal action that FMO
6    initiated against the company and me.
7        Q    Did FMO instigate that criminal
8    action, or was that a criminal action
9    instigated by the Government of Venezuela?
10       A    It was an action that was based
11   on information given by FMO to the ministry
12   of mining in relation to all the contracts.
13       Q    And did that information then
14   make its way up to the prosecutorial arm of
15   the Venezuelan government, and did they
16   then issue legal proceedings against CME?
17       A    Yes.
18       Q    And they issued legal
19   proceedings against you in particular?
20       A    Yes.
21       Q    And do you know that a part of
22   the basis of those legal proceedings was
23   based on Mr. Sabbagh's testimony?
24       A    I don't know.
25       Q    No?

Page 1136

1        CME v. FMO - Volume V
2            MR. FREVOLA:  I am actually
3        going to interrupt for one second.
4            This goes to the issue of FMO's
5        legal team.  With regards to people on
6        the legal team here, with regard to
7        the London proceedings, FMO has pulled
8        their corruption arguments from those
9        proceedings.  I understand that
10       because there are certain
11       undertakings -- there are certain
12       obligations that British legally
13       trained persons had with regards to
14       making allegations in proceedings.
15           We have somebody that's British
16       qualified here in this room, and I'm
17       just asking for the record whether or
18       not he is endorsing this argument
19       here, because it's something that is
20       of interest, I think, over in London,
21       if it has to happen.
22           MR. DRAKE:  I think you're
23       entitled to ask the question, and I'm
24       not required to answer it.
25           MR. FREVOLA:  I just want to

Page 1137

1        CME v. FMO - Volume V
2        put that on the record, that I've
3        asked the question.
4            CHAIRMAN KIMBALL:  Okay.  It's
5        in the record, and Mr. Drake has
6        responded.
7            Mr. Keane.
8        Q    Mr. Serrao, have you
9    investigated the basis for the
10   prosecutorial actions that have been
11   instituted by the Government of Venezuela
12   against CME?
13       A    I understand that they stated
14   that our contracts were illegal and we
15   should not be paid in iron ore.
16       Q    Have you reviewed any documents
17   filed by the Government of Venezuela in
18   respect to the prosecutorial actions taken
19   against CME or yourself?
20       A    I saw.  Yes.
21       Q    What did you see?
22       A    That we have been accused of
23   damaging the patrimony of the country.
24       Q    And in that document or
25   documents, did you see reference to the

Page 1138

1        CME v. FMO - Volume V
2    guilty plea entered by Mr. Sabbagh in which
3    he implicates CME as being involved in
4    illicit activities?
5        A    No, I haven't seen that.
6            CHAIRMAN KIMBALL:  Mr. Keane,
7        given the sensitive nature of these
8        questions, I ask you to be very
9        specific when you ask these questions.
10           MR. KEANE:  I will try to do
11       that.
12       Q    Have you seen a document by the
13   Republic of Venezuela issued by counsel
14   Milvira Ashney Caraballo,
15   C-a-r-a-b-a-l-l-o, Araque, A-r-a-q-u-e,
16   dated October 24, 2013?
17           CHAIRMAN KIMBALL:  Does that
18       document have an exhibit number?
19           MR. KEANE:  It does not.
20       Q    And it, in part, says:
21           "Requirements of Article 236 of
22   the organic-code-of-criminal-procedure are
23   fully met to order the preventive detention
24   of citizens, Tyrone Vicente Serrao
25   Baptista...."

Page 1139

1                CME v. FMO – Volume V
2          It goes on.
3          CHAIRMAN KIMBALL:  Is that a
4     document which has been produced to
5     CME?
6          MR. KEANE:  Yes, it has.  It's
7     annex 3 to Paula Maria Ziri Castro
8     Lopez's witness fact statement.  We
9     have copies.
10         MR. DENIG:  That would be
11    great.
12         CHAIRMAN KIMBALL:  I have a
13    copy.
14         Let's mark this document as
15    Serrao 57.
16         (Exhibit No. Serrao 57, Annex 3
17    to Paula Maria Ziri Castro Lopez's
18    Witness Fact Statement, is introduced
19    into the Proceedings.)
20         CHAIRMAN KIMBALL:  The question
21    is whether you've seen this before.
22    Q     That's the question.
23    A     I saw this document produced
24 by -- by my attorney.  I saw this document
25 that I've been shown by my attorney.

Page 1140

1                CME v. FMO – Volume V
2          CHAIRMAN KIMBALL:  When was
3     that.
4          THE WITNESS:  I think it was
5     when we received the documents from
6     Ferrominera.  When we received the --
7     it was in -- a week ago, I think, or
8     so.  About a week ago.
9          CHAIRMAN KIMBALL:  Was that the
10    first time you had seen this document?
11         THE WITNESS:  Yes.
12         CHAIRMAN KIMBALL:  Please
13    proceed, Mr. Keane.  Sorry to
14    interrupt.
15    Q     Mr. Serrao, you note that in
16 what has been marked as Exhibit 57:
17         "The Court considers that it is
18 dealing with the offense of direct
19 involvement in the crime of fraudulent
20 embezzlement, collusion of a public
21 official with a contractor, collusion to
22 commit a crime."
23         Do you see that?
24    A     That's what the document reads.
25    Q     Has a warrant of arrest been

Page 1141

1                CME v. FMO – Volume V
2     issued against you, to your knowledge?
3     A     I saw that as well, that day.
4     Q     I'm sorry.
5          MR. FREVOLA:  To your
6     knowledge.
7     A     To my knowledge, yes.
8     Q     Does it ask you to surrender to
9  the jurisdiction of Venezuela?
10    A     From what is read?
11    Q     I'm sorry?
12    A     From what is read in the
13 document?
14         MR. FREVOLA:  Look at it.  Read
15    it.
16    A     Can I see a copy?
17         CHAIRMAN KIMBALL:  Is this
18    document the warrant of arrest you
19    were looking to, Mr. Keane?
20         MR. KEANE:  I don't believe
21    it's the actual warrant, no.  It's a
22    referral for a warrant.
23         (There was a discussion off the
24    record.)
25         MR. KEANE:  I stand corrected.

Page 1142

1                CME v. FMO – Volume V
2     Apparently, it is construed as the
3     warrant.
4          MR. FREVOLA:  I'm going to say
5     that at the last cite in the
6     paragraph, the recital on the 14th
7     page says:
8          "May the corresponding arrest
9     warrant be issued for the citizen
10    previously identified."
11         CHAIRMAN KIMBALL:  We simply
12    want it for the record.  If you're
13    referring to the warrant of arrest,
14    that's the document you should be
15    referring to.
16         MR. KEANE:  I suppose we could
17    call that this.
18    Q     So, Mr. Serrao, was this
19 document served on you?
20    A     No.
21    Q     Do you hold a Venezuelan
22 passport?
23    A     Yes.
24    Q     Has anyone from the Government
25 of Venezuela contacted you in reference to

Page 1143

```
1                CME v. FMO - Volume V
2    this warrant of arrest, Exhibit 57?
3         A     No.
4         Q     Have you taken any legal action
5    in Venezuela with respect to this warrant
6    of arrest?
7         A     Yes.
8         Q     What action have you taken?
9         A     We filed a constitutional
10   injunction.
11        Q     And what, if any, results from
12   that filing have you received?  Has there
13   been a decision made?
14        A     The constitutional injunction
15   made Ferrominera -- or informed the Court
16   and Ferrominera, the parties, and the
17   constitutional injunction requested a stay
18   of the criminal proceeding until a decision
19   was made from the administrative court and
20   an audit of the account was to take place.
21        So court open -- get
22   instruction to open the financial audit
23   later on, when that decision was made in
24   favor of CME, stating that the contracts
25   were legal, were lawful, were correct.
```

Page 1144

```
1                CME v. FMO - Volume V
2         We filed a transfer of that
3    decision to the criminal court, and we
4    haven't heard anything.  Transfer of the
5    decision of the civil court was transferred
6    to the -- to the -- transferred from the --
7    administrative court was transferred to the
8    criminal court, and we haven't heard
9    nothing as yet from them.
10        Q     How are you keeping abreast of
11   the status of the application for motion.
12        A     Through an attorney that
13   presented that document in the court.
14        Q     When was the last time you
15   heard from that attorney?
16        A     It was about a week or so.
17        Q     Okay.  So to your knowledge,
18   that application has not been denied?
19        A     It's in the court, but there's
20   not --
21        MR. FREVOLA:  Did you answer
22   the question?
23        Q     Do you have any intention to
24   present yourself to the Government of
25   Venezuela in response to this warrant for
```

Page 1145

```
1                CME v. FMO - Volume V
2    your arrest?
3         A     It's difficult.
4         MR. FREVOLA:  I'm going to
5         object to that.  I mean, you're
6         talking about him -- I mean, he should
7         be able to take a Fifth Amendment
8         right on this in terms of --
9         Q     I'm just asking if he intends
10   to --
11        MR. FREVOLA:  This is --
12        Q     -- go and defend himself.
13        CHAIRMAN KIMBALL:  The
14   objection is a sound one.  So we'll
15   support that objection.
16        Q     Now, in your statement, at
17   paragraph 169, you refer to a document
18   which was 491 pages long, with a summary of
19   claims against CME being less than one
20   page, and you refer to the page number of
21   that of 149 -- sorry, 491-page document,
22   which is Exhibit 40 to your statement.
23        Do you see that?
24        MR. FREVOLA:  Here.
25        Q     Do you see your statement where
```

Page 1146

```
1                CME v. FMO - Volume V
2    you say that?
3         A     Yes.
4         Q     And if you look at Exhibit 40
5    to your statement, which is what you are
6    referring to, do you see that there is a
7    reference to a Document 18 at -- this is on
8    page 156 of your Exhibit 40.
9         A     Yes.
10        Q     The first paragraph.
11        Have you ever seen that
12   Document 18?
13        A     Yes.
14        Q     And does that document refer to
15   CME in pages 2 through 366?
16        A     Page 156?
17        Q     No.  Pages 2 through --
18        MR. FREVOLA:  Stop turning.
19        Ed, if I may just --
20        MR. KEANE:  Sure.
21        MR. FREVOLA:  He's asking
22   you --
23        MR. KEANE:  I'm sorry.
24        MR. FREVOLA:  Mr. Keane asked
25   if you had seen this Document 18, with
```

Page 1147

1    CME v. FMO – Volume V
2    all of those pages.  In other words,
3    not that you see it on the page -- he
4    didn't ask you if you saw it on the
5    page.  He asked if you've seen that
6    document.
7         A     Yes.
8               MR. FREVOLA:  You've that
9    document?
10        A     That is the full document.
11        Q     Yes.
12              MR. FREVOLA:  Okay.
13        A     Yes.
14              MR. KEANE:  He has seen it.
15              MR. FREVOLA:  I just want to
16   make sure he's seen it.
17        A     Yes.
18        Q     And that goes on at some length
19   about CME; does it not?
20        A     Not that I'm aware of.
21              CHAIRMAN KIMBALL:  Is that
22   document in the record, Mr. Keane?
23              MR. KEANE:  Actually, it is,
24   right?  It's the R --
25              MS. FALCON LOPEZ:  May I?

Page 1148

1    CME v. FMO – Volume V
2              CHAIRMAN KIMBALL:  Please.
3              MS. FALCON LOPEZ:  Okay.  That
4    document is -- that Document 18 is an
5    appendix of a criminal investigation
6    that is about 30,000 pages.  So we
7    didn't introduce the whole thing.  But
8    in Paula Castro's annexes, she
9    explains it, and also she has given
10   the -- what is called the
11   "administrative record 005" in its
12   entirety.  It's an annex of
13   Ms. Paula -- we have it here if you
14   would like to see it.
15              MR. KEANE:  Is that R-25?
16              MS. FALCON LOPEZ:  No.
17              CHAIRMAN KIMBALL:  I just
18   wanted to know if that Document 18,
19   folios 2 through 366, were part of the
20   record.
21              MR. KEANE:  It appears they are
22   not.  I will provide a copy now to
23   everyone.
24              CHAIRMAN KIMBALL:  They are
25   not.

Page 1149

1    CME v. FMO – Volume V
2         Q     But for clarity, the prior
3    page, 155, at the bottom, the last bullet
4    point explains what this document is,
5    administrative record number 005.
6               It goes on to say that
7    essentially it concerns itself with the FMO
8    and the Commodities and Minerals portion of
9    the overall appendix, which is thousands of
10   pages long.
11              MR. FREVOLA:  We still haven't
12   seen it.
13              MR. KEANE:  We'll give you a
14   copy right now.
15              Do you have a copy?
16              (There was a discussion off the
17   record.)
18              MR. FREVOLA:  Mr. Kimball, I'll
19   take a moment while they're going
20   through this to note our objection
21   that there are dozens, I believe, of
22   exhibits in FMO's amended answer
23   exhibits that are selectively
24   translated.
25              And the panel chairman may

Page 1150

1    CME v. FMO – Volume V
2    recall that, when we put in the
3    declaratory judgment and provided the
4    selective translation, you asked we
5    put in the entire document so the
6    panel could see the entire document.
7               What is good for the goose is
8    good for the gander, as far as I'm
9    concerned, because I do know that
10   there are definitely selective
11   passages in there, that there are
12   other passages that pertain -- that
13   help CME.
14              And, you know, if they're
15   introducing the document, they need
16   to, you know, pay for the translation
17   and put the translation in.
18              Now, I'm not asking them to
19   translate a 30,000-page document.  I
20   do have some degree of reasonableness.
21   But I am talking about, there are
22   certain ones that they put in
23   that were not translated.
24              CHAIRMAN KIMBALL:  We can take
25   up this point --

Page 1151

1      CME v. FMO - Volume V
2           MR. SICILIANO:  Later.
3           CHAIRMAN KIMBALL:  -- later.
4      Right now we have a witness who is
5      being cross-examined.  We would like
6      to continue with that.
7           If you have questions about the
8      specific document, I do think it
9      should be in front of him.
10          (There was a discussion off the
11     record.)
12          CHAIRMAN KIMBALL:  We've marked
13     the document that was just distributed
14     as Serrao 58.  And perhaps you could
15     explain, Mr. Keane or Ms. Lopez, what
16     this document is.
17          (Exhibit No. Serrao 58,
18     Document, is introduced into the
19     proceedings.)
20          MR. KEANE:  So this is the
21     appendix that's referred to --
22          CHAIRMAN KIMBALL:  Well,
23     obviously it's not 364 pages of
24     document.
25          MR. KEANE:  No.

Page 1152

1      CME v. FMO - Volume V
2           MR. WENTZ:  Yes.
3           MR. KEANE:  But the witness, in
4      this paragraph 169, says that the
5      public minister's published list of
6      companies had only a one-page
7      reference to it, to CME.
8           But if you look at the actual
9      document, which is the Exhibit 40, to
10     his statement, it in turn references
11     Document 18, which is the appendix;
12     and it's identified on page 155 of
13     Exhibit 40 as administrative record
14     number 005, related to the:
15          "Alleged pecuniary damage to
16     the Venezuelan government by applying
17     to strategic alliances and offsetting
18     iron ore between FMO and Commodities
19     and Minerals."
20          And those are the pages that we
21     produced, which --
22          MR. FREVOLA:  We may be able to
23     stipulate on this document.
24          MR. KEANE:  CME.
25          MR. FREVOLA:  CME is not trying

Page 1153

1      CME v. FMO - Volume V
2      to take the position that the
3      allegations against Mr. Serrao were
4      contained on one page.
5           What we're trying to show is
6      that there were 491 pages of
7      allegations against companies, and CME
8      was on one page.  And that's the
9      only -- that's the only point that was
10     being made on that.
11          So we will acknowledge the fact
12     that there are other documents that
13     are longer that are claiming against
14     CME or Mr. Serrao, if that's where
15     you're trying to go, so we can move
16     on.
17          MR. KEANE:  That's certainly a
18     part of where I'm going.
19          MR. FREVOLA:  Okay.
20          CHAIRMAN KIMBALL:  My concern
21     is just to make sure we have an
22     accurate description of the document
23     before you ask questions.  And you can
24     proceed with the questions, if you
25     wish.

Page 1154

1      CME v. FMO - Volume V
2           MR. KEANE:  Thank you.
3      Q    Mr. Serrao, have you seen that
4      document I have now provided you?
5      A    Which document, sir?
6      Q    What has just been marked as --
7           MR. WENTZ:  58.
8      Q    58.
9      A    I don't remember having seen
10     this document.
11     Q    Now, your attorney in Venezuela
12     didn't obtain it and provide it to you?
13     A    No.
14          CHAIRMAN KIMBALL:  Mr. Keane,
15     does FMO intend to produce a witness
16     in these hearings who will testify
17     about this document?
18          MR. KEANE:  Yes, we do.
19          CHAIRMAN KIMBALL:  And who will
20     that be?
21          MR. KEANE:  The Venezuelan
22     government prosecutor who is involved
23     with the claim against -- the charges
24     against CME and --
25          CHAIRMAN KIMBALL:  Is that

Page 1155

1                CME v. FMO - Volume V
2    Paula Maria Ziri Castro?
3              MR. KEANE:  That's correct.
4              CHAIRMAN KIMBALL:  Thank you.
5              MR. KEANE:  Let's just have a
6    two-minute break.
7              CHAIRMAN KIMBALL:  Let's keep
8    it to two minutes.
9              (There was a discussion off the
10   record.)
11             (A break is taken.)
12             CHAIRMAN KIMBALL:  Let's
13   proceed.
14             MR. KEANE:  We are, at this
15   point, concluding our
16   cross-examination of Mr. Serrao.  We
17   tender him for redirect, if there is
18   any.
19             MR. FREVOLA:  Does the panel
20   have any questions before we do
21   redirect?
22             CHAIRMAN KIMBALL:  Let's do the
23   redirect first.
24             MR. SICILIANO:  Please.
25             MR. FREVOLA:  Okay.  Can we

Page 1156

1                CME v. FMO - Volume V
2    have a few minutes?
3              (A break is taken.)
4              CHAIRMAN KIMBALL:  Let's go
5    back on the record.
6              Mr. Frevola.
7              MR. FREVOLA:  Thank you,
8    Mr. Kimball.
9    REDIRECT EXAMINATION
10   BY MR. FREVOLA:
11        Q     Mr. Serrao, with regards to
12   yesterday, Mr. Keane asked you about
13   corporate share ownership of CME, but he
14   didn't specify a time frame for when that
15   corporate ownership was.
16        A     Yes.
17        Q     With respect to your ownership
18   of CME, when you first wound up purchasing
19   into CME Switzerland, what was your share
20   ownership then?
21        A     50 percent.
22        Q     Currently, what is your share
23   ownership of CME personally?
24        A     None.
25        Q     Okay.  What share ownership --

Page 1157

1                CME v. FMO - Volume V
2    you mentioned a corporation yesterday.
3        A     Yes.
4        Q     What is the share ownership of
5    that corporation?
6        A     100 percent.
7        Q     Thank you.
8              (There was a discussion off the
9    record.)
10             CHAIRMAN KIMBALL:  The question
11   is:  What corporation owns 100 percent
12   of CME?
13             THE WITNESS:  I think it's a
14   company called Superior Limited.
15             CHAIRMAN KIMBALL:  Do you own
16   shares in that company?
17             THE WITNESS:  Yes, I do.
18             CHAIRMAN KIMBALL:  How many?
19             THE WITNESS:  Around
20   20 percent.
21             CHAIRMAN KIMBALL:  When did
22   that change take place?
23             THE WITNESS:  In -- around five
24   or six years ago.  I can't remember
25   exactly, but --

Page 1158

1                CME v. FMO - Volume V
2              (There was a discussion off the
3    record.)
4              CHAIRMAN KIMBALL:  And who owns
5    the remaining 80 percent?
6              THE WITNESS:  That's is
7    another -- another organization.
8              CHAIRMAN KIMBALL:  Can you
9    identify that organization?
10             THE WITNESS:  Honestly, I can't
11   remember the name.  I can't remember
12   the name of it.  But I could get it
13   for you.  I could get it for you.
14             CHAIRMAN KIMBALL:  All right.
15   We request that you do so.  Is it an
16   individual or another company?
17             THE WITNESS:  It's another
18   company.
19             (Document, Identification of 80
20   percent owner of Superior Limited,
21   requested.)
22             MR. WENTZ:  Is that other
23   company controlled by an individual or
24   individuals?
25             THE WITNESS:  It's a company --

Page 1159

```
1              CME v. FMO - Volume V
2      I'll say bearer share?  I think it is.
3      I think is -- but if you'd like, I
4      could find it exactly and give you the
5      exact how is the structure.
6              CHAIRMAN KIMBALL:  Why don't
7      you create a little organization chart
8      for us.  That might be the best way.
9              THE WITNESS:  Yes, I can do
10     that.
11             CHAIRMAN KIMBALL:  If there are
12     bearer shares, just indicate there are
13     bearer shares and what percent are
14     bearer shares.
15             THE WITNESS:  Yes.
16             CHAIRMAN KIMBALL:  Are the
17     shares you own bearer shares?
18             THE WITNESS:  The shares.  I
19     don't know if mine is -- but I will
20     also indicate it for you.  I can't
21     remember right now.
22             CHAIRMAN KIMBALL:  Okay.  Thank
23     you.
24             (Document, Bearer share
25     breakdown, requested.)
```

Page 1160

```
1              CME v. FMO - Volume V
2              MR. WENTZ:  Do you know where
3      that company is domiciled?
4      A     In the -- I think one is in
5      the -- in the Bahamas.  In the Bahamas.
6      But I will give you exactly what it is.
7              MR. FREVOLA:  We'll give you a
8      flow chart.
9              THE WITNESS:  Yes.
10             MR. WENTZ:  With the
11     individuals who control the shares.
12             THE WITNESS:  Yes.
13             MR. WENTZ:  Okay.  Thank you.
14             MR. FREVOLA:  All right.
15             CHAIRMAN KIMBALL:  I recommend
16     that you take that flow chart back a
17     few years, five or six years, as you
18     said.
19             THE WITNESS:  Okay.  I will do
20     so, sir.
21     CONTINUED EXAMINATION
22     BY MR. FREVOLA:
23     Q     Turning to Exhibit 1 of your
24     witness statement, Mr. Serrao.
25     A     Turning to what?
```

Page 1161

```
1              CME v. FMO - Volume V
2      Q     Exhibit 1.
3              Mr. Keane wound up asking you
4      about FOB purchases under the iron ore
5      sales contract.  And in the second
6      paragraph of the second page of the iron
7      ore sales contract, it starts off with
8      the -- read along with me.
9              "The total quantity shall be
10     loaded at Puerto Ordaz, plus completion at
11     the transfer vessel Boca Grande, referred
12     to as," quote, "T/V," capital T, slash,
13     capital V, unquote, "or by transit shipment
14     from self-unloading vessels at Serpent's
15     Mouth."
16             What does the "plus completion"
17     mean there?
18     A     The -- top off.  The completion
19     means that you will top off the vessel or
20     finalize the loading that the vessel will
21     require to export.
22     Q     And why would vessels be
23     topping off at the transfer station?
24     A     Because the river has a certain
25     limit, a draft limit.  So we will load in
```

Page 1162

```
1              CME v. FMO - Volume V
2      Puerto Ordaz, and then the balance required
3      for the total shipment will be loaded in
4      the transfer vessel.
5      Q     What kind of vessels are you
6      talking about there?
7      A     In that case, it will be
8      Panamax that is able to go navigate up the
9      Orinoco River.
10     Q     When CME was taking iron ore
11     cargos from FMO under the iron ore sales
12     contract, what percentage of vessels were
13     Panamax vessels?
14     A     Almost over 80 percent.
15     Q     Okay.  Okay.  And how many of
16     your iron ore cargos did you wind up
17     topping off at the transfer station?
18     A     Almost all of them.
19     Q     Okay.  I refer you to clause 4
20     of the iron ore sales contract.  At the
21     bottom of the page where clause 4 starts is
22     page number 8, and it continues on to page
23     number 9, it looks like?
24     A     Yes.
25     Q     Do you see that?
```

Page 1163

```
 1              CME v. FMO - Volume V
 2        A     Yes.
 3        Q     Right at the bottom of page 8,
 4   it says:
 5              "The iron ore shall be
 6   transferred to buyer."
 7              Who is the buyer?
 8        A     CME.
 9        Q     "As said iron ore is loaded
10   into hold of the vessel from Puerto Ordaz,
11   TV, or by transshipment from self-unloading
12   vessel at Serpent's Mouth."
13              Do you see that?
14        A     Yes.
15        Q     It also then says that:
16              "Legal title to said iron ore
17   shall remain with seller."
18              Who is seller?
19        A     Ferrominera.
20        Q     "As security for until payment
21   of the portion of the purchase price of
22   each shipment hereunder referred to in
23   clause 8 hereunder as the initial payment."
24              Okay.  So you see that, right?
25        A     Yes.
```

Page 1164

```
 1              CME v. FMO - Volume V
 2        Q     Okay.  And move on to
 3   clause five, which is at the very start of
 4   that clause.  Read along with me.
 5              "The base purchase prices, FOB
 6   ST, hold the vessel at Puerto Ordaz, or T/V
 7   or by transshipment from self-unloading
 8   vessels at Serpent's Mouth."
 9              And then you have pricing for
10   that, correct?
11        A     Correct.
12        Q     All right.  Let's move on to
13   clause 8.
14              Now, this is terms of payment.
15   Now, at the very bottom of clause 8, it
16   talks about how payments were structured
17   under the original iron ore sales contract,
18   right?
19        A     Yes.
20        Q     All right.
21              CHAIRMAN KIMBALL:  Mr. Frevola,
22        remember this is redirect, not
23        cross-examination.
24              MR. FREVOLA:  Understood.
25        Thank you, Mr. Kimball.
```

Page 1165

```
 1              CME v. FMO - Volume V
 2        Q     With respect to the FOB value
 3   of the iron ore delivered, what does it say
 4   in clause 8, at the bottom of the page
 5   there, with respect to how it's going to be
 6   invoiced?
 7        A     Should be payable against
 8   presentation of the provisional invoice for
 9   each shipment loaded at Puerto Ordaz, plus
10   T/V or by transshipment from self-unloading
11   vessel at Serpent's Mouth.
12        Q     Okay.  Now, going back to where
13   it says "Puerto Ordaz plus T/V," what does
14   the "plus" mean?
15        A     It's the material that is going
16   to be loaded, that you have to add.  I
17   mean, FOB, whatever, in Puerto Ordaz, plus
18   whatever is loaded in transfer station,
19   which is also part of the FOB.
20        Q     Okay.  A little bit higher up
21   in the initial payment paragraph, they talk
22   about "total dry weight."  What would
23   constitute "total dry weight"?
24        A     The total loading of the
25   vessel.
```

Page 1166

```
 1              CME v. FMO - Volume V
 2        Q     Total loading of the vessel at
 3   Puerto Ordaz or total loading of the vessel
 4   after topping off at the transfer station?
 5        A     After topping off at the
 6   transfer station.
 7        Q     And with regards to payment,
 8   when did CME pay for these cargos topped
 9   off at the transfer station?
10        A     Once the vessel sailed and once
11   the documents are received.
12        Q     Sail from where?
13        A     From the transfer station.
14        Q     Okay.  Moving on to Addendum 2,
15   which Mr. Keane did not mention yesterday.
16              At the bottom of the English
17   version of Addendum 2, the
18   second-to-the-last paragraph of the first
19   page of Addendum 2, what are they basing
20   the FOB pricing on?
21        A     In the US dollar for dry metric
22   ton unit, FOB Puerto Ordaz, plus completion
23   at the transfer station Boca Grande.
24        Q     Moving on to Addendum 3.
25              Now, Mr. Keane asked you about
```

Page 1167

```
1              CME v. FMO – Volume V
2    the very -- go to the very last page of the
3    English version.  Go to the very last page
4    of Addendum 3.
5              There you go.
6              Now, with respect to this wire
7    transfer payment, what was going on here
8    with regards to the 40 percent and then the
9    55 percent?
10             CHAIRMAN KIMBALL:  I'm not sure
11        I understand the question.  What do
12        you mean, what was going on?
13        Q     With respect to the 40 percent,
14   why was CME paying the 40 percent before
15   the vessel's arrival at the loading point?
16        A     Ferrominera requested us to
17   please pay that up front and re-incorporate
18   it at an event.
19        Q     Okay.  Now, the next
20   55 percent, when was that to be paid?
21        A     Against the presentation of the
22   provisional invoice.
23        Q     And it refers to clause 8 for
24   the pricing issues.  That's clause 8 in the
25   iron ore sales contract?
```

Page 1168

```
1              CME v. FMO – Volume V
2        A     Yes.
3        Q     Now, with regards to -- with
4    regards to that, going back to clause 8, at
5    the bottom of page 13, when would you be
6    paying for the -- that final 55 percent, or
7    that additional 55 percent?
8        A     Do you mean 95 percent?
9        Q     Well, you testified that you
10   paid 40 percent as an advance payment,
11   right?
12       A     Yes.
13       Q     There was an additional
14   55 percent under that wire transfer
15   provision in Addendum 3.
16       A     That we would pay once we
17   receive the documents.
18       Q     And that's when?
19       A     Provisional document.  Once the
20   vessel sales.
21       Q     From?
22       A     From Boca Grande.
23       Q     Okay.  We're going to
24   Addendum 6 now.
25             What is Addendum 6?
```

Page 1169

```
1              CME v. FMO – Volume V
2        A     On one side, it's -- in the
3    "whereas," it explains about that the buyer
4    wasn't able to supply the total material --
5    the total amount -- volume of material, and
6    also explains that --
7              MR. WENTZ:  Did you mean the
8         seller?  You said the buyer.
9        A     The seller.
10             MR. WENTZ:  Just to be clear.
11             MR. FREVOLA:  Sorry.
12       A     However, the volume of
13   2.7 million -- 2.7 million -- sorry, that
14   the seller wasn't able to provide to the
15   buyer -- I'm sorry, could only be able to
16   provide -- I'm so sorry -- 2,169,000 tons,
17   781, of the 2 million 700 metric tons iron
18   ore that should have been provided in --
19   contractually during this 2007, 2008 fiscal
20   year.
21             It also speaks about an amount
22   of material that Ferrominera had available
23   at the pellet plant, which is a scrap
24   material that is a result of screening the
25   pellets, and was offering that to the
```

Page 1170

```
1              CME v. FMO – Volume V
2    buyer, to CME, on the -- where it was.
3        Q     Okay.  And what was the
4    condition of that material?
5        A     That material is left over from
6    the process of screening, so it was dust.
7    And we said that we could make use of this
8    material.
9        Q     Now, with respect to this
10   particular contract, what type of vessel
11   was specified to carry this particular
12   addendum, this particular cargo?
13       A     It states that it should be
14   shipped in Handymax type of vessel in
15   cargos of 30,000 metric ton, minus, plus
16   10 percent.
17       Q     Okay.  And the pricing on that.
18   If you look at the third numbered
19   paragraph, it says "price"?
20       A     Yes.
21       Q     With regards to where it's
22   going to be loaded, what does it say about
23   where it's going to be loaded?
24       A     Loading at Puerto Ordaz port.
25       Q     Okay.  Now, with regards to
```

Page 1171

1            CME v. FMO – Volume V
2    this particular --
3            CHAIRMAN KIMBALL:  Question.
4            Why did this addendum provide
5            for loading only at Puerto Ordaz.
6        A    Because the size of the vessel
7    is a Handymax vessel.  So you could load
8    that amount in Puerto Ordaz only.
9            MR. FREVOLA:  You took my last
10   question, Mr. Kimball.
11           CHAIRMAN KIMBALL:  Thank you.
12       Q    All right.  Get the witness
13   statement.
14           Paragraph 13 of your witness
15   statement, Mr. Serrao, your witness
16   statement, there was a fair amount of
17   questioning about the --
18           MR. SICILIANO:  Let me ask a
19   question.  I'm a little confused, and
20   I don't want to carry that confusion
21   forward.
22           This Addendum No. 6, was this a
23   sort of forgiveness for the shortfall?
24       A    Addendum No. 6.
25           MR. SICILIANO:  Yes.  It says:

Page 1172

1            CME v. FMO – Volume V
2            "Whereas the seller could only
3            provide 2,169,881 tons of the
4            2,700,000 tons contracted."
5            Then it goes down to dealing
6            with this particular cargo, which
7            comes to 400,000 tons.  What is the
8            purpose of this addendum?  Is it a
9            forgiveness addendum?
10           THE WITNESS:  It was just
11           indicated there that from one side,
12           they didn't supply us with enough
13           material; and they are offering a
14           different material in a different
15           place, for us to consider.
16           MR. SICILIANO:  That's my
17           point.  Is this a separate contract?
18           Is it a forgiveness or partial
19           forgiveness of the shortfall?  What's
20           the purpose of this being an addendum
21           that mentions this particular cargo?
22           This could have been a separate and
23           independent contract, and we would
24           still have a shortfall under one, of
25           the 2 million 7.

Page 1173

1            CME v. FMO – Volume V
2            THE WITNESS:  Yes.
3            MR. SICILIANO:  I'm trying to
4    grasp what the purpose of this is.
5            THE WITNESS:  We had a shortage
6    of the iron ore, the FSF, which is the
7    other quality.  And for that iron ore
8    fines, red fines, we made a separate
9    contract for this material.
10           MR. SICILIANO:  Okay.  Thank
11   you.
12       Q    Paragraph 13 of your witness
13   statement, there was questions about
14   addenda under the iron ore sales contract,
15   the 2004 iron ore sales contract.  I was
16   going to have you take a look at
17   Amendment 5 to the iron ore sales contract.
18           CHAIRMAN KIMBALL:  We are back
19   in Exhibit 1, Addendum 5?
20           MR. FREVOLA:  Yes.
21       Q    What is -- what is -- what is
22   Addendum 5, the transaction identified in
23   Addendum 5?
24       A    It's a -- it's about the
25   stackers that Ferrominera wanted to buy.

Page 1174

1            CME v. FMO – Volume V
2        Q    Okay.  Now, a stacking
3    system -- with respect to your slides
4    yesterday, one of the slides showed two
5    ridges of iron ore and big cranes over it
6    that were, like, spreading out the iron
7    ore?
8        A    Yes.
9        Q    What were those things?
10       A    Those were the stackers.
11       Q    Okay.  Now, under this
12   contract, the quote for the stacker that
13   CME gave to Ferrominera was what?
14       A    10,784,300.
15           MR. SICILIANO:  US dollars?
16           THE WITNESS:  US dollars, yes.
17       Q    And so as CME was providing
18   this service to FMO, how did CME invoice
19   FMO?
20       A    Invoice in US dollars for the
21   supply of the stackers.
22       Q    Okay.  And in response to those
23   invoices, when FMO paid -- well, first of
24   all, in the contract, how was FMO supposed
25   to pay?

Page 1175

1              CME v. FMO - Volume V
2        A     25 percent in advance, through
3   a banking transfer, and/or the mechanism of
4   compensation or exchange of iron ore.
5        Q     Okay.  With regards to the way
6   that Ferrominera actually paid, how did
7   they actually pay for the stacker?
8        A     They paid in US dollars, and
9   they paid the equivalent in iron ore.
10       Q     Okay.  And the pricing was
11  determined by -- how was the price of the
12  iron ore determined?
13       A     Market price, according to the
14  contract.  It's according to clause 8 of
15  the contract.
16             CHAIRMAN KIMBALL:  Did you
17       refer to that benchmark that you
18       described yesterday?
19       A     Yes.  It's a formula that is
20  applied.  You apply a formula that is based
21  on the -- on the characteristics, also, of
22  the material.  And it's based -- at this
23  time, I think we used -- I think we used
24  the Carajas.
25       Q     The Brazilian --

Page 1176

1              CME v. FMO - Volume V
2        A     The Brazilian, yes.
3              MR. SICILIANO:  And is that a
4        published index that come out monthly,
5        weekly, like Platts does?
6              THE WITNESS:  Since the
7        beginning of the contract, Ferrominera
8        used Carajas, and it was done with all
9        of the buyers or whoever was buying.
10       And they used the -- that benchmark,
11       which was the result of negotiation
12       between Brazil CVRD and the biggest
13       steelworks in Japan.  It was Nippon
14       and NKK.
15             So whatever they will agree at
16       the beginning of the year, Ferrominera
17       adopted that, and it was an agreement
18       to do so, also, for -- with the buyers
19       of their ore, during the year.
20             MR. SICILIANO:  So the price
21       would remain stable throughout the
22       year?
23             THE WITNESS:  Throughout the
24       year.
25             MR. SICILIANO:  The only price

Page 1177

1              CME v. FMO - Volume V
2   variable would be the quality of the
3   ore?
4              THE WITNESS:  Yes.
5              CHAIRMAN KIMBALL:  Just while
6        we're focusing on this point, if we
7        look at the main body of the iron ore
8        contract, in Exhibit 1, can you just
9        confirm that the benchmark you're
10       talking about is the one that is
11       referred to in clause 5?  It's at
12       page 9, at the bottom of the page.
13             THE WITNESS:  Yes.  That was
14       the price at that time, when the
15       contract was established.  For Asia,
16       those are the prices.  And for the US,
17       that would be the price for the lump
18       ore that at that time we were selling
19       to US.  And in Europe, Europe will be
20       that other line of prices.
21             CHAIRMAN KIMBALL:  You said
22       that at some point, instead of using
23       Carajas, you used Platts.  Do you
24       remember what year that was that you
25       made that change?

Page 1178

1              CME v. FMO - Volume V
2              THE WITNESS:  I think we
3        changed it after -- I think it was
4        2009.  I believe so.  I can't remember
5        right now.  But it was changed because
6        Ferrominera decided to use a different
7        benchmark.  First it was Platts --
8        sorry.  First, I think it was --
9        sometimes they used Metal Bulletin,
10       and then they sometimes they swapped
11       to Platts.  But it's a negotiation.
12       It was agreed on the contract.
13             MR. SICILIANO:  But in each
14       case, it was FMO that chose which
15       benchmark to use and when?
16             THE WITNESS:  Yes.
17             MR. SICILIANO:  Thank you.
18             MR. WENT2:  Once it shifted to
19       Platts, did it float?
20             THE WITNESS:  It floated.
21             MR. WENT2:  Okay.
22             THE WITNESS:  We used to have
23       an average, if I'm not mistaken,
24       approximately.  It's an average of --
25       the base price will be an average of

Page 1179

```
 1              CME v. FMO - Volume V
 2    the number of days --
 3              MR. WENTZ:  Right.
 4              THE WITNESS:  -- or weeks
 5    before and after the shipment takes
 6    place.
 7              So that is the base, and then
 8    from there, there is a formula that we
 9    will come to a price.
10              CHAIRMAN KIMBALL:  Not to jump
11    too far ahead.  But was that same
12    method used for pricing under the
13    TSMC.
14              THE WITNESS:  The TSMC?  What
15    do you mean by the TSMC?  The TSMC is
16    a transfer station management.
17              CHAIRMAN KIMBALL:  You set a
18    price for the iron ore that was to be
19    delivered under that contract?
20              THE WITNESS:  Yes, because the
21    TSMC, the services, we will invoice
22    Ferrominera and -- according to that
23    contract, and Ferrominera will sell
24    iron ore on the basis of the contract
25    for iron ore.  And whatever is owed to
```

Page 1180

```
 1              CME v. FMO - Volume V
 2    the party -- if we would have owed
 3    money to Ferrominera, we would pay.
 4    If Ferrominera owes money in the
 5    financial position to CME, and then we
 6    will -- we will charge -- from the
 7    iron ore, we will offset with iron
 8    ore.
 9              MR. WENTZ:  But the value of
10    the iron ore was set according to the
11    index that was chosen at that time.
12              THE WITNESS:  Yes, in
13    accordance with the contract.
14              MR. WENTZ:  According to the
15    TSMC or according to the iron ore.
16              THE WITNESS:  According to --
17    the iron ore that will be offset is
18    the invoice that Ferrominera has
19    issued to CME in accordance to the
20    iron ore sales contract.
21              CHAIRMAN KIMBALL:  Who in your
22    office was in charge of keeping track
23    of that?
24              THE WITNESS:  We had our
25    management operation management for
```

Page 1181

```
 1              CME v. FMO - Volume V
 2    that.
 3              CHAIRMAN KIMBALL:  What were
 4    the names of the people?
 5              THE WITNESS:  Carlos Suarez one
 6    of them.  And also was another one,
 7    called Marlo.  Carlos was the main
 8    one.
 9              CHAIRMAN KIMBALL:  Okay.
10              THE WITNESS:  Yeah.
11              MR. WENTZ:  Did they work for
12    Ms. Sherriff?
13              THE WITNESS:  Yes.
14              MR. WENTZ:  Okay.
15              MR. DENIG:  May I clarify,
16    Mr. Chairman?
17              You asked -- your question, you
18    were asking who was in charge of
19    keeping track of the price --
20              CHAIRMAN KIMBALL:  Yes.
21              MR. DENIG:  -- mechanism --
22              CHAIRMAN KIMBALL:  Who was
23    following the price indexes?  That's
24    my question.
25              MR. DENIG:  I just wanted to
```

Page 1182

```
 1              CME v. FMO - Volume V
 2    clarify.
 3              THE WITNESS:  The price is, in
 4    accordance with the contract,
 5    Ferrominera will send us the invoice.
 6    And Carlos will check that everything
 7    is in accordance with the contract,
 8    because it's a formula that is related
 9    to the specifications, to the
10    humidity, to the "F-e" content, et
11    cetera.
12              MR. WENTZ:  So with regard to
13    the TSMC, there was a minimum payment
14    that was due, a minimum amount that
15    was due, on a monthly basis, correct?
16              THE WITNESS:  Yes.
17              MR. WENTZ:  And the value of
18    that ore was set according to this
19    index and this mechanism that you just
20    described; is that correct?
21              THE WITNESS:  For the ore, yes.
22              MR. WENTZ:  For the ore, the
23    value of the ore?
24              THE WITNESS:  Of the ore, yes,
25    that's been invoiced to CME, right.
```

Page 1183

1          CME v. FMO - Volume V
2          MR. WENTZ:  Once it went to
3    Platts, it was a floating mechanism?
4          THE WITNESS:  Yes.
5          MR. WENTZ:  During the course
6    of the TSMC, was it always floating?
7    That was two thousand --
8          CHAIRMAN KIMBALL:  Ten.
9          MR. WENTZ:  Ten, I believe.
10         THE WITNESS:  Yes.  And the
11   answer is the following:
12         We have different contracts
13   with Ferrominera.  For example, the
14   long-term contract goes with the
15   Platts and according to formulas.  If
16   Ferrominera, for example, have an
17   additional material coming from a
18   separate mine or date, they will
19   decide.
20         If they have a material -- they
21   said, "Look, I have two shipments or
22   one shipment that I could give you, or
23   I would like to go in the market, or
24   can you give me a -- an offer," we
25   will see -- we will make -- it could

Page 1184

1          CME v. FMO - Volume V
2    be -- that could be a spot contract,
3    but for a fixed price.
4          I just wanted to answer you
5    that it's not all, everything, you
6    know.  So it could be that one day
7    Ferrominera come up, as I mentioned
8    before, with a quantity, and we will
9    say, "No, we don't want to have it" or
10   "yes, we're going to have it, and it's
11   a fixed price."
12         But it must be a very short
13   shipment.
14         MR. WENTZ:  A spot.
15         THE WITNESS:  Very spot, yes.
16   It will be next month.
17         MR. WENTZ:  Understood.  Thank
18   you.
19         MR. SICILIANO:  While we're on
20   this pricing, because it's a rather
21   important issue, under the transfer
22   service management contract, there was
23   a certain quantity per month
24   throughput, and it seems to me that we
25   concluded that FMO did not meet that

Page 1185

1          CME v. FMO - Volume V
2    volume.
3          So you just testified that the
4    price that was applied to that
5    contract was determined by FMO when
6    they invoiced you for the commodities
7    they did provide.  But if there was a
8    shortfall, how did the shortfall get
9    priced?
10         THE WITNESS:  I think that we
11   are mixing two things.
12         The transfer -- the TSMC, they
13   call it like that, TSMC, transfer
14   management station contract --
15         MR. SICILIANO:  Yes.
16         THE WITNESS:  When you speak
17   about the "throughput," that is a
18   volume of material under that contract
19   that CME confirms themselves, under
20   that contract with Ferrominera, to
21   transfer that material with the
22   shuttle vessels.  It has nothing to do
23   with sales of material.  It's just we
24   are -- we are hired by them to do so.
25         MR. SICILIANO:  Okay.

Page 1186

1          CME v. FMO - Volume V
2          THE WITNESS:  So -- yeah, so
3    just to let you know, for example, if
4    Ferrominera, if, under that contract,
5    say:
6          "Look, CME I'm going to
7    transfer to that transfer station,
8    during one year, 7 million tons,"
9    that's Ferrominera's material.
10         I mean, we are not supposed to
11   take 1 pound of that material.
12         MR. SICILIANO:  So your income
13   would be capped?
14         MR. FREVOLA:  I think "cap" is
15   the wrong word.  I think if you read
16   the contract, there is a --
17         MR. WENTZ:  Wait.
18         MR. FREVOLA:  I'm sorry.
19         MR. WENTZ:  I mean, I don't
20   think you're sworn.
21         MR. FREVOLA:  Excuse me.
22   Pardon me.
23         MR. WENTZ:  All right.
24         THE WITNESS:  The amount of
25   material -- did I explain myself

Page 1187

CME v. FMO – Volume V

1   CME v. FMO – Volume V
2   before?
3          MR. SICILIANO:  Yes.  It's a
4   throughput charge, unrelated to the
5   value of the commodity.
6          THE WITNESS:  Yes.  The
7   throughput charge for the TSMC is in
8   respect to a job that we are going to
9   do for Ferrominera.  So the contract
10  states that, if Ferrominera say to
11  CME, let's say in a month, "We only
12  transfer to the transfer station and
13  into vessels, export vessels, we only
14  transfer," just to say a number,
15  "300,000 tons," Ferrominera will --
16  our -- the minimum that we would
17  charge is 500,000 tons because we have
18  a fixed cost.  We have fixed -- you
19  know, that's the value.
20         However, if we -- and that was
21  a compromise to do 6 million tons per
22  year.
23         Although Ferrominera, they will
24  export more than, let's say -- sorry.
25  We have -- we have -- let's say

Page 1188

1   CME v. FMO – Volume V
2   Ferrominera -- then that will be --
3   let's say Ferrominera produced more
4   than that, but sold from FOB by --
5   it's their decision to sell.  Then
6   that material will not go to the
7   transfer station, but is Ferrominera's
8   decision.
9          MR. SICILIANO:  All right.
10  Thank you.
11         MR. WENTZ:  With regard to the
12  6 million that you mentioned --
13         THE WITNESS:  6 million?  I
14  have to check.
15         MR. WENTZ:  I thought it was a
16  6 million annual figure that was
17  supposed to be the throughput under
18  the TSMC.  Correct?
19         THE WITNESS:  I think so.  Let
20  me just double-check.  But I think so.
21         It is?  Let me just
22  double-check, please.
23         MR. WENTZ:  I don't want to
24  waste time.  But let's just say it's
25  6 million.

Page 1189

1   CME v. FMO – Volume V
2          THE WITNESS:  Yes.
3          MR. WENTZ:  Then the value of
4   that ore would be set according to the
5   pricing mechanism in the iron ore
6   contract at the time?
7          THE WITNESS:  No.
8          MR. WENTZ:  How is the value of
9   that ore set?
10         THE WITNESS:  There is a value
11  per ton that is established in the
12  transfer station management contract.
13         MR. WENTZ:  Okay.  So that
14  doesn't relate back to the iron ore
15  contract?
16         THE WITNESS:  No.
17         MR. WENTZ:  It's a separate
18  pricing mechanism?
19         THE WITNESS:  It's a separate
20  pricing mechanism.
21         MR. WENTZ:  And was that
22  Platts?
23         MR. SICILIANO:  No.
24         THE WITNESS:  No.  It's not a
25  pricing for -- for the service.

Page 1190

1   CME v. FMO – Volume V
2          MR. WENTZ:  Okay.
3          THE WITNESS:  The service is
4   just a dollar per ton.
5          Now, the sales is in respect --
6   if they're selling the material, it's
7   on the basis of Platts.
8          MR. WENTZ:  Okay.  Okay.  Thank
9   you.
10  CONTINUED EXAMINATION
11  BY MR. FREVOLA:
12     Q     While we're on that topic,
13  Mr. Serrao, there was one thing, I believe,
14  on that, just to conclude it.
15         If you look at Exhibit 22,
16  which is the transfer system management
17  contract, paragraph 17 of the transfer
18  system management contract, paragraph 2 of
19  that, of that provision, you just testified
20  that, if FMO did not provide 500,000 tons,
21  metric tons, of iron ore in a month, you
22  will still charge them for 500,000 tons as
23  a minimum throughput amount, correct?
24     A     Yes.
25     Q     What would happen if FMO had

Page 1191

```
 1                  CME v. FMO – Volume V
 2   given you 600,000 metric tons in a month?
 3   Would it still be 500,000?  Would it still
 4   be the Platts rate?
 5        A     No.  We will charge 500,000 for
 6   the first 500, plus -- we will charge for
 7   600.
 8        Q     And the per-ton rate that is in
 9   paragraph 2 of clause 17, that would be the
10   rate that applied?
11        A     Yes.
12             CHAIRMAN KIMBALL:  I have a
13        question about that, not to interrupt
14        you.  But I want to make sure we
15        understand this exactly right.
16             Now, I'm jumping ahead a little
17        bit.  But we're looking at the summary
18        of account that was produced as part
19        of the -- Ms. Sherriff's statement,
20        and I'm looking at page CME 02465.  So
21        I can put it in front of you.
22             It lists monthly throughput
23        amounts, for example, for January
24        of 2011, February of 2011, March 2011,
25        showing a price of $6.08, as opposed
```

Page 1192

```
 1                  CME v. FMO – Volume V
 2        to the $6.87 that is referred to in
 3        clause 17.
 4             Can you explain why there is
 5        that difference?
 6        A     Can I?  Yes.
 7             That's in the beginning of
 8        the -- yes.  Let me see.
 9             CHAIRMAN KIMBALL:  If you don't
10        know the answer, we can ask
11        Ms. Sherriff tomorrow.
12             THE WITNESS:  That will be
13        better, yeah, because from my
14        recollection, just to let you -- when
15        we took over the transfer system,
16        Ferrominera had a problem with their
17        operator, so he left.
18             In the beginning, we adopted to
19        the budget that Ferrominera had, and
20        then -- something like that.  But I
21        would -- I will prefer Ms. Sherriff to
22        give you a better explanation than
23        that.
24             CHAIRMAN KIMBALL:  Okay.  Thank
25        you.
```

Page 1193

```
 1                  CME v. FMO – Volume V
 2             MR. FREVOLA:  Thank you, sir.
 3        Q     Yesterday, during your
 4   testimony, at one point Mr. Keane had asked
 5   you whether or not CME had contracted with
 6   third parties on behalf of FMO, was the
 7   expression he used.  With respect to -- you
 8   said yes.
 9             Now, with respect to CME's
10   entering contracts with third parties, how
11   did CME enter contracts with third parties
12   when providing services to FMO?
13             MR. KEANE:  Asked and answered.
14             CHAIRMAN KIMBALL:  You can
15        answer.
16        A     Contracts?  What I understood
17   from Mr. Keane, probably is a matter of
18   language -- but when he mentioned this,
19   what contracts may have CME done or
20   supplied to FMO.
21             But the way it's done is that
22   CME will establish a contract with the
23   supplier of the goods or services and
24   establish a contract with Ferrominera for
25   the sale of that goods or services.
```

Page 1194

```
 1                  CME v. FMO – Volume V
 2        Q     With respect to the issue that
 3   was raised by Mr. Keane, how many contracts
 4   did CME enter into where it was acting as
 5   an agent and bringing FMO together with a
 6   third-party contractor for services
 7   provided by CME?
 8        A     None.
 9        Q     Mr. Keane also asked whether
10   CME marketed ore to China.
11             With respect to ore that was
12   coming from Ferrominera while CME was
13   there, what ore did CME -- sorry, what ore
14   did FMO sell to China?
15        A     None.
16        Q     Who sold the ore to China?
17        A     CME.
18        Q     And what ore was that?
19        A     The iron ore from the contracts
20   that we purchased from Ferrominera.
21        Q     Now, Mr. Keane also asked you
22   whether CME's sales -- iron ore sales
23   profits were pooled with FMO.
24             With respect to the commercial
25   alliance agreement that CME had with FMO,
```

Page 1195

```
1                 CME v. FMO - Volume V
2    what type of a trust provision did that
3    contract have?
4        A     Well, it's -- it's written in
5    the CAA, in the trust provisions.
6        Q     Okay.  The Exhibit 5.
7        A     Five.
8              It's in clause 7, right?
9        Q     Seven.
10             CHAIRMAN KIMBALL:  Which
11       exhibit are you looking at?
12             MR. FREVOLA:  Exhibit 5, the
13       commercial alliance agreement.
14       A     Seven, eight, nine, right.
15   Ten, also.
16       Q     Okay.  With respect to the
17   trust fund option that was -- that was set
18   forth in the CAA, how was that trust fund
19   option implemented?
20       A     This was never implemented.
21       Q     Why not?
22       A     Ferrominera decided not to.
23       Q     Yesterday you testified that
24   the primary objective of the framework
25   agreement between CME and CVG was to
```

Page 1196

```
1                 CME v. FMO - Volume V
2    produce 30 million tons of iron ore.
3              Do you remember that?
4        A     Yes.
5        Q     Okay.  Who was supposed to work
6    with CME to make that production happen?
7        A     Ferrominera.
8        Q     Okay.  And what was CME going
9    to provide to Ferrominera as part of that
10   arrangement?
11       A     Services, equipment, and the
12   production.
13       Q     And what was CME going to get
14   in return from Ferrominera, FMO?
15       A     Iron ore.
16       Q     Now, with respect to the
17   commercial alliance agreement, what was
18   that contract's purpose, to your
19   understanding?
20       A     The CAA will give the overall
21   structure of how the -- this would work,
22   would bring Ferrominera in, and will give
23   the general view of how it could work.
24       Q     And how did CME provide its
25   performance to FMO under the parties'
```

Page 1197

```
1                 CME v. FMO - Volume V
2    strategic alliance?
3              MR. KEANE:  I have to object.
4        It seems to me we have left the proper
5        redirect.
6              CHAIRMAN KIMBALL:  You can
7        answer.
8        A     CME will perform with
9    development contracts.
10       Q     And what examples of
11   development contracts were CME's
12   performance?
13       A     For example, the TSMC, the
14   stacker, the wagons.  Those are contracts
15   that will help the production.
16       Q     Okay.  What services did CME
17   provide to FMO under the CAA?
18       A     None.
19       Q     Now, with respect to bunkers
20   that CME provided to FMO, what amount of
21   bunkers was provided to FMO under the CAA?
22       A     Under the CAA, nothing.
23       Q     What type of invoicing did CME
24   provide to FMO for bunkers as a
25   reimbursable expense under the CAA?
```

Page 1198

```
1                 CME v. FMO - Volume V
2        A     Under the CAA, nothing.
3        Q     What contracts -- could you
4    provide an example of a contract under
5    which CME did provide bunkers to FMO?
6        A     To FMO, CME is not
7    responsible -- let me put it this way.
8              Your question is, again,
9    please?
10       Q     What I'm asking about is, what
11   contracts -- what contract that CME had
12   with FMO would result in CME providing
13   bunkers to FMO or paying for bunkers to
14   FMO?
15       A     None, because the bunker is the
16   responsibility of FMO.
17             CHAIRMAN KIMBALL:  Just to
18       clarify, though, you testified that
19       there were certain instances where CME
20       actually paid for bunkers.
21             THE WITNESS:  Yes, paid for
22       bunkers.
23             MR. SICILIANO:  Precisely.
24             THE WITNESS:  But does not --
25       what's the question?
```

Page 1199

1          CME v. FMO – Volume V
2       Q     Under what contract?
3       A     Under what contract?
4       Q     Yeah.
5       A     We would pay for that on behalf
6   of Ferrominera for the shuttle vessels, for
7   example, that, under the contract,
8   Ferrominera is supposed to pay, and if
9   Ferrominera asks CME to help with the
10  financing, then CME will do the payment for
11  the bunker.
12      Q     Okay.  Going back to the Serrao
13  Exhibit 1.
14            MR. SICILIANO:  Excuse me.
15            The point being that there's no
16        governing contract requiring you to do
17        so, but you did that because C --
18        because FMO was unable to otherwise
19        pay for the bunkers; is that right?
20            THE WITNESS:  Yes.
21            MR. WENTZ:  You were required
22        to provide bunkers for the transfer
23        station, however; weren't you?
24            THE WITNESS:  Yes.  But that is
25        under the transfer station contract,

Page 1200

1          CME v. FMO – Volume V
2        and there is the subcontractor that is
3        responsible for that.
4            MR. WENTZ:  That was a transfer
5        system management contract, right?
6            THE WITNESS:  Yes.
7            MR. WENTZ:  All right.
8       Q     Back to Serrao witness
9   statement, Exhibit 5 -- sorry, Exhibit 1, I
10  should say -- no, Exhibit 5.  I'm right.
11            And we're going to look at
12  clause 2, subclause 4, which is
13  titled "Development Contract."
14            CHAIRMAN KIMBALL:  What page?
15            MR. FREVOLA:  Page 3 of 8 on
16        the English version.  It's the
17        commercial lines agreement.
18      Q     Now, the last four lines of
19  that -- of that paragraph -- actually, I'll
20  take it back.  The last six lines.
21            It starts at the end of the --
22  of the sixth line from the end, and on the
23  right-hand side of that line.
24            "All of those contracts that
25  need to be signed and executed which must

Page 1201

1          CME v. FMO – Volume V
2   equally be reconciled to this contract,
3   among which are all of those needed for the
4   financial leveraging by foreign financial
5   entities of the projects, as well as the
6   project and service contracts themselves
7   that are assigned to third parties, and to
8   which CME subrogates Ferrominera with
9   regard to the obligations they assume in
10  the contract."
11            Do you see that?
12      A     Yes.
13      Q     With regards to that language,
14  how many different types of contracts were
15  contemplated by this clause, different
16  types?
17      A     There are three of them, if I
18  could point out.  One is the financing that
19  CME provides.  The other one is the
20  development contracts for goods, for
21  example, equipments, services.  And the
22  other one that I will believe is subrogate,
23  is the third one.
24      Q     Yesterday, when you
25  mentioned -- when you were asked about

Page 1202

1          CME v. FMO – Volume V
2   subrogating contracts, you mentioned --
3            CHAIRMAN KIMBALL:  Wait a
4        minute.  I didn't follow the last
5        part.
6            Which ones are you saying are
7        subrogated?
8            THE WITNESS:  A subrogation is
9        the last line here.  CME subrogates to
10        Ferrominera, subrogates Ferrominera
11        with regards to the obligation they
12        assume in the contract.
13            CHAIRMAN KIMBALL:  All right.
14        Can you give some examples of the
15        rights that were subrogated?
16            THE WITNESS:  Yes.  If you look
17        at the contract for the PTLB-II, it is
18        a contract between Ferrominera and
19        EIH, and CME is signing, in the same
20        contract, as a subrogator to
21        Ferrominera's obligation to pay.
22            So we are financing in a
23        subrogated way.  They are not charging
24        anything.  You're just paying the
25        company for the work they are doing.

Page 1203

```
 1              CME v. FMO - Volume V
 2        CHAIRMAN KIMBALL:  Okay.  And
 3    which exhibit is that contract?
 4        MR. FREVOLA:  That contract, I
 5    don't think --
 6        MR. DENIG:  The contract is
 7    part of the supporting documentation
 8    in the Sherriff Exhibit 1.  It's a
 9    Spanish document.  We are not relying
10    on it directly for any of our claims
11    in these claims proceedings under the
12    General Piar transfer service
13    management contract.
14        But since it's come up, we
15    could provide documents and separate
16    exhibits to the panel and could
17    arrange for a translation.
18        CHAIRMAN KIMBALL:  We would ask
19    you to do so.
20        (Document, PTLB-II contract,
21    requested.)
22    Q    With respect to the
23    subrogated-type contracts, you said CME
24    would provide financing in a certain
25    amount?
```

Page 1204

```
 1              CME v. FMO - Volume V
 2    A    Yes.
 3    Q    In return, what would CME get
 4    for providing that financing?
 5    A    Iron ore.
 6    Q    In what amount?
 7    A    In the amount of US dollars
 8    that represents the amount paid by CME on
 9    behalf of FMO.
10    Q    Just what type of interest
11    charges were on that?
12    A    None.
13    Q    Okay.  What example can you
14    give me of a financing contract?
15    A    Ferrominera will ask CME to pay
16    the dry dock costs, for example, ask us to
17    pay for other supplies that they have
18    purchased on their own, spares or a
19    Caterpillar or whatever that they will ask
20    us, "Can you pay that company, please?"
21    Then we will pay.
22    Q    And when you did that, what did
23    CME get in return?
24    A    We will get iron ore.
25    Q    And on those contracts, what
```

Page 1205

```
 1              CME v. FMO - Volume V
 2    interest was charged?
 3    A    None, nothing.
 4    Q    Now, with regard to the goods
 5    and services contracts, what was the
 6    arrangement that -- the trust arrangement
 7    contemplated in the CAA?  What was CME
 8    supposed to do?
 9    A    If we would have used the --
10    you mean the trust --
11    Q    Yes.
12    A    -- option?
13         We will -- we will give or
14    supply those costs -- sorry, those goods
15    and services at cost because it will be
16    inside a -- Ferrominera will supply the
17    iron ore.  CME will supply the goods and
18    services at cost.
19    Q    Okay.  In the trust context,
20    what contracts would have been created?
21    Who would FMO be contracting with?
22    A    FMO will be contracting
23    directly.
24    Q    With?
25    A    With the supplier.
```

Page 1206

```
 1              CME v. FMO - Volume V
 2    Q    Okay.  In that situation, what
 3    would have CME gotten as a result or as a
 4    by-product of those contracts?
 5    A    CME will receive a commission.
 6    Q    You testified before that FMO
 7    rejected the trust procedure?
 8    A    Yes.
 9    Q    Okay.  What did CME instead
10    have to do?
11    A    We -- we -- we then maintain
12    somewhat the barter arrangement, where CME
13    will sell to FMO and affirm that CME has
14    purchased -- will then sell it to CME, and
15    CME will sell the iron ore -- sorry, FMO
16    will sell the iron ore to CME.  I'm sorry.
17    Q    And so in that situation, how
18    many contracts existed?
19    A    It will be only the trust in
20    that case.
21    Q    No, no.  I was saying, but in a
22    situation where CME had to go out and get
23    contractors and bring them in and then
24    create a separate contract with FMO, how
25    many contracts were there?
```

Page 1207
1          CME v. FMO - Volume V
2          A     Well, there would be a number
3    of contracts.  If I have to hire, let's
4    say, a charter, in this case I will sell it
5    to FMO.  Right?
6          Q     Okay.  For the charter example.
7          A     For the charter.
8          CHAIRMAN KIMBALL:  Yeah, we
9    need some examples.
10         Q     Yeah.  What I was trying to do
11   is just, for a head charter, how many
12   contracts, if you had a charter, how many
13   contracts would there be for a ship?
14         A     In that case, it would be two.
15         Q     In the case of bringing in, for
16   example, the manufacturing of a piece of
17   equipment, for example, the -- for bringing
18   in those big trucks for the PTLB
19   installation -- I'm not sure if that would
20   qualify.
21         A     That wouldn't go in there, no.
22         Q     Okay.  Can you give me another
23   example?
24         A     The -- well the stacker, for
25   example.  The stacker, we purchase the

Page 1208
1          CME v. FMO - Volume V
2    stacker.  We have an arrangement with a
3    decent crew, approved by FMO anyway because
4    of the specifications.
5          We will not go out and buy
6    something that we want.  Ferrominera says,
7    "I want this specification."  So we will
8    sell the stacker to Ferrominera.
9          Q     Okay.  Now, in that --
10         CHAIRMAN KIMBALL:  With respect
11         to the stacker, who specifically were
12         you dealing with at FMO?
13         THE WITNESS:  With the
14         engineering people.  And then once
15         they establish or agree on the
16         technical part of it, which then they
17         will send a -- well, send the
18         proposal -- they will send that -- if
19         they accept it, they will send it to
20         the commercial department.
21         CHAIRMAN KIMBALL:  Who in the
22         commercial department did you deal
23         with in terms of the stacker?
24         THE WITNESS:  With the stacker?
25         CHAIRMAN KIMBALL:  Yes.

Page 1209
1          CME v. FMO - Volume V
2          THE WITNESS:  May I look?
3          CHAIRMAN KIMBALL:  Yes you may
4    look.  If you're not sure, you can
5    fill it in later.  But I'd like to
6    have the names of the people you dealt
7    with.
8          THE WITNESS:  Okay.  The people
9    in the engineering department, there
10   was Mr. DeAlva, Mr. -- on the stacker
11   side.
12         For the stacker, whoever is
13   related in the engineering department
14   to the -- what was called PMH, is a
15   production area and is responsible for
16   that equipment and that area.
17         So they would request us, "can
18   you give a proposal," and then we will
19   start to discuss the technical part of
20   it.  And then if it's approved, they
21   will send it to the commercial
22   department, and then we will come and
23   discuss the contract.
24         Q     With regard to the two
25   contracts between CME and an outside

Page 1210
1          CME v. FMO - Volume V
2    contractor, and then CME with FMO, as
3    opposed to the situation where CME was
4    linking FMO up directly with an outside
5    contractor under the trust agreement, what
6    extra risk did CME take on the
7    two-contracts system?
8          A     Well, financial payments.  We
9    are here now seeking for payments that have
10   not been complied with by Ferrominera.
11         Q     What did FMO tell CME about its
12   cost for production of the iron ore that it
13   was selling to CME?
14         MR. MAZUR:  Objection.
15         A     Nothing.
16         CHAIRMAN KIMBALL:  Can we be
17         more specific in time frame?
18         MR. FREVOLA:  Okay.
19         MR. KEANE:  Well, it's rank
20         hearsay.  I mean, it really should be
21         inadmissible.
22         MR. FREVOLA:  We're talking
23         about the situation where with respect
24         to -- I mean --
25         CHAIRMAN KIMBALL:  Well, you

Page 1211

1    CME v. FMO - Volume V
2    can answer the question.  I just would
3    request that you be more specific in
4    terms of timing.
5         MR. FREVOLA:  If you allow me a
6    foundational question, I might be able
7    to do it easier.
8         Q    Mr. Serrao, did CME ever have
9    conversations -- I'm sorry.
10        Did FMO ever have conversations
11   with CME about its production of iron ore
12   costs that it had with the iron ore
13   contract with CME?
14        A    No.
15        Q    Did FMO ever tell CME it was
16   profiting from its sales to CME?
17        A    No.
18        Q    With regards to a couple of
19   other items that you -- that Mr. Keane
20   asked you, I think earlier today he asked
21   you whether Arivenca provided services to
22   FMO.  For example, he asked if Arivenca
23   provided bunkers to FMO.  And you said yes.
24        What did Arivenca actually
25   provide to FMO?

Page 1212

1    CME v. FMO - Volume V
2         A    The payment that CME sent to
3    Arivenca for the bunker.
4         Q    So Arivenca didn't show up with
5    bunkers and give them to FMO?
6         A    No.
7         Q    With respect to other
8    services --
9         CHAIRMAN KIMBALL:  Mr. Frevola,
10        let's just remember this is redirect.
11        MR. FREVOLA:  I'm trying.
12        CHAIRMAN KIMBALL:  It's a
13        little leading here.
14        Q    With regards to other services,
15   again, Mr. Keane mentioned other services
16   that Arivenca provided to FMO.  What other
17   services did FMO -- sorry, did Arivenca
18   provide to FMO, actual services?
19        A    Other than a financial route,
20   nothing.
21        Q    There was some testimony
22   earlier regarding the shuttle vessels and
23   whether the shuttle vessels were ever used
24   to carry CME cargos.  Did there come a time
25   when the General Piar traveled to China to

Page 1213

1    CME v. FMO - Volume V
2    go to dry dock?
3         A    Yes.
4         Q    Was that --
5         CHAIRMAN KIMBALL:  Well, is the
6         question whether the General Piar
7         carried CME's cargo?
8         MR. FREVOLA:  Yes.
9         Q    Did the General Piar carry
10   CME's cargo?
11        A    Yes.
12        Q    Okay.  What -- what hire did
13   FMO pay to CME for that -- for that
14   carriage?
15        CHAIRMAN KIMBALL:  Why would
16        FMO pay hire?
17        MR. FREVOLA:  I'm -- I'm trying
18        not to lead him.
19        MR. DRAKE:  You're not doing a
20        very good job.
21        A    When the vessel was redelivered
22   by FMO to CME in accordance to the contract
23   which is out there at the buoy, the vessel
24   loaded the material, as an export vessel,
25   and it ceased -- I mean, the hire ceased

Page 1214

1    CME v. FMO - Volume V
2    there.  I mean, it's off hire.
3         From there on, the vessel went
4    to China, but under CME's cost.
5         Q    When did the vessel go back on
6    hire to FMO?
7         A    When it came back from China.
8         CHAIRMAN KIMBALL:  Wait.  Was
9         this after the delivery or before?
10        THE WITNESS:  For dry docking.
11        CHAIRMAN KIMBALL:  What year
12        was that?
13        THE WITNESS:  I can't remember
14        the date.
15        A    But we took the opportunity to
16   take iron ore.  So we bought iron ore from
17   FMO and transported it.
18        Q    With respect to the lawsuit
19   that CME filed against Gretchen Shipping
20   that you testified about earlier today,
21   what amount of hire did CME get back from
22   Gretchen for that charter period as a
23   result of that lawsuit?
24        CHAIRMAN KIMBALL:  What charter
25        period?

Page 1215

CME v. FMO - Volume V

1        MR. FREVOLA:  With the head
2  charter -- the charter -- with head
3  owners Gretchen Shipping, the vessel
4  was on -- was chartered essentially
5  from January of 2010 until
6  October 2013, with some off-hire
7  periods.
8      Q    Correct?
9      A    Yes.
10     Q    When CME sued Gretchen Shipping
11 for breach of the head charter of the
12 General Piar --
13     A    Yes.
14     Q    -- what hire discounts did CME
15 receive as a result of that claim?
16     A    I think nothing.
17        MR. WENTZ:  Was the answer
18 "nothing"?
19        THE WITNESS:  Nothing, yeah.
20        MR. SICILIANO:  What hire
21 discount?
22        MR. FREVOLA:  Yeah.  Did CME
23 get a return of hire from Gretchen as
24 a result of that lawsuit.

Page 1216

CME v. FMO - Volume V

1        CHAIRMAN KIMBALL:  But you said
2  the lawsuit was settled.
3        MR. FREVOLA:  The lawsuit was
4  settled.
5        MR. SICILIANO:  By payment
6  of -- from CME to FMO.
7      I have questions about this.
8  If you're going to leave the Piar,
9  then I'm going to have to ask.
10        MR. FREVOLA:  Please do,
11 Mr. Siciliano.
12        MR. SICILIANO:  Mr. Serrao, if
13 you know, what happened after the Piar
14 was redelivered by you to Gretchen?
15 Where did she go?  What was her next
16 employment?
17     A    We redelivered the vessel to
18 the owners.  And after a few weeks or so,
19 Ferrominera hired the vessel back and put
20 it in operation again.
21        MR. SICILIANO:  All right.
22 Your documents show that there was a
23 settlement of about 10 percent of
24 Gretchen's gross claim.  But to us in

Page 1217

CME v. FMO - Volume V

1  this business, we know that a gross
2  claim is rarely ever the actual
3  damages.
4      Is the reason or one of the
5  primary reasons for there being a
6  dramatic deduction or reduction in the
7  amount of the claim made by Gretchen
8  and the amount you paid -- isn't that
9  subsequent employment for the
10 remainder of the charter period that
11 remained under your charter to
12 Gretchen?
13        THE WITNESS:  We settled.  We
14 didn't charge them, right.
15        MR. SICILIANO:  You're not
16 listening.
17     Is one of the reasons why the
18 18 million was reduced to 1 million
19 8 -- was there not a recognition that
20 the ship was going to be earning
21 moneys during the interim period that
22 Gretchen was claiming against you, if
23 you know?
24        THE WITNESS:  I don't know.  I

Page 1218

CME v. FMO - Volume V

1  can't remember that.  It could be, but
2  I don't know.
3        MR. SICILIANO:  Thank you.
4        THE WITNESS:  Thank you.
5      Q    From your first business
6  transaction while you were at EIRON in
7  2000, through the time when you ceased
8  doing business with FMO in October of 2013,
9  how many presidents -- how many people
10 served as president of FMO during that time
11 period?
12     A    Up to the moment that we were
13 forced out, you mean?
14     Q    Yes.
15     A    Six.
16     Q    What were their names, if you
17 know them?
18     A    The first one was
19 Lisandro Garcia.  The other one after
20 was -- the second name, I can't remember.
21 But his name is Roy, Roy something.  And
22 then came Mr. Cesar Virtani [phonetic].
23 And then came Mr. Radwan.  And then came --
24        MR. WENTZ:  What was number

```
                                     Page 1219
1              CME v. FMO - Volume V
2     four?
3              THE WITNESS: Number --
4              MR. WENTZ: The one you just
5     mentioned.
6              THE WITNESS: Mr. Radwan.
7     Radwan.
8              MR. WENTZ: Radwan. Oh, oh,
9     Sabbagh.
10    A        Sabbagh.
11             Then after, came Mr. Ivan
12    Hernandez, and then Mr. Zambrano.
13    Q        You testified earlier that CME
14    received commissions on iron ore sales, and
15    that was a practice that had existed for a
16    period of time?
17    A        Yes.
18    Q        When was the first time that
19    you personally were involved in a
20    transaction where a commission of this type
21    was provided?
22    A        Already from 2000, when it was
23    with EIRON. And Ferrominera will pay
24    commission to other traders as well that
25    are in doing the business of the port.
```

```
                                     Page 1220
1              CME v. FMO - Volume V
2              MR. FREVOLA: Mind if we take a
3     break? I think we're getting close.
4              MR. WENTZ: We probably have
5     some more questions. I don't know
6     what you want us to do now.
7              MR. FREVOLA: Oh. Why don't
8     you do them, and then --
9              CHAIRMAN KIMBALL: We're going
10    to ask Mr. Keane if he wants to do a
11    recross.
12             MR. FREVOLA: I have a couple
13    more redirect questions. I think I
14    have a couple more, but I'm almost
15    done.
16             CHAIRMAN KIMBALL: Let's do
17    this.
18             We'll take a short break,
19    really short.
20             (A break is taken.)
21             CHAIRMAN KIMBALL: We'll go
22    back on the record.
23             Any other questions?
24             MR. FREVOLA: Only one.
25    CONTINUED REDIRECT EXAMINATION
```

```
                                     Page 1221
1              CME v. FMO - Volume V
2     BY MR. FREVOLA:
3     Q        Mr. Serrao, there was a
4     question where Mr. Keane wound up asking
5     you if you were served with an arrest
6     warrant from the Venezuelan court?
7     A        Yes.
8     Q        How was that document delivered
9     to you? How did you see it?
10    A        You showed it to me.
11    Q        What other ways did you receive
12    it, besides that?
13    A        No other way.
14             MR. FREVOLA: Okay. No further
15    questions.
16             CHAIRMAN KIMBALL: When did you
17    first see that arrest warrant?
18             THE WITNESS: The document that
19    I saw now, Michael showed it to me.
20    That was a week ago, something like
21    that. It was when we received -- I
22    understand we received it from
23    Ferrominera.
24             CHAIRMAN KIMBALL: Okay. Well,
25    in the documents which had been
```

```
                                     Page 1222
1              CME v. FMO - Volume V
2     produced, FMO marked as Exhibit R-28,
3     a document which is described as a
4     request for arrest warrant.
5              MR. SICILIANO: That's the same
6     document.
7              CHAIRMAN KIMBALL: That's the
8     same document.
9              MR. WENTZ: It's been around.
10             CHAIRMAN KIMBALL: I'll
11    withdraw it.
12             Mr. Keane, any questions?
13             MR. KEANE: A few.
14    RECROSS EXAMINATION
15    BY MR. KEANE:
16    Q        Mr. Serrao, you testified
17    further concerning the CAA. And as I
18    understood your testimony, you divided
19    development contracts into three parts.
20             Do you recall that testimony?
21    A        Yes.
22    Q        Now, if you turn your attention
23    to the CAA, paragraph 4, entitled
24    "Development Contracts."
25             MR. FREVOLA: 2 sub 4?
```

Page 1223

```
 1                 CME v. FMO - Volume V
 2              MR. KEANE:  2 sub 4, right.
 3         Q    Do you have it?
 4         A    Yes.
 5         Q    And does it begin with:
 6              "Is the condition assumed by
 7      all contracts linked to the corporate and
 8      business alliance framework agreement"?
 9              Do you see that language?
10         A    Yes.
11         Q    And if you read on -- read it
12      to yourself; read it out loud, whatever
13      suits you -- it refers to "all contracts,"
14      I'll say, half a dozen times, easily.  And
15      there is no distinguishing reference that I
16      can find in that clause concerning
17      "development contracts" that treats any
18      type of contract that's in association with
19      the CAA any differently from any others.
20              Can you point me to any
21      language in that clause that supports your
22      contention that there were three types of
23      contracts and that only one of those types
24      was a subrogation arrangement?
25              CHAIRMAN KIMBALL:  Do you
```

Page 1224

```
 1                 CME v. FMO - Volume V
 2      understand the question?
 3         A    The question is, again, please?
 4      Just to make sure, thank you.
 5         Q    Development contracts.  The
 6      language in that clause refers to all
 7      contracts in multiple points; does it not?
 8         A    Yes.  It reads like that.
 9         Q    And you suggested a certain
10      type of contract was a subrogation type,
11      which meant that the cost of the contract
12      would be passed on to FMO without any
13      markup.
14              Do you recall that testimony?
15         A    Yes.
16         Q    And I'm asking you to direct me
17      to any language in that development
18      contract clause that supports your position
19      that any type of development contract could
20      be treated differently than another type of
21      development contract.
22         A    It's clearly stated here in the
23      lines that we read before.  So we are
24      interpreting it.
25         Q    Which lines are you referring
```

Page 1225

```
 1                 CME v. FMO - Volume V
 2      to?
 3         A    "The amount which all of the
 4      contracts that today have been signed by
 5      Ferrominera and CME in compliance with the
 6      object of the alliance and all of the
 7      contracts that need to be signed and
 8      executed which must equally be reconciled
 9      to this contract, among which are," of
10      those -- so it's "among."  So they're
11      classifying "among," -- "which are those
12      needed for financial levering by foreign
13      financial entities."
14              So if we supply -- if we supply
15      funding for Ferrominera, that is considered
16      one way, as well as projects and services
17      contracts themselves, that are signed with
18      third parties and to which CME subrogates
19      Ferrominera.  That's another group.
20              So if we don't -- if we don't
21      establish the trust agreement where
22      Ferrominera will be selling the iron ore to
23      the Chinese or to any customer, any client,
24      then the contracts, the development
25      contracts which are understood to be
```

Page 1226

```
 1                 CME v. FMO - Volume V
 2      separate, are linked as a purpose for being
 3      paid with iron ore.  But they are separate
 4      contracts between CME and FMO.
 5         Q    Well, the language you read
 6      said all the contracts and then had
 7      groupings of the contracts under that,
 8      right?  And all of those contracts had to
 9      be harmonized with the purposes and the
10      terms of the CAA; is that not correct?
11         A    Yes.  But the CAA have
12      different options.  So if Ferrominera did
13      not choose the option of the trust, we
14      maintain the CAA having contracts which are
15      barter contracts.
16         Q    This contract was entered into
17      after you say that FMO rejected the trust
18      arrangement, correct?
19         A    Rejected the trust arrangement.
20              MR. FREVOLA:  I think that's
21         misstating his testimony.
22              MR. KEANE:  I don't think it
23         is.  We can look at his statement.  It
24         says so.
25         Q    Didn't it take you almost two
```

Page 1227
```
 1            CME v. FMO - Volume V
 2   years to negotiate this contract, sir?
 3        A     Yes.  A long time.
 4        Q     Right.  And your statement says
 5   that, in paragraph 39:
 6        "CME'S" proposed -- "proposal
 7   was that CME would act as an intermediary,"
 8   et cetera, et cetera.
 9            Isn't that the trust
10   arrangement you're talking about?
11        A     That's what it was proposed.
12        Q     Right.  And then in 40, you say
13   that FMO rejected that proposal, correct?
14        A     Correct.
15        Q     And in 41, you say there was a
16   compromise, and that resulted in the
17   contract that we have before us right now;
18   is that correct?
19        A     Yes.
20        Q     So the development contract
21   language we're looking at fully
22   contemplated that the trust agreement was
23   not going to be employed in order to fund
24   the CAA's goals.  That was known when this
25   contract was entered into, and it was known
```

Page 1228
```
 1            CME v. FMO - Volume V
 2   when the development contract language
 3   we're looking at was agreed?
 4        MR. FREVOLA:  I'm just going to
 5        object because I think the contract
 6        has got terms in it and it's signed by
 7        the parties.
 8        CHAIRMAN KIMBALL:  Well, it's,
 9        I think, a fair question to ask a
10        witness whether the trust concept that
11        is specifically referred to in the
12        agreement had been rejected before the
13        agreement was signed.
14        A     What -- the rejection is not
15   rejection of the CAA, because we signed it.
16   But Ferrominera rejected the concept of
17   establishing the trust.
18        CHAIRMAN KIMBALL:  Mr. Keane
19        was asking about timing.
20        Q     Before or after this contract
21   was signed?
22        A     I can't remember the --
23   honestly, I can't remember the date.
24        Q     Well, look at your statement.
25   Look at paragraph 39.  Look at paragraph 40
```

Page 1229
```
 1            CME v. FMO - Volume V
 2   and 41.
 3            Isn't it perfectly plain the
 4   trust arrangement was reflected before the
 5   compromise was reached and this agreement
 6   was entered into?
 7        A     Yes.  Once this was signed,
 8   Ferrominera did not choose the option of
 9   the trust.
10        Q     No.  I think you're
11   misunderstanding my question.  I'm looking
12   for a chronology here.
13            Paragraph 39 says there was a
14   proposal by CME with respect to the CAA
15   terms, correct, commission basis?
16        A     That is how the proposal was
17   made in the beginning.
18        Q     Stay with me.
19            So the contract is not signed
20   now.  That's the proposal, correct?
21        A     Yes.
22        Q     And then in 40, you say that
23   FMO rejected the proposal, correct?
24        A     Yes.
25        Q     In favor of a barter agreement?
```

Page 1230
```
 1            CME v. FMO - Volume V
 2        A     Yes.
 3        Q     So now the contract is still
 4   not signed, correct?
 5        A     We went ahead and signed it.
 6        Q     Well, at the time that FMO
 7   rejected it, was there a contract?
 8        A     No, there was not a contract.
 9        Q     And then 41 tells us, after
10   that, there was a compromise reached,
11   correct?
12        A     Yes.
13        Q     And then the contract was
14   executed?
15        A     Which is this.
16        Q     Right.
17            So then we know the contract
18   was executed after the trust agreement or
19   arrangement was rejected, according to you,
20   by FMO?
21        A     Yes.
22        Q     Now --
23        CHAIRMAN KIMBALL:  Well, so
24        we're clear, what contract reflects
25        the compromise?
```

Page 1231

```
 1              CME v. FMO - Volume V
 2        THE WITNESS:  Which contract
 3    reflects which compromise?  Sorry.
 4        CHAIRMAN KIMBALL:  Mr. Keane is
 5    asking you about the compromise you
 6    referred to in paragraph 41 of your
 7    statement.  What contract reflects
 8    that compromise?
 9        THE WITNESS:  This one we
10    signed.
11        CHAIRMAN KIMBALL:  Which one?
12        THE WITNESS:  The CAA.
13     Q     Referring to exhibit?
14     A     So the rejection by FMO was
15    from their -- one of their attorneys that
16    did not agree and wanted to keep -- wanted
17    to keep the barter arrangement.  So the
18    compromise that was met was that we will
19    keep the barter arrangement because we have
20    to keep the link of the CAA for the purpose
21    of being able to receive iron ore in
22    payments or for offsetting goods and
23    services supplied.
24     Q     Right.  And that -- the
25    contract that results, it is Exhibit 22 to
```

Page 1232

```
 1              CME v. FMO - Volume V
 2    your statement; is that right?
 3        MR. WENTZ:  Exhibit 5.
 4     Q     Strike that.
 5        Exhibit 5.  Exhibit 5?
 6     A     Exhibit -- I believe, yes.
 7     Q     And in Exhibit 5, the language
 8    in the second clause, subpart 4,
 9    development contracts, talks about all the
10    contracts, correct?
11     A     Yes.
12     Q     We had discussed, I think to
13    the point of exhaustion, the terms and the
14    conditions of the CAA, and the intent.  So
15    I'm not going to go over that again.
16        On the point of commissions, do
17    you know if FMO paid any commissions to any
18    parties working under a CAA or a framework
19    agreement?
20     A     I don't think Ferrominera has
21    such a contract with anybody.
22     Q     So is it fair to say, when you
23    say they paid commissions from whenever you
24    started and what have you, to other
25    traders, that those were under pure
```

Page 1233

```
 1              CME v. FMO - Volume V
 2    purchase and sale agreements such as CME
 3    had in the early days of its relationship
 4    with FMO but which changed with the
 5    framework agreement and the CAA?
 6     A     Sorry.  FMO did pay commission.
 7    I know that they paid commission to others.
 8     Q     All right.  And my question is:
 9        Were those commissions paid
10    under a pure purchase and sale agreement?
11     A     Yes.
12        MR. KEANE:  I think that's all
13    I have.
14        CHAIRMAN KIMBALL:  Any further
15    redirect?
16        MR. FREVOLA:  Can I have two
17    minutes outside the room?
18        CHAIRMAN KIMBALL:  We're going
19    to make Andrea the timekeeper here.
20    Two minutes.
21        (There was a discussion off the
22    record.)
23        CHAIRMAN KIMBALL:  Please
24    proceed.
25        MR. FREVOLA:  No re-redirect.
```

Page 1234

```
 1              CME v. FMO - Volume V
 2        CHAIRMAN KIMBALL:  Okay.
 3    Mr. Siciliano?
 4        MR. SICILIANO:  I have a couple
 5    of questions about the time charters,
 6    Mr. Serrao.
 7        You were asked by Mr. Keane
 8    what was the point of a subcontract
 9    between yourself and FMO.  Why not
10    simply invoice for the services of the
11    time charter and a new charter --
12    let's use the General Piar, for
13    example -- why not simply invoice
14    those to FMO?
15        Well, in my 40 years of
16    experience in the -- running ships and
17    listening to arguments like this, it's
18    always been a roulette such as you
19    employed in that case.  But my
20    question is really more fundamental.
21        Why did FMO choose you to act
22    as an intermediary, so to speak,
23    between the head owners and
24    themselves?
25        THE WITNESS:  Ferrominera --
```

Page 1235

1          CME v. FMO – Volume V
2          MR. SICILIANO:  Yes.
3          THE WITNESS:  -- hired other
4    ships to other people as -- other
5    companies as well, in the same way.
6          MR. SICILIANO:  I'm only
7    speaking about you, sir.
8          THE WITNESS:  But they invited
9    us to a quotation, to an offer.  We
10   answered it, and we were told -- we
11   were confirmed that we had the
12   business.  I mean, we were selected
13   for this.
14         I believe that Ferrominera,
15   because of the payment, that they
16   don't have cash; they will prefer to
17   do the -- a contract with a company
18   that is buying ore and is able to
19   finance or to support this operation.
20         MR. SICILIANO:  Did -- to your
21   knowledge, did FMO have the financial
22   wherewithal to contract directly with
23   the head owners, or did they require
24   an intermediary, such as yourself?
25      A    I will say, if Ferrominera make

Page 1236

1          CME v. FMO – Volume V
2    a decision to do so, they are advised to do
3    so.  They have -- they could do so if they
4    were able to do so.
5          MR. SICILIANO:  But
6    Ferrominera -- it was Ferrominera's
7    decision to go through you, as opposed
8    to chartering direct?
9          THE WITNESS:  Yes.
10         MR. SICILIANO:  I think
11   Mr. Wentz is better suited to deal
12   with the pricing, particularly with
13   the floating Platts.  So I'm going to
14   leave that to him.
15         But coming to the commissions
16   issue, you said that commissions were
17   paid to CME by FMO.  Did FMO object to
18   doing that?  Did they do so under
19   protest?  What was the arrangement?
20         How did these commission
21   payments come about, if they were
22   supposed to be something additional to
23   the other compensations, arrangements
24   in the contract?
25         THE WITNESS:  It begins by --

Page 1237

1          CME v. FMO – Volume V
2    it begun by -- in the year 2000, they
3    paid a commission to companies that
4    were selling their material.  We were
5    receiving a commission before CME as
6    well, when I was working with EIRON,
7    and that continued when we established
8    a contract.
9          Ferrominera continued to pay a
10   commission, and it become custom for
11   them to pay.  We never said "don't
12   pay."  I mean, they were paying these
13   commissions that were considered
14   for -- for cost for -- you know, we
15   were going into these conferences and
16   traveling to China, and they
17   considered that -- or it was
18   discussed, and they were -- they were
19   paying that, until 2011, when we
20   received a letter from FMO saying:
21         "With respect to this
22   commission, we will not -- we -- we
23   will not like -- we will not continue
24   paying commission."
25         And this was a letter.

Page 1238

1          CME v. FMO – Volume V
2          And said, "Well, thank you,
3    it's okay."
4          It was a letter received the
5    second half of 2011, I think it was.
6    And from there on, they stopped paying
7    commissions.
8          MR. SICILIANO:  Did you protest
9    in any way?
10         THE WITNESS:  No, I didn't.
11         MR. SICILIANO:  Okay.  Let's
12   turn to Arivenca.  I want to better
13   understand the role and purpose for
14   Arivenca in this transaction.
15         THE WITNESS:  Yes sir.
16         MR. SICILIANO:  I'm going to
17   state what I understand the situation
18   to be, and I want you to tell me if my
19   impression is correct or incorrect.
20         My impression is that Arivenca
21   was only used for domestic services
22   within Venezuela.
23         Is that correct.
24         THE WITNESS:  Arivenca is manly
25   used for payments that CME requires to

Page 1239

1          CME v. FMO – Volume V
2    be made in Venezuela.
3          MR. SICILIANO:  CME requires to
4    be made in Venezuela why?  Because
5    that's the law.
6          THE WITNESS:  Because that's
7    the law, yes.
8          MR. SICILIANO:  So it's
9    required that all domestic services be
10   dealt with through a domestic company?
11         THE WITNESS:  Yes.
12         MR. SICILIANO:  So in order to
13   abide by that law, you funded
14   Arivenca, and Arivenca paid for these
15   services on behalf of FMO?
16         THE WITNESS:  When was
17   required, yes.
18         MR. SICILIANO:  If and as when
19   required.
20         There was some talk about there
21   being a markup of all or nearly all of
22   Arivenca's invoices to FMO.  Do you
23   remember that?
24         THE WITNESS:  Yes.
25         MR. SICILIANO:  And I think you

Page 1240

1          CME v. FMO – Volume V
2    said it was on the order of 5 percent
3    for an administrative charge?
4          THE WITNESS:  Yes.
5          MR. SICILIANO:  Is that
6    correct?
7          THE WITNESS:  Yes.
8          MR. SICILIANO:  Is that charge
9    anywhere -- recorded in any other
10   contracts, in, any of the writings
11   that were exchanged?
12         THE WITNESS:  I remember, yes.
13   The answer is yes.  I can't remember
14   where, but I could locate it.  But I
15   know that in one of those minutes of
16   meetings that we sent to Ferrominera:
17         "It's okay you are asking me to
18   pay, pay for that.  That's okay.  But
19   you are asking continuously, so
20   it's -- it's a -- it's a -- it's a
21   service that we are -- you are asking
22   us."
23         And I believe that, if we have
24   to go and pay for, for example --
25   there is a permission.  When a vessel

Page 1241

1          CME v. FMO – Volume V
2    comes in, for example, a shuttle
3    vessel, it will require permission
4    from the authorities.
5          You need to pay taxes there for
6    that vessel.  You need to pay the
7    tugboat.  You need to pay -- so
8    Ferrominera should be doing that.  And
9    then they asked us once, and then
10   again and then again.
11         So we said to them:
12         "Look, if we're going to do
13   this, we have overhead.  We have costs
14   also in doing all this."
15         So we -- in one minute
16   somewhere, we have that we agreed to
17   5 percent administration fee.
18         MR. SICILIANO:  If you can
19   resurrect that agreement and present
20   it, that will be a big help.
21         (Document, Agreement between
22   CME and FMO for an administrative fee,
23   requested.)
24         MR. SICILIANO:  Let me ask you:
25         Do you have any record, any

Page 1242

1          CME v. FMO – Volume V
2    writing, where FMO objected to the
3    payment of that administrative charge.
4          THE WITNESS:  Might be.  I'm
5    not sure.  But during the -- the
6    financial audit in 2014.
7          MR. SICILIANO:  I should
8    have -- I should have been more clear.
9          During the time that these were
10   being billed, not of the time of the
11   reconciliation, were there any
12   contemporaneous objections raised to
13   the administrative charge?
14         THE WITNESS:  I'm sorry.  I
15   can't remember.  I can't remember.
16         MR. SICILIANO:  That's the full
17   answer.
18         Today you mentioned a firm
19   called SMT Holland.  Is that related
20   to the SMT organization, SMT, if you
21   know?
22         THE WITNESS:  No.
23         MR. SICILIANO:  Could we take a
24   look at what was introduced today as
25   Serrao Exhibit 56?

Page 1243
1          CME v. FMO – Volume V
2               This is that communication from
3     you, sir, to Mr. Vazquez,
4     V-A-Z-Q-U-E-Z, where you recite --
5     where you begin by saying:
6               "Dear, Jerry, based upon the
7     estimated figures for the transfer
8     system contract, I am allocating a
9     16.5 percent share of my participation
10    agreed with Clemente as follow."
11              I'm a little confused on the
12    arithmetic.
13              If you can, is it 16.5 percent
14    of the 100 percent, or is it
15    16.5 percent of your 50 percent?
16         THE WITNESS:  It's the
17    16.5 percent of my 50 percent from
18    what -- from the 40 percent.  That is,
19    say, it is 16 percent from the
20    40 percent.
21         MR. SICILIANO:  Okay.  That's
22    what I thought.  I just wanted to be
23    clear.
24              Thank you.  I have no other
25    questions.

Page 1244
1          CME v. FMO – Volume V
2         THE WITNESS:  Thank you.
3         MR. WENTZ:  Okay.  Mr. Serrao,
4     I just would like to be clear that I
5     understand the complete list of what
6     you consider to be development
7     contracts under the CAA.  Okay?
8         THE WITNESS:  Yes.
9         MR. WENTZ:  So there's a series
10    of vessel charters, correct?
11        THE WITNESS:  Yes.
12        MR. WENTZ:  And all of those
13    are development contracts?
14        THE WITNESS:  Yes.
15        MR. WENTZ:  So the
16    General Piar, the Palini?
17        THE WITNESS:  Yes.
18        MR. WENTZ:  The Taiglad?
19        THE WITNESS:  Yes.
20        MR. WENTZ:  The Blount?
21        THE WITNESS:  Yes.
22        MR. WENTZ:  And the Gypsum
23    Integrity?
24        THE WITNESS:  Yes.
25        MR. WENTZ:  Each one of those

Page 1245
1          CME v. FMO – Volume V
2     is a development contract under the
3     CAA, correct?
4         THE WITNESS:  Considered, yes.
5         MR. WENTZ:  Then the TSMC is a
6     development contract.
7         THE WITNESS:  Yes.
8         MR. WENTZ:  And the PTLB-II --
9         THE WITNESS:  Is a development
10    contract.
11        MR. WENTZ:  And then the wagons
12    contract?
13        THE WITNESS:  Yes.
14        MR. WENTZ:  In each of those
15    instances, did you mark up the costs
16    that CME paid?  So was there a markup
17    when you billed -- CME billed FMO?
18        THE WITNESS:  Not in all.
19        MR. WENTZ:  Not in every one?
20    Why not?
21        THE WITNESS:  In PTLB-II, we
22    did not.
23        MR. WENTZ:  Why was that?
24        THE WITNESS:  Because it's a
25    subrogated.  It's a contract that

Page 1246
1          CME v. FMO – Volume V
2     Ferrominera signed with that company,
3     and we were just making -- financing
4     the project for Ferrominera.
5         MR. WENTZ:  And as I understand
6     it, that contract will be produced,
7     but has not been produced yet?
8         MR. DENIG:  It has been
9     produced in the Spanish version as
10    part of the supporting documents in
11    Sherriff Exhibit 1.  We'll provide a
12    full translation.
13        MR. WENTZ:  That would be
14    helpful, to be able to compare that.
15             (Document, Spanish translation
16    of PTLB-II, requested.)
17        MR. WENTZ:  Okay.  Very good.
18             Now, when you -- I'm interested
19    in understanding better the
20    methodology CME followed in arriving
21    at the prices that it charged to FMO
22    for these various development
23    contracts.  Okay?
24             So, for example, with the
25    General Piar charter, were you the

Page 1247

```
 1              CME v. FMO - Volume V
 2    primary person on behalf of CME that
 3    handled that transaction?
 4              THE WITNESS:  No.
 5              MR. WENTZ:  Who was?
 6              THE WITNESS:  Also was -- from
 7    the side of CME was Arturo Contreras.
 8              MR. WENTZ:  And who is he?
 9              THE WITNESS:  He is a coworker.
10              MR. WENTZ:  Coworker.  But he's
11    not an owner of CME; is he?
12              THE WITNESS:  No.
13              MR. WENTZ:  Who else?
14              THE WITNESS:  No one else.
15              MR. WENTZ:  But when it came to
16    the decision-making, you made the
17    final decisions?
18              THE WITNESS:  Yes.
19              MR. WENTZ:  So they reported to
20    you?
21              THE WITNESS:  Yes.
22              MR. WENTZ:  Okay.  Who is your
23    counterparty that you dealt with at
24    FMO?
25              THE WITNESS:  For that?
```

Page 1248

```
 1              CME v. FMO - Volume V
 2              MR. WENTZ:  For that contract.
 3              THE WITNESS:  Arturo will
 4    negotiate the terms with Ferrominera
 5    people.  And when the contract was
 6    ready to sign, they will submit it to
 7    their president, and I will sign.
 8              MR. WENTZ:  So Mr. Sabbagh?
 9              THE WITNESS:  Yes, in that
10    case.
11              MR. WENTZ:  So I'm speaking
12    just with -- in this particular
13    instance, with regard to the
14    General Piar.
15              THE WITNESS:  Yes.
16              MR. WENTZ:  So at that point in
17    time, how long had you known
18    Mr. Sabbagh?
19              THE WITNESS:  I know
20    Mr. Sabbagh from 2007, when he came as
21    the president of -- I met him, yes.
22              MR. WENTZ:  Okay.  So during
23    the period that the relationship
24    transferred between buy/sell to more
25    of a barter arrangement, as we've
```

Page 1249

```
 1              CME v. FMO - Volume V
 2    discussed, Mr. Sabbagh was the
 3    president during that period of time?
 4              THE WITNESS:  Yes.
 5              MR. WENTZ:  And you dealt with
 6    him as your counterpart at FMO during
 7    that period of time?
 8              THE WITNESS:  Yes.  He was the
 9    president.  Yes.
10              MR. WENTZ:  And you were the
11    person in charge of CME, correct?
12              THE WITNESS:  Yes.
13              MR. WENTZ:  Okay.  With regard
14    to where -- we've seen pictures of the
15    place where the iron ore is produced,
16    and we've seen the pictures of the
17    port and pictures of the transfer
18    station.
19              THE WITNESS:  Yes.
20              MR. WENTZ:  During the period
21    of time that you were involved in
22    this, where did you live?
23              THE WITNESS:  Part-time in the
24    US and part-time in Venezuela, back
25    and forward.
```

Page 1250

```
 1              CME v. FMO - Volume V
 2              MR. WENTZ:  You were in Miami?
 3              THE WITNESS:  Yes.
 4              MR. WENTZ:  And you were going
 5    back and forth?
 6              THE WITNESS:  Yes.
 7              MR. WENTZ:  And when you were
 8    in Venezuela, where did you live?
 9              THE WITNESS:  In a house over
10    there.
11              MR. WENTZ:  At Port Ortiz or --
12              THE WITNESS:  In Puerto Ordaz.
13              MR. WENTZ:  Ordaz.
14              THE WITNESS:  Yeah.
15              MR. WENTZ:  So that was
16    basically the load.  You were there on
17    site?
18              THE WITNESS:  Yes.
19              MR. WENTZ:  Was Mr. Sabbagh
20    also there on site?
21              THE WITNESS:  Yes.
22              MR. WENTZ:  So you would run
23    into him?  You guys had dinner
24    together, and things of that nature?
25              THE WITNESS:  I never had
```

Page 1251
```
 1            CME v. FMO – Volume V
 2    dinner with him.
 3            MR. WENTZ:  Never had dinner
 4    with him.
 5            THE WITNESS:  Never.
 6            MR. WENTZ:  I was curious about
 7    your relationship with Mr. Sabbagh.
 8            THE WITNESS:  Yes.
 9            MR. WENTZ:  So you had no -- no
10    social relationship with him?
11            THE WITNESS:  No.
12            MR. WENTZ:  It was only a
13    business relationship?
14            THE WITNESS:  Business
15    relationship.
16            MR. WENTZ:  Okay.  With regard
17    to how the prices were established,
18    that were charged by CME to FMO, for
19    example, one of the development
20    contracts, the General Piar, can you
21    walk us through how that would happen?
22    How did you decide what to charge FMO?
23            THE WITNESS:  At that time, I
24    calculated some risk that we could
25    have.  And we had to open a letter of
```

Page 1252
```
 1            CME v. FMO – Volume V
 2    credit, for example, for the head
 3    owners.  We -- I considered at that
 4    time, that was the amount that I
 5    considered that was suitable.  And I
 6    made a proposal in response to a
 7    request, and it was accepted.
 8            MR. WENTZ:  Did you -- did you
 9    discuss that personally, you and
10    Mr. Sabbagh?
11            THE WITNESS:  No.
12            MR. WENTZ:  So there was not a
13    direct negotiation between you and
14    Mr. Sabbagh with regard to that
15    pricing?
16            THE WITNESS:  Absolutely not.
17            MR. WENTZ:  Okay.  With regard
18    to the -- for example, the wagons
19    contract.
20            THE WITNESS:  Yes.
21            MR. WENTZ:  Did you -- was it
22    your custom -- in that particular
23    instance, did you receive multiple
24    bids from various suppliers of wagons?
25            THE WITNESS:  No.
```

Page 1253
```
 1            CME v. FMO – Volume V
 2            MR. WENTZ:  You just reached
 3    out to one?
 4            THE WITNESS:  Yes.
 5            MR. WENTZ:  Okay.  And was the
 6    process for determining the price that
 7    was going to be charged to FMO by CME
 8    for the wagons the same, similar to
 9    what you just described.
10            THE WITNESS:  Yes.  It's
11    financing, freight.  We have to pay
12    the freight.  We have to pay the
13    financing, insurance and all, the
14    risk, and receiving, to receive iron
15    ore, you know.
16            MR. WENTZ:  So with regard to
17    the -- to the various goods and
18    services that -- that CME provided to
19    FMO under the CAA, there was not a
20    bidding process that CME engaged in?
21            In other words, CME didn't
22    reach out to three or four bidders and
23    then pass that on to FMO; that was not
24    your policy?
25            THE WITNESS:  No.
```

Page 1254
```
 1            CME v. FMO – Volume V
 2            MR. WENTZ:  Okay.  And what was
 3    the reason -- I understand that one of
 4    the reasons for the CAA was to avoid
 5    public bidding laws in Venezuela.  Is
 6    that correct?
 7            THE WITNESS:  Yes.  Yes.
 8            MR. WENTZ:  And I'm trying to
 9    understand how the -- you -- how the
10    contracts that you mentioned in your
11    testimony --
12            THE WITNESS:  Yes.
13            MR. WENTZ:  -- that preceded
14    the formation of the CAA -- for
15    example, you mentioned a wagon tilter.
16            THE WITNESS:  Yes.
17            MR. WENTZ:  Is it correct -- my
18    understanding, my recollection is that
19    that was provided prior to the CAA,
20    correct?
21            THE WITNESS:  Yes.
22            MR. WENTZ:  And it was provided
23    for iron ore, correct?
24            THE WITNESS:  Yes.
25            MR. WENTZ:  And that was not a
```

Page 1255

```
 1                CME v. FMO - Volume V
 2    public bid situation?
 3            THE WITNESS:  Not a public bid.
 4            MR. WENTZ:  Okay.  So was there
 5    any -- if you -- if CME was able to
 6    engage in those types of contracts
 7    prior to 2010 without the public
 8    bidding process, then what was the
 9    requirement?
10            I don't understand the
11    requirement for the CAA in 2010.  Can
12    you help me understand that?
13            THE WITNESS:  In 2010, before
14    the CAA was signed, you mean?
15            MR. WENTZ:  Correct.
16            THE WITNESS:  Ferrominera has
17    the right and is -- I don't know if
18    they did or not, but to ask for offers
19    to whoever they consider.
20            When we receive a letter
21    saying, "Mr. CME, we will need this or
22    that; can you present the proposal,"
23    and then we will send an offer, and
24    they will analyze the offer.
25            We will say:
```

Page 1256

```
 1                CME v. FMO - Volume V
 2            "This is going to be this
 3    brand, this price," and so forth.
 4            And they will analyze that
 5    within their engineering divisions and
 6    so forth, and the conditions of
 7    payment, payment terms, sorry.  And
 8    they will decide whether we -- they
 9    will buy from us or not.
10            MR. WENTZ:  So you are not
11    aware of whether public bidding took
12    place on those projects?
13            THE WITNESS:  I'm not aware.
14            MR. WENTZ:  You simply
15    responded to a request for a proposal?
16            THE WITNESS:  Yes.
17            MR. WENTZ:  And you won?
18            THE WITNESS:  And I won.
19            MR. WENTZ:  As far as you know?
20            THE WITNESS:  As far as I know.
21    I received a letter.  It said:
22            "Sir, you are being awarded"
23    for that and for the supply of this or
24    that, whatever it is.
25            MR. WENTZ:  Okay.  So I have a
```

Page 1257

```
 1                CME v. FMO - Volume V
 2    question about Exhibit 56, the E-Mail.
 3            THE WITNESS:  Yes.
 4            MR. WENTZ:  The commercial
 5    alliance agreement is dated
 6    21 December 2010, I believe.
 7            THE WITNESS:  Yes.
 8            MR. WENTZ:  This E-Mail is
 9    dated September 3, 2010.
10            As I recall, the transfer
11    system management contract is dated
12    August 7, 2010.
13            THE WITNESS:  Yes.
14            MR. WENTZ:  So this E-Mail
15    would have followed the execution of
16    the transfer system management
17    contract, but preceded the execution
18    of the CAA; is that correct?
19            THE WITNESS:  Yes.
20            MR. WENTZ:  Okay.  I would like
21    to understand this transaction and how
22    the money flows, if you can help me.
23            Jerry is your lawyer?
24            THE WITNESS:  Yes.
25            MR. WENTZ:  Who is Clemente?
```

Page 1258

```
 1                CME v. FMO - Volume V
 2            THE WITNESS:  Clemente is a
 3    partner of the company that has the
 4    operation.
 5            MR. WENTZ:  What operation?
 6            THE WITNESS:  The operation for
 7    the transfer station.
 8            MR. WENTZ:  Your subcontractor?
 9            THE WITNESS:  And he's partner
10    of that company.
11            MR. WENTZ:  That company is
12    subcontracted to CME?
13            THE WITNESS:  SMT, CME
14    contracted SMT.
15            MR. WENTZ:  To perform the
16    maintenance?
17            THE WITNESS:  To perform the
18    maintenance, yes.
19            MR. WENTZ:  Of the transfer
20    station?
21            THE WITNESS:  Station, yes.
22            MR. WENTZ:  Clemente is a
23    partner in SMT?
24            THE WITNESS:  Yes, SMT.
25            MR. WENTZ:  SMT.
```

Page 1259

1          CME v. FMO - Volume V
2          And you discuss:
3          "My participation agreed with
4    Clemente."
5          THE WITNESS:  Yes.
6          MR. WENTZ:  What was your
7    participation agreed with Clemente?
8          THE WITNESS:  Well, he -- he
9    voluntarily offered me this amount of
10   money out of that business.
11         MR. WENTZ:  So CME contracted
12   with SMT, and SMT refunded money back
13   to CME?
14         THE WITNESS:  No, not SMT.
15   Clemente as a person, he voluntarily
16   offered me that amount of money.
17         MR. WENTZ:  So he's an owner of
18   SMT?
19         THE WITNESS:  No.  He's a --
20   he's the owner of Silva Shipping, who
21   is the agent that has the consortium.
22         MR. WENTZ:  So Clemente is not
23   a partner in SMT?
24         THE WITNESS:  His company is.
25         MR. WENTZ:  Ah, Silva?

Page 1260

1          CME v. FMO - Volume V
2          THE WITNESS:  Yes.
3          MR. WENTZ:  Okay.  So Silva is
4    an owner of SMT?
5          THE WITNESS:  Of the
6    consortium.
7          MR. WENTZ:  And Clemente is a
8    partner in Silva?
9          THE WITNESS:  Yes.
10         MR. WENTZ:  Okay.  And what was
11   Silva's activity with regard to the
12   transfer system contract?
13         THE WITNESS:  He is -- he's a
14   partner in Silva, yes.
15         MR. WENTZ:  What did Silva do?
16   What was Silva's role?
17         THE WITNESS:  I don't know
18   exactly what he does.  I don't know
19   exactly what he does in the -- he's
20   partner with the -- with a group of
21   the -- with SMT.
22         MR. WENTZ:  Is Silva a person?
23         THE WITNESS:  Silva is a
24   person, yes, Clemente.
25         MR. WENTZ:  That's his first

Page 1261

1          CME v. FMO - Volume V
2    name?
3          THE WITNESS:  Yes.
4          MR. WENTZ:  Okay.  Sorry.
5          THE WITNESS:  Sorry.
6          MR. WENTZ:  So Silva Clemente
7    is a partner in SMT?
8          THE WITNESS:  Yes.
9          MR. WENTZ:  And Silva Clemente
10   offered to refund money to you
11   personally?
12         THE WITNESS:  He offered me, as
13   a voluntary, to give me that as a gift
14   or -- yeah.
15         MR. WENTZ:  Right.  So you
16   awarded him, his company, SMT, the
17   contract, and he gave you money back?
18         THE WITNESS:  Well, he -- he --
19   he voluntarily paid me that money.
20         MR. WENTZ:  He gave you money
21   back, correct?
22         THE WITNESS:  Yes.
23         MR. WENTZ:  And so the deal
24   here was that there was going to be a
25   certain amount of money given back,

Page 1262

1          CME v. FMO - Volume V
2    correct, and it was going to be split
3    between the -- you were going to get
4    50 percent, right?
5          THE WITNESS:  Yes.
6          MR. WENTZ:  Who is Baumann.
7          THE WITNESS:  Just Baumann is
8    Clemente's company.
9          MR. WENTZ:  Is it a company or
10   a man?
11         THE WITNESS:  It's a company.
12         MR. WENTZ:  What does Baumann
13   do?
14         THE WITNESS:  I don't know.
15   That's Clemente's company.
16         MR. WENTZ:  Why does Baumann
17   get 40 percent.
18         THE WITNESS:  No.  Baumann give
19   20 percent.
20         MR. WENTZ:  To who?
21         THE WITNESS:  To me, of what he
22   had received.  He said, "I will offer
23   you -- I will like to give you this
24   money."
25         I didn't receive it right away.

Page 1263
```
 1              CME v. FMO - Volume V
 2    I didn't receive it -- all of that.
 3    It just happened a few months only.
 4    Then it stopped.
 5              MR. WENTZ:  "From the
 6    40 percent belonging to Baumann, as
 7    you know, this amount has been agreed
 8    with Clemente to be equally split
 9    between him and myself."
10              THE WITNESS:  Yes.
11              MR. WENTZ:  Okay.  So Baumann
12    gives 20 to Clemente and 20 to you,
13    correct?
14              THE WITNESS:  Yes.
15              MR. WENTZ:  On a percentage
16    basis?
17              THE WITNESS:  Yes.
18              MR. WENTZ:  Okay.  Was this a
19    customary practice with regard to
20    development contracts that CME engaged
21    in?
22              THE WITNESS:  No.
23              MR. WENTZ:  Was there another
24    example of this type of structure,
25    that you can think of, with regard to
```

Page 1264
```
 1              CME v. FMO - Volume V
 2    any of the development contracts that
 3    we listed?
 4              THE WITNESS:  No.  This is the
 5    only one that existed.
 6              MR. WENTZ:  Why was this
 7    different?
 8              THE WITNESS:  I mean, he
 9    offered me that; and I said, "Yes, why
10    not?"
11              So he offered me that money,
12    and I accepted it.  It's his personal
13    money.  It was coming to me
14    personally.
15              MR. WENTZ:  And why were you
16    splitting it with "Dear Jerry"?
17              THE WITNESS:  I was just giving
18    Jerry an amount of money for the
19    services, the entire services that he
20    was doing for me as an attorney,
21    representing and doing a few
22    activities in real estate.
23              Whatever I would require, he
24    will be my lawyer.  Instead of giving
25    him a salary or so, I will pay him.
```

Page 1265
```
 1              CME v. FMO - Volume V
 2    That was the idea.
 3              MR. WENTZ:  Okay.  Was any of
 4    this situation ever disclosed to FMO?
 5              THE WITNESS:  No.
 6              MR. WENTZ:  No.  Okay.
 7              CHAIRMAN KIMBALL:  So we're
 8    clear about this, the first sentence
 9    says, quote:
10              "I am allocating a 16.5 percent
11    share of my participation, agreed with
12    Clemente."
13              So we're clear, your
14    "participation" in what?
15              THE WITNESS:  Of what Clemente
16    had offered me.
17              CHAIRMAN KIMBALL:  Which is
18    what?
19              THE WITNESS:  He offered me
20    half of his amount of money that he
21    was going to receive.
22              CHAIRMAN KIMBALL:  This is not
23    referring to money that was going to
24    be earned under the TSMC contract with
25    FMO?
```

Page 1266
```
 1              CME v. FMO - Volume V
 2              THE WITNESS:  This is money
 3    that Clemente was going to receive for
 4    his duties or his services, or
 5    whatever he was doing in -- in his
 6    company.  His -- the money to pay to
 7    him, he said to me, "I would like to
 8    give you half of this amount."  I
 9    estimated it to be that.
10              CHAIRMAN KIMBALL:  The services
11    he was going to provide were what?
12              THE WITNESS:  I don't know the
13    details of what service he will
14    provide, but he was -- was going to
15    receive that amount of money from --
16    paid by -- by -- to Baumann.
17              CHAIRMAN KIMBALL:  Is there a
18    written agreement with Clemente?
19              THE WITNESS:  No.
20              CHAIRMAN KIMBALL:  Is there a
21    written agreement with Baumann?
22              THE WITNESS:  No.
23              CHAIRMAN KIMBALL:  So I'm
24    remaining confused.
25              The money flow here that would
```

Page 1267

```
1              CME v. FMO – Volume V
2      go to Clemente, just explain to me
3      where that would come from.
4              THE WITNESS:  Clemente have
5      told me that he was going to receive
6      that money from his company, from his
7      group of companies.
8              CHAIRMAN KIMBALL:  For services
9      provided?
10             THE WITNESS:  For -- for the
11     business, related, yes.
12             CHAIRMAN KIMBALL:  What kind of
13     services were they providing?
14             THE WITNESS:  I don't know
15     exactly what he was doing, honestly.
16             CHAIRMAN KIMBALL:  Well, what
17     did you know about it?
18     A       I know that he's a partner in
19     that business with the people from SMT.
20     But I don't know specifically what services
21     he would supply.
22             CHAIRMAN KIMBALL:  And the
23     services SMT provided were what?
24             THE WITNESS:  SMT was doing
25     work in the -- in the transfer system,
```

Page 1269

```
1              CME v. FMO – Volume V
2              Was any of this money ever
3      paid?
4              THE WITNESS:  He paid about two
5      or three months only, and then he
6      didn't continue paying.
7              CHAIRMAN KIMBALL:  Did Vazquez
8      ever receive anything?
9              THE WITNESS:  Vazquez also
10     receive, also, about two or
11     three months.  But then it was
12     stopped.
13             CHAIRMAN KIMBALL:  Why did it
14     stop?
15             THE WITNESS:  We agreed it was
16     like that.  I mean, we said --
17     Clemente said he couldn't be able to
18     continue doing it.
19             CHAIRMAN KIMBALL:  Did SMT
20     continue providing services under the
21     TSMC agreement with CME?
22             THE WITNESS:  Yes.
23             CHAIRMAN KIMBALL:  How long did
24     that continue?
25             THE WITNESS:  Until we were
```

Page 1268

```
1              CME v. FMO – Volume V
2      in the transfer station.
3              CHAIRMAN KIMBALL:  Under
4      contract with CME?
5              THE WITNESS:  Under contract
6      with CME, yes.
7              CHAIRMAN KIMBALL:  So is this
8      communication referring to money
9      that -- participation by you and the
10     money that was going to be paid by CME
11     to SMT?
12             THE WITNESS:  No.  This is
13     talking about the participation that
14     Clemente offered me.  I used the word
15     "participation," but it's a money that
16     he offered me voluntarily.
17             CHAIRMAN KIMBALL:  Okay.
18             MR. SICILIANO:  But aren't you
19     saying that the origin of those moneys
20     that he was going to pay back to you
21     are moneys that CME paid to SMT for
22     services to the transfer station?
23             THE WITNESS:  Yes.
24             CHAIRMAN KIMBALL:  Okay.
25     That's what I was trying to clear up.
```

Page 1270

```
1              CME v. FMO – Volume V
2      forced out.
3              CHAIRMAN KIMBALL:  I have some
4      different questions.
5              Would you please look at
6      paragraph 17 of your statement.
7              Do you have that in front of
8      you?
9              THE WITNESS:  Yes.
10             CHAIRMAN KIMBALL:  Just take a
11     minute and read it.
12             Did you have any discussions
13     with anyone at FMO about the effect of
14     this new law of public contracts?
15             THE WITNESS:  No, I didn't.
16             CHAIRMAN KIMBALL:  Did your
17     attorneys --
18             THE WITNESS:  Yes.
19             CHAIRMAN KIMBALL:  -- have such
20     discussions?
21             THE WITNESS:  Yes.
22             CHAIRMAN KIMBALL:  And who were
23     your attorneys?
24             THE WITNESS:  A lawyer called
25     Gustavo Blanco.
```

Page 1271

```
            CME v. FMO – Volume V
 1
 2          CHAIRMAN KIMBALL:  All right.
 3    Do you know who he spoke with?
 4          THE WITNESS:  He spoke with
 5    Lydia Rojas.
 6          CHAIRMAN KIMBALL:  What was his
 7    position?
 8          THE WITNESS:  No.  Lydia Rojas
 9    is a lawyer, female.
10          CHAIRMAN KIMBALL:  Was she a
11    lawyer with FMO?
12          THE WITNESS:  Yes, sir.
13          CHAIRMAN KIMBALL:  Did CME
14    receive formal legal advice from your
15    lawyer about the effect of this law?
16          THE WITNESS:  Can you repeat,
17    please?
18          CHAIRMAN KIMBALL:  Sure.  Did
19    CME receive formal legal advice from
20    your lawyer about the effect of this
21    law?
22          THE WITNESS:  Yes.
23          CHAIRMAN KIMBALL:  I have a
24    question for you concerning the
25    charter party for the General Piar.
```

Page 1272

```
            CME v. FMO – Volume V
 1
 2          THE WITNESS:  Yes.
 3          CHAIRMAN KIMBALL:  A copy of
 4    that charter party has been marked as
 5    Exhibit 7 to your statement.
 6          Now, you will recall that,
 7    during the security application, the
 8    panel was provided with two different
 9    versions of that charter party.
10          THE WITNESS:  Yes.
11          CHAIRMAN KIMBALL:  And can you
12    explain why there were two different
13    versions of that charter party?
14          THE WITNESS:  The first charter
15    party signed was subject to
16    adjustment, if it was necessary, after
17    we finished the discussions with the
18    ship -- the head owners.  It was
19    signed with Ferrominera to assure the
20    contract that is a compromise.
21          And then after we finish
22    discussing the terms with the ship
23    owner -- it was in April, a few months
24    after -- then we did the corrections
25    in the final one and we signed.
```

Page 1273

```
            CME v. FMO – Volume V
 1
 2          And it was backdated because
 3    the terms of the vessel was already
 4    heading -- everything was arranged,
 5    the arrival date and so forth.
 6          So what we did, we modified the
 7    contract and signed the new one, which
 8    was -- will be the final one.  And the
 9    one that we signed before was void.
10          CHAIRMAN KIMBALL:  Who signed
11    the new -- the replacement charter for
12    FMO?
13          THE WITNESS:  For FMO, the new
14    one, Mr. Radwan.
15          CHAIRMAN KIMBALL:  Did you have
16    any direct discussions with him
17    concerning the replacement of the
18    original charter by the one that was
19    backdated?
20          THE WITNESS:  No.  That was --
21    that was Mr. Arturo Contreras, who was
22    doing the negotiations and putting
23    everything in place.  And I signed the
24    day they told me it was ready for
25    sign.  But he had all the negotiations
```

Page 1274

```
            CME v. FMO – Volume V
 1
 2    with the people from commercial
 3    department.
 4          CHAIRMAN KIMBALL:  Okay.  Do
 5    you know the names of any of the
 6    people at FMO with whom he dealt with?
 7          THE WITNESS:  At that time, I
 8    think it was the commercial -- the
 9    commercial manager was, I believe,
10    Juan Vazquez.
11          CHAIRMAN KIMBALL:  Would you
12    turn to paragraph 215 of your
13    statement.
14          This may be a question for your
15    counsel.  But in paragraph 215, you
16    make reference to an application to
17    the Court of Criminal Appeals of the
18    Supreme Court of Justice.
19          My question is:
20          Has a copy of that application
21    been provided to us?
22          MR. FREVOLA:  I don't think so.
23    If memory serves me correct, it could
24    be several hundred pages long and in
25    Spanish.  So I don't think that we did
```

Page 1275

```
 1             CME v. FMO - Volume V
 2    translate it.  We could definitely
 3    provide a Spanish copy to you,
 4    probably as early as tomorrow.
 5             MR. SICILIANO:  It's not going
 6    to do me any good.
 7             CHAIRMAN KIMBALL:  What is the
 8    status of that application?
 9             THE WITNESS:  It -- the
10    application is in the criminal court,
11    was submitted.  And it's called
12    extension, or let's put it judicial --
13    "jurisdictional extension."  It's a
14    procedure where we -- our lawyers and
15    we are informing the criminal court of
16    the administrative procedure that took
17    place, and is related to what the
18    accusations in the criminal court are.
19             They are attaching the entire
20    proceedings that took two-and-a-half
21    years, during the administrative
22    proceedings, also participation of the
23    general -- attorney general, and with
24    the decision that they made that
25    established -- that states that our
```

Page 1276

```
 1             CME v. FMO - Volume V
 2    contracts that CME has established in
 3    the strategic alliance are lawful,
 4    correct, and requesting a dismissal of
 5    the criminal accusations.
 6             CHAIRMAN KIMBALL:  Has any
 7    opposition to that application been
 8    filed by the prosecutor?
 9             THE WITNESS:  It was brought,
10    but I don't know as of today what is
11    the result of that.
12             MR. SICILIANO:  Can you at
13    least tell us when the application was
14    filed, what date?
15             THE WITNESS:  This one
16    specifically here, to the Supreme
17    Court, was filed, according to this
18    here -- no.  Sorry.
19             MR. FREVOLA:  That's a
20    declaratory judgment.
21             THE WITNESS:  That's a
22    declaratory judgment.
23             MR. FREVOLA:  What did you do
24    after you got the declaratory
25    judgment?
```

Page 1277

```
 1             CME v. FMO - Volume V
 2             THE WITNESS:  We filed a
 3    camparo [phonetic] with the -- we
 4    filed the -- this -- we filed at the
 5    Supreme Court under criminal chamber,
 6    and then they -- they instructed us to
 7    take it to the criminal lower court,
 8    where they -- Ferrominera and the
 9    ministry had filed that accusation.
10    And they received that on the 30th of
11    March, now.
12             CHAIRMAN KIMBALL:  Of 2017?
13             THE WITNESS:  Of 2017, yes.
14             CHAIRMAN KIMBALL:  Just so
15    we're clear, did the prosecutor file
16    an opposition?
17             THE WITNESS:  No.  Not that I
18    know.
19             CHAIRMAN KIMBALL:  Do you have
20    any idea what the timing of that
21    application is?  For example, when is
22    it likely to be dealt with by that
23    court?
24             THE WITNESS:  Since it was
25    submitted already, they should have
```

Page 1278

```
 1             CME v. FMO - Volume V
 2    done something.  But they have not.
 3    Up to now, nothing has been done.
 4             MR. FREVOLA:  What is supposed
 5    to be done when the document is filed
 6    in the court?
 7        A    After, I think five days, if I
 8    remember, the Court should have admitted
 9    the motion.  But they have not.
10             MR. KEANE:  If I can interrupt.
11             CHAIRMAN KIMBALL:  Who
12    represents you in that proceeding?
13             THE WITNESS:  A lawyer in
14    Caracas.
15             CHAIRMAN KIMBALL:  The name of
16    the lawyer?
17             THE WITNESS:  Severo Riester
18    [phonetic].
19             MR. KEANE:  We have a copy of
20    the decision on that application.
21             CHAIRMAN KIMBALL:  All right.
22    We haven't seen that.
23             MR. KEANE:  No.  It's in
24    Spanish.  We haven't had it
25    translated.  But we do have it.
```

Page 1279

```
 1              CME v. FMO - Volume V
 2         It denies the application.
 3    We're happy to provide it to everyone.
 4         CHAIRMAN KIMBALL:  We'd like to
 5    see that.
 6         Are you aware it was done?
 7         THE WITNESS:  No.
 8         MR. FREVOLA:  What was the date
 9    of that decision?
10         MS. FALCON LOPEZ:
11    February 28, 2017.
12         MR. FREVOLA:  So you're saying
13    it was denied before CME actually
14    filed it?
15         MS. FALCON LOPEZ:  CME filed
16    the "abocamiento."
17         MR. KEANE:  We will provide you
18    a copy.  Do you have someone else --
19    well, Mr. Serrao.
20         CHAIRMAN KIMBALL:  Let me make
21    a suggestion here.
22         Let me ask counsel to sort out
23    the chronology on that application.
24    If you would, I'd appreciate it.
25         I just have one other question
```

Page 1280

```
 1              CME v. FMO - Volume V
 2    for Mr. Serrao.
 3         During those years, 2008 to
 4    2013, did CME have other business
 5    besides what you were doing with FMO?
 6         THE WITNESS:  CME, no.
 7         CHAIRMAN KIMBALL:  So that was
 8    its sole activity?
 9         THE WITNESS:  Yes.
10         CHAIRMAN KIMBALL:  Were you
11    working on other things?
12         THE WITNESS:  Yes.
13         CHAIRMAN KIMBALL:  With a
14    different company?
15         THE WITNESS:  Different
16    companies, yes.
17         CHAIRMAN KIMBALL:  What else
18    were you working on?
19         THE WITNESS:  Agencies.  We
20    supply rolls for steelworks.  We
21    had -- and trading with the other --
22    castings and things like that.
23         CHAIRMAN KIMBALL:  And my final
24    question is:
25         Did you ever meet General
```

Page 1281

```
 1              CME v. FMO - Volume V
 2    Zambrano.
 3         THE WITNESS:  No.
 4         CHAIRMAN KIMBALL:  Mr. Keane,
 5    do you have any follow-up questions?
 6         MR. KEANE:  I don't.  Thank
 7    you.
 8         MR. WENTZ:  I have one question
 9    I forgot to ask.  I apologize.
10         In the framework agreement,
11    paragraph 1.4, it has a description of
12    CME.  I was just curious as to your
13    opinion as to whether at the time the
14    framework agreement was signed that
15    was an accurate description of CME.
16         THE WITNESS:  One?
17         MR. FREVOLA:  What's the
18    number, please?
19         MR. WENTZ:  1.4 of the second
20    page of the agreement.  It's paragraph
21    one, "Background and Considerations,"
22    1.4.
23         THE WITNESS:  CME?  You want me
24    to explain as you say?
25         MR. WENTZ:  My question was:
```

Page 1282

```
 1              CME v. FMO - Volume V
 2         Is that description, at the
 3    time that the framework agreement was
 4    signed, is that description accurate.
 5         THE WITNESS:  Yes.
 6         MR. WENTZ:  Yes?
 7         THE WITNESS:  Yes.
 8         MR. WENTZ:  Okay.  Thank you.
 9         CHAIRMAN KIMBALL:  Does anyone
10    have other questions for Mr. Serrao?
11         Mr. Serrao, you are excused.
12         MR. FREVOLA:  Could I have two
13    more minutes?
14         CHAIRMAN KIMBALL:  No.
15         Okay.  We'll go off record,
16    briefly.
17         (There was a discussion off the
18    record.)
19         CHAIRMAN KIMBALL:  Back on the
20    record.
21         The hearing is adjourned.  We
22    will resume tomorrow at 9:30 with the
23    questioning of Ms. Sherriff.
24         (Arbitration adjourned,
25    5:17 p.m.)
```

Page 1283

```
 1
 2                    J U R A T
 3
 4         I DO HEREBY CERTIFY that I have
 5   read the foregoing transcript of my
 6   deposition testimony.
 7
 8
 9
10
11   SWORN TO AND SUBSCRIBED
12   BEFORE ME THIS
13   DAY OF 2017
14   _ _ _ _ _ _ _ _ _ _
15
16
17
18
19
20
21
22
23
24
25
```

Page 1285

```
 1
 2                  E X H I B I T S
 3               AND DOCUMENT REQUESTS
 4
 5   NUMBER      DESCRIPTION              PAGE
 6
 7   Document, letter from FMD          1019
     railroad department to CME
 8   requesting quotation, requested
 9   Document, charter from the         1047
     Blount, requested
10
11   Document, Identification of 80     1158
     percent owner of Superior
12   Limited, requested
13   Document, Bearer share breakdown,  1159
     requested
14   Document, PTLB-II contract,        1203
     requested
15
16   Document, Agreement between CME    1241
     and FMD for an administrative
17   fee, requested
18   Document, Spanish translation of   1246
     PTLB-II, requested
19
20
21
22
23
24
25
```

Page 1284

```
 1
 2                    I N D E X
 3
 4
 5   WITNESS        DIRECT        CROSS
 6
 7
 8
 9   TYRONE SERRAO
10
11
12
13     BY MR. KEANE            1022, 1222
14
15
16
17     BY MR. PREVOLA    1156
18
19
20
21
22
23
24
25
```

Page 1286

```
 1
 2
 3   Exhibit No. Serrao 55,            1101
     Mr. Serrao's Declaration in CME
 4   v. Gretchen Shipping, et al.
 5   Exhibit No. Serrao 56,            1133
     September 3, 2010 E-Mail with a
 6   payment schedule for Geraldo
     Vazquez
 7
 8   Exhibit No. Serrao 57, Annex 3 to 1139
     Paula Maria Ziri Castro Lopez's
 9   Witness Fact Statement
10   Exhibit No. Serrao 58, Document   1151
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

10/31/2017                                                                    1287

Page 1287

```
 1
 2                    CERTIFICATE
 3
 4         I, TAB PREWETT, A Registered
      Professional Reporter, Notary Public,
 5    Certified LiveNote Reporter, and Certified
      Shorthand Reporter, do hereby certify that
 6    the foregoing is a true and accurate
      transcript of the proceedings as taken
 7    stenographically by and before me at the
      time, place and on the date hereinbefore
 8    set forth.
 9
10         I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor
11    attorney nor counsel of any of the parties
      to this action, and that I am neither a
12    relative nor employee of such attorney or
      counsel, and that I'm not financially
13    interested in the action.
14    TAB Prewett
15    _____
16      TAB PREWETT
17
18
      My Commission expires February 9, 2019
19    Dated:  June 3, 2017
20
21
22
23
24
25
```

## $

**$1,732,893.71**
1081:7
**$1.7** 1080:17
**$10,000** 1050:2
1059:20 1078:21
1097:10,16
**$10,000-a-day**
1066:3
**$18** 1080:17
**$18,413,841.72**
1081:6
**$20,000** 1128:7,9
**$25,000** 1049:18
1059:21 1068:10
1082:3 1083:24
1098:11
**$25,000-a-day**
1066:4
**$28,000** 1099:23
1100:6
**$3,293,431.93**
1131:8
**$3.3** 1131:11 1132:8
**$35,000** 1048:4
1068:9 1086:8
1097:20,22 1098:9
**$6.08** 1191:25
**$6.87** 1192:2

## 0

**005** 1148:11 1149:5
1152:14
**02465** 1191:20

## 1

**1** 1069:6 1103:18,25
1118:3 1160:23
1161:2 1173:19
1177:8 1186:11
1199:13 1200:9
1203:8 1217:19
1246:11
**1,116** 1104:17
**1.4** 1281:11,19,22
**10** 1081:8 1123:15
1132:20 1170:16

1216:24
**10,784,300** 1174:14
**100** 1157:6,11
1243:14
**103** 1134:5
**11** 1022:10 1023:16
1056:6 1123:15
**12** 1025:11,22
1026:25 1029:22
1030:17 1031:2,23
1044:5 1056:9
1057:7
**13** 1057:14 1063:9,
17 1064:2 1168:5
1171:14 1173:12
**14** 1063:14 1122:24
1124:7
**149** 1145:21
**14th** 1142:6
**155** 1149:3 1152:12
**156** 1146:8,16
**16** 1243:19
**16.5** 1131:5,24
1132:7 1243:9,13,
15,17 1265:10
**169** 1145:17 1152:4
**17** 1105:19 1106:4,8
1190:17 1191:9
1192:3 1270:6
**18** 1146:7,12,25
1148:4,18 1152:11
1217:19
**19** 1123:19
**1970** 1123:20
1124:10
**1974** 1123:23
**1997** 1123:4,9
1124:4

## 2

**2** 1118:3 1146:15,17
1148:19 1166:14,
17,19 1169:17
1172:25 1190:18
1191:9 1200:12
1222:25 1223:2
**2,000** 1102:9,20
1104:18
**2,169,000** 1169:16

**2,169,881** 1172:3
**2,700,000** 1172:4
**2.7** 1169:13
**20** 1157:20 1262:19
1263:12
**200** 1021:3
**2000** 1218:8
1219:22 1237:2
**2004** 1057:18
1069:7 1173:15
**2007** 1119:23
1169:19 1248:20
**2008** 1110:12
1115:15,21,22
1116:3 1119:23
1124:25 1125:6
1169:19 1280:3
**2009** 1117:11,12
1178:4
**2010** 1129:2 1133:8
1215:6 1255:7,11,
13 1257:6,9,12
**2011** 1089:25
1191:24 1237:19
1238:5
**2013** 1016:10
1138:16 1215:7
1218:9 1280:4
**2014** 1242:6
**2017** 1277:12,13
1279:11
**21** 1048:10 1257:6
**215** 1274:12,15
**22** 1053:18,19
1190:15 1231:25
**236** 1138:21
**24** 1138:16
**25** 1175:2
**25,000/$35,000**
1061:11
**28** 1053:20 1279:11

## 3

**3** 1108:20 1116:16
1118:3 1129:2
1131:10 1133:8
1139:7,16 1166:24
1167:4 1168:15
1200:15 1257:9

**3,000** 1104:4,9
1107:11
**3.3** 1131:25
**30** 1043:11 1133:17
1196:2
**30,000** 1148:6
1170:15
**30,000-page**
1150:19
**300,000** 1187:15
**30th** 1277:10
**35,000** 1048:19
1049:5,6
**364** 1151:23
**366** 1146:15
1148:19
**39** 1227:5 1228:25
1229:13

## 4

**4** 1069:9,10 1108:20
1118:3 1122:25
1123:2 1162:19,21
1200:12 1222:23,25
1223:2 1232:8
**4,400** 1102:15
**4,500** 1102:15
**40** 1063:12,14,15
1066:10 1132:18
1145:22 1146:4,8
1152:9,13 1167:8,
13,14 1168:10
1227:12 1228:25
1229:22 1234:15
1243:18,20 1262:17
1263:6
**400,000** 1172:7
**41** 1064:10 1118:9,
11 1227:15 1229:2
1230:9 1231:6
**42** 1044:5,25 1045:5
**43** 1045:5
**44** 1045:5
**45** 1045:5
**46** 1044:5 1045:6
**48-21** 1061:4
**491** 1145:18 1153:6
**491-page** 1145:21

## 5

**5** 1041:24 1069:21 1093:15 1108:20 1173:17,19,22,23 1177:11 1195:6,12 1200:9,10 1232:3,5,7 1240:2 1241:17
**50** 1131:4,18,23,25 1132:6,19 1156:21 1243:15,17 1262:4
**50,000** 1126:9
**500** 1191:6
**500,000** 1187:17 1190:20,22 1191:3,5
**54** 1124:19 1125:8
**55** 1101:9,10,19,20 1105:21 1106:4 1167:9,20 1168:6,7,14
**56** 1133:5,6,7 1134:25 1242:25 1257:2
**57** 1139:15,16 1140:16 1143:2
**58** 1151:14,17 1154:7,8
**5:11** 1118:13

## 6

**6** 1102:16 1124:8 1168:24,25 1171:22,24 1187:21 1188:12,13,16,25
**600** 1191:7
**600,000** 1191:2

## 7

**7** 1103:3,23 1109:2,6 1172:25 1186:8 1195:8 1257:12 1272:5
**7/14/2008** 1118:12
**70** 1080:23
**700** 1169:17
**70s** 1122:23

**74** 1078:8,23 1124:10
**75** 1124:11
**781** 1169:17

## 8

**8** 1162:22 1163:3,23 1164:13,15 1165:4 1167:23,24 1168:4 1175:14 1200:15 1217:20
**80** 1158:5,19 1162:14

## 9

**9** 1049:23 1069:17 1107:17 1162:23 1177:12
**90** 1081:13
**94** 1053:21,23
**95** 1054:3,10 1168:8
**97** 1123:19

## A

**A-R-A-Q-U-E** 1138:15
**abide** 1239:13
**ability** 1102:3
**abocamiento** 1279:16
**abreast** 1144:10
**abroad** 1028:21
**Absolutely** 1252:16
**accept** 1208:19
**acceptance** 1021:14
**accepted** 1019:22 1021:13 1034:9 1065:8,11 1066:6,15 1067:8,12 1087:13 1252:7 1264:12
**accepting** 1021:19
**accommodate** 1023:2
**accomplish** 1029:15 1112:19

**accordance** 1074:15 1180:13,19 1182:4,7 1213:22
**account** 1143:20 1191:18
**accurate** 1153:22 1281:15
**accusation** 1277:9
**accusations** 1275:18 1276:5
**accused** 1137:22
**achieve** 1029:11
**achieved** 1036:12
**acknowledge** 1153:11
**acquisition** 1024:15 1025:16 1056:12
**act** 1112:7 1227:7 1234:21
**acting** 1093:7,24 1105:7 1194:4
**action** 1135:2,3,5,8,10 1143:4,8
**actions** 1076:20 1137:10,18
**activities** 1138:4 1264:22
**activity** 1094:11 1260:11 1280:8
**actual** 1027:9 1104:15 1141:21 1152:8 1212:18 1217:3
**ad** 1063:18
**add** 1031:19 1032:20 1165:16
**addenda** 1057:15 1173:14
**addendum** 1022:12 1023:18 1025:12,24,25 1026:6,7,19,23 1027:7,10 1031:24,25 1166:14,17,19,24 1167:4 1168:15,24,25 1170:12 1171:4,22,24 1172:8,9,20 1173:19,22,23
**addition** 1086:7 1097:6

**additional** 1023:20,22 1052:6 1066:2 1092:9,15 1168:7,13 1183:17 1236:22
**address** 1119:19
**addresses** 1040:19 1042:13 1043:15
**adequate** 1134:16
**adjourn** 1099:14
**adjustment** 1272:16
**administration** 1093:15,16 1241:17
**administrative** 1143:19 1144:7 1148:11 1149:5 1152:13 1240:3 1241:22 1242:3,13 1275:16,21
**admitted** 1278:8
**adopted** 1176:17 1192:18
**advance** 1168:10 1175:2
**advice** 1131:12 1271:14,19
**advise** 1019:12
**advised** 1236:2
**affidavit** 1079:18 1080:22 1084:14
**affirm** 1206:13
**afternoon** 1041:6
**Agencies** 1280:19
**agency** 1113:21 1114:2 1129:23
**agent** 1090:22 1092:5 1093:8 1098:24 1194:5 1259:21
**agree** 1039:25 1063:5 1068:13 1129:13,15 1130:3 1176:15 1208:15 1231:16
**agreed** 1016:21 1017:7 1035:13 1061:25 1083:19 1129:17 1178:12 1228:3 1241:16 1243:10 1259:3,7 1263:7 1265:11 1269:15

**agreement** 1021:17 1028:4 1037:3 1060:9 1061:24 1068:6 1070:10 1090:5,14 1116:14 1117:8 1118:15 1120:22,24 1176:17 1194:25 1195:13,25 1196:17 1200:17 1210:5 1223:8 1225:21 1227:22 1228:12,13 1229:5, 25 1230:18 1232:19 1233:5,10 1241:19, 21 1257:5 1266:18, 21 1269:21 1281:10,14,20

**agreements** 1038:13 1060:22 1067:13 1088:22 1233:2

**ahead** 1034:15 1041:3 1179:11 1191:16 1230:5

**allegation** 1084:8,19

**allegations** 1079:15, 16,19 1080:12,15, 25 1081:4,12 1082:25 1083:4,11, 12 1084:11 1104:20 1136:14 1153:3,7

**alleged** 1079:12 1080:13 1152:15

**alleging** 1104:25

**alliance** 1037:2,5, 17,19,20 1039:12, 16 1040:3 1043:22 1045:19 1046:24 1090:5 1194:25 1195:13 1196:17 1197:2 1223:8 1225:6 1257:5 1276:3

**alliances** 1152:17

**allies** 1040:3 1045:20

**allocated** 1131:5

**allocating** 1243:8 1265:10

**ally** 1064:17 1066:8

**amended** 1101:12 1109:3 1149:22

**amendment** 1053:13 1145:7 1173:17

**amount** 1016:20,21 1017:5,6,23 1018:5, 8 1020:18 1021:22 1062:4 1081:7 1086:19 1169:5,21 1171:8,16 1182:14 1186:24 1190:23 1197:20 1203:25 1204:6,7,8 1214:21 1217:8,9 1225:3 1252:4 1259:9,16 1261:25 1263:7 1264:18 1265:20 1266:8,15

**amounts** 1191:23

**analyze** 1255:24 1256:4

**and/or** 1175:3

**Andrea** 1233:19

**annex** 1139:7,16 1148:12

**annexes** 1148:8

**annual** 1188:16

**answers** 1101:12

**anticipation** 1118:22

**apologize** 1281:9

**Apparently** 1142:2

**Appeals** 1274:17

**appears** 1148:21

**appended** 1129:3

**appendix** 1148:5 1149:9 1151:21 1152:11

**applicable** 1042:21

**application** 1134:25 1144:11,18 1272:7 1274:16,20 1275:8, 10 1276:7,13 1277:21 1278:20 1279:2,23

**applied** 1175:20 1185:4 1191:10

**apply** 1175:20

**applying** 1152:16

**appreciated** 1125:25

**approved** 1208:3 1209:20

**approximately** 1178:24

**April** 1272:23

**Araque** 1138:15

**arbitration** 1016:19 1017:4,15,17,19 1134:13,18

**arbitrators** 1134:9

**area** 1040:12,14,16 1041:16 1094:10 1118:19 1119:11 1125:22 1209:15,16

**argument** 1066:22 1085:17 1136:18

**arguments** 1136:8 1234:17

**arithmetic** 1243:12

**Arivenca** 1090:21, 22 1091:15,20,23 1092:2,4,8 1093:5, 6,7 1098:22,23 1211:21,22,24 1212:3,4,16,17 1238:12,14,20,24 1239:14

**Arivenca's** 1239:22

**arm** 1135:14

**arrange** 1069:13 1087:22 1203:17

**arranged** 1092:6 1273:4

**arrangement** 1046:23 1090:4 1095:12,17,23,25 1096:7,12 1112:2 1196:10 1205:6 1206:12 1208:2 1223:24 1226:18,19 1227:10 1229:4 1230:19 1231:17,19 1236:19 1248:25

**arrangements** 1116:2 1236:23

**arrest** 1140:25 1141:18 1142:8,13 1143:2,6 1145:2 1221:5,17 1222:4

**arrival** 1167:15 1273:5

**arriving** 1246:20

**Article** 1138:21

**Arturo** 1110:5 1122:14 1247:7 1248:3 1273:21

**ascertain** 1050:18

**Ashney** 1138:14

**Asia** 1177:15

**asks** 1199:9

**aspects** 1085:3

**assessment** 1082:23

**assets** 1028:21

**assign** 1023:6

**assigned** 1201:7

**assisted** 1105:3

**associate** 1064:16

**association** 1223:18

**assume** 1023:13 1052:14 1066:21 1085:17 1115:17 1201:9 1202:12

**assumed** 1223:6

**assuming** 1078:5

**assure** 1272:19

**attaching** 1275:19

**attaining** 1056:2

**attended** 1111:19

**attention** 1222:22

**attorney** 1139:24,25 1144:12,15 1154:11 1264:20 1275:23

**attorneys** 1231:15 1270:17,23

**audibly** 1088:19

**audit** 1143:20,22 1242:6

**August** 1257:12

**authorities** 1241:4

**average** 1178:23,24, 25

**avoid** 1254:4

**awarded** 1256:22 1261:16

**aware** 1147:20 1256:11,13 1279:6

**B**

back 1015:15
  1023:15 1029:21
  1050:19 1056:5
  1099:18 1106:22,23
  1118:7 1125:14,17
  1133:19 1156:5
  1160:16 1165:12
  1168:4 1173:18
  1189:14 1199:12
  1200:8,20 1214:5,7,
  21 1216:20 1220:22
  1249:24 1250:5
  1259:12 1261:17,
  21,25 1268:20
back-to-back
  1105:22 1106:11
backdated 1273:2,
  19
Background
  1281:21
Bahamas 1160:5
balance 1072:12
  1162:2
bananas 1098:6
banking 1175:3
Baptista 1138:25
bargain 1065:9
Barimas 1127:12
barter 1095:12,22,
  25 1096:2,6,11
  1206:12 1226:15
  1229:25 1231:17,19
  1248:25
base 1164:5
  1178:25 1179:7
based 1083:12
  1131:24 1135:10,23
  1175:20,22 1243:6
basically 1250:16
basing 1166:19
basis 1070:25
  1071:2 1072:24
  1135:22 1137:9
  1179:24 1182:15
  1190:7 1229:15
  1263:16
Baumann 1129:21
  1132:12,13 1262:6,
  7,12,16,18 1263:6,

11 1266:16,21
bearer 1159:2,12,
  13,14,17,24
began 1125:11
begin 1223:5 1243:5
beginning 1053:20
  1087:4 1089:23
  1128:17 1176:7,16
  1192:7,18 1229:17
begins 1236:25
begun 1237:2
behalf 1046:15
  1051:12 1060:5
  1061:18 1063:5
  1091:10 1108:5
  1193:6 1199:5
  1204:9 1239:15
  1247:2
belief 1083:18
  1084:21
beliefs 1083:9,13
believed 1083:6
  1084:6,21
belonging 1263:6
benchmark 1175:17
  1176:10 1177:9
  1178:7,15
benefit 1066:9
  1081:5
benefits 1090:14
bid 1020:10,15,17,
  20 1021:10,13,22
  1255:2,3
bidders 1253:22
bidding 1122:16
  1253:20 1254:5
  1255:8 1256:11
bids 1122:15
  1252:24
big 1125:9 1126:9
  1127:5,7 1174:5
  1207:18 1241:20
biggest 1176:12
billed 1242:10
  1245:17
bit 1165:20 1191:17
Blanco 1270:25
Blount 1047:5,6,10,
  14,15,17,19
  1048:13 1050:9
  1055:10 1067:9,16

1075:24 1099:21
  1107:25 1244:20
board 1036:25
Boca 1054:24
  1072:12 1161:11
  1166:23 1168:22
body 1021:22
  1177:7
Bolivar 1027:20
  1030:11 1114:9
  1115:19 1116:16,21
  1117:3 1119:5
  1120:4,12 1121:8
  1122:18 1123:3
  1124:14 1125:3
  1126:12 1127:14
  1128:3,13
bottom 1149:3
  1162:21 1163:3
  1164:15 1165:4
  1166:16 1168:5
  1177:12
bought 1214:16
brackets 1022:14,15
brand 1256:3
Brazil 1176:12
Brazilian 1175:25
  1176:2
breach 1215:12
break 1015:22
  1033:14 1050:18
  1052:18,21
  1099:12,16
  1133:12,17 1155:6,
  11 1156:3 1220:3,
  18,20
breakdown 1159:25
bring 1084:4
  1196:22 1206:23
bringing 1194:5
  1207:15,17
British 1136:12,15
broad 1033:8
  1134:7
brought 1049:10
  1075:18 1081:21
  1085:3 1100:18
  1104:11 1121:18
  1129:5 1276:9
budget 1192:19
built 1060:8

bulk 1072:12
bullet 1149:3
Bulletin 1178:9
bunker 1031:10
  1198:15 1199:11
  1212:3
bunkers 1031:16,
  19,22 1032:3
  1033:17,18 1034:13
  1036:18 1065:22
  1091:7 1197:19,21,
  24 1198:5,13,20,22
  1199:19,22 1211:23
  1212:5
buoy 1213:23
business 1037:13
  1066:13 1088:12
  1097:18 1112:4
  1217:2 1218:6,9
  1219:25 1223:8
  1235:12 1251:13,14
  1259:10 1267:11,19
  1280:4
businessman
  1061:23
buy 1121:24
  1173:25 1208:5
  1256:9
buy/sell 1057:17
  1248:24
buyer 1064:18
  1069:12 1070:5,10
  1076:11 1163:6,7
  1169:3,8,15 1170:2
buyers 1077:8,11
  1176:9,18
buying 1089:9,12
  1176:9 1235:18
by-product 1206:4

**C**

C-A-R-A-B-A-L-L-O
  1138:15
CAA 1037:12,17,18,
  23 1038:6,13,25
  1039:6,8,24 1040:5,
  11,13,18 1041:12,
  20 1042:12,14
  1043:6,14,16
  1044:9 1045:16,18
  1046:6,12,14,20,22

1056:6 1060:5,8,21
1061:14 1063:2,10
1064:3,5,11,23
1065:2,25 1067:25
1085:6,18,25
1086:5 1087:21,24
1088:4,15,21,22
1089:7 1090:3,8,9,
14,17 1094:23
1095:6,7,18,19
1096:11 1195:5,18
1196:20 1197:17,
21,22,25 1198:2
1205:7 1222:17,23
1223:19 1226:10,
11,14 1228:15
1229:14 1231:12,20
1232:14,18 1233:5
1244:7 1245:3
1253:19 1254:4,14,
19 1255:11,14
1257:18

**CAA's** 1063:19
1227:24
**calculated** 1251:24
**calculation** 1131:24
**call** 1047:24
1089:15 1142:17
1185:13
**called** 1040:14,16
1148:10 1157:14
1181:7 1209:14
1242:19 1270:24
1275:11
**camparo** 1277:3
**cap** 1186:14
**capacity** 1027:15
1028:16 1075:13
**capital** 1161:12,13
**capped** 1186:13
**capture** 1127:19
**captures** 1125:9
**Caraballo** 1138:14
**Caracas** 1278:14
**Carajas** 1175:24
1176:8 1177:23
**care** 1112:25
**cargo** 1071:9,12,16,
19,22 1072:3
1073:7,20,21
1075:4 1076:11
1086:10 1087:6,15,

23 1089:7 1090:18
1102:3 1170:12
1172:6,21 1213:7,
10
**cargos** 1074:11
1086:15,18
1162:11,16 1166:8
1170:15 1212:24
**Carlos** 1110:4
1181:5,7 1182:6
**Caroni** 1054:18
1058:13 1113:6
**carriage** 1127:7
1213:14
**carried** 1213:7
**carry** 1075:4
1170:11 1171:20
1212:24 1213:9
**case** 1034:12,17
1035:14 1073:13
1084:14 1094:12
1134:8 1162:7
1178:14 1206:20
1207:4,14,15
1234:19 1248:10
**cases** 1094:14
1097:7
**cash** 1023:3
1235:16
**castings** 1280:22
**Castro** 1139:7,17
1155:2
**Castro's** 1148:8
**category** 1075:25
**Caterpillar** 1204:19
**ceased** 1124:16
1125:3 1213:25
1218:8
**Cerro** 1027:19
1114:9 1115:19
1116:16,21 1117:3
1119:5 1120:4,12
1121:8 1122:18
1123:3 1124:14
1125:3 1126:12
1127:14 1128:3,13
**Cesar** 1218:23
**cetera** 1182:11
1227:8
**chairman** 1015:3,
11,16,20 1016:7,11,
14,18,25 1017:10,

14,18,24 1018:10,
17,21 1019:2,6,11,
17,21 1020:2,6
1022:4 1026:18
1027:5 1033:5,13
1038:19 1041:14,22
1044:20 1046:9
1048:8 1049:22
1052:17,22 1053:18
1054:11 1055:14,20
1058:7 1059:4,14
1062:14,19 1063:24
1067:14,18
1068:13,25 1070:18
1077:25 1082:8,11
1099:13,17,25
1100:7 1101:8,18
1103:12,22
1105:10,13,17
1107:16 1108:2,15
1117:22 1118:2
1120:25 1121:4,12,
17 1124:6 1126:17,
20,24 1129:20
1133:2,6,11,16,19
1137:4 1138:6,17
1139:3,12,20
1140:2,9,12
1141:17 1142:11
1145:13 1147:21
1148:2,17,24
1149:25 1150:24
1151:3,12,22
1153:20 1154:14,
19,25 1155:4,7,12,
22 1156:4 1157:10,
15,18,21 1158:4,8,
14 1159:6,11,16,22
1160:15 1164:21
1167:10 1171:3,11
1173:18 1175:16
1177:5,21 1179:10,
17 1180:21 1181:3,
9,16,20,22 1183:8
1191:12 1192:9,24
1193:14 1195:10
1197:6 1198:17
1200:14 1202:3,13
1203:2,18 1207:8
1208:10,21,25
1209:3 1210:16,25
1212:9,12 1213:5,
15 1214:8,11,24
1216:2 1220:9,16,

21 1221:16,24
1222:7,10 1223:25
1228:8,18 1230:23
1231:4,11 1233:14,
18,23 1234:2
1265:7,17,22
1266:10,17,20,23
1267:8,12,16,22
1268:3,7,17,24
1269:7,13,19,23
1270:3,10,16,19,22
1271:2,6,10,13,18,
23 1272:3,11
1273:10,15 1274:4,
11 1275:7 1276:6
1277:12,14,19
1278:11,15,21
1279:4,20 1280:7,
10,13,17,23 1281:4
**chamber** 1277:5
**change** 1096:4
1124:24 1157:22
1177:25
**changed** 1043:4
1057:17 1090:4,7
1178:3,5 1233:4
**characteristics**
1175:21
**characterizes**
1030:16
**charge** 1025:9
1056:23 1097:12
1112:15 1180:6,22
1181:18 1187:4,7,
17 1190:22 1191:5,
6 1217:15 1240:3,8
1242:3,13 1249:11
1251:22
**charged** 1032:15
1048:3 1077:21
1079:13 1080:3
1093:16 1205:2
1246:21 1251:18
1253:7
**charges** 1093:15,16
1154:23 1204:11
**charging** 1086:7
1131:15 1202:23
**chart** 1075:5 1159:7
1160:8,16
**charter** 1034:17,19,
20 1035:11,14,16,
25 1040:10

1047:14,16,19
1048:12 1052:2,5,8
1055:7,11,23,24
1056:17,19,24
1057:2 1058:20
1059:10,12 1062:23
1065:19 1066:4
1067:7 1075:17
1076:13 1077:22
1079:10 1080:8
1081:3 1083:18
1097:9,12 1103:4,6,
13 1105:22,23
1106:10,11,17,19
1107:12 1108:5
1109:10,15,21,22,
23 1110:7,10
1207:4,6,7,11,12
1214:22,24 1215:3,
12 1217:11,12
1234:11 1246:25
1271:25 1272:4,9,
13,14 1273:11,18

**chartered** 1035:7
1047:10 1048:20
1050:3,4 1052:9
1058:21,25 1073:6
1074:24 1075:6
1078:17,18 1101:24
1215:5

**chartering** 1025:6
1036:13 1055:10
1058:18 1236:8

**charters** 1034:2,5
1047:2,8 1061:8
1068:17 1234:5
1244:10

**check** 1051:13
1099:21 1116:6
1123:21 1182:6
1188:14

**chief** 1122:10

**China** 1070:24
1071:13 1072:4
1086:18 1087:6
1194:10,14,16
1212:25 1214:4,7
1237:16

**Chinese** 1118:20
1225:23

**choose** 1226:13
1229:8 1234:21

**chose** 1178:14
**chosen** 1180:11
**chronology** 1229:12
1279:23
**cite** 1142:5
**citizen** 1142:9
**citizens** 1138:24
**civil** 1144:5
**claim** 1016:18
1017:3,13,17,19
1018:4 1080:17,18
1081:2,8,13
1154:23 1215:16
1216:25 1217:3,8
**claimed** 1079:9
**claiming** 1153:13
1217:23
**claims** 1081:6
1145:19 1203:10,11
**clarification**
1049:13
**clarifications**
1020:3
**clarify** 1181:15
1182:2 1198:18
**clarity** 1149:2
**classifying** 1225:11
**clause** 1027:12,18
1041:20 1042:22
1069:9,10,21
1077:23 1103:18,25
1107:18 1162:19,21
1163:23 1164:3,4,
13,15 1165:4
1167:23,24 1168:4
1175:14 1177:11
1191:9 1192:3
1195:8 1200:12
1201:15 1223:16,21
1224:6,18 1232:8
**clauses** 1027:11
**clear** 1021:4
1041:23 1062:21,22
1063:23 1069:2
1072:16 1077:15
1169:10 1230:24
1242:8 1243:23
1244:4 1265:8,13
1268:25 1277:15
**Clemente** 1129:17,
19,20 1130:3,6,8,
15,19,20,21,22

1243:10 1257:25
1258:2,22 1259:4,7,
15,22 1260:7,24
1261:6,9 1263:8,12
1265:12,15 1266:3,
18 1267:2,4
1268:14 1269:17
**Clemente's** 1262:8,
15
**client** 1015:13
1119:2 1225:23
**clients** 1118:21
**close** 1220:3
**CME** 1015:1 1016:1,
15,20,22 1017:1,5,7
1018:1 1019:1,9,12
1020:1 1021:1
1022:1,13,21
1023:1,12 1024:1,
14,17,22 1025:1,2,
8,15 1026:1,10,14
1027:1,13 1028:1,
14 1029:1,7,16,19,
20,23 1030:1,4,9,18
1031:1,4,11 1032:1,
11,14,21 1033:1,11,
19,21 1034:1,11,18,
25 1035:1,7,10,15,
21,25 1036:1,5,8,
12,15,21 1037:1
1038:1 1039:1
1040:1 1041:1
1042:1 1043:1
1044:1 1045:1
1046:1,16 1047:1
1048:1,13 1049:1,9,
17 1050:1,3 1051:1,
7 1052:1,13 1053:1
1054:1,4,22 1055:1,
8,9 1056:1,10,13
1057:1,16 1058:1,2,
4 1059:1 1060:1
1061:1 1062:1
1063:1,2,19 1064:1,
14 1065:1,2,7,24
1066:1 1067:1,15
1068:1 1069:1
1070:1,10,20
1071:1,10 1072:1,
13 1073:1,3,10,18,
22 1074:1,13,19
1075:1,10 1076:1,
18 1077:1,7,12,16,

20 1078:1 1079:1,
13 1080:1,8,24
1081:1,5,20 1082:1,
14,22 1083:1,19
1084:1 1085:1,3
1086:1,8,17 1087:1,
16 1088:1,12
1089:1,13 1090:1,
23 1091:1 1092:1,5,
6 1093:1,21 1094:1
1095:1,13,21
1096:1,4 1097:1
1098:1,22 1099:1
1100:1,3,5 1101:1,
21 1102:1 1103:1,4,
11,13 1104:1
1105:1,23 1106:1,
12 1107:1 1108:1,6
1109:1,14 1110:1,
12 1111:1 1112:1,
15 1113:1 1114:1
1115:1 1116:1,20
1117:1,15,17
1118:1 1119:1
1120:1 1121:1,6,21,
25 1122:1,4,8,10
1123:1 1124:1
1125:1 1126:1,13
1127:1,24 1128:1
1129:1,5 1130:1,15
1131:1 1132:1
1133:1 1134:1,2
1135:1,16 1136:1
1137:1,12,19
1138:1,3 1139:1,5
1140:1 1141:1
1142:1 1143:1,24
1144:1 1145:1,19
1146:1,15 1147:1,
19 1148:1 1149:1
1150:1,13 1151:1
1152:1,7,24,25
1153:1,7,14 1154:1,
24 1155:1 1156:1,
13,18,19,23 1157:1,
12 1158:1 1159:1
1160:1 1161:1
1162:1,10 1163:1,8
1164:1 1165:1
1166:1,8 1167:1,14
1168:1 1169:1
1170:1,2 1171:1
1172:1 1173:1
1174:1,13,17,18

1175:1 1176:1
1177:1 1178:1
1179:1 1180:1,5,19
1181:1 1182:1,25
1183:1 1184:1
1185:1,19 1186:1,6
1187:1,11 1188:1
1189:1 1190:1
1191:1,20 1192:1
1193:1,5,11,19,22
1194:1,4,7,10,12,
13,17,25 1195:1,25
1196:1,6,8,13,24
1197:1,8,16,20,23
1198:1,5,6,11,12,19
1199:1,9,10 1200:1
1201:1,8,19 1202:1,
9,19 1203:1,23
1204:1,3,8,15,23
1205:1,7,17 1206:1,
3,5,9,12,13,14,15,
16,22 1207:1
1208:1 1209:1,25
1210:1,2,3,6,11,13
1211:1,8,11,13,15,
16 1212:1,2,24
1213:1,13,22
1214:1,19,21
1215:1,11,15,23
1216:1,7 1217:1
1218:1 1219:1,13
1220:1 1221:1
1222:1 1223:1
1224:1 1225:1,5,18
1226:1,4 1227:1,7
1228:1 1229:1,14
1230:1 1231:1
1232:1 1233:1,2
1234:1 1235:1
1236:1,17 1237:1,5
1238:1,25 1239:1,3
1240:1 1241:1,22
1242:1 1243:1
1244:1 1245:1,16,
17 1246:1,20
1247:1,2,7,11
1248:1 1249:1,11
1250:1 1251:1,18
1252:1 1253:1,7,18,
20,21 1254:1
1255:1,5,21 1256:1
1257:1 1258:1,12,
13 1259:1,11,13
1260:1 1261:1

1262:1 1263:1,20
1264:1 1265:1
1266:1 1267:1
1268:1,4,6,10,21
1269:1,21 1270:1
1271:1,13,19
1272:1 1273:1
1274:1 1275:1
1276:1,2 1277:1
1278:1 1279:1,13,
15 1280:1,4,6
1281:1,12,15,23
**CME's** 1019:22
1070:23 1076:6
1081:2 1085:21
1092:23 1125:2,10
1134:25 1193:9
1194:22 1197:11
1213:7,10 1214:4
1227:6
**CMO** 1019:18
**coal** 1077:4
**collusion** 1140:20,
21
**commenced**
1095:17
**commercial** 1060:2,
3 1194:24 1195:13
1196:17 1200:17
1208:20,22 1209:21
1257:4 1274:2,8,9
**commercialization**
1029:2
**commission**
1086:9,14,20
1087:12,14,16,18
1089:15,21
1090:13,19 1206:5
1219:20,24 1229:15
1233:6,7 1236:20
1237:3,5,10,22,24
**commissions**
1086:17,24 1087:4,
5,7,10 1089:23
1219:14 1232:16,
17,23 1233:9
1236:15,16 1237:13
1238:7
**commit** 1140:22
**commitment** 1116:9
**commodities**
1100:18 1149:8

1152:18 1185:6
**commodity** 1187:5
**communication**
1243:2 1268:8
**companies** 1018:19
1122:5 1152:6
1153:7 1235:5
1237:3 1267:7
1280:16
**company** 1023:7
1036:21 1066:13
1113:24 1114:4,19
1121:18,24 1132:13
1135:6 1157:14,16
1158:16,18,23,25
1160:3 1202:25
1204:20 1235:17
1239:10 1246:2
1258:3,10,11
1259:24 1261:16
1262:8,9,11,15
1266:6 1267:6
1280:14
**compare** 1246:14
**compensated**
1090:17
**compensation**
1060:23 1097:7
1175:4
**compensations**
1236:23
**complain** 1104:10
**complement**
1044:10
**complete** 1244:5
**completely** 1115:11
**completion**
1161:10,16,18
1166:22
**compliance** 1225:5
**complied** 1210:10
**comply** 1029:20
**complying** 1028:25
**Compound** 1111:12
**comprehensive**
1126:25 1127:4
**compromise**
1187:21 1227:16
1229:5 1230:10,25
1231:3,5,8,18
1272:20

**concept** 1029:23
1065:2 1228:10,16
**concern** 1153:20
**concerned** 1150:9
**concerns** 1149:7
**conclude** 1190:14
**concluded** 1184:25
**concluding** 1155:15
**conclusion** 1038:18
1083:8 1089:3
**condition** 1124:15,
25 1170:4 1223:6
**conditioned**
1044:15
**conditions** 1084:6
1106:24,25 1232:14
1256:6
**confer** 1130:3
**conferences**
1237:15
**confirm** 1050:19
1177:9
**confirmed** 1235:11
**confirms** 1185:19
**confused** 1031:25
1073:24 1171:19
1243:11 1266:24
**confusing** 1034:24
**confusion** 1171:20
**connection** 1044:7
**consideration**
1088:23
**considerations**
1024:9 1079:2
1281:21
**considered** 1015:13
1039:21 1133:25
1225:15 1237:13,17
1245:4 1252:3,5
**considers** 1140:17
**consortium** 1259:21
1260:6
**constitute** 1165:23
**constitutional**
1143:9,14,17
**construction**
1019:14 1128:11
**construed** 1142:2
**consummate**
1021:15

**contacted** 1142:25
**contained** 1153:4
**contemplate** 1061:16
**contemplated** 1023:19 1063:2 1201:15 1205:7 1227:22
**contemporaneous** 1242:12
**content** 1182:10
**contention** 1223:22
**context** 1205:19
**continue** 1023:8 1101:6 1128:14 1151:6 1237:23 1269:6,18,20,24
**continued** 1022:7 1053:10 1100:12 1134:21 1160:21 1190:10 1220:25 1237:7,9
**continues** 1162:22
**continuously** 1240:19
**contract** 1015:9,24 1016:16 1018:5,6, 11 1019:23 1020:11 1021:15 1028:24 1032:18 1033:10 1034:10 1035:13,15 1037:12 1041:18 1042:7 1043:5,25 1048:7,22,24 1052:11 1053:13,15 1055:3 1056:18 1057:18 1059:13 1062:2,12,23,24 1063:20 1064:14 1066:24 1068:3,23 1069:2,4,9 1076:13, 14 1077:7 1079:25 1080:4 1083:23 1085:11,12,21,22, 24 1086:3,22 1087:5,22 1088:22 1089:9,14 1091:10 1092:19 1094:10 1097:19 1098:18 1104:21 1107:9 1109:16 1116:8,11, 19,24 1118:15,23

1120:8,10,18,20 1121:7,10 1124:15 1130:9,16 1131:7, 10 1133:24 1134:3, 11,16 1161:5,7 1162:12,20 1164:17 1167:25 1170:10 1172:17,23 1173:9, 14,15,17 1174:12, 24 1175:14,15 1176:7 1177:8,15 1178:12 1179:19, 23,24 1180:13,20 1182:4,7 1183:14 1184:2,22 1185:5, 14,18,20 1186:4,16 1187:9 1189:6,12, 15 1190:17,18 1193:22,24 1195:3 1198:4,11 1199:2,3, 7,16,25 1200:5,13 1201:2,10 1202:12, 17,18,20 1203:3,4, 6,13,20 1204:14 1206:24 1209:23 1211:13 1213:22 1223:18 1224:10, 11,18,19,21 1225:9 1226:16 1227:2,17, 20,25 1228:2,5,20 1229:19 1230:3,7,8, 13,17,24 1231:2,7, 25 1232:21 1235:17,22 1236:24 1237:8 1243:8 1245:2,6,10,12,25 1246:6 1248:2,5 1252:19 1257:11,17 1260:12 1261:17 1265:24 1268:4,5 1272:20 1273:7
**contract's** 1196:18
**contracted** 1034:8 1172:4 1193:5 1258:14 1259:11
**contracting** 1030:13 1061:17 1065:12 1205:21,22
**contractor** 1140:21 1194:6 1210:2,5
**contractors** 1206:23
**contracts** 1029:17 1036:22,25

1040:11,15,17,19, 20 1041:21 1042:13,20,23,24 1043:15,21 1044:4, 7,14 1045:3,9,15 1046:11,14 1051:11 1052:13 1056:22,23 1057:20 1060:4,15 1061:5,15,16 1062:7,9 1063:10 1064:24 1067:12 1070:9 1076:19 1083:22 1095:9 1115:18 1116:6,25 1131:13 1135:12 1137:14 1143:24 1183:12 1193:10, 11,16,19 1194:3,19 1197:9,11,14 1198:3,11 1200:24 1201:6,14,20 1202:2 1203:23 1204:25 1205:5,20 1206:4,18,25 1207:3,12,13 1209:25 1222:19,24 1223:7,13,17,23 1224:5,7 1225:4,7, 17,24,25 1226:4,6, 7,8,14,15 1232:9,10 1240:10 1244:7,13 1246:23 1251:20 1254:10 1255:6 1263:20 1264:2 1270:14 1276:2
**contractual** 1087:8 1116:2,9,14
**contractually** 1169:19
**Contreras** 1110:5 1247:7 1273:21
**contributions** 1024:16 1025:17 1056:12
**control** 1160:11
**controlled** 1158:23
**convenient** 1133:12,15
**conversations** 1211:9,10
**copies** 1114:13 1139:9

**copy** 1019:3 1041:19 1100:15 1139:13 1141:16 1148:22 1149:14,15 1272:3 1274:20 1275:3 1278:19 1279:18
**corporate** 1028:25 1156:13,15 1223:7
**corporation** 1157:2, 5,11
**correct** 1019:22 1029:7 1035:16 1036:3,7 1040:8,9 1042:3,12 1043:14 1045:20 1047:3 1048:21 1050:5 1055:4 1057:23 1059:18 1060:19 1061:2 1064:19,20 1067:11 1068:20,21 1071:20 1073:16 1080:18 1081:11,17 1083:10 1084:22 1086:6 1087:10 1088:6,9 1091:7 1095:12 1098:19 1103:24 1104:5,15, 22 1105:8 1110:22 1111:2 1117:16 1118:15 1122:22 1143:25 1155:3 1164:10,11 1182:15,20 1188:18 1190:23 1215:9 1226:10,18 1227:13,14,18 1229:15,20,23 1230:4,11 1232:10 1238:19,23 1240:6 1244:10 1245:3 1249:11 1254:6,17, 20,23 1255:15 1257:18 1261:21 1262:2 1263:13 1274:23 1276:4
**corrected** 1141:25
**corrections** 1272:24
**correctly** 1030:17
**corruption** 1136:8
**cost** 1031:6,16,18 1033:19,21,22 1034:18,20,22,23,

25 1035:11,20
1036:16,19,24
1046:16 1052:4,5
1055:9 1058:24
1066:10 1068:16
1077:19 1091:23
1092:16 1093:3
1094:7 1187:18
1205:15,18 1210:12
1214:4 1224:11
1237:14

**costs** 1022:17
1073:2 1087:17,18
1204:16 1205:14
1211:12 1241:13
1245:15

**counsel** 1105:7
1138:13 1274:15
1279:22

**counterpart** 1249:6

**counterparty**
1247:23

**country** 1028:22
1137:23

**couple** 1211:18
1220:12,14 1234:4

**court** 1049:16
1080:10 1084:14
1140:17 1143:15,
19,21 1144:3,5,7,8,
13,19 1221:6
1274:17,18
1275:10,15,18
1276:17 1277:5,7,
23 1278:6,8

**cover** 1023:7

**covered** 1115:11

**coworker** 1247:9,10

**cranes** 1174:5

**create** 1056:24,25
1159:7 1206:24

**created** 1205:20

**credit** 1252:2

**crew** 1208:3

**crime** 1140:19,22

**criminal** 1135:2,3,5,
7,8 1143:18 1144:3,
8 1148:5 1274:17
1275:10,15,18
1276:5 1277:5,7

**cross** 1015:5
1022:5,7 1053:5,10

1100:12 1134:21

**cross-examination**
1100:9 1133:22
1155:16 1164:23

**cross-examined**
1151:5

**crushing** 1022:15

**crux** 1032:9

**CSR** 1019:13 1134:3

**curious** 1251:6
1281:12

**current** 1027:16
1028:17

**custom** 1087:13
1089:24 1237:10
1252:22

**customary** 1263:19

**customer** 1225:23

**CVG** 1028:19 1029:3
1117:13,16,17
1119:4 1195:25

**CVRD** 1176:12


**D**

**daily** 1049:15
1099:22 1100:4

**damage** 1152:15

**damages** 1217:4

**damaging** 1137:23

**date** 1115:15
1116:22 1118:11
1123:23 1183:18
1214:14 1228:23
1273:5 1276:14
1279:8

**dated** 1129:2
1138:16 1257:5,9,
11

**day** 1048:4 1049:18
1053:2 1059:21
1068:9 1082:3
1083:24 1086:8
1097:10,17,20,22
1098:9,12 1099:24
1100:6 1141:3
1184:6 1273:24

**days** 1052:24
1179:2 1233:3
1278:7

**deal** 1018:12 1031:4
1032:10 1066:17
1074:11 1076:18
1098:24 1122:7
1208:22 1236:11
1261:23

**dealing** 1119:4,7,13
1140:18 1172:5
1208:12

**dealings** 1075:11

**dealt** 1109:13
1134:12 1209:6
1239:10 1247:23
1249:5 1274:6
1277:22

**Dealva** 1209:10

**Dear** 1243:6
1264:16

**December** 1257:6

**decent** 1208:3

**decide** 1076:16
1077:16 1092:14
1183:19 1251:22
1256:8

**decided** 1085:24
1089:25 1178:6
1195:22

**decides** 1074:18
1076:15

**deciding** 1134:17

**decision** 1015:15
1143:13,18,23
1144:3,5 1188:5,8
1236:2,7 1275:24
1278:20 1279:9

**decision-making**
1247:16

**decisions** 1247:17

**declaration** 1022:10
1023:16 1082:21
1100:16,23 1101:21
1105:19,20 1122:25
1129:4

**declaratory** 1150:3
1276:20,22,24

**decline** 1134:9

**declined** 1015:14

**deduction** 1217:7

**defend** 1145:12

**defendants** 1081:2

**defense** 1109:3

**define** 1075:15

**defined** 1038:13
1039:6

**defines** 1040:18
1046:20

**degree** 1150:20

**deliver** 1016:15

**delivered** 1016:8
1095:14 1165:3
1179:19 1221:8

**delivery** 1214:9

**demand** 1102:8

**demanded** 1102:7

**demonstrated**
1114:21

**denied** 1144:18
1279:13

**denies** 1279:2

**DENIG** 1063:22
1064:2 1101:11,14
1109:20 1114:14
1118:6,11 1139:10
1181:15,21,25
1203:6 1246:8

**department** 1018:14
1019:9 1208:20,22
1209:9,13,22
1274:3

**depending** 1044:17
1045:10

**depends** 1043:24
1066:12 1071:24
1086:3 1093:10

**depict** 1124:13

**describe** 1027:4

**description** 1104:12
1153:22 1281:11,15

**designating**
1074:20

**desire** 1052:6

**destination** 1072:5,
8,20 1073:16

**detail** 1082:22

**details** 1019:19
1091:12 1109:12,13
1266:13

**detention** 1138:23

**determined** 1092:23
1175:11,12 1185:5

**determining** 1253:6
**develop** 1121:19
  1122:9
**developing** 1119:11
**development**
  1036:25 1040:10,
  15,17,18,20
  1041:18,21 1042:7,
  13,20,23 1043:5,15,
  21 1044:4,7,14
  1045:3,9,15
  1046:11 1064:24
  1128:17 1197:9,11
  1200:13 1201:20
  1222:19,24 1223:17
  1224:5,17,19,21
  1225:24 1227:20
  1228:2 1232:9
  1244:6,13 1245:2,6,
  9 1246:22 1251:19
  1263:20 1264:2
**difference** 1016:20
  1017:4,22 1050:2
  1078:16 1126:11
  1192:5
**differential** 1050:8
  1061:11 1077:19
  1097:16
**differently** 1045:10
  1223:19 1224:20
**difficult** 1080:13
  1145:3
**dinner** 1250:23
  1251:2,3
**direct** 1140:18
  1224:16 1236:8
  1252:13 1273:16
**directing** 1134:2
**directly** 1072:4
  1073:15 1203:10
  1205:23 1210:4
  1235:22
**disagree** 1038:12
  1039:5,7,15,22
**disagreeing**
  1039:17,19
**discharge** 1102:18,
  24 1103:5,18
  1104:2,8,13 1107:6,
  10,12,19
**discharged** 1104:16

**disclosed** 1265:4
**discount** 1215:22
**discounts** 1215:15
**discover** 1086:2
**discovered** 1080:8
  1082:2,15,20
**discovery** 1085:8
  1134:8
**discuss** 1209:19,23
  1252:9 1259:2
**discussed** 1056:10
  1059:9 1063:18
  1067:25 1078:19
  1088:4 1111:25
  1232:12 1237:18
  1249:2
**discusses** 1030:21
**discussing** 1030:20
  1130:14 1272:22
**discussion** 1028:8
  1070:2,16 1100:10
  1107:14 1108:18,24
  1128:23 1141:23
  1149:16 1151:10
  1155:9 1157:8
  1158:2 1233:21
**discussions** 1015:8
  1110:5 1270:12,20
  1272:17 1273:16
**dismissal** 1276:4
**dispute** 1015:17
**distinct** 1057:19
  1076:20
**distinguishing**
  1223:15
**distributed** 1151:13
**District** 1100:17
  1129:6
**divided** 1222:18
**division** 1020:11
**divisions** 1256:5
**divulge** 1085:20
**divulged** 1105:6
**dock** 1058:14
  1113:16,18 1204:16
  1213:2
**docking** 1113:9,13
  1214:10
**document** 1019:8
  1037:21 1046:22
  1047:16 1053:17

1054:16 1106:6
1133:3 1134:7
1137:24 1138:12,18
1139:4,14,23,24
1140:10,24
1141:13,18
1142:14,19 1144:13
1145:17,21 1146:7,
12,14,25 1147:6,9,
10,22 1148:4,18
1149:4 1150:5,6,15,
19 1151:8,13,16,18,
24 1152:9,11,23
1153:22 1154:4,5,
10,17 1158:19
1159:24 1168:19
1203:9,20 1221:8,
18 1222:3,6,8
1241:21 1246:15
1278:5
**documentation**
  1203:7
**documents** 1049:16
  1137:16,25 1140:5
  1153:12 1166:11
  1168:17 1203:15
  1216:23 1221:25
  1246:10
**dollar** 1030:11
  1166:21 1190:4
**dollars** 1048:19
  1095:20 1098:3
  1174:15,16,20
  1175:8 1204:7
**domestic** 1238:21
  1239:9,10
**domiciled** 1160:3
**double-charging**
  1090:12
**double-check**
  1188:20,22
**dozen** 1223:14
**dozens** 1149:21
**draft** 1161:25
**Drake** 1136:22
  1137:5 1213:19
**dramatic** 1217:7
**dry** 1058:13 1113:9,
  13,16,18 1165:22,
  23 1166:21 1204:16
  1213:2 1214:10

**dual** 1108:12
**due** 1182:14,15
**dust** 1170:6
**duties** 1111:5,19
  1266:4
**duty** 1085:7,18

E

**E-MAIL** 1129:2,9,11
  1133:8 1257:2,8,14
**earlier** 1055:6
  1078:15 1211:20
  1212:22 1214:20
  1219:13
**early** 1233:3 1275:4
**earned** 1265:24
**earning** 1217:21
**easier** 1101:17
  1211:7
**easily** 1223:14
**Ed** 1050:15 1105:25
  1146:19
**effect** 1270:13
  1271:15,20
**efficiency** 1068:3
**efforts** 1114:22
**EIH** 1202:19
**EIRON** 1218:7
  1219:23 1237:6
**element** 1031:19
  1032:21 1033:10
  1035:21 1036:17
  1060:19
**embezzlement**
  1140:20
**employed** 1227:23
  1234:19
**employee** 1110:2
**employees** 1109:24
**employment**
  1216:17 1217:10
**encompass** 1114:25
**end** 1021:15 1101:2
  1125:7 1200:21,22
**ended** 1109:17
  1125:11 1126:14
**endorsing** 1136:18
**engage** 1255:6

engaged 1029:8
1253:20 1263:20
engineering
1208:14 1209:9,13
1256:5
English 1028:12
1037:25 1038:8
1041:24 1166:16
1167:3 1200:16
enter 1106:17,19
1193:11 1194:4
entered 1035:15,25
1056:18,22 1060:5,
14 1087:21 1090:3
1138:2 1226:16
1227:25 1229:6
entering 1112:2
1131:14 1193:10
Enterprises 1100:19
entire 1045:2
1072:10 1087:24
1115:3 1150:5,6
1264:19 1275:19
entirety 1106:21
1148:12
entities 1201:5
1225:13
entitled 1041:21
1136:23 1222:23
equally 1201:2
1225:8 1263:8
equipment 1110:18
1126:7 1128:18
1196:11 1207:17
1209:16
equipments
1201:21
equivalent 1098:9
1175:9
essentially 1052:24
1064:12 1080:10
1149:7 1215:5
establish 1193:22,
24 1208:15 1225:21
established 1028:24
1029:3 1037:14
1044:18 1045:11,12
1177:15 1189:11
1237:7 1251:17
1275:25 1276:2
establishing
1228:17

estate 1264:22
estimate 1131:19,22
estimated 1131:19
1243:7 1266:9
et al 1100:20
1101:22
Europe 1177:19
event 1084:25
1167:18
eventually 1020:18
evidence 1078:6
1101:5
evolved 1064:12
exact 1159:5
examination 1015:5
1022:5,7 1041:17
1053:6,10 1100:12
1134:21 1156:9
1160:21 1190:10
1220:25 1222:14
examples 1094:19
1197:10 1202:14
1207:9
excavates 1126:8
exchange 1024:19
1056:15 1057:21
1062:3 1063:21
1065:4,25 1175:4
exchanged 1240:11
exclusive 1120:2,10
1121:6
Exclusively 1120:16
exclusivity 1120:8
1121:11,15
Excuse 1027:17
1127:11 1186:21
1199:14
executed 1200:25
1225:8 1230:14,18
execution 1257:15,
17
exhaustion 1232:13
exhibit 1041:24
1048:9,23 1049:23
1053:18,19 1069:6
1101:7,12,20
1102:16 1103:3,23
1105:21 1106:4,7
1107:17 1108:20
1109:2 1116:16
1122:25 1124:19

1125:8 1129:3
1133:7 1138:18
1139:16 1140:16
1143:2 1145:22
1146:4,8 1151:17
1152:9,13 1160:23
1161:2 1173:19
1177:8 1190:15
1195:6,11,12
1199:13 1200:9,10
1203:3,8 1222:2
1231:13,25 1232:3,
5,6,7 1242:25
1246:11 1257:2
1272:5
exhibits 1048:11
1049:21 1108:23
1149:22,23 1203:16
existed 1206:18
1219:15 1264:5
exorbitant 1079:13
1080:2,9 1082:3,16,
23 1083:20,25
1084:3 1085:9
expectation
1101:25 1102:5
expense 1025:5
1069:13 1197:25
expenses 1024:14,
18,23,25 1025:3,15
1029:24 1030:12,
19,20,21 1056:11,
14
experience 1110:6,
8,9,13 1111:9
1112:3 1234:16
experienced
1092:17
experiencing
1030:13 1055:9
explain 1151:15
1186:25 1192:4
1267:2 1272:12
1281:24
explained 1020:9
1082:6
explains 1026:22
1123:5 1148:9
1149:4 1169:3,6
explanation
1192:22

exploitation
1121:16
export 1070:13
1161:21 1187:13,24
1213:24
exporting 1070:13
expression 1062:24
1193:7
extension 1275:12,
13
extent 1032:11
extra 1210:6

F

F-E 1182:10
fabricating 1110:17
facilitate 1127:7
facility 1114:9
1126:12
fact 1039:23 1112:7
1139:8,18 1153:11
failure 1043:3
fair 1041:16 1115:6
1171:16 1228:9
1232:22
FALCON 1101:13
1118:4 1147:25
1148:3,16 1279:10,
15
fall 1045:15
familiar 1053:16
favor 1143:24
1229:25
February 1191:24
1279:11
fee 1241:17,22
feel 1090:11
fell 1037:2 1055:2
female 1271:9
Ferrominera
1022:25 1025:9
1028:20 1030:5
1032:5,8 1034:5,7,9
1036:8,23 1052:11
1058:10,11,21,23
1059:13 1060:18
1065:4 1066:6
1067:7 1071:6
1072:23 1076:14,16
1081:20,24 1085:11

ARBETER

05/01/2017

12

1086:2,4 1087:3
1089:10,13,22
1095:13,15,20
1102:7 1112:17
1116:23 1140:6
1143:15,16 1163:19
1167:16 1169:22
1173:25 1174:13
1175:6 1176:7,16
1178:6 1179:22,23
1180:3,4,18 1182:5
1183:13,16 1184:7
1185:20 1186:4
1187:9,10,15,23
1188:2,3 1192:16,
19 1193:24
1194:12,20 1195:22
1196:7,9,14,22
1199:6,8,9 1201:8
1202:10,18 1204:15
1205:16 1208:6,8
1210:10 1216:20
1219:23 1221:23
1225:5,15,19,22
1226:12 1228:16
1229:8 1232:20
1234:25 1235:14,25
1236:6 1237:9
1240:16 1241:8
1246:2,4 1248:4
1255:16 1272:19
1277:8

**Ferrominera's**
1186:9 1188:7
1202:21 1236:6

**fewer** 1021:5

**field** 1115:8 1118:10

**figure** 1188:16

**figures** 1243:7

**file** 1277:15

**filed** 1079:4 1100:16
1137:17 1143:9
1144:2 1214:19
1276:8,14,17
1277:2,4,9 1278:5
1279:14,15

**filing** 1143:12

**fill** 1209:5

**final** 1072:8 1073:15
1168:6 1247:17
1272:25 1273:8
1280:23

**finalize** 1161:20

**finally** 1021:16

**finance** 1235:19

**financial** 1019:24
1027:14 1028:15,18
1029:9 1114:3
1143:22 1180:5
1201:4 1210:8
1212:19 1225:12,13
1235:21 1242:6

**financing** 1057:21
1063:11,21 1064:16
1065:4,21 1127:25
1199:10 1201:18
1202:22 1203:24
1204:4,14 1246:3
1253:11,13

**find** 1019:5 1050:21
1059:23 1072:2
1159:4 1223:16

**fine** 1050:22

**fines** 1173:8

**finish** 1041:15
1053:2,5,6 1272:21

**finished** 1272:17

**firm** 1242:18

**fiscal** 1169:19

**fit** 1042:14 1043:16,
22

**fixed** 1107:9,13
1184:3,11 1187:18

**float** 1178:19

**floated** 1178:20

**floating** 1183:3,6
1236:13

**flow** 1160:8,16
1266:25

**flows** 1257:22

**FMO** 1015:1 1016:1,
8,12,14,21 1017:1,6
1018:1,6,12,15
1019:1,8,12,18,22
1020:1,12,19
1021:1 1022:1,13
1023:1 1024:1,17
1025:1 1026:1
1027:1 1028:1
1029:1,18,19,24
1030:1,13,19
1031:1,7,8 1032:1,
16,19 1033:1
1034:1,12,19

1035:1,8,11,16,22
1036:1,6,17 1037:1
1038:1 1039:1
1040:1 1041:1
1042:1 1043:1
1044:1 1045:1
1046:1,15 1047:1
1048:1,3,13 1049:1
1050:1 1051:1,7,12
1052:1,3 1053:1
1054:1 1055:1,8,24
1056:1,14,18
1057:1,16 1058:1
1059:1,5,15 1060:1,
6 1061:1,18 1062:1,
3 1063:1,5 1064:1,
17 1065:1,14,15,16
1066:1,23 1067:1,
15 1068:1,7,16
1069:1 1070:1
1071:1 1072:1
1073:1 1074:1,16,
17 1075:1 1076:1
1077:1,21 1078:1,
18 1079:1 1080:1,3
1081:1 1082:1,15,
18 1083:1 1084:1
1085:1,2,8,19
1086:1,8,16 1087:1
1088:1 1089:1
1090:1 1091:1,2,10,
22 1092:1,3,17
1093:1,4,17,24
1094:1,5 1095:1,9
1096:1,4,16,19
1097:1 1098:1,19,
22 1099:1,9 1100:1
1101:1 1102:1,18
1103:1,11,14
1104:1 1105:1,23
1106:1,12,17
1107:1,10 1108:1
1109:1 1110:1,21,
25 1111:1 1112:1
1113:1 1114:1
1115:1 1116:1
1117:1,13 1118:1
1119:1,8 1120:1
1121:1 1122:1
1123:1 1124:1
1125:1 1126:1
1127:1 1128:1
1129:1 1130:1
1131:1 1132:1

1133:1 1134:1,7
1135:1,5,7,11
1136:1,7 1137:1
1138:1 1139:1
1140:1 1141:1
1142:1 1143:1
1144:1 1145:1
1146:1 1147:1
1148:1 1149:1,7
1150:1 1151:1
1152:1,18 1153:1
1154:1,15 1155:1
1156:1 1157:1
1158:1 1159:1
1160:1 1161:1
1162:1,11 1163:1
1164:1 1165:1
1166:1 1167:1
1168:1 1169:1
1170:1 1171:1
1172:1 1173:1
1174:1,18,19,23,24
1175:1 1176:1
1177:1 1178:1,14
1179:1 1180:1
1181:1 1182:1
1183:1 1184:1,25
1185:1,5 1186:1
1187:1 1188:1
1189:1 1190:1,20,
25 1191:1 1192:1
1193:1,6,12,20
1194:1,5,14,23,25
1195:1 1196:1,14,
25 1197:1,17,20,21,
24 1198:1,5,6,12,
13,14,16 1199:1,18
1200:1 1201:1
1202:1 1203:1
1204:1,9 1205:1,21,
22 1206:1,6,13,15,
24 1207:1,5 1208:1,
3,12 1209:1 1210:1,
2,4,11 1211:1,10,
15,22,23,25 1212:1,
5,16,17,18 1213:1,
13,16,22 1214:1,6,
17 1215:1 1216:1,7
1217:1 1218:1,9,11
1219:1 1220:1
1221:1 1222:1,2
1223:1 1224:1,12
1225:1 1226:1,4,17
1227:1,13 1228:1

1229:1,23 1230:1,6,
20 1231:1,14
1232:1,17 1233:1,4,
6 1234:1,9,14,21
1235:1,21 1236:1,
17 1237:1,20
1238:1 1239:1,15,
22 1240:1 1241:1,
22 1242:1,2 1243:1
1244:1 1245:1,17
1246:1,21 1247:1,
24 1248:1 1249:1,6
1250:1 1251:1,18,
22 1252:1 1253:1,7,
19,23 1254:1
1255:1 1256:1
1257:1 1258:1
1259:1 1260:1
1261:1 1262:1
1263:1 1264:1
1265:1,4,25 1266:1
1267:1 1268:1
1269:1 1270:1,13
1271:1,11 1272:1
1273:1,12,13
1274:1,6 1275:1
1276:1 1277:1
1278:1 1279:1
1280:1,5 1281:1
**FMO's** 1029:10
1034:3 1133:25
1136:4 1149:22
**FOB** 1070:24,25
1071:3,4,19
1072:23 1076:19
1161:4 1164:5
1165:2,17,19
1166:20,22 1188:4
**focused** 1123:23
**focusing** 1177:6
**folios** 1148:19
**follow** 1020:6
1076:2 1202:4
1243:10
**follow-up** 1281:5
**force** 1077:22
**forced** 1122:5
1218:14 1270:2
**foregoing** 1057:15
**foreign** 1201:4
1225:12
**forgiveness**

1171:23 1172:9,18,
19
**forgot** 1281:9
**formal** 1021:13
1271:14,19
**formation** 1254:14
**formula** 1175:19,20
1179:8 1182:8
**formulas** 1183:15
**forward** 1171:21
1249:25
**found** 1038:7
1039:2
**foundational** 1211:6
**frame** 1085:23
1115:4 1156:14
1210:17
**framework** 1060:9
1116:13 1117:8
1118:15 1120:22,
23,24 1195:24
1223:8 1232:18
1233:5 1281:10,14
**franchise** 1120:3
**fraud** 1079:9,24
1080:5 1084:7
1085:8 1104:21,24
1105:2
**fraudulent** 1140:19
**freight** 1048:16,18
1049:8,13 1051:7
1253:11,12
**Frevola** 1017:21,25
1018:9,24 1019:4
1021:4 1025:20,23
1026:9 1027:17,24
1029:14 1030:15
1031:22 1032:22
1034:22 1035:2,6
1038:14,22 1040:24
1041:4 1042:2,4
1045:5,21 1046:6
1047:21 1048:10
1049:3,12 1050:15,
17,23 1051:2,5
1053:25 1054:9,14
1055:12,17 1061:3,
9,12 1062:5,17
1063:16 1064:4
1068:11 1069:10,
16,20,23 1070:4,6
1072:15 1075:15

1078:4,9,13 1082:4,
8,10 1088:25
1099:19 1100:4
1101:10 1103:7,15,
19 1105:25 1106:5
1108:7,11,22
1109:5,22 1118:9,
13 1124:3,5,20
1125:12 1127:11
1136:2,25 1141:5,
14 1142:4 1144:21
1145:4,11,24
1146:18,21,24
1147:8,12,15
1149:11,18
1152:22,25 1153:19
1155:19,25 1156:6,
7,10 1160:7,14,22
1164:21,24 1169:11
1171:9 1173:20
1186:14,18,21
1190:11 1193:2
1195:12 1200:15
1203:4 1210:18,22
1211:5 1212:9,11
1213:8,17 1215:2,
23 1216:4,11
1220:2,7,12,24
1221:2,14 1222:25
1226:20 1228:4
1233:16,25 1274:22
1276:19,23 1278:4
1279:8,12 1281:17
**front** 1109:6,7
1151:9 1167:17
1191:21 1270:7
**FSF** 1173:6
**fulfilling** 1111:23
**full** 1017:22 1018:5,
8 1147:10 1242:16
1246:12
**fully** 1138:23
1227:21
**fund** 1042:22
1043:4,23 1044:8,
15,17 1045:11
1195:17,18 1227:23
**fundamental**
1234:20
**funded** 1239:13
**funding** 1023:8
1225:15

**G**

**gander** 1150:8
**Garcia** 1218:20
**gave** 1072:19
1174:13 1261:17,20
**general** 1046:23
1048:21 1051:15
1055:2 1067:19
1081:3 1086:11
1097:9 1108:5
1109:11,16 1196:23
1203:12 1212:25
1213:6,9 1215:13
1234:12 1244:16
1246:25 1248:14
1251:20 1271:25
1275:23 1280:25
**generally** 1091:13
**generators** 1127:9
**Geraldo** 1105:16
1129:4 1133:9
**giant** 1126:6
**gift** 1261:13
**give** 1015:7 1030:4
1052:18 1065:15
1090:9 1126:21
1133:23 1149:13
1159:4 1160:6,7
1183:22,24 1192:22
1196:20,22 1202:14
1204:14 1205:13
1207:22 1209:18
1212:5 1261:13
1262:18,23 1266:8
**giving** 1053:4
1264:17,24
**goal** 1036:12 1088:4
**goals** 1029:2
1227:24
**good** 1026:9 1051:5
1088:13 1150:7,8
1213:20 1246:17
1275:6
**goods** 1032:13,15,
19 1057:20 1058:3,
6 1060:18 1062:2
1063:3,11,20
1065:3,13 1090:25
1091:9,25 1093:3
1095:14 1096:15,18

1098:25 1099:9
1193:23,25 1201:20
1205:4,14,17
1231:22 1253:17
**goose** 1150:7
**governing** 1199:16
**government**
1119:14,16,20
1122:8 1124:16
1135:9,15 1137:11,
17 1142:24 1144:24
1152:16 1154:22
**grabbed** 1106:5,6
**Grande** 1054:24
1072:12 1161:11
1166:23 1168:22
**granted** 1134:7
**grasp** 1173:4
**great** 1139:11
**greatly** 1125:25
**Gretchen** 1079:6,7,
14 1080:25 1081:21
1083:19,24 1085:4,
22 1100:19 1101:22
1102:10,12 1103:5
1104:11,22 1105:4
1106:20 1107:13
1109:18,19 1129:5
1214:19,22 1215:4,
11,24 1216:15
1217:8,13,23
**Gretchen's** 1081:5,
8,13 1216:25
**gross** 1216:25
1217:2
**group** 1115:3
1129:22 1132:14
1225:19 1260:20
1267:7
**groupings** 1226:7
**guaranteeing**
1028:23
**guidance** 1094:9
**guidelines** 1029:2,
11
**guiding** 1092:22
1093:22 1094:3
**guilty** 1138:2
**Gustavo** 1270:25
**guys** 1250:23

**Gypsum** 1244:22

**H**

**half** 1111:14
1223:14 1238:5
1265:20 1266:8
**handle** 1023:9
**handled** 1247:3
**handling** 1073:20
**Handymax** 1170:14
1171:7
**happen** 1136:21
1190:25 1196:6
1251:21
**happened** 1096:8
1216:14 1263:3
**happy** 1017:2
1279:3
**hard** 1114:13 1115:8
**harmonized** 1226:9
**hat** 1115:8
**head** 1047:18
1051:9 1077:22
1081:3 1085:13
1100:5 1105:4
1109:20,22,23
1207:11 1215:2,3,
12 1234:23 1235:23
1252:2 1272:18
**heading** 1273:4
**heard** 1114:7
1144:4,8,15
**hearing** 1015:5
**hearings** 1154:16
**hearsay** 1210:20
**helpful** 1246:14
**hereunder** 1163:22,
23
**Hernandez** 1219:12
**higher** 1020:21
1021:7 1165:20
**hire** 1049:15 1050:3,
4 1059:11,21
1067:7 1068:8,10
1075:6 1078:22
1079:13 1080:2,8
1081:6,13 1082:2,
14,17 1083:18,25
1085:9 1086:7
1097:23,25 1099:23

1100:2,3,4 1107:3
1207:3 1213:12,16,
25 1214:2,6,21
1215:15,21,24
**hired** 1076:13,14
1185:24 1216:20
1235:3
**hold** 1055:17
1142:21 1163:10
1164:6
**holds** 1022:18
**Holland** 1111:25
1242:19
**homogenization**
1022:16
**honestly** 1158:10
1228:23 1267:15
**hour** 1102:9,21
1104:4,17,18
1107:11 1126:9
1131:16
**house** 1250:9
**huge** 1110:8
**humidity** 1182:10
**hundred** 1274:24

**I**

**idea** 1125:22 1265:2
1277:20
**Identification**
1158:19
**identified** 1075:22
1142:10 1152:12
1173:22
**identify** 1158:9
**illegal** 1137:14
**illicit** 1138:4
**impact** 1026:22
**implemented**
1028:18 1195:19,20
**implicates** 1138:3
**important** 1027:20
1184:21
**impose** 1085:6
**imposes** 1085:18
**impression**
1238:19,20
**improvements**
1114:8 1127:20

**inactive** 1122:22
1123:4,8
**inadmissible**
1210:21
**includes** 1054:18
**including** 1023:20,
22 1049:21 1064:16
1073:19 1074:8
**income** 1186:12
**incorporated**
1128:10
**incorrect** 1057:8
1238:19
**increase** 1078:21
1088:5 1091:22
**increasing** 1020:25
1029:11
**incur** 1024:14
1025:15 1056:11
**incurred** 1029:25
1093:23
**independent**
1172:23
**index** 1176:4
1180:11 1182:19
**indexes** 1181:23
**indications** 1093:2
**individual** 1158:16,
23
**individuals** 1158:24
1160:11
**induced** 1084:7
**inducement**
1079:10,25 1080:5
1085:9 1104:21
**information** 1134:14
1135:11,13
**informed** 1143:15
**informing** 1275:15
**infrastructure**
1027:21
**initial** 1163:23
1165:21
**initiated** 1135:6
**initiating** 1128:13
**injunction** 1143:10,
14,17
**inside** 1023:6
1064:4 1205:16
**installation** 1207:19

**instance** 1034:11
1072:16 1248:13
1252:23
**instances** 1051:6
1072:13,18 1076:17
1092:13,15 1093:13
1198:19 1245:15
**instigate** 1135:7
**instigated** 1135:9
**instituted** 1137:11
**instructed** 1120:13
1277:6
**instruction** 1143:22
**instructions**
1074:15
**insurance** 1253:13
**Integrity** 1244:23
**intend** 1053:2
1154:15
**intended** 1044:9
**intends** 1145:9
**intent** 1046:13
1063:19 1106:16
1232:14
**intention** 1144:23
**interest** 1029:10
1067:21 1114:4
1136:20 1204:10
1205:2
**interested** 1020:24
1246:18
**interests** 1063:4
**interfaced** 1109:18
**interim** 1217:22
**intermediary** 1227:7
1234:22 1235:24
**interpret** 1043:25
**interpretation**
1057:4,7,9
**interpreting**
1224:24
**interrupt** 1136:3
1140:14 1191:13
1278:10
**intervening** 1027:15
1028:16
**introduce** 1027:11
1148:7
**introduced** 1101:23
1133:10 1139:18
1151:18 1242:24

**introducing** 1150:15
**investigated** 1137:9
**investigation**
1148:5
**investment** 1027:21
**invited** 1020:10
1034:6 1235:8
**invoice** 1024:17,23
1029:24 1030:11,19
1031:6,18,20
1032:14,19
1033:21,22
1034:12,18,19
1035:10 1056:14
1059:6 1092:8,14
1093:8,23 1094:4,6,
15 1165:8 1167:22
1174:18,20 1179:21
1180:18 1182:5
1234:10,13
**invoiced** 1020:19
1024:24 1030:22
1033:18 1036:15,18
1046:16 1091:22
1165:6 1182:25
1185:6
**invoices** 1019:23
1098:2 1174:23
1239:22
**invoicing** 1031:15
1052:3 1055:8,25
1058:24 1197:23
**involved** 1029:9
1050:8 1065:20,21,
22,23 1109:9
1126:13,14 1127:24
1138:3 1154:22
1219:19 1249:21
**involvement** 1076:6
1125:2,7,10
1140:19
**iron** 1016:15
1022:17 1023:2,5
1028:23 1031:13,17
1052:13 1053:13
1057:18 1065:5
1068:23 1069:14
1070:9,13,25
1077:4,11 1089:10,
12,13 1095:8,24
1096:19,21 1097:11
1137:15 1152:18
1161:4,6 1162:10,

11,16,20 1163:5,9,
16 1164:17 1165:3
1167:25 1169:17
1173:6,7,14,15,17
1174:5,6 1175:4,9,
12 1177:7 1179:18,
24,25 1180:7,10,15,
17,20 1189:5,14
1190:21 1194:19,22
1196:2,15 1204:5,
24 1205:17
1206:15,16 1210:12
1211:11,12 1214:16
1219:14 1225:22
1226:3 1231:21
1249:15 1253:14
1254:23
**issue** 1032:25
1041:4 1135:16
1136:4 1184:21
1194:2 1236:16
**issued** 1135:18
1138:13 1141:2
1142:9 1180:19
**issues** 1134:17
1167:24
**italicized** 1037:25
**item** 1066:10
**items** 1127:5,8
1211:19
**Ivan** 1219:11

**J**

**January** 1117:10,11
1191:23 1215:6
**Japan** 1176:13
**Jerry** 1243:6
1257:23 1264:16,18
**job** 1187:8 1213:20
**joint** 1037:9,24
1038:7 1039:2,21
1045:18,23 1046:7,
20 1066:18,22
**Juan** 1274:10
**judgment** 1150:3
1276:20,22,25
**judicial** 1275:12
**jump** 1179:10
**jumping** 1191:16
**jurisdiction** 1141:9

**jurisdictional**
1275:13
**Justice** 1274:18
**justify** 1077:19
1078:21

**K**

**Keane** 1015:10,18
1020:4 1022:4,6,8
1025:22 1026:4,20,
21 1027:7,22
1028:6 1032:2
1033:13,16 1035:4
1038:21 1041:3,8,
15 1042:3 1046:3
1047:23 1049:4
1050:16,22,24
1051:4 1052:18,20
1053:8,11 1055:21
1061:7,10 1064:7
1069:5,8,18,22
1074:7 1075:20
1078:3,7 1099:11
1100:9,13 1101:4,
16 1103:9,24
1106:3 1107:17,20
1108:15 1111:16
1114:12 1117:24
1120:25 1121:3
1124:22 1126:23
1127:15 1133:4,11,
14 1134:19,20,22
1137:7 1138:6,10,
19 1139:6 1140:13
1141:19,20,25
1142:16 1146:20,
23,24 1147:14,22,
23 1148:15,21
1149:13 1151:15,
20,25 1152:3,24
1153:17 1154:2,14,
18,21 1155:3,5,14
1156:12 1161:3
1166:15,25 1193:4,
13,17 1194:3,9,21
1197:3 1210:19
1211:19 1212:15
1220:10 1221:4
1222:12,13,15
1223:2 1226:22
1228:18 1231:4
1233:12 1234:7

1278:10,19,23
1279:17 1281:4,6
**keeping** 1144:10
1180:22 1181:19
**Kimball** 1015:3,16,
20 1016:7,11,14,18,
25 1017:10,14,18,
23,24 1018:10,17,
21 1019:2,6,11,17,
21 1020:2 1022:4
1026:18 1027:5
1033:5,13 1038:19
1041:6,14,22
1044:20 1046:9
1048:8 1049:22
1052:17,22 1053:18
1054:11 1055:14,20
1058:7 1059:4,14
1062:14,19 1063:24
1067:14,18
1068:13,25 1070:18
1077:25 1082:8,11
1099:13,17,20,25
1100:7 1101:8,18
1103:12,22
1105:10,13,17
1107:16 1108:2,15
1117:22 1118:2
1120:25 1121:4,12,
17 1124:6 1126:17,
20,24 1133:2,6,11,
16,19 1137:4
1138:6,17 1139:3,
12,20 1140:2,9,12
1141:17 1142:11
1145:13 1147:21
1148:2,17,24
1149:18 1150:24
1151:3,12,22
1153:20 1154:14,
19,25 1155:4,7,12,
22 1156:4,8
1157:10,15,18,21
1158:4,8,14 1159:6,
11,16,22 1160:15
1164:21,25 1167:10
1171:3,10,11
1173:18 1175:16
1177:5,21 1179:10,
17 1180:21 1181:3,
9,20,22 1183:8
1191:12 1192:9,24
1193:14 1195:10
1197:6 1198:17

1200:14 1202:3,13
1203:2,18 1207:8
1208:10,21,25
1209:3 1210:16,25
1212:9,12 1213:5,
15 1214:8,11,24
1216:2 1220:9,16,
21 1221:16,24
1222:7,10 1223:25
1228:8,18 1230:23
1231:4,11 1233:14,
18,23 1234:2
1265:7,17,22
1266:10,17,20,23
1267:8,12,16,22
1268:3,7,17,24
1269:7,13,19,23
1270:3,10,16,19,22
1271:2,6,10,13,18,
23 1272:3,11
1273:10,15 1274:4,
11 1275:7 1276:6
1277:12,14,19
1278:11,15,21
1279:4,20 1280:7,
10,13,17,23 1281:4
**kind** 1162:5 1267:12
**knew** 1019:15
1111:24
**knowledge** 1141:2,
6,7 1144:17
1235:21

___

## L

**language** 1025:11,
25 1026:24 1027:3
1037:24 1038:7
1039:2 1043:5
1056:8 1193:18
1201:13 1223:9,21
1224:6,17 1226:5
1227:21 1228:2
1232:7
**late** 1122:23
**law** 1239:5,7,13
1270:14 1271:15,21
**lawful** 1143:25
1276:3
**laws** 1254:5
**lawsuit** 1049:10
1079:4 1081:20,22

1084:4 1085:3
1100:18 1104:10
1129:5 1214:18,23
1215:25 1216:3,4
**lawyer** 1038:15,16
1043:8 1105:2,11,
14,15 1257:23
1264:24 1270:24
1271:9,11,15,20
1278:13,16
**lawyers** 1275:14
**lead** 1213:18
**leading** 1212:13
**learned** 1085:21
**leave** 1216:9
1236:14
**leeway** 1053:5
**left** 1170:5 1192:17
1197:4
**leg** 1073:2
**legal** 1038:17
1089:2 1131:12
1135:2,16,18,22
1136:5,6 1143:4,25
1163:16 1271:14,19
**legally** 1136:12
**length** 1147:18
**letter** 1018:13,18,22
1019:8 1020:23
1021:14,19,21,23
1237:20,25 1238:4
1251:25 1255:20
1256:21
**leveraging** 1028:19
1029:9 1201:4
**levering** 1225:12
**light** 1094:4
**limit** 1161:25
**Limited** 1157:14
1158:20
**lines** 1061:4
1200:17,18,20
1224:23,25
**link** 1231:20
**linked** 1046:12
1057:19 1223:7
1226:2
**linking** 1210:4
**Lisandro** 1218:20
**list** 1152:5 1244:5

**listed** 1264:3
**Listen** 1125:16
**listening** 1125:12
1217:17 1234:17
**lists** 1191:22
**live** 1249:22 1250:8
**load** 1071:10,13
1072:4,11 1073:6
1074:20 1075:2
1161:25 1171:7
1250:16
**loaded** 1022:18
1071:16,23
1072:19,21
1074:12,16 1161:10
1162:3 1163:9
1165:9,16,18
1170:22,23 1213:24
**loading** 1071:5
1072:9 1073:21
1110:17 1161:20
1165:24 1166:2,3
1167:15 1170:24
1171:5
**loads** 1072:6
**local** 1091:19,21
**locate** 1240:14
**logistics** 1027:15
1028:15
**London** 1136:7,20
**long** 1123:7 1145:18
1149:10 1227:3
1248:17 1269:23
1274:24
**long-term** 1183:14
**longer** 1064:13
1090:4 1153:13
**looked** 1037:23
1038:6
**Lopez** 1101:13
1118:4 1147:25
1148:3,16 1151:15
1279:10,15
**Lopez's** 1139:8,17
**lose** 1097:4
**lot** 1127:16
**loud** 1223:12
**lower** 1277:7
**lump** 1177:17
**lunch** 1133:13,17,18

**Lydia** 1271:5,8

**M**

**machineries** 1128:4
**machinery** 1126:16
**machines** 1127:8
**made** 1023:4
  1027:21 1079:16
  1097:8 1104:20
  1112:13 1114:8
  1127:20 1143:13,
  15,19,23 1153:10
  1173:8 1177:25
  1217:8 1229:17
  1239:2,4 1247:16
  1252:6 1275:24
**main** 1069:8 1177:7
  1181:7
**maintain** 1054:5
  1112:8 1206:11
  1226:14
**maintaining**
  1110:13 1112:5
**maintenance**
  1111:22 1113:2
  1132:16 1258:16,18
**majeure** 1077:22
**major** 1127:20
**make** 1036:22
  1063:24,25 1066:17
  1090:24 1094:23,25
  1096:23 1135:14
  1147:16 1153:21
  1170:7 1183:25
  1191:14 1196:6
  1224:4 1233:19
  1235:25 1274:16
  1279:20
**making** 1023:3
  1066:14 1098:14,
  17,24 1136:14
  1246:3
**man** 1262:10
**manage** 1054:5
**management**
  1053:15 1055:3
  1076:10 1077:6
  1179:16 1180:25
  1184:22 1185:14
  1189:12 1190:16,18
  1200:5 1203:13

  1257:11,16
**manager** 1074:3
  1075:13 1274:9
**managing** 1073:18
**manly** 1238:24
**manner** 1044:16
**manufacturing**
  1207:16
**March** 1191:24
  1277:11
**margin** 1024:25
  1033:23
**Maria** 1139:7,17
  1155:2
**mark** 1066:24
  1091:25 1092:8,14
  1093:22 1094:4
  1099:8 1101:6,9,14,
  17,18 1133:3,5
  1139:14 1245:15
**marked** 1105:20
  1140:16 1151:12
  1154:6 1222:2
  1272:4
**market** 1034:7
  1059:11 1175:13
  1183:23
**marketed** 1194:10
**marketing** 1088:12
**marketplace**
  1029:16 1030:2
  1031:5 1032:12,18
  1056:21 1061:25
  1063:3
**markup** 1059:7,20
  1066:3,10 1093:4,9
  1094:16 1098:25
  1224:13 1239:21
  1245:16
**Marlo** 1181:7
**material** 1057:22
  1063:21 1074:16,18
  1120:15 1128:12
  1165:15 1169:4,5,
  22,24 1170:4,5,8
  1172:13,14 1173:9
  1175:22 1183:17,20
  1185:18,21,23
  1186:9,11,25
  1188:6 1190:6
  1213:24 1237:4

**materials** 1118:25
**mathematical**
  1132:10
**matter** 1134:12
  1193:17
**MAZUR** 1210:14
**means** 1031:8
  1065:11 1090:10
  1106:24 1161:19
**meant** 1053:14
  1126:25 1224:11
**mechanism** 1060:23
  1175:3 1181:21
  1182:19 1183:3
  1189:5,18,20
**mediating** 1028:18
**meet** 1184:25
  1280:25
**meeting** 1104:12
**meetings** 1109:25
  1122:12,13,14
  1240:16
**memory** 1274:23
**mention** 1044:6
  1166:15
**mentioned** 1031:23
  1033:17 1039:18,
  24,25 1040:5
  1053:12 1062:11
  1083:2 1084:9
  1121:14 1157:2
  1184:7 1188:12
  1193:18 1201:25
  1202:2 1212:15
  1219:5 1242:18
  1254:10,15
**mentions** 1172:21
**met** 1138:23
  1231:18 1248:21
**Metal** 1178:9
**method** 1179:12
**methodology**
  1246:20
**metric** 1102:21
  1104:17,18 1166:21
  1169:17 1170:15
  1190:21 1191:2
**Miami** 1250:2
**Michael** 1221:19
**middle** 1098:23
  1115:8

**million** 1080:17
  1131:11 1132:8
  1169:13,17 1172:25
  1186:8 1187:21
  1188:12,13,16,25
  1196:2 1217:19
**Milvira** 1138:14
**mind** 1078:21
  1092:23 1103:15
  1119:23 1220:2
**mine** 1116:3,10,16,
  21 1117:3 1118:23
  1119:5,12,20
  1120:4,12 1121:8,
  19,24 1122:9,18,22
  1123:3,7 1124:9
  1125:3,10 1126:8,
  15 1127:14,17,21,
  24 1159:19 1183:18
**mine's** 1124:14
**Minerals** 1100:18
  1149:8 1152:19
**mines** 1115:19
**minimum** 1182:13,
  14 1187:16 1190:23
**mining** 1114:9
  1126:7,12 1135:12
**minister's** 1152:5
**ministry** 1135:11
  1277:9
**minus** 1170:15
**minute** 1052:19
  1202:4 1241:15
  1270:11
**minutes** 1133:17
  1155:8 1156:2
  1233:17,20 1240:15
**mirror** 1106:18
**miscounted** 1028:6
**misrecollecting**
  1107:24
**missing** 1066:2
  1126:5
**misspoke** 1103:10
**misstating** 1226:21
**mistake** 1123:20
  1124:2,3
**mistaken** 1178:23
**misunderstanding**
  1229:11

**misunderstood** 1126:2

**mixing** 1073:23 1185:11

**modified** 1273:6

**moment** 1149:19 1218:13

**money** 1031:10 1094:23,25 1180:3, 4 1257:22 1259:10, 12,16 1261:10,17, 19,20,25 1262:24 1264:11,13,18 1265:20,23 1266:2, 6,15,25 1267:6 1268:8,10,15 1269:2

**moneys** 1217:22 1268:19,21

**month** 1184:16,23 1187:11 1190:21 1191:2

**monthly** 1176:4 1182:15 1191:22

**months** 1263:3 1269:5,11 1272:23

**motion** 1144:11 1278:9

**mouth** 1045:25 1046:5 1062:6 1161:15 1163:12 1164:8 1165:11

**move** 1040:25 1076:25 1103:16 1153:15 1164:2,12

**Moving** 1062:25 1166:14,24

**multiple** 1032:24 1041:8 1224:7 1252:23

**mutual** 1066:9 1068:5

### N

**names** 1181:4 1209:6 1218:17 1274:5

**nature** 1061:24 1138:7 1250:24

**nauseam** 1063:18

**navigate** 1162:8

**necessarily** 1060:19 1099:3 1107:8

**necessity** 1058:14

**needed** 1023:3 1201:3 1225:12

**negotiate** 1227:2 1248:4

**negotiated** 1018:11 1061:2 1108:4 1122:7

**negotiating** 1109:10 1110:7,10

**negotiation** 1176:11 1178:11 1252:13

**negotiations** 1109:15 1273:22,25

**negotiator** 1122:10

**Nippon** 1176:13

**NKK** 1176:14

**nominated** 1071:5

**notary** 1016:4

**note** 1052:23 1140:15 1149:20

**number** 1020:25 1022:12 1027:10 1030:11,12 1044:25 1047:2 1048:9 1049:21 1069:17 1114:6 1117:23,25 1118:3 1122:12 1138:18 1145:20 1149:5 1152:14 1162:22,23 1179:2 1187:14 1207:2 1218:25 1219:3 1281:18

**numbered** 1170:18

**numbers** 1118:5

**numerically** 1101:6

### O

**oath** 1015:25

**object** 1032:23 1038:15 1040:25 1045:22 1082:9,10 1089:2 1145:5 1197:3 1225:6 1228:5 1236:17

**objected** 1242:2

**objecting** 1062:5

**objection** 1055:18 1063:22,25 1068:11,14 1145:14,15 1149:20 1210:14

**objections** 1242:12

**objective** 1195:24

**obligation** 1087:8 1111:23 1202:11,21

**obligations** 1136:12 1201:9

**obliged** 1087:22

**obtain** 1026:15 1031:5 1036:7 1051:8 1063:3 1154:12

**obtained** 1029:17 1032:12 1046:15,17 1047:2 1058:3,5 1086:16 1092:2

**obtaining** 1030:2 1034:2 1093:4

**occasions** 1093:13

**ocean** 1073:3

**October** 1138:16 1215:7 1218:9

**off-hire** 1215:7

**offense** 1140:18

**offer** 1015:14 1034:10 1059:10 1081:25 1082:13 1101:4 1183:24 1235:9 1255:23,24 1262:22

**offered** 1034:8 1259:9,16 1261:10, 12 1264:9,11 1265:16,19 1268:14,16

**offering** 1169:25 1172:13

**offers** 1255:18

**office** 1180:22

**official** 1024:18 1056:15 1140:21

**offset** 1180:7,17

**offsetting** 1152:17 1231:22

**onboard** 1071:19

**one-page** 1152:6

**one-sided** 1082:5

**open** 1122:15 1143:21,22 1251:25

**operate** 1054:5 1074:14,25

**operated** 1076:8

**operating** 1074:23

**operation** 1054:23 1075:7,14 1076:21 1124:9 1128:14,15 1180:25 1216:21 1235:19 1258:4,5,6

**operations** 1023:7,9 1104:16 1128:2

**operative** 1022:14

**operator** 1192:17

**opinion** 1067:2,3,5 1281:13

**opportunity** 1214:15

**opposed** 1035:19 1050:21 1052:3 1055:8,25 1058:24 1059:6 1191:25 1210:3 1236:7

**opposition** 1276:7 1277:16

**option** 1042:16 1043:19 1195:17,19 1205:12 1226:13 1229:8

**options** 1037:20 1086:4 1226:12

**Ordaz** 1071:11 1072:7,9,11 1073:7 1113:24 1161:10 1162:2 1163:10 1164:6 1165:9,13, 17 1166:3,22 1170:24 1171:5,8 1250:12,13

**order** 1025:6 1029:15 1047:14 1060:17 1065:13 1134:2,10 1138:23 1227:23 1239:12 1240:2

**ore** 1016:15 1022:17 1023:2,6 1028:24 1031:13,17,21

1032:17 1052:13,15
1053:13 1057:18
1058:4 1060:21,24
1061:14,16 1062:4
1065:5,15,16,25
1068:23 1069:14
1070:10,11,13,21,
25 1075:11 1076:18
1077:4 1088:22
1089:10,12,13
1094:24 1095:5,8,
11,16,24 1096:6,16,
20,21,23 1097:12,
21 1098:3,6,9
1120:3,11 1121:7,
24 1122:17 1127:7
1137:15 1152:18
1161:4,7 1162:10,
11,16,20 1163:5,9,
16 1164:17 1165:3
1167:25 1169:18
1173:6,7,14,15,17
1174:5,7 1175:4,9,
12 1176:19 1177:3,
7,18 1179:18,24,25
1180:7,8,10,15,17,
20 1182:18,21,22,
23,24 1189:4,5,9,14
1190:21 1194:10,
11,13,16,18,19,22
1196:2,15 1204:5,
24 1205:17
1206:15,16 1210:12
1211:11,12 1214:16
1219:14 1225:22
1226:3 1231:21
1235:18 1249:15
1253:15 1254:23

**organic-code-of-
criminal-procedure**
1138:22
**organization**
1158:7,9 1159:7
1242:20
**orientation** 1126:22
**origin** 1268:19
**original** 1057:18
1164:17 1273:18
**Orinoco** 1028:20
1054:19 1058:13
1113:6 1162:9
**Ortiz** 1250:11

**outcome** 1081:22
**outfit** 1132:15
**overarching** 1065:2
**overhead** 1241:13
**owed** 1179:25
1180:2
**owes** 1180:4
**owned** 1132:13
**owner** 1049:9,18
1051:9 1067:16
1073:4 1100:5
1129:21 1158:20
1247:11 1259:17,20
1260:4 1272:23
**owners** 1034:8
1035:24 1036:2
1052:10 1079:5,6
1085:13 1105:5
1215:4 1216:19
1234:23 1235:23
1252:3 1272:18
**ownership** 1156:13,
15,17,20,23,25
1157:4
**owns** 1157:11
1158:4

### P

**p.m.** 1118:13
**package** 1124:19
**pages** 1145:18
1146:15,17 1147:2
1148:6 1149:10
1151:23 1152:20
1153:6 1274:24
**paid** 1016:20 1017:5
1032:4,7 1033:11,
19,22,23 1036:18
1058:4 1059:7
1073:3,10 1087:3,7,
11,14,16,18
1089:15,22 1094:24
1095:16,20 1096:5,
19 1097:20,22
1098:2,6,8 1130:4
1137:15 1167:20
1168:10 1174:23
1175:6,8,9 1198:20,
21 1204:8 1217:9
1226:3 1232:17,23
1233:7,9 1236:17

1237:3 1239:14
1245:16 1261:19
1266:16 1268:10,21
1269:3,4
**Palini** 1076:4
1099:22 1244:16
**Panamax** 1162:8,13
**panel** 1015:15,21
1125:20 1133:22,25
1134:6 1149:25
1150:6 1155:19
1203:16 1272:8
**paragraph** 1022:10
1023:16 1024:13
1025:22 1026:25
1029:22 1030:17
1031:2,23 1053:21,
22,23 1054:2,10
1056:6,9 1057:7,14
1063:9,12 1064:2,
10 1069:17,19,21
1078:2,7,10,23
1080:23 1105:19
1106:4,8 1122:24
1124:6 1132:4
1134:5 1142:6
1145:17 1146:10
1152:4 1161:6
1165:21 1166:18
1170:19 1171:14
1173:12 1190:17,18
1191:9 1200:19
1222:23 1227:5
1228:25 1229:13
1231:6 1270:6
1274:12,15
1281:11,20
**paragraphs** 1044:5
**paraphrasing**
1064:13
**Pardon** 1089:18
1105:12 1186:22
**part** 1018:22
1022:11,13 1023:5
1024:13 1026:19
1028:13 1063:6
1065:24 1072:11
1075:23 1076:8
1077:21 1078:15
1087:23 1088:14
1093:11 1111:14
1125:23 1129:21,23
1135:21 1138:20

1148:19 1153:18
1165:19 1191:18
1196:9 1202:5
1203:7 1208:16
1209:19 1246:10
**part-time** 1249:23,
24
**partial** 1172:18
**partially** 1072:21
**participation**
1129:16 1243:9
1259:3,7 1265:11,
14 1268:9,13,15
1275:22
**parties** 1029:17
1030:3,14 1032:13
1036:2 1037:14
1040:10 1065:12
1077:8 1089:8
1090:25 1110:7,10
1111:18 1134:6
1143:16 1193:6,10,
11 1201:7 1225:18
1228:7 1232:18
**parties'** 1196:25
**partner** 1066:18,23
1085:19 1127:21
1258:3,9,23
1259:23 1260:8,14,
20 1261:7 1267:18
**partnership** 1037:9
1040:3 1045:19
**parts** 1222:19
**party** 1034:18,19,20
1035:17 1056:19,24
1079:10 1180:2
1271:25 1272:4,9,
13,15
**pass** 1021:16
1024:3 1056:19
1092:3,16 1093:8
1124:20 1253:23
**passages** 1150:11,
12
**passed** 1093:2
1094:6,15 1224:12
**passing** 1035:20
1094:5
**passport** 1142:22
**past** 1087:12
**patrimony** 1137:23

**Paula** 1139:7,17
1148:8,13 1155:2
**pay** 1016:22 1017:7
1031:9,12 1065:16
1070:10,20,24,25
1072:23 1073:11
1087:5 1095:13
1097:11,24
1129:14,15 1150:16
1166:8 1167:17
1168:16 1174:25
1175:7 1180:3
1199:5,8,19
1202:21 1204:15,
17,20,21 1213:13,
16 1219:23 1233:6
1237:9,11,12
1240:18,24 1241:5,
6,7 1253:11,12
1264:25 1266:6
1268:20
**payable** 1165:7
**paying** 1049:9,17
1051:8 1065:22
1067:16 1072:14
1080:9 1082:17,22
1098:11 1167:14
1168:6 1198:13
1202:24 1237:12,
19,24 1238:6
1269:6
**payment** 1016:15
1023:2,4 1061:15
1087:9 1092:19
1105:3 1129:13
1130:5,7 1133:9
1163:20,23 1164:14
1165:21 1166:7
1167:7 1168:10
1182:13 1199:10
1212:2 1216:6
1235:15 1242:3
1256:7
**payments** 1090:24
1164:16 1210:8,9
1231:22 1236:21
1238:25
**pecuniary** 1152:15
**pellet** 1169:23
**pellets** 1169:25
**pending** 1042:5
1121:2,5 1125:17

**people** 1111:24
1136:5 1181:4
1208:14 1209:6,8
1218:10 1235:4
1248:5 1267:19
1274:2,6
**per-ton** 1191:8
**perceived** 1079:24
1080:2
**percent** 1066:10
1081:8,13 1093:15
1131:4,5,18,23,24,
25 1132:6,7,18,19,
20 1156:21 1157:6,
11,20 1158:5,20
1159:13 1162:14
1167:8,9,13,14,20
1168:6,7,8,10,14
1170:16 1175:2
1216:24 1240:2
1241:17 1243:9,13,
14,15,17,18,19,20
1262:4,17,19
1263:6 1265:10
**percentage** 1129:16
1130:4,22 1162:12
1263:15
**percentages**
1086:20
**perfectly** 1229:3
**perform** 1029:18
1111:5 1197:8
1258:15,17
**performance** 1102:2
1196:25 1197:12
**performing** 1065:24
**period** 1096:9
1114:24 1127:24
1214:22,25
1217:11,22 1218:12
1219:16 1248:23
1249:3,7,20
**periods** 1215:8
**permission** 1240:25
1241:3
**person** 1122:9
1247:2 1249:11
1259:15 1260:22,24
**personal** 1264:12
**personally** 1156:23
1219:19 1252:9
1261:11 1264:14

**persons** 1136:13
**pertain** 1150:12
**phonetic** 1218:23
1277:3 1278:18
**photograph** 1115:7
1117:20 1118:12
1123:16 1126:10
**photographs**
1114:7,13,16,20,25
1117:19 1124:13,18
1125:4 1127:16
**phrase** 1043:8
**Piar** 1048:21 1049:9
1050:5 1051:15
1052:3 1055:2,10
1061:10,12 1067:19
1075:24 1077:20
1078:17 1079:6
1081:3 1082:15
1085:4 1086:8,11
1097:9 1101:25
1104:7 1107:10
1108:5 1109:11,16
1203:12 1212:25
1213:6,9 1215:13
1216:9,14 1234:12
1244:16 1246:25
1248:14 1251:20
1271:25
**Piar's** 1049:18
1052:5
**picture** 1125:24
1128:8
**pictures** 1125:21
1126:6,21 1127:19
1128:16 1249:14,
16,17
**piece** 1126:7
1128:18 1207:16
**pieces** 1021:3
**pilot** 1127:12
**place** 1042:16
1043:20 1054:15
1115:18 1143:20
1157:22 1172:15
1179:6 1249:15
1256:12 1273:23
1275:17
**plain** 1229:3
**plant** 1169:23
**Platts** 1176:5
1177:23 1178:7,11,

19 1183:3,15
1189:22 1190:7
1191:4 1236:13
**played** 1074:19
**plea** 1138:2
**PMH** 1209:14
**point** 1022:17,21
1024:7 1029:6
1036:5 1041:9
1054:13,21,22
1058:19 1061:4
1071:4,5,18 1078:2
1086:23 1087:9,20
1090:2,8 1096:14
1106:17 1107:18
1115:17 1119:3,15
1125:23 1131:10
1149:4 1150:25
1153:9 1155:15
1167:15 1172:17
1177:6,22 1193:4
1199:15 1201:18
1223:20 1232:13,16
1234:8 1248:16
**pointing** 1054:15
**points** 1224:7
**policy** 1253:24
**pooled** 1194:23
**port** 1071:13,16,23
1072:4 1073:7
1074:21 1075:3
1170:24 1219:25
1249:17 1250:11
**portion** 1065:24
1149:8 1163:21
**ports** 1071:10
1074:20
**pose** 1038:22
**position** 1153:2
1180:5 1224:18
1271:7
**possibility** 1111:25
1119:11
**pound** 1186:11
**Powerpoint** 1115:4
1118:7
**practice** 1087:13
1219:15 1263:19
**preceded** 1254:13
1257:17
**Precisely** 1198:23

prefer 1192:21
1235:16

prepared 1133:23

present 1032:16
1035:10 1059:10
1109:24 1144:24
1241:19 1255:22

presentation 1118:8
1165:8 1167:21

presented 1031:20
1035:12 1066:14
1067:6 1144:13

presenting 1030:10

president 1016:12
1051:18 1218:11
1248:7,21 1249:3,9

presidents 1218:10

preventive 1138:23

previous 1027:16
1028:16

previously 1016:4
1142:10

price 1020:24
1021:3,6 1023:5
1050:8 1060:25
1066:5 1078:17,18
1094:23 1163:21
1170:19 1175:11,13
1176:20,25
1177:14,17 1178:25
1179:9,18 1181:19,
23 1182:3 1184:3,
11 1185:4 1191:25
1253:6 1256:3

priced 1185:9

prices 1164:5
1177:16,20 1246:21
1251:17

pricing 1164:9
1166:20 1167:24
1170:17 1175:10
1179:12 1184:20
1189:5,18,20,25
1236:12 1252:15

primary 1195:24
1217:6 1247:2

principle 1092:22
1093:22

prior 1149:2
1254:19 1255:7

pro 1065:14

problem 1032:25
1192:16

procedure 1206:7
1275:14,16

proceed 1015:4
1022:22 1041:17
1055:21 1062:15
1100:8 1108:3,17
1134:19 1140:13
1153:24 1155:13
1233:24

proceeding 1143:18
1278:12

proceedings
1101:23 1133:10
1135:16,19,22
1136:7,9,14
1139:19 1151:19
1203:11 1275:20,22

process 1170:6
1253:6,20 1255:8

processes 1122:16

produce 1134:3
1154:15 1196:2

produced 1018:22
1047:18 1120:5,11
1122:17 1139:4,23
1152:21 1188:3
1191:18 1222:2
1246:6,7,9 1249:15

producing 1109:17

product 1030:5
1080:5 1088:6,24

production 1028:25
1134:10 1196:6,12
1197:15 1209:15
1210:12 1211:11

productivity
1029:12 1088:5

products 1091:2

profit 1024:25
1031:19 1032:21
1033:23 1035:21
1036:17,22 1052:6
1066:17,25 1092:9,
15 1096:23 1097:8
1098:14,17,25

profiting 1211:16

profits 1066:14
1194:23

project 1024:7,11
1119:23 1201:6

1246:4

projects 1027:16
1028:17 1029:8
1201:5 1225:16
1256:12

promising 1089:6

proper 1197:4

proposal 1015:12
1021:19,21 1035:12
1066:15 1067:6
1208:18 1209:18
1227:6,13 1229:14,
16,20,23 1252:6
1255:22 1256:15

proposed 1105:21
1106:10 1227:6,11

prosecutor 1154:22
1276:8 1277:15

prosecutorial
1135:14 1137:10,18

prosper 1088:8

protection 1135:2

protest 1236:19
1238:8

prove 1080:13

proved 1080:24

provide 1025:6
1026:11 1036:6,9
1058:15 1060:17
1065:3,13 1092:9
1148:22 1154:12
1169:14,16 1171:4
1172:3 1185:7
1190:20 1196:9,24
1197:17,24 1198:4,
5 1199:22 1203:15,
24 1211:25 1212:18
1246:11 1266:11,14
1275:3 1279:3,17

provided 1058:5
1062:4 1068:24
1088:23 1091:2,19
1096:6,16 1098:19
1099:2,9 1100:14
1124:13 1125:5
1126:8,10 1127:6
1128:7 1150:3
1154:4 1169:18
1194:7 1197:20,21
1211:21,23 1212:16
1219:21 1253:18
1254:19,22 1267:9,

23 1272:8 1274:21

provider 1025:18,19

providers 1024:16
1025:17 1026:16
1028:21 1056:13,21

providing 1064:15
1068:8 1091:3
1174:17 1193:12
1198:12 1204:4
1267:13 1269:20

provision 1023:21
1057:20 1063:20
1168:15 1190:19
1195:2

provisional 1165:8
1167:22 1168:19

provisions 1061:15
1063:11 1068:2
1195:5

PTLB 1207:18

PTLB-II 1128:11
1202:17 1203:20
1245:8,21 1246:16

public 1016:5
1140:20 1152:5
1254:5 1255:2,3,7
1256:11 1270:14

published 1152:5
1176:4

Puerto 1071:11
1072:7,9,11 1073:7
1113:24 1161:10
1162:2 1163:10
1164:6 1165:9,13,
17 1166:3,22
1170:24 1171:5,8
1250:12

pulled 1136:7

pulling 1022:14

Punta 1127:12

purchase 1033:9
1060:22 1090:5,25
1163:21 1164:5
1207:25 1233:2,10

purchase/sale
1096:5

purchased 1070:22
1071:9,19 1086:15
1194:20 1204:18
1206:14

purchaser 1064:17
1075:10 1076:18

purchasers 1075:4
purchases 1074:12
   1161:4
purchasing 1156:18
pure 1232:25
   1233:10
purpose 1028:23
   1172:8,20 1173:4
   1196:18 1226:2
   1231:20 1238:13
purposes 1034:3
   1134:16 1226:9
Pursuant 1054:4
purview 1045:16
put 1024:7,10
   1126:20 1137:2
   1150:2,5,17,22
   1191:21 1198:7
   1216:20 1275:12
putting 1045:25
   1046:3 1062:6
   1273:22

## Q

qualified 1136:16
qualify 1207:20
quality 1173:7
   1177:2
quantity 1161:9
   1184:8,23
question 1017:12
   1030:7,8,25
   1032:10,23 1033:2,
   6,7 1034:16
   1035:24 1038:4,20,
   23 1042:5,6 1043:2,
   11 1044:11,21,23
   1052:19 1055:15,22
   1058:8 1061:13
   1062:15,16,18,20,
   21 1068:15 1070:4,
   19 1073:24 1076:4,
   25 1077:17 1078:14
   1082:12 1085:16
   1092:12 1095:10
   1107:24 1108:3,12,
   16 1109:8 1110:23
   1111:13 1116:18
   1121:2,5 1122:21
   1125:14,16,18
   1126:3,18 1127:3

1136:23 1137:3
1139:20,22 1144:22
1157:10 1167:11
1171:3,10,19
1181:17,24 1191:13
1198:8,25 1211:2,6
1213:6 1221:4
1224:2,3 1228:9
1229:11 1233:8
1234:20 1257:2
1271:24 1274:14,19
1279:25 1280:24
1281:8,25
questioning 1015:7
   1171:17
questions 1015:23
   1039:11 1041:7,13
   1138:8,9 1151:7
   1153:23,24 1155:20
   1173:13 1216:8
   1220:5,13,23
   1221:15 1222:12
   1234:5 1243:25
   1270:4 1281:5
quick 1076:24
quid 1065:14
quo 1065:14
quotation 1018:15
   1019:10 1030:4
   1235:9
quote 1034:6
   1161:12 1174:12
   1265:9
quoted 1018:16
   1021:2 1034:6
   1066:5
quoting 1030:10

## R

R-12 1109:2,6
R-25 1148:15
R-28 1222:2
Radwan 1218:24
   1219:6,7,8 1273:14
railcar 1115:9
railcars 1123:17
railroad 1018:14
   1019:9 1020:11
raised 1032:3
   1134:17 1194:3
   1242:12

range 1064:15
   1072:3
rank 1210:19
rarely 1217:3
rate 1024:19
   1030:21 1047:9,11,
   12,25 1048:3,15,16,
   18,21,25 1049:8,14,
   17 1050:3,4 1051:7
   1056:15 1068:9
   1078:22 1079:13
   1082:2,14,22
   1083:18,25 1086:7
   1100:5 1102:18,24
   1103:6,18 1104:2,8,
   13 1107:3,6,10,12,
   19 1191:4,8,10
rates 1080:2
   1082:16 1085:10
   1099:21,23 1100:2
   1104:16
rationale 1078:16
re-incorporate
   1167:17
re-redirect 1233:25
reach 1102:6,15,23
   1253:22
reached 1104:7,9
   1229:5 1230:10
   1253:2
reactivation
   1027:19
read 1026:14
   1028:10,11 1030:9
   1037:4,7,19
   1042:10 1044:24
   1054:9,12 1078:23
   1090:8 1125:14,17
   1141:10,12,14
   1161:8 1164:4
   1186:15 1223:11,12
   1224:23 1226:5
   1270:11
reading 1026:23
   1028:5,7 1070:15
   1078:11
reads 1140:24
   1224:8
ready 1015:3 1248:6
   1273:24
real 1264:22

reason 1024:8
   1123:5 1217:5
   1254:3
reasonable 1059:22
reasonableness
   1150:20
reasons 1217:6,18
   1254:4
recall 1037:22,23
   1038:2,5 1039:10,
   13 1047:25 1049:19
   1077:24 1081:23
   1085:5 1086:25
   1087:2 1088:3
   1103:2 1114:10
   1119:9 1122:19
   1150:2 1222:20
   1224:14 1257:10
   1272:6
recalled 1038:25
receipt 1065:5
receive 1060:24
   1121:6 1128:12
   1130:6,8,11,16,18,
   19,23 1131:10
   1168:17 1206:5
   1215:16 1221:11
   1231:21 1252:23
   1253:14 1255:20
   1262:25 1263:2
   1265:21 1266:3,15
   1267:5 1269:8,10
   1271:14,19
received 1018:14
   1086:17 1140:5,6
   1143:12 1166:11
   1219:14 1221:21,22
   1237:20 1238:4
   1256:21 1262:22
   1277:10
receiving 1082:14,
   19 1105:3 1130:21
   1237:5 1253:14
recess 1133:18
recital 1142:6
recite 1243:4
recognition 1217:20
recognize 1129:9
recognized 1079:24
recollection
   1121:13 1122:21
   1123:7,11 1192:14

1254:18
**recommend**
1160:15
**reconciled** 1201:2
1225:8
**reconciliation**
1019:24 1242:11
**reconsider** 1020:23
**record** 1018:23
1028:9 1041:23
1050:20 1052:23
1063:23 1070:3,17
1099:18 1100:11
1107:15 1108:19,25
1118:6 1128:24
1133:20 1134:15
1136:17 1137:2,5
1141:24 1142:12
1147:23 1148:11,20
1149:5,17 1151:11
1152:13 1155:10
1156:5 1157:9
1158:3 1220:22
1233:22 1241:25
**recorded** 1240:9
**recross** 1220:11
1222:14
**red** 1173:8
**redelivered** 1213:21
1216:15,18
**redirect** 1155:17,21,
23 1156:9 1164:22
1197:5 1212:10
1220:13,25 1233:15
**reduce** 1081:25
**reduced** 1021:2
1217:19
**reducing** 1080:16
1081:12
**reduction** 1082:13
1217:7
**refer** 1053:14
1063:8 1091:5
1101:15 1145:17,20
1146:14 1162:19
1175:17
**reference** 1042:20
1044:13 1045:8
1054:13 1058:2
1064:3 1137:25
1142:25 1146:7
1152:7 1223:15

1274:16
**references** 1026:5
1152:10
**referral** 1141:22
**referred** 1039:12
1040:2 1041:19
1042:22 1134:4
1151:21 1161:11
1163:22 1177:11
1192:2 1228:11
1231:6
**referring** 1026:20,21
1043:10 1064:11
1105:18 1118:7
1122:24 1135:4
1142:13,15 1146:6
1224:25 1231:13
1265:23 1268:8
**refers** 1167:23
1223:13 1224:6
**refinanced** 1128:10
**reflect** 1030:12
**reflected** 1229:4
**reflects** 1230:24
1231:3,7
**refresh** 1123:6
**refund** 1261:10
**refunded** 1259:12
**regard** 1116:15
1136:6 1182:12
1188:11 1201:9
1205:4 1209:24
1248:13 1249:13
1251:16 1252:14,17
1253:16 1260:11
1263:19,25
**reimbursable**
1197:25
**reimburse** 1031:13
1032:8 1094:7
**reimbursed** 1032:16
**reimbursement**
1031:21
**rejected** 1206:7
1226:17,19 1227:13
1228:12,16 1229:23
1230:7,19
**rejection** 1228:14,
15 1231:14
**relate** 1189:14
**related** 1152:14

1182:8 1209:13
1242:19 1267:11
1275:17
**relation** 1135:12
**relationship**
1057:16,17 1064:14
1096:3 1233:3
1248:23 1251:7,10,
13,15
**relieved** 1084:5
**relying** 1203:9
**remain** 1163:17
1176:21
**remainder** 1217:11
**remained** 1217:12
**remaining** 1158:5
1266:24
**remember** 1017:20
1033:24,25
1047:11,12 1048:5
1086:21 1089:16,20
1090:6 1093:19,25
1113:15,19 1115:5,
12 1119:17,24
1120:6,17 1121:14,
15 1130:24,25
1132:21 1154:9
1157:24 1158:11
1159:21 1164:22
1177:24 1178:4
1196:3 1212:10
1214:13 1218:2,21
1228:22,23 1239:23
1240:12,13 1242:15
1278:8
**remind** 1015:24
**repaid** 1031:17
**repair** 1112:10,11
1132:16
**repairing** 1110:15
**repairs** 1112:13,16,
19 1113:2,4,8
**repeat** 1044:19
1124:17 1271:16
**rephrase** 1016:24
1055:16 1062:17
1109:8 1124:23
**replacement**
1273:11,17
**report** 1015:8
**reported** 1247:19

**reporter** 1125:17
**represent** 1102:11
1129:3
**representative**
1090:23 1109:19
**represented** 1125:4
**representing**
1264:21
**represents** 1204:8
1278:12
**Republic** 1138:13
**request** 1029:20
1035:8 1134:2
1158:15 1209:17
1211:3 1212:2
1252:7 1256:15
**requested** 1019:10
1021:6 1034:5
1036:7 1047:17
1143:17 1158:21
1159:25 1167:16
1203:21 1241:23
1246:16
**requesting** 1018:15
1019:9 1276:4
**requests** 1029:19
**require** 1030:6
1085:7 1113:9
1161:21 1235:23
1241:3 1264:23
**required** 1024:10
1085:20 1113:13
1136:24 1162:2
1199:21 1239:9,17,
19
**requirement** 1255:9,
11
**requirements**
1102:17 1138:21
**requires** 1027:20
1238:25 1239:3
**requiring** 1199:16
**resale** 1096:23
**reservations** 1044:6
**resolve** 1015:18
**respect** 1046:14
1067:2 1076:9,21
1102:2,18 1109:14
1110:25 1122:11
1133:23 1137:18
1143:5 1156:17
1165:2,5 1167:6,13

Case 1:19-cv-25217-DPG Document 32-14 Entered on FLSD Docket 09/27/2021 Page 95 of 101
ARBENET et al.
05/01/2017
24

1170:9 1174:3
1187:8 1190:5
1193:7,9 1194:2,11,
24 1195:16 1196:16
1197:19 1203:22
1208:10 1210:23
1212:7 1214:18
1229:14 1237:21
**responded** 1137:6
1256:15
**response** 1144:25
1174:22 1252:6
**responsibilities**
1022:22 1023:13
1052:14 1110:21,25
**responsibility**
1031:9 1070:23
1198:16
**responsible**
1054:22 1198:7
1200:3 1209:15
**rest** 1132:10
**restate** 1082:12
**rests** 1058:3
**result** 1029:25
1081:4 1093:23
1169:24 1176:11
1198:12 1206:3
1214:23 1215:16,25
1276:11
**resulted** 1227:16
**resulting** 1024:15
1025:16 1056:11
**results** 1143:11
1231:25
**resume** 1015:4
1133:21
**resurrect** 1241:19
**return** 1196:14
1204:3,23 1215:24
**returning** 1041:9
**revenues** 1130:10,
15
**reviewed** 1137:16
**revised** 1021:10,13
**revitalization**
1115:19 1116:10,20
1117:2 1119:5,19
**revitalize** 1116:2
1118:23

**revolve** 1015:17
**ridges** 1174:5
**Riester** 1278:17
**right-hand** 1200:23
**rights** 1202:15
**Rio** 1054:18,19
1058:13 1113:6
**risk** 1059:23,25
1060:2,4,18,24
1061:17,21 1078:19
1210:6 1251:24
1253:14
**risks** 1065:8,12,19,
20,21,23
**river** 1161:24 1162:9
**Rojas** 1271:5,8
**role** 1074:19
1238:13 1260:16
**rolls** 1280:20
**room** 1041:2
1136:16 1233:17
**roughly** 1132:7
**roulette** 1234:18
**route** 1212:19
**Roy** 1218:22
**ruling** 1133:23
**run** 1250:22
**running** 1234:16

---

**S**

**Sabbagh** 1051:12,
16,19,23 1059:18
1132:23 1138:2
1219:9,10 1248:8,
18,20 1249:2
1250:19 1251:7
1252:10,14
**Sabbagh's** 1135:23
**sail** 1073:15
1166:12
**sailed** 1166:10
**sake** 1066:21
1085:17
**salary** 1264:25
**sale** 1060:22 1069:3
1086:9 1087:15,19,
23 1090:5,18
1120:11 1193:25
1233:2,10

**sales** 1057:18
1064:14 1086:24
1088:21 1161:5,7
1162:11,20 1164:17
1167:25 1168:20
1173:14,15,17
1180:20 1185:23
1190:5 1194:22
1211:16 1219:14
**sat** 1109:17
**satisfaction** 1068:5
1096:14,18
**satisfactory** 1119:2
**schedule** 1129:12
1133:9
**scheme** 1042:14
1043:16
**scope** 1046:23
**scrap** 1169:23
**screening** 1169:24
1170:6
**second-to-the-last**
1166:18
**seconds** 1043:11
**section** 1044:3,4
1045:2 1064:5
**security** 1163:20
1272:7
**seeking** 1210:9
**select** 1111:7,15
1114:20
**selected** 1114:15
1235:12
**selecting** 1111:18
**selective** 1150:4,10
**selectively** 1149:23
**self-unloading**
1161:14 1163:11
1164:7 1165:10
**sell** 1088:5 1089:7,
13 1095:5 1120:3,
14 1121:7 1122:16
1179:23 1188:5
1194:14 1206:13,
14,15,16 1207:4
1208:8
**seller** 1163:17,18
1169:8,9,14 1172:2
**selling** 1036:23
1088:24 1177:18
1190:6 1210:13

1225:22 1237:4
**send** 1182:5
1208:17,18,19
1209:21 1255:23
**sense** 1066:7
**sensitive** 1138:7
**sentence** 1069:24,
25 1106:9 1132:4
1265:8
**separate** 1042:24
1059:13 1076:14,
20,23 1172:17,22
1173:8 1183:18
1189:17,19 1203:15
1206:24 1226:2,3
**September** 1016:9
1129:2 1133:8
1257:9
**series** 1057:19
1244:9
**Serpent's** 1161:14
1163:12 1164:8
1165:11
**Serrao** 1015:6,22
1020:7 1022:9
1032:2 1033:6
1040:25 1041:11
1048:11 1052:25
1053:7,12 1062:15,
19 1067:14 1069:5
1100:14 1101:7,9,
19,20 1108:4
1128:25 1133:7
1134:23 1137:8
1138:24 1139:15,16
1140:15 1142:18
1151:14,17 1153:3,
14 1154:3 1155:16
1156:11 1160:24
1171:15 1190:13
1199:12 1200:8
1211:8 1216:13
1221:3 1222:16
1234:6 1242:25
1244:3 1279:19
1280:2
**Serrao's** 1027:2
1101:21 1134:4
**served** 1142:19
1218:11 1221:5
**serves** 1274:23

service 1024:16
1025:9,17,19
1026:16 1028:21
1029:19 1036:9
1052:10 1056:13,21
1059:12 1066:11
1090:13 1093:3
1174:18 1184:22
1189:25 1190:3
1201:6 1203:12
1240:21 1266:13
services 1026:10,17
1027:4 1029:18
1030:3 1031:6,7
1032:13,15,19,20
1046:17 1056:2
1057:21 1058:3,5
1060:17 1061:17
1062:2 1063:4,11,
20 1064:15 1065:3,
13 1091:4,9,18,19,
21 1092:2 1095:14
1096:15,20 1097:15
1098:18,25 1099:9
1179:21 1193:12,
23,25 1194:6
1196:11 1197:16
1201:21 1205:5,15,
18 1211:21 1212:8,
14,15,17,18
1225:16 1231:23
1234:10 1238:21
1239:9,15 1253:18
1264:19 1266:4,10
1267:8,13,20,23
1268:22 1269:20
servicing 1034:3
set 1042:21 1043:4
1052:23 1056:7
1060:24 1062:4
1080:10 1179:17
1180:10 1182:18
1189:4,9 1195:17
settle 1081:5
settled 1216:3,5
1217:14
settlement 1216:24
Severo 1278:17
share 1131:7,18,23
1156:13,19,22,25
1157:4 1159:2,24
1243:9 1265:11

shares 1157:16
1159:12,13,14,17,
18 1160:11
Sherriff 1181:12
1192:11,21 1203:8
1246:11
Sherriff's 1191:19
shifted 1178:18
ship 1022:18
1207:13 1217:21
1272:18,22
shipment 1161:13
1162:3 1163:22
1165:9 1179:5
1183:22 1184:13
shipments 1183:21
shipped 1087:6
1170:14
shipping 1079:7,14
1081:21 1083:19
1085:4,22 1100:19
1101:22 1103:5
1104:11,22 1105:4
1106:20 1107:13
1112:5 1113:20
1114:2 1129:6
1214:19 1215:4,11
1259:20
ships 1234:16
1235:4
short 1043:13
1052:18 1099:14
1184:12 1220:18,19
shortage 1173:5
shortfall 1171:23
1172:19,24 1185:8
shortly 1129:24
show 1052:16
1057:15 1062:10
1092:20 1103:16
1115:13 1116:11
1117:19 1125:20
1153:5 1212:4
1216:23
showed 1174:4
1221:10,19
showing 1191:25
shown 1027:13
1028:14 1049:17
1114:16 1139:25
shuttle 1023:21,23
1025:7,8 1039:20

1058:16 1073:20
1074:9,14,17
1075:2,23 1076:8
1106:13 1112:12
1185:22 1199:6
1212:22,23 1241:2
shuttled 1077:5
shuttling 1036:9
1075:6
Siciliano 1017:8
1020:5,9,14,17
1021:9,12,20
1022:2 1026:25
1074:5 1100:2
1111:12 1123:22
1151:2 1155:24
1171:18,25 1172:16
1173:3,10 1174:15
1176:3,20,25
1178:13,17 1184:19
1185:15,25 1186:12
1187:3 1188:9
1189:23 1198:23
1199:14 1215:21
1216:6,12,13,22
1217:16 1218:4
1222:5 1234:3,4
1235:2,6,20 1236:5,
10 1238:8,11,16
1239:3,8,12,18,25
1240:5,8 1241:18,
24 1242:7,16,23
1243:21 1268:18
1275:5 1276:12
side 1169:2 1172:11
1200:23 1209:11
1247:7
Sierra 1028:20
sign 1248:6,7
1273:25
signature 1100:25
signed 1034:10
1039:8 1051:11,16,
22 1059:15 1096:11
1200:25 1225:4,7,
17 1228:6,13,15,21
1229:7,19 1230:4,5
1231:10 1246:2
1255:14 1272:15,
19,25 1273:7,9,10,
23 1281:14
significant 1066:17
1124:24

signing 1095:17,18
1202:19
Silva 1113:20
1129:23 1259:20,25
1260:3,8,14,15,22,
23 1261:6,9
Silva's 1260:11,16
similar 1253:8
simple 1063:25
1077:17
simply 1033:15
1035:20 1052:3
1058:18 1068:15
1092:16 1142:11
1234:10,13 1256:14
sir 1016:17 1041:19
1048:12 1053:22
1077:9,18 1116:13
1154:5 1160:20
1193:2 1227:2
1235:7 1238:15
1243:3 1256:22
1271:12
sit 1094:18
site 1250:17,20
situation 1206:2,17,
22 1210:3,23
1238:17 1255:2
1265:4
sixth 1200:22
size 1072:10 1171:6
slash 1161:12
Slide 1118:9
slides 1118:8
1174:3,4
slow 1104:17
small 1127:10
SMT 1111:24
1112:4,24 1132:14
1242:19,20
1258:13,14,23,24,
25 1259:12,14,18,
23 1260:4,21
1261:7,16 1267:19,
23,24 1268:11,21
1269:19
social 1251:10
sold 1052:10
1059:12 1072:5
1077:7 1094:24
1096:19 1188:4
1194:16

sole 1280:8
solely 1075:2
sort 1108:11
   1171:23 1279:22
sound 1145:14
Southern 1100:17
   1129:6
Spanish 1037:24
   1038:8 1203:9
   1246:9,15 1274:25
   1275:3 1278:24
spares 1204:18
speak 1015:11
   1185:16 1234:22
speaking 1235:7
   1248:11
speaks 1088:15
   1169:21
specific 1026:19
   1033:9,10 1071:25
   1078:2 1092:19
   1107:18 1125:24
   1138:9 1151:8
   1210:17 1211:3
specifically 1060:12
   1061:5,20 1062:11,
   13 1063:7 1089:21
   1093:6,25 1094:10
   1099:6 1111:20
   1119:9,24 1120:6
   1125:19 1208:11
   1228:11 1267:20
   1276:16
specification
   1208:7
specifications
   1182:9 1208:4
split 1262:2 1263:8
splitting 1264:16
spoke 1091:7
   1271:3,4
spoken 1119:25
spot 1184:2,14,15
spreading 1174:6
ST 1164:6
stable 1176:21
stacker 1174:12
   1175:7 1197:14
   1207:24,25 1208:2,
   8,11,23,24 1209:10,
   12

stackers 1173:25
   1174:10,21
stacking 1022:16
   1174:2
stamp 1115:15
stand 1141:25
standing 1115:7
   1117:21 1118:10
   1123:16
start 1015:6 1035:3,
   4 1111:21 1118:3
   1128:2 1164:3
   1209:19
started 1053:23
   1119:19 1120:4
   1121:21 1128:3
   1232:24
starts 1044:5
   1134:24 1161:7
   1162:21 1200:21
state 1082:9
   1238:17
stated 1137:13
   1224:22
statement 1026:2,5,
   22 1027:2 1029:22
   1030:9 1039:11
   1040:7 1044:3,14,
   24 1045:23 1046:8
   1049:21 1053:20,25
   1056:5,10 1057:8
   1063:9,13 1064:11
   1077:18 1078:8
   1081:16 1088:11
   1102:16 1103:3
   1116:17 1122:23,24
   1134:5,24 1139:8,
   18 1145:16,22,25
   1146:5 1152:10
   1160:24 1171:13,
   15,16 1173:13
   1191:19 1200:9
   1226:23 1227:4
   1228:24 1231:7
   1232:2 1270:6
   1272:5 1274:13
states 1022:10
   1023:16 1024:13
   1027:12 1028:13
   1170:13 1187:10
   1275:25
stating 1143:24

station 1023:20
   1054:6,17 1071:15
   1072:22 1073:19
   1074:3,6,7,8,22
   1075:3,14 1076:10,
   12,21 1077:6
   1127:13 1161:23
   1162:17 1165:18
   1166:4,6,9,13,23
   1179:16 1185:14
   1186:7 1187:12
   1188:7 1189:12
   1199:23,25 1249:18
   1258:7,20,21
   1268:2,22
stations 1023:22
status 1015:7
   1144:11 1275:8
stay 1063:17
   1143:17 1229:18
steelworks 1176:13
   1280:20
stevedoring
   1022:16
stipulate 1152:23
stop 1146:18
   1269:14
stopped 1128:15
   1238:6 1263:4
   1269:12
strategic 1037:2,5,
   17,18,19 1046:24
   1152:17 1197:2
   1276:3
strictly 1076:9
Strike 1232:4
structure 1031:3
   1159:5 1196:21
   1263:24
structured 1032:11
   1164:16
struggling 1058:22
Suarez 1110:4
   1181:5
sub-charter 1035:22
   1058:10,11,23
   1059:5
sub-chartered
   1080:4
sub-charters
   1059:15

subclause 1200:12
subcontract
   1019:19 1111:4
   1234:8
subcontracted
   1258:12
subcontracting
   1019:13
subcontractor
   1112:20,22 1128:5
   1200:2 1258:8
subcontractors
   1111:8 1112:8
subcontracts
   1058:2
subject 1272:15
submit 1248:6
submitted 1020:15
   1021:10 1079:18
   1084:14 1275:11
   1277:25
subparagraph
   1023:25 1041:20
subpart 1232:8
subrogate 1201:22
subrogated 1062:23
   1202:7,15,23
   1245:25
subrogated-type
   1203:23
subrogates 1201:8
   1202:9,10 1225:18
subrogating 1202:2
subrogation
   1028:19 1029:10
   1060:6 1062:3,7,9,
   12 1063:2 1202:8
   1223:24 1224:10
subrogator 1202:20
subsequent
   1127:17 1217:10
substantial 1081:4
substantive 1085:2
successful 1080:16
   1081:12 1097:2
sued 1215:11
sufficient 1027:14
   1028:14
suggested 1224:9
suggesting 1045:24

suggestion 1279:21
suitable 1252:5
suited 1236:11
suits 1223:13
sum 1131:7,10
summary 1145:18
 1191:17
Superior 1157:14
 1158:20
supplied 1127:25
 1193:20 1231:23
supplier 1193:23
 1205:25
suppliers 1252:24
supplies 1204:17
supply 1028:23
 1169:4 1172:12
 1174:21 1205:14,
 16,17 1225:14
 1256:23 1267:21
 1280:20
support 1145:15
 1235:19
supporting 1203:7
 1246:10
supports 1223:21
 1224:18
suppose 1015:10
 1092:21 1142:16
supposed 1033:18
 1130:6,8,15
 1174:24 1186:10
 1188:17 1196:5
 1199:8 1205:8
 1236:22 1278:4
Supreme 1274:18
 1276:16 1277:5
surrender 1141:8
swapped 1178:10
Switzerland
 1156:19
swore 1084:13,22
sworn 1016:4
 1100:23 1186:20
system 1053:15
 1055:3 1076:13
 1130:9,16 1174:3
 1190:16,18 1192:15
 1200:5 1210:7
 1243:8 1257:11,16
 1260:12 1267:25

T

T/v 1161:12 1164:6
 1165:10,13
Taiglad 1099:22
 1244:18
takes 1082:5 1179:5
taking 1060:23
 1065:19 1070:14
 1090:13 1162:10
talk 1165:21
 1239:20
talked 1061:6
talking 1025:4,11,24
 1026:2 1033:9,12
 1040:22 1053:24
 1060:13 1061:7,20
 1063:6 1069:2,3
 1071:25 1083:23
 1093:11 1095:7
 1099:6 1113:5
 1125:24 1145:6
 1150:21 1162:6
 1177:10 1210:22
 1227:10 1268:13
talks 1064:24
 1164:16 1232:9
taxes 1241:5
team 1136:5,6
technical 1027:14
 1028:15 1208:16
 1209:19
telling 1085:8
tells 1027:25 1230:9
temporary 1023:21
ten 1127:22 1183:8,
 9 1195:15
tender 1155:17
tenure 1127:21
term 1045:23 1054:6
terms 1027:11
 1040:19 1061:2
 1084:5 1086:5
 1089:2 1106:18,23,
 24 1145:8 1164:14
 1208:23 1211:4
 1226:10 1228:6
 1229:15 1232:13
 1248:4 1256:7
 1272:22 1273:3

testified 1016:5
 1168:9 1185:3
 1190:19 1195:23
 1198:18 1206:6
 1214:20 1219:13
 1222:16
testify 1016:5
 1154:16
testimony 1037:16
 1038:5 1046:4
 1077:24 1078:5
 1082:6 1114:7
 1135:23 1193:4
 1212:21 1222:18,20
 1224:14 1226:21
 1254:11
thing 1031:17,18
 1054:10,12 1099:19
 1148:7 1190:13
things 1023:19
 1032:24 1064:12
 1084:15 1092:5
 1096:15 1103:16
 1125:9 1174:9
 1185:11 1250:24
 1280:11,22
thinking 1119:22
third-party 1026:16
 1031:5 1036:2
 1046:14 1063:4
 1077:8,11 1194:6
thought 1054:15
 1057:12 1188:15
 1243:22
thousand 1117:10
 1183:7
thousands 1149:9
throughput 1184:24
 1185:17 1187:4,7
 1188:17 1190:23
 1191:22
thrust 1087:24
ticket 1127:8
tilter 1254:15
time 1016:12
 1023:12 1024:9
 1043:13 1052:12
 1055:11,24 1058:12
 1061:8 1068:17
 1075:17 1083:14,15
 1096:9,10 1099:15
 1103:4 1105:21,23

 1106:10,11,17,18
 1110:10 1113:17,18
 1114:24 1115:4
 1118:18 1121:21
 1124:15,25 1125:2,
 10,11 1126:13,14
 1127:23 1133:12,15
 1140:10 1144:14
 1156:14 1175:23
 1177:14,18 1180:11
 1188:24 1189:6
 1210:17 1212:24
 1218:8,11 1219:16,
 18 1227:3 1230:6
 1234:5,11 1242:9,
 10 1248:17 1249:3,
 7,21 1251:23
 1252:4 1274:7
 1281:13
time-charter
 1067:10
time-chartered
 1074:25 1075:12,
 16,21 1076:7
timekeeper 1233:19
times 1041:8
 1113:14 1223:14
timing 1211:4
 1228:19 1277:20
title 1163:16
titled 1200:13
today 1037:16
 1039:5 1041:16
 1048:19 1052:25
 1053:3,7 1083:17
 1084:17 1094:18
 1099:8 1123:13
 1211:20 1214:20
 1225:4 1242:18,24
 1276:10
told 1068:21
 1078:15 1081:23
 1235:10 1267:5
 1273:24
tomorrow 1192:11
 1275:4
ton 1166:22 1170:15
 1189:11 1190:4
tons 1102:9,21
 1104:9,17,18
 1107:11 1126:9
 1169:16,17 1172:3,

4,7 1186:8 1187:15,
17,21 1190:20,21,
22 1191:2 1196:2
**top** 1072:22 1073:14
1161:18,19
**topic** 1077:2
1190:12
**topped** 1166:8
**topping** 1161:23
1162:17 1166:4,5
**total** 1081:7 1131:6
1161:9 1162:3
1165:22,23,24
1166:2,3 1169:4,5
**track** 1115:10
1180:22 1181:19
**traders** 1219:24
1232:25
**trading** 1280:21
**trained** 1136:13
**transaction** 1173:22
1218:7 1219:20
1238:14 1247:3
1257:21
**transcript** 1062:11
**transfer** 1023:20,22
1053:14 1054:6,17
1055:3 1074:5,7,8,
21 1075:3,14
1076:10,12,21
1077:5,6 1130:9,16
1144:2,4 1161:11,
23 1162:4,17
1165:18 1166:4,6,9,
13,23 1167:7
1168:14 1175:3
1179:16 1184:21
1185:12,13,21
1186:7 1187:12,14
1188:7 1189:12
1190:16,17 1192:15
1199:22,25 1200:4
1203:12 1243:7
1249:17 1257:10,16
1258:7,19 1260:12
1267:25 1268:2,22
**transferred** 1022:13
1144:5,6,7 1163:6
1248:24
**transit** 1073:3
1161:13

**translate** 1150:19
1275:2
**translated** 1149:24
1150:23 1278:25
**translation** 1041:25
1150:4,16,17
1203:17 1246:12,15
**transparency**
1067:22 1068:2
1085:7,18
**transparent** 1068:6
**transportation**
1022:15 1052:15
1069:13 1070:11,
12,14,21 1073:2
**transported**
1214:17
**transshipment**
1071:14 1072:22
1073:15,19 1074:3,
21 1163:11 1164:7
1165:10
**traveled** 1212:25
**traveling** 1237:16
**treated** 1045:10
1224:20
**treats** 1223:17
**trucks** 1207:18
**true** 1045:16
1065:20 1067:9
1098:21 1127:15
**trust** 1042:16,21
1043:4,19,23
1044:8,15,17
1045:11 1195:2,5,
17,18 1205:6,10,19
1206:7,19 1210:5
1225:21 1226:13,
17,19 1227:9,22
1228:10,17 1229:4,
9 1230:18
**truth** 1016:5
**TSMC** 1054:4
1179:13,14,15,21
1180:15 1182:13
1183:6 1185:12,13
1187:7 1188:18
1197:13 1245:5
1265:24 1269:21
**tugboat** 1241:7
**turn** 1134:23
1152:10 1222:22

1238:12 1274:12
**turning** 1022:9
1146:18 1160:23,25
**TV** 1163:11
**two-and-a-half**
1275:20
**two-contracts**
1210:7
**two-minute** 1155:6
**two-thirds** 1103:20,
25
**type** 1170:10,14
1195:2 1197:23
1204:10 1219:20
1223:18 1224:10,
19,20 1263:24
**types** 1076:7
1201:14,16
1223:22,23 1255:6
**typographic** 1124:2
**Tyrone** 1138:24

**U**

**ultimate** 1072:20
**unable** 1199:18
**unanimously**
1134:9
**understand** 1027:6
1032:6 1033:7
1035:23 1037:5,11,
16 1044:21 1059:2
1073:5 1084:20
1085:14 1094:22
1115:24 1126:18
1136:9 1137:13
1167:11 1191:15
1221:22 1224:2
1238:13,17 1244:5
1246:5 1254:3,9
1255:10,12 1257:21
**understanding**
1090:10 1132:3
1196:19 1246:19
1254:18
**understands** 1033:4
**understood** 1044:16
1053:9 1164:24
1184:17 1193:16
1222:18 1225:25
**undertaking**

1116:15
**undertakings**
1136:11
**undertook** 1110:20,
24
**unit** 1166:22
**unjustifiable**
1082:24 1084:4
**unload** 1102:3
**unquote** 1161:13
**unrelated** 1187:4
**unsupportable**
1084:7

**V**

**V-A-Z-Q-U-E-Z**
1243:4
**variable** 1177:2
**varies** 1092:4
**vary** 1071:15
**Vazquez** 1105:16
1129:4,14 1130:4
1131:9 1133:9
1243:3 1269:7,9
1274:10
**Venezuela** 1090:23
1113:21 1119:14,
16,21 1122:8
1135:9 1137:11,17
1138:13 1141:9
1142:25 1143:5
1144:25 1154:11
1238:22 1239:2,4
1249:24 1250:8
1254:5
**Venezuelan** 1124:16
1135:15 1142:21
1152:16 1154:21
1221:6
**venture** 1037:9,24
1038:7 1039:2,22
1045:19,24 1046:7,
21 1066:18
**venturer** 1066:22
**version** 1028:12
1037:25 1038:8,9
1105:22 1106:11
1166:17 1167:3
1200:16 1246:9

**versions** 1048:24
  1108:21 1272:9,13
**vessel** 1025:6,7,8,
  18 1036:2,6,13,16
  1047:6 1050:3,5,14
  1052:15 1055:7,23
  1056:17 1058:18,
  20,25 1068:8
  1071:20,25 1072:6,
  9,10,14,19 1073:4,
  6,10,14 1074:17
  1097:23 1102:2,23
  1104:12,16
  1106:12,13 1111:21
  1125:21 1127:6
  1161:11,19,20
  1162:4 1163:10,12
  1164:6 1165:11,25
  1166:2,3,10
  1168:20 1170:10,14
  1171:6,7 1213:21,
  23,24 1214:3,5
  1215:4 1216:18,20
  1240:25 1241:3,6
  1244:10 1273:3
**vessel's** 1167:15
**vessels** 1023:21,23
  1034:3 1035:7
  1039:20,21 1051:3,
  4,8 1054:18,23
  1055:11,24 1067:10
  1073:20,21 1074:9,
  15,25 1075:2,12,16,
  21,23 1076:7,9,16
  1110:13,15,18
  1112:6,8,11,12
  1113:5 1161:14,22
  1162:5,12,13
  1164:8 1185:22
  1187:13 1199:6
  1212:22,23
**Vicente** 1138:24
**view** 1082:5,16
  1196:23
**Virtani** 1218:23
**visiting** 1118:19
**vividly** 1114:22
**void** 1273:9
**volume** 1015:1
  1016:1 1017:1
  1018:1 1019:1
  1020:1 1021:1
  1022:1 1023:1

1024:1 1025:1
1026:1 1027:1
1028:1 1029:1
1030:1 1031:1
1032:1 1033:1
1034:1 1035:1
1036:1 1037:1
1038:1 1039:1
1040:1 1041:1
1042:1 1043:1
1044:1 1045:1
1046:1 1047:1
1048:1 1049:1
1050:1 1051:1
1052:1 1053:1
1054:1 1055:1
1056:1 1057:1
1058:1 1059:1
1060:1 1061:1
1062:1 1063:1
1064:1 1065:1
1066:1 1067:1
1068:1 1069:1
1070:1 1071:1
1072:1 1073:1
1074:1 1075:1
1076:1 1077:1
1078:1 1079:1
1080:1 1081:1
1082:1 1083:1
1084:1 1085:1
1086:1 1087:1
1088:1 1089:1
1090:1 1091:1
1092:1 1093:1
1094:1 1095:1
1096:1 1097:1
1098:1 1099:1
1100:1 1101:1
1102:1 1103:1
1104:1 1105:1
1106:1 1107:1
1108:1 1109:1
1110:1 1111:1
1112:1 1113:1
1114:1 1115:1
1116:1 1117:1
1118:1 1119:1
1120:1 1121:1
1122:1 1123:1
1124:1 1125:1
1126:1 1127:1
1128:1 1129:1
1130:1 1131:1

1132:1 1133:1
1134:1 1135:1
1136:1 1137:1
1138:1 1139:1
1140:1 1141:1
1142:1 1143:1
1144:1 1145:1
1146:1 1147:1
1148:1 1149:1
1150:1 1151:1
1152:1 1153:1
1154:1 1155:1
1156:1 1157:1
1158:1 1159:1
1160:1 1161:1
1162:1 1163:1
1164:1 1165:1
1166:1 1167:1
1168:1 1169:1,5,12
1170:1 1171:1
1172:1 1173:1
1174:1 1175:1
1176:1 1177:1
1178:1 1179:1
1180:1 1181:1
1182:1 1183:1
1184:1 1185:1,2,18
1186:1 1187:1
1188:1 1189:1
1190:1 1191:1
1192:1 1193:1
1194:1 1195:1
1196:1 1197:1
1198:1 1199:1
1200:1 1201:1
1202:1 1203:1
1204:1 1205:1
1206:1 1207:1
1208:1 1209:1
1210:1 1211:1
1212:1 1213:1
1214:1 1215:1
1216:1 1217:1
1218:1 1219:1
1220:1 1221:1
1222:1 1223:1
1224:1 1225:1
1226:1 1227:1
1228:1 1229:1
1230:1 1231:1
1232:1 1233:1
1234:1 1235:1
1236:1 1237:1
1238:1 1239:1

1240:1 1241:1
1242:1 1243:1
1244:1 1245:1
1246:1 1247:1
1248:1 1249:1
1250:1 1251:1
1252:1 1253:1
1254:1 1255:1
1256:1 1257:1
1258:1 1259:1
1260:1 1261:1
1262:1 1263:1
1264:1 1265:1
1266:1 1267:1
1268:1 1269:1
1270:1 1271:1
1272:1 1273:1
1274:1 1275:1
1276:1 1277:1
1278:1 1279:1
1280:1 1281:1
**voluntarily** 1259:9,
  15 1261:19 1268:16
**voluntary** 1261:13

---

## W

**wagon** 1021:6
  1254:15
**wagons** 1015:9,23
  1016:8,16,19,21
  1017:3,6,8,9,11,15,
  17,19 1018:4,11
  1019:14,23
  1020:22,25 1021:5
  1036:19 1133:24
  1134:3,10,13,15
  1197:14 1245:11
  1252:18,24 1253:8
**wait** 1027:24
  1186:17 1202:3
  1214:8
**waiting** 1031:16
**walk** 1251:21
**wanted** 1022:25
  1125:20 1148:18
  1173:25 1181:25
  1184:4 1231:16
  1243:22
**warrant** 1140:25
  1141:18,21,22
  1142:3,9,13 1143:2,

5 1144:25 1221:6,
17 1222:4
**washing** 1127:8
**waste** 1188:24
**ways** 1037:13
1221:11
**week** 1140:7,8
1144:16 1221:20
**weekly** 1176:5
**weeks** 1179:4
1216:19
**weight** 1165:22,23
**Wentz** 1028:3
1069:7 1076:24
1077:10,14,17
1120:21 1121:23
1122:3,21 1152:2
1154:7 1158:22
1160:2,10,13
1169:7,10 1178:18,
21 1179:3 1180:9,
14 1181:11,14
1182:12,17,22
1183:2,5,9 1184:14,
17 1186:17,19,23
1188:11,15,23
1189:3,8,13,17,21
1190:2,8 1199:21
1200:4,7 1215:18
1218:25 1219:4,8
1220:4 1222:9
1232:3 1236:11
1244:3,9,12,15,18,
20,22,25 1245:5,8,
11,14,19,23 1246:5,
13,17 1247:5,8,10,
13,15,19,22 1248:2,
8,11,16,22 1249:5,
10,13,20 1250:2,4,
7,11,13,15,19,22
1251:3,6,9,12,16
1252:8,12,17,21
1253:2,5,16 1254:2,
8,13,17,22,25
1255:4,15 1256:10,
14,17,19,25 1257:4,
8,14,20,25 1258:5,
8,11,15,19,22,25
1259:6,11,17,22,25
1260:3,7,10,15,22,
25 1261:4,6,9,15,
20,23 1262:6,9,12,
16,20 1263:5,11,15,

18,23 1264:6,15
1265:3,6 1281:8,19,
25
**wherewithal**
1235:22
**wide** 1064:15
**win** 1097:5
**wind** 1162:16
**wire** 1167:6 1168:14
**withdraw** 1078:14
1107:23 1222:11
**withdrawn** 1071:8
1108:3
**won** 1097:7
1256:17,18
**word** 1039:18
1062:25 1121:10
1186:15 1268:14
**wording** 1043:9
**words** 1040:6
1045:25 1046:3
1052:7 1062:6
1147:2 1253:21
**work** 1085:25
1132:16 1181:11
1196:5,21,23
1202:25 1267:25
**worked** 1037:8
**working** 1066:8
1232:18 1237:6
1280:11,18
**works** 1036:21
1037:6 1066:13
**worth** 1131:19,20,
23,25 1132:7
**wound** 1156:18
1161:3 1221:4
**writing** 1087:9
1242:2
**writings** 1240:10
**written** 1022:10
1134:5 1195:4
1266:18,21
**wrong** 1057:3
1062:24 1064:25
1106:6 1108:23
1186:15
**wrote** 1084:12

---

### Y

**year** 1169:20
1176:16,19,22,24
1177:24 1186:8
1187:22 1214:11
1237:2
**years** 1054:6
1089:24 1123:15
1127:22 1157:24
1160:17 1227:2
1234:15 1275:21
1280:3
**yesterday** 1037:22
1038:6,25 1041:5
1062:10 1067:25
1088:3 1091:16
1106:22 1122:20
1123:22 1156:12
1157:2 1166:15
1174:4 1175:18
1193:3 1195:23
1201:24
**yesterday's** 1046:4
**York** 1100:17
1129:7

---

### Z

**Zambrano** 1016:13
1219:12 1281:2
**Ziri** 1139:7,17
1155:2